## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
:
*In re* : **Chapter 11**
:
**NEWPAGE CORPORATION, *et al.*,** : **Case No. 11-12804 (    )**
:
Debtors.[1] : **Joint Administration Requested**
:
------------------------------------------------------------x

## DECLARATION OF GEORGE F. MARTIN IN SUPPORT
## OF THE DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS

George F. Martin declares as follows:

1.    I am the President and Chief Executive Officer ("CEO") of NewPage

Corporation ("NewPage") and certain of its subsidiaries and affiliates (collectively with

NewPage, the "Debtors"). On the date hereof (the "Commencement Date"), each of the Debtors

is commencing a voluntary case under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"). I am familiar with the day-to-day operations, business, and financial

affairs of the Debtors, having served as President and CEO of each of the Debtors and as a

member of the board of directors of NewPage, NewPage Holding Corporation ("NewPage

Holding"), and NewPage Group, Inc. ("NewPage Group") since August 2010. Prior to serving

as President and CEO of the Debtors, I served as senior vice president of operations, and from

2006-2007 as vice president of operations. Before that, I served as vice president of coated

operations from May 2005 to March 2006. I was employed by Westvaco and MeadWestvaco for

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Chillicothe Paper Inc. (6154), Escanaba Paper Company (5598), Luke Paper Company (6265), NewPage Canadian Sales LLC (5384), NewPage Consolidated Papers Inc. (8330), NewPage Corporation (6156), NewPage Energy Services LLC (1838), NewPage Group Inc. (2465), NewPage Holding Corporation (6158), NewPage Port Hawkesbury Holding LLC (8330), NewPage Wisconsin System Inc. (3332), Rumford Paper Company (0427), Upland Resources, Inc. (2996), and Wickliffe Paper Company LLC (8293). The Debtors' corporate headquarters is located at 8540 Gander Creek Drive, Miamisburg, OH 45342.

22 years prior to 2005 in the coated paper business. My educational and professional qualifications include a bachelor of arts degree in chemistry from Franklin and Marshall College in Lancaster, Pennsylvania, and a doctorate in organic chemistry from Duke University in Durham, North Carolina.

2.      I submit this declaration (the "Declaration") to provide the Court and other parties in interest with an overview of the Debtors' businesses and to describe the circumstances compelling the commencement of these chapter 11 cases. I also submit this Declaration in support of the first day motions and applications (collectively, the "First Day Pleadings") filed by the Debtors contemporaneously herewith, or as soon as reasonably practicable hereafter, by which the Debtors seek relief enabling the Debtors and their non-debtor subsidiaries and affiliates to continue as valuable going concerns, to operate effectively, to minimize certain of the potential adverse effects of the commencement of their chapter 11 cases, and to preserve and maximize the value of the Debtors' estates. I submit this declaration based on personal knowledge, except as expressly provided, and as my testimony if called to testify.

3.      Concurrently herewith, NewPage Port Hawkesbury Corp. ("NPPH"), a NewPage subsidiary, is commencing proceedings under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, (as amended, the "CCAA"), in the Supreme Court of Nova Scotia, in Halifax, Nova Scotia, Canada (the "Canadian Court," and the filing, the "Canadian Proceeding"). As part of the CCAA proceedings, NPPH will seek to (a) impose a stay of all proceedings against NPPH and its property and undertaking; (b) appoint Ernst & Young, Inc. as Monitor in the Canadian Proceedings; and (c) authorize NPPH to restructure and to conduct a sales process to seek a buyer for its property and undertaking.

2

**Debtors' Business—Overview**

A.      **The Company's History**

4.      The Debtors and their non-debtor subsidiaries and affiliates (collectively, the "Company") comprise the largest coated paper manufacturer in North America based on production capacity. Two of the Debtors' paper mills have their roots in the West Virginia Paper Company (a/k/a the West Virginia Pulp & Paper Company, and later, Westvaco) that was established in 1888 by William Luke along the Potomac River in Maryland. On May 2, 2005, the printing and writing papers business of MeadWestvaco was acquired by NewPage, a newly formed entity for the purpose of the acquisition. The acquisition was financed through a series of debt financings described in more detail below.

5.      The Company originally constituted five pulp and paper manufacturing mills in Kentucky, Maine, Maryland, Michigan, and Ohio. In April 2006, the Company sold its carbonless operations located in Ohio to global specialty papermaker P.H. Glatfelter Company, and in 2007, the Company purchased the North American assets of Stora Enso Oyj ("SEO"), which included mills in Minnesota, Wisconsin, and Nova Scotia, Canada. In connection with the SEO asset acquisition, SEO acquired from Cerberus Capital Management, L.P. ("Cerberus"), the NewPage Group's primary equity sponsor, approximately 20% of the equity in NewPage Group. NewPage Group owns 100% of the common stock of NewPage Holding, which in turn owns 100% of the common stock of NewPage. NewPage is the Company's primary operating subsidiary and directly and indirectly owns the other Debtors (the "Subsidiary Debtors") and various other affiliated non-debtor entities.[2] The Subsidiary Debtors primarily own and operate

---

[2] A corporate organizational chart is attached hereto as Exhibit A.

the various paper mills in the United States.  Non-debtor NPPH primarily owns and operates the mill in Canada and manages the Debtors' Canadian operations.

**B.      The Company's Business**

6.      Headquartered in Miamisburg, Ohio, the Debtors' mills primarily produce coated paper, which, unlike regular writing or typing paper, is the type of paper typically used in magazines, magazine covers and inserts, corporate annual reports, high-end advertising brochures, direct mail advertising, coated labels, catalogs, and textbooks.  While the Company also manufactures supercalendered paper, uncoated paper, and specialty labels (and NPPH manufactures supercalendered paper and newsprint),[3] coated paper represented approximately 80% of its net sales (including NPPH) for the year ended December 31, 2010.  Approximately 90% of the Company's sales are within the United States.

**(i)      Manufacturing**

7.      The Company operates 16 papermaking machines at paper mills located in Kentucky, Maine, Maryland, Michigan, Minnesota, Wisconsin, and Nova Scotia, Canada, with distribution centers near major print markets, including New York, Chicago, Minneapolis, and Atlanta.  As of June 30, 2011, the Company had production capacity of approximately 3.6 million short tons (one short ton equals 2,000 pounds) of paper, including approximately 2.9 million short tons of coated paper, approximately 500,000 short tons of uncoated paper, and approximately 200,000 short tons of specialty paper.

8.      Paper production requires three crucial inputs:  (a) pulp (wood reduced to its paper-making form), (b) water, and (c) chemicals.  As to pulp, the primary sources for paper production are timber and its byproducts, such as wood chips.  The Company maintains a policy

---

[3] See below for a description of these different types of paper.

of obtaining wood produced by trained loggers in compliance with sustainable forestry principles, and produces most of its own pulp from wood logs and wood chips purchased locally. While, in limited instances, the Company purchases pulp directly from other mills, most of the Company's pulp production is done in-house at its various mills. Excess pulp produced at the Company mills is sold by the Company to third parties in the United States and internationally.

9. Once the wood has been reduced to pulp, it is then bleached and refined to adjust the length and surface area of the pulp fibers. The pulp is then mixed with other materials, including clay, calcium carbonate, and starch, and is uniformly distributed onto a continuous screen to extract water and form a web. The web is further pressed between large rollers and dried with steam to remove the remaining water and wound into large rolls. If the paper is to be coated, it is passed through coating machines where latex-based coatings are applied. The paper is eventually shipped in its roll form or cut into sheets and delivered to merchants, printers, and end-users.

10. Water and chemicals are used in virtually every step of the papermaking process. The Company's primary water supply is derived from local lakes or rivers, which require applicable licenses and permits for its usage. Chemicals used in the production of paper include latex and starch, which are used to affix coatings to paper; calcium carbonate, which brightens paper; titanium dioxide, which makes paper opaque; and other chemicals used to bleach or color paper or purify the Company's water supply. These chemical products are purchased by the Company from various suppliers.

11. Because paper production is also energy intensive, the Company generates power at most of its facilities using by-products of the manufacturing process to off-set its need to procure energy from outside sources. Of the energy produced by the Company, most of it is

used internally. During 2010, the Company produced approximately 50% of its energy requirements by burning of biomass-related fuels, some of which are by-products of paper production, including black liquor, wood waste, and bark. For the balance of its energy needs, the Company purchases various energy-related products from outside suppliers, including natural gas, fuel oil, steam, petroleum coke, tire-derived fuel, coal, wood waste, and electricity.

12. In addition, one of the Debtors' non-debtor affiliates, Consolidated Water Power Company ("CWPCo"), provides electricity to the Debtors' mills located in central Wisconsin. CWPCo has 33.3 megawatts of generating capacity on 39 generators located in five hydroelectric plants on the Wisconsin River. CWPCo is a regulated public utility and also provides electricity to a small number of residential, light commercial, and light industrial customers. In February 2010, the Company announced that it had signed an agreement with Wisconsin Rapids Water Works Lighting Commission to sell CWPCo's primary assets to the city of Wisconsin Rapids, subject to regulatory approval. In the spring of 2011, NewPage submitted testimony in support of the sale to the applicable regulatory board. As of the Commencement Date, regulatory approval remains pending and is expected to coincide with the anticipated consummation of the Debtors' overall restructuring efforts. Upon closing the sale, the Company's central Wisconsin mills (Wisconsin Rapids, Biron, and Stevens Point) will also become customers of the city of Wisconsin Rapids' utility.

**(ii)    Products**

13. As noted, the Company's paper products include coated paper, supercalendered paper, newsprint, and specialty papers.

*Coated Paper*: Coated paper is paper treated with certain chemical compounds to enhance gloss, smoothness, and surface qualities, such as ink absorption. Coated paper consists of both coated freesheet and coated groundwood. Coated groundwood papers are generally

lighter, less expensive, and not as bright as coated freesheet paper. Coated freesheet papers comprised 58% (coated groundwood papers represented 42%) of the coated paper produced by the Company in 2010. Coated papers are used for printing higher-end brochures, annual reports, and yearbooks, among other things.

*Supercalendered Paper*: Supercalendered paper is uncoated paper treated to give it a gloss and smoothness similar to coated paper. The Company primarily produces supercalendered paper for magazines, catalogs, advertisements, inserts, and flyers.

*Newsprint Paper*: Newsprint paper is uncoated groundwood paper used primarily for printing daily newspapers and other publications. NPPH was a niche supplier of newsprint paper serving the North American and select international markets in the publishing and printing industry.

*Specialty Paper*: Specialty paper is primarily used in producing labels and packaging for other products, including food wrappers and packaging, glass and plastic bottle labels, and technical labels used by the shipping industries.

**(iii)    Sales, Marketing, and Distribution**

14.    The Company sells paper products primarily in the United States and Canada, using three sales channels: (a) direct sales, which consist of sales made directly to end-use customers (primarily large companies such as publishers, printers, and retailers); (b) merchant sales, which consist of sales made to paper merchants and brokers, who in turn sell to end-use customers; and (c) specialty sales, which consist of sales made to packaging and label manufacturers. Across these three channels, the Company's sales professionals are compensated with a salary and bonus plan based on account profitability and individual assignments.

7

15.     As part of its distribution chain, the Company owns one warehouse, leases space in approximately 35 warehouses, and uses third parties to ship its products by truck and rail.

**(iv)     Employees**

16.     As of July 31, 2011, the Company's U.S. workforce consisted of approximately 6,000 employees. Approximately 70% of its employees are represented by labor unions, including the United Steelworkers; the International Brotherhood of Electrical Workers; the Communications, the International Association of Machinists and Aerospace Workers; the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; the Teamsters, Chauffeurs, Warehousemen and Helpers; and the Office & Professional Employees' International Union. The Debtors have 16 collective bargaining agreements, of which the majority were recently settled and ratified and of which only one remains open and subject to negotiation as of the Commencement Date. The newly ratified collective bargaining agreements expire at different times through November 2015.

17.     Certain employees of Cerberus and/or its affiliates have provided and, in some cases, continue to provide services to the Debtors in a consulting capacity. Cerberus routinely retains consultants that specialize in operations management support and who provide Cerberus with consulting advice concerning companies in which funds and accounts managed by Cerberus or its affiliates are invested. From time to time, Cerberus makes the services of these consultants available to Cerberus "portfolio" companies, such as the Company. The Company previews and agrees in advance on all services to be rendered. In 2010, the Company reimbursed Cerberus $1,921,000 for these services. These consulting services were provided at rates not greater than the fees that Cerberus paid to the applicable consultant, together with reimbursement of out-of-pocket expenses incurred by the consultant in providing those services.

8

The Debtors believe the terms of these consulting arrangements are comparable to terms that would have been obtained from an unaffiliated third-party. Cerberus also provides certain services free of charge, including chairman and company director fees and expenses for directors affiliated with Cerberus.

18.     In addition, Chan W. Galbato, Lenard B. Tessler, Alexander M. Wolf, Raymond H. Wechsler, and Thomas L. Zambelli each serve on the board of directors for NewPage, NewPage Group, and NewPage Holding. Messrs. Galbato, Tessler, Wolf, Wechsler, and Zambelli are each employed by Cerberus and/or a Cerberus affiliate. Directors who are employees of Cerberus or a Cerberus affiliate do not receive compensation for their service as directors.

**Overview of the Debtors' Prepetition Indebtedness[4]**

**A.     Revolving Credit Facility**

19.     As the credit documents show, NewPage is the borrower under the Revolving Credit and Guaranty Agreement, dated as of December 21, 2007 (as amended from time to time, the "Senior Secured Revolver," and the lender parties thereto from time to time, the "Revolver Lenders"). Each of the Debtors (other than NewPage Group) and NPPH, are guarantors under the Senior Secured Revolver (collectively, the "Revolver Guarantors"). The Senior Secured Revolver has a total commitment of $500 million, of which there was $131 million of borrowings (excluding letters of credit) outstanding as of June 30, 2011.

20.     In January 2011, Revolver Lenders with commitments aggregating $470 million of the $500 million total commitment under the Senior Secured Revolver accepted an amendment to the Senior Secured Revolver extending its maturity. Accordingly, for those

---

[4] The terms of the prepetition indebtedness are taken from the Debtors' credit agreements, indentures, and security agreements.

Revolver Lenders, the Senior Secured Revolver matures upon the first to occur of (a) December 21, 2012 and (b) the later of (i) March 1, 2012, and (ii) the earliest date that is 61 days prior to the scheduled maturity date of the Senior Secured First Lien Notes and Senior Secured Second Lien Notes (each as defined below, and together, the "Senior Secured Notes"). If the Senior Secured Second Lien Notes are not repaid or refinanced by December 2, 2011, the Senior Secured Revolver for this portion of the commitment will mature on March 1, 2012.[5] As of June 30, 2011, NewPage also has $101 million in letters of credit ("L/C's") issued but undrawn under the Senior Secured Revolver, which are used, for among other things, to secure certain premium obligations under the Debtors' insurance policies, to support the Debtors' energy requirements, and to backstop future, currently undiscovered, environmental liability, if any. Amounts outstanding under the Senior Secured Revolver bear interest, at the option of NewPage, at a rate per annum equal to either (i) the base rate plus 2.5%, or (ii) LIBOR plus 3.5%. The weighted-average interest rate on the outstanding balance at December 31, 2010 was 4.7%.

21. NewPage and each of the Revolver Guarantors granted the Revolver Lenders a first priority security interest in, and lien against, present and future cash, deposit accounts, accounts receivable, inventory, and intercompany debt (the "ABL Collateral") to secure their obligations under the Senior Secured Revolver.

**B.      11.375% Senior Secured Notes Due 2014**

22. NewPage is also the issuer of 11.375% senior secured first-lien notes due 2014 (the "Senior Secured First Lien Notes") pursuant to an indenture dated as of September 30,

---

[5] The remaining $30 million of the commitment under the Senior Secured Revolver matures upon the first to occur of (i) December 21, 2012 and (ii) the earliest date that is 181 days prior to the scheduled maturity date of the Senior Secured Notes, and the Senior Unsecured Notes (as defined below), the NewPage Holding PIK Notes (as defined below), and any refinancing thereof. If the Senior Secured Second Lien Notes are not repaid or refinanced prior to July 4, 2011, the $30 million portion of the commitment will mature on October 2, 2011.

2009, among NewPage, and each of NewPage's wholly owned direct and indirect subsidiaries other than CWPCo (collectively, the "Subsidiary Guarantors"), as guarantors, and the Bank of New York Mellon, as trustee (as amended from time to time, the "First Lien Indenture"). The Senior Secured First Lien Notes consist of $1.77 billion in face value notes with an effective interest rate of 13.7%. The obligations of NewPage and each of the Subsidiary Guarantors under the Senior Secured First Lien Notes are secured by a first-priority lien against substantially all their respective assets other than the ABL Collateral (the "Fixed Collateral"), and by a second priority lien on the ABL Collateral. The Senior Secured First Lien Notes mature on the earlier of (i) December 31, 2014 or (ii) the date that is 31 days prior to the maturity date of the Senior Secured Second Lien Notes, the Senior Unsecured Notes, the NewPage Holding PIK Notes (as defined below), or any refinancing thereof. If the Senior Secured Second Lien Notes, are not repaid or refinanced by March 31, 2012, the Senior Secured First Lien Notes would mature on that date.

C. **Senior Secured Second Lien Notes**

23. NewPage is also the issuer of the Senior Secured Second Lien Notes consisting of (a) $806 million face value of 10% fixed rate senior secured second lien notes (the "Second Lien Fixed Rate Notes") pursuant to an indenture dated as of May 2, 2005, among NewPage, the Subsidiary Guarantors, as guarantors, and HSBC Bank USA, National Association, as trustee (as amended from time to time, the "Second Lien Fixed Rate Notes Indenture"); and (b) $225 million face value of floating rate senior secured second lien notes (the "Second Lien Floating Rate Notes," and together with the Second Lien Fixed Rate Notes, the "Senior Secured Second Lien Notes") pursuant to an indenture, dated as of May 2, 2005, among NewPage, the Subsidiary Guarantors, as guarantors, and HSBC Bank USA, National Association, as trustee (as amended from time to time, the "Second Lien Floating Rate Notes

11

Indenture"). The Senior Secured Second Lien Notes mature on May 1, 2012. Interest on the Second Lien Fixed Rate Notes is fixed at 10% and interest on the Second Lien Floating Rate Notes resets quarterly at a rate per annum equal to LIBOR plus 6.25% (6.5% at December 31, 2010).

24.     The obligations of NewPage and each of the Subsidiary Guarantors under the Senior Secured Second Lien Notes are secured by a second-priority lien on the Fixed Collateral. The Senior Secured Second Lien Notes are also subordinated in right of payment to the Senior Secured Revolver and the Senior Secured First Lien Notes, and are senior in right of payment to the Senior Unsecured Notes.

**D.     12% Senior Unsecured Notes**

25.     NewPage is the issuer of 12% senior unsecured subordinated notes due 2013 (the "Senior Unsecured Notes") pursuant to that certain indenture, dated as of May 2, 2005, among NewPage, the Subsidiary Guarantors (as guarantors), and HSBC Bank USA, National Association, as trustee (as may be amended from time to time, the "Senior Unsecured Indenture"). The Senior Unsecured Notes consist of $200 million face value senior subordinated notes that mature on May 1, 2013. The Senior Unsecured Notes are subordinated in right of payment to the Senior Secured Notes and borrowings under the Senior Secured Revolver. Interest on the Senior Unsecured Notes accrues at the rate of 12% per annum.

**E.     NewPage Holding Senior Unsecured PIK Notes**

26.     NewPage Holding is also the issuer of floating rate senior unsecured PIK notes due 2013 (the "NewPage Holding PIK Notes") pursuant to an indenture, dated as of May 2, 2005, between NewPage Holding and HSBC Bank USA, National Association, as trustee (as amended from time to time, the "NewPage Holding PIK Notes Indenture"). As of June 30, 2011, the NewPage Holding PIK Notes have a current balance outstanding of approximately $228

12

million and mature on November 1, 2013. Interest on the NewPage Holding PIK Notes resets semi-annually at a rate per annum equal to LIBOR plus 7% (7.4% at December 31, 2010) and is payable by the issuance of additional NewPage Holding PIK Notes until maturity. The NewPage Holding PIK Notes are unsecured and not guaranteed.

### F.     NewPage Group Unsecured PIK Notes

27.     In connection with the acquisition of SEO's North American assets, NewPage Group issued to SEO $200 million in aggregate principal amount of floating rate senior unsecured PIK Notes due 2015 (the "NewPage Group PIK Notes"), pursuant to an indenture dated as of December 21, 2007, among NewPage Group and HSBC Bank USA, National Association, as trustee (as may be amended from time to time, the "NewPage Group PIK Notes Indenture"). The NewPage Group PIK Notes have a current outstanding balance of approximately $270 million and mature on December 21, 2015. Interest on the NewPage Group PIK Notes resets semi-annually at a rate per annum equal to LIBOR plus 7% and is payable by the issuance of additional NewPage Group PIK Notes. The NewPage Group PIK Notes are unsecured and are not guaranteed.

28.     For the quarter ending June 30, 2011, the Company reported total gross revenue of approximately $888 million and Adjusted EBITDA of $32 million. As of June 30, 2011, the Company's unaudited consolidated balance sheet (including NPPH) reflected total assets of approximately $3.4 billion and total liabilities of approximately $4.2 billion.

### Events Leading To Chapter 11 & CCAA

### A.     The Debtors' Operations and Significant Debt Obligations

29.     Several factors contributed to the commencement of these chapter 11 cases. As with any business, the Debtors' financial performance depends primarily on the demand for their products and the prices at which they can be sold. In the last few years, the

13

Debtors have seen a significant decline in the North American demand for coated paper, and although this decline has impacted many of the markets for the Debtors' key products, it has yet to result in a counterbalancing decrease in the production capacity trying to access those markets. The North American paper industry is cyclical and prices for paper, like other cyclical products, are largely affected by the relation of demand to available supply. The North American coated paper demand is primarily driven by advertising and print media usage. In particular, the demand for certain grades of coated paper is affected by spending on catalog and promotional materials by retailers and spending on magazine advertising, which affects the number of printed pages in magazines. The current unrest in the global economy and the preceding "great recession" have resulted in a general decrease in both advertising spending and magazine/catalog circulation, as well as an overall decline in the demand for coated paper, the Debtors' primary product. Negative trends in advertising, increases in the use of electronic data transmission and storage, continued expansion of the Internet as a medium for numerous advertising and marketing applications, an increased demand for electronic reading material, and increased postal rates, have also contributed to substantial price competition and volatility in the pulp and paper industry.

30. In addition, despite the decline in North American demand, foreign imports from Europe and Asia, driven by similar overcapacity in their own markets, continue to have a negative impact on North American coated paper suppliers. This has led to significant levels of market-related downtime and temporary shutdowns, especially during 2008 and 2009. Accordingly, from January 2008 through December 2010, mills and machines comprising the paper industry throughout North America with gross coated paper capacity of more than 2 million tons have been closed or re-aligned to produce other types of paper.

14

31.     Finally, the rising costs of raw materials, including significant increases in energy, fuel and chemical costs, have also negatively impacted the Debtors' financial performance, liquidity and stability. Wood prices are affected directly by the cost of wood in the Debtors' regional locations and indirectly by the effect of higher fuel costs on logging and transportation of timber to the Debtor's facilities. While the Debtors have fiber supply agreements in place that ensure a portion of their wood requirements, purchases under these agreements are typically at market rates. The prices of market pulp and chemicals have also fluctuated significantly. Pulp prices fluctuate due to changes in worldwide consumption of pulp, pulp capacity additions, expansions or curtailments affecting the supply of pulp, changes in inventory levels by pulp consumers (which affect short-term demand) and pulp producer cost changes related to wood availability and environmental issues. Certain chemicals used in the papermaking process are petroleum-based and also fluctuate with the price of crude oil.

32.     While the Debtors produce a large portion of their energy requirements from burning wood waste and other byproducts of the paper manufacturing process, during 2010, the Debtors generated only approximately 50% of their energy requirements from these sources. The remaining energy (consisting of electricity and fuels, primarily natural gas, fuel oil, and coal) is purchased from third-party suppliers. Crude oil and other energy costs remain volatile.

33.     Notwithstanding the significant reduction in coated paper demand and increased input costs, the Debtors were able to significantly improve performance during the first half of 2011, generating significant levels of EBITDA and cash flow, through a combination of increased prices and operational streamlining. However, due to higher inflation and lower demand for coated paper products, the Debtors' operational improvements were insufficient to permit the Debtors to recover from the pressure the paper manufacturing industry has been

15

enduring. With the Debtors' cash position already significantly constrained, negative press regarding the Debtors' ability to refinance its maturing debt obligations caused vendors to significantly slash trade terms or to switch to pay in advance or cash on delivery —adding additional stress to the Debtors' cash situation created by its high debt service.

34.     By the second quarter of 2011, as a result of the above factors, the Debtors' liquidity position became severely constrained, and the Debtors began to consider various restructuring alternatives. The Debtors retained Lazard Frères & Co. ("Lazard") to analyze and determine whether an out-of-court restructuring of the Debtors' balance sheet would be possible. At that time, Lazard considered various options to improve the Debtors' liquidity and debt positions, including increasing the borrowing capacity under the Senior Secured Revolver and refinancing certain debt obligations. Lazard's efforts were met with a general market unwillingness to provide the Debtors with additional financing or to increase the Debtors' borrowing base. The lack of market interest in an out-of-court restructuring, coupled with the Debtors' increasing needs to service, and in the near term refinance the majority of, their long-term debt obligations, convinced the Debtors that an out-of-court restructuring was becoming increasingly unlikely.

35.     Accordingly, after considering all available options, the Debtors determined that their burdensome long-term debt obligations were impeding their ability to continue the strides in operational improvements that they had been making in 2011, and, having concluded that seeking chapter 11 relief would be in their best interests, as well as those of their creditors and other parties in interest, commenced these cases.

**B.      Canadian Operations and Settlement and Transition Agreement**

36.     NPPH has been operating cash flow negative for some time, incurring operating losses of approximately $4 million per month, due to the same declining market

16

demand for NPPH's paper products and rising input costs that have adversely impacted the Debtors. In addition, the relative value of the Canadian dollar to the U.S. dollar has further exacerbated the impact on NPPH. Accordingly, over the past year, NPPH has been examining various restructuring alternatives, including the potential marketing and sale of its business operations. As negotiations surrounding a potential sale ensued, NPPH's performance continued to decline. Ultimately, NPPH determined to implement a process for an orderly reduction of its operations, while at the same time preserving its assets for a potential sale as a going concern. During this period, NewPage continued to support NPPH operations with both administrative and financial services in the ordinary course to bridge it to a potential sale, notwithstanding NPPH's declining performance.

37.     On August 22, 2011, NPPH announced that it had scheduled planned down-time for its mill, targeting the shut down of its newsprint paper production on September 10, 2011, and its glossy paper production on September 16, 2011. NPPH intends to run its paper making machines in "Hot Idle" post-September 16, 2011, allowing for the substantial shutdown of the manufacturing facilities of NPPH, but continuing to run the machines to facilitate start-up, support a future sale process, and preserve their value.

38.     In connection with the planned down-time for NPPH and eventual "Hot Idle" state, NewPage determined that it was appropriate to provide certain services to NPPH to assist NPPH with the closure of its mills, maintenance of its machines, and realization of its outstanding accounts receivable, and to resolve complex issues surrounding disputed ownership of certain accounts receivable and inventory. Accordingly, on September 1, 2011, NewPage and NPPH entered into that certain Settlement and Transition Agreement (the "Settlement & Transition Agreement"). The Settlement & Transition Agreement provides, among other things,

17

for NewPage to pay $23 million (the "Settlement Funds") in settlement of certain potential

disputes over certain accounts receivable and inventory existing on, or arising after, September 2,

2011. In addition, NewPage is required to pay certain amounts necessary for NPPH to continue

operations pending a sale or winddown process. The Settlement & Transition Agreement further

contemplates NewPage and NPPH providing each other with certain administrative and other

services during an agreed upon transition period. The Settlement & Transition Agreement is

subject to the approval of the Canadian Court as part of NPPH's commencement of the CCAA

Proceedings.

## Support for Relief Requested in the First Day Pleadings[67]

39.     Concurrently with the filing of their chapter 11 petitions, or as soon as

practicable thereafter, the Debtors have filed (or will file) several first day pleadings and

applications (the "First Day Pleadings") and a number of accompanying proposed orders (the

"First Day Orders"), pursuant to which the Debtors request relief they believe is critical to enable

them to preserve their going concern value for creditors.

40.     I have reviewed each of the First Day Pleadings referenced below. The

First Day Pleadings were prepared with my input and assistance, or the input and assistance of

employees working under my supervision. I believe the information contained in the First Day

Pleadings is accurate and correct. A brief description of the relief requested and the facts

supporting each of the First Day Pleadings and First Day Orders is set forth below. As set forth

more fully below, I believe that the relief requested in these motions and applications is critical

---

[6] The Debtors have also filed concurrently herewith the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364: (I) Authorizing Debtors to (A) Obtain Post-Petition Financing, and (B) Grant Senior Liens, Junior Liens and Superpriority Administrative Expense Status; (II) Approving Use of Cash Collateral; (III) Granting Adequate Protection to Certain Prepetition Secured Parties; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "DIP Motion"); and the declarations of Jay Epstein, the Debtors' Chief Financial Officer, and J. Blake O'Dowd, managing director at Lazard in support of the DIP Motion.

[7] Capitalized terms not defined hereafter shall have the same meanings as ascribed to such terms in the respective First Day Pleadings.

to the Debtors' ability to preserve the value of their estates and assist in their reorganization efforts.

**(i)     Debtors' Motion for an Order Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1, Directing Joint Administration of Chapter 11 Cases**

41.     As an initial matter, the Debtors are requesting joint administration of their cases for procedural purposes only. Joint administration avoids the preparation, service, and filing of duplicative notices, pleadings, and orders in each individual Debtor's case. This will save considerable expense, time and resources, and facilitate the ability of parties in interest to monitor these chapter 11 cases.

42.     I believe joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates, and all parties in interest.

**(ii)    Debtors' Motion, Pursuant to Sections 105(a), 345, 363, 364, and 503(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, for Order (I) Authorizing Debtors to Continue Using their Cash Management System, Including the Movement of Funds Between Debtor and Non-debtor Affiliates, and Maintain Existing Bank Accounts and Business Forms, and (II) Waiving Compliance with the Deposit and Investment Requirements of Section 345(b) of the Bankruptcy Code**

43.     To efficiently manage their businesses and operations, the Debtors and their non-debtor affiliates utilize a largely centralized cash management system (the "Cash Management System") to collect and transfer funds from numerous sources and accounts, disburse funds to satisfy obligations arising from the daily operation of their businesses, and invest funds pursuant to, *inter alia,* the Debtors' investment guidelines. To facilitate the Debtors' transition into chapter 11 and the uninterrupted operation of their Cash Management System, including the movement of funds between Debtor and non-debtor affiliates, the Debtors request authority to (i) continue using their existing Cash Management System, (ii) maintain the

existing bank accounts and business forms currently in use, and (iii) forego compliance with the restrictive deposit and investment requirements outlined in the U.S. Trustee's guidelines.

44.     In the ordinary course of business, the Debtors use the Cash Management System, which is similar to those utilized by other large companies that manufacture and sell goods in many different states and locations, to streamline collection, transfer, and disbursement of funds generated by the Debtors' business operations. The Cash Management System is operated and maintained by NewPage, the Debtors' primary operating entity. All receivables are received by and all payables are paid by, NewPage on behalf of each of the Debtors and non-debtor affiliates, with the exception of NPPH, in the ordinary course of business.

45.     The Cash Management System has three main components: (a) cash collection; (b) cash concentration; and (c) cash disbursements to fund the Debtors' operations. The Debtors are also in the process of moving their accounts from JPMorgan Chase Bank, N.A. ("JPM") to Wells Fargo Bank, N.A. ("Wells Fargo"), to increase liquidity by not having to fund up front ACH transfers, and to reduce certain fees. The Debtors also maintain as part of their Cash Management System certain accounts in Canada for the collection and distribution of Canadian dollars attendant to their Canadian operations.

   *(a)     Cash Collection*

46.     All cash in United States ("U.S.") currency received by the Debtors are currently deposited each day into the Wells Fargo Receivables Account (the "WFRA"). All monies generated by electronic fund transfers in U.S. currency are currently deposited each day into the JPM Receivable Account (the "JPMRA," and together with the WFRA, the "U.S. Cash Account"), and upon completion of the Bank Account transition will be deposited into the WFRA. All monies generated by the Debtors in Canadian currency are deposited into either the JPM Lockbox or the WRFA as part of the prepetition transition of the Debtors' Bank Accounts

NYA 651771.1

to Wells Fargo (together, the "Canadian Cash Account"). The Debtors have also set up various accounts for receiving and handling certain government grants with respect to medical and retiree benefits and other non-recurring receipts (the "Special Purpose Cash Accounts," and together with the U.S. Cash Account and the Canadian Cash Account, the "Cash Accounts"). Each of the Cash Account is a zero balance account ("ZBA"), meaning that money is swept at the close of each day into central accounts, as explained below.

### (b)     Cash Concentration

47.     At the end of the business day, the funds in each of the Cash Accounts are "swept" into the Debtors' central depository accounts, which are either the U.S. JPM Concentration Account, which, as part of the account transition, is then manually swept into the U.S. Wells Fargo Concentration Account (the "U.S. Concentration Account") or the Canadian Wells Fargo Concentration Account (the "Canadian Concentration Account"). At the end of each business day, excess funds held in the U. S. Concentration Account are "swept" into an offshore overnight investment account for a higher interest rate of return. The next business day the "swept" funds, including the earned interest, are remitted back into the Debtors' U. S. Concentration Account.

### (c)     Cash Disbursements

48.     Upon NewPage's request, cash is transferred from the U.S. Concentration Account or Canadian Concentration Account, as applicable, to fund operations and payroll obligations of the applicable Debtor through various ZBA disbursement accounts. The Debtors also maintain a limited number of special purpose disbursement accounts, which are used for, among other things, funding workers' compensation obligations, escrow accounts, and certain mill-specific operations.

NYA 651771.1

### (d)     Existing Bank Accounts and Business Forms

49.     If the Debtors were required to close the bank accounts comprising the Cash Management System (the "Bank Accounts") and open new accounts, it would be unduly burdensome and disruptive.  The transition to chapter 11 will be more efficient and orderly if the Debtors have the discretion to continue use of the Bank Accounts following the Commencement Date with the same account numbers, and to pay any bank fees that may be incurred in connection with the Bank Accounts or any other new account that may be opened in the ordinary course of the Debtors' businesses.

50.     Additionally, to minimize administrative expense and delay, the Debtors request authority to continue to use their checks and their existing business correspondence and forms, including letterheads, wire transfer instructions, and other business forms (collectively, the "Business Forms") substantially in the form existing before the Commencement Date, without reference to the Debtors' status as debtors in possession.  If the Debtors need to purchase new check stock or additional other Business Forms during the pendency of these chapter 11 cases, such check stock and/or other Business Forms will include a legend referring to the Debtors as "Debtors in Possession" or "DIP."

### (e)     Intercompany Cash Flows

51.     The records reflecting flow of funds among the various Debtor and non-debtor affiliates are maintained primarily by NewPage, and thus distributions and receipts may reflect cash balances due and owing from one Debtor to another Debtor or, from a Debtor to a non-debtor affiliate and *vice versa*.  These balances represent either extensions of intercompany credit made in the ordinary course of business, including with respect to NPPH or purchases of electricity in the ordinary course of business from CWPCO.  To ensure that each individual Debtor will not, at the expense of their creditors fund the operations of an affiliated entity, the

22

Debtors request authority to treat all intercompany obligations arising after the Commencement Date in the ordinary course of business as administrative expenses. If such intercompany claims are treated as administrative expenses, then each entity utilizing funds flowing through the Cash Management System and receiving services through the intercompany arrangements should continue to bear ultimate repayment responsibility for such ordinary course transactions and their related share of the cost of services provided.

### (f)   *Waiver of Section 345 Requirements*

52.   In connection with this Affidavit, I was provided with a copy of, and have reviewed, the U.S. Trustee's deposit and investment guidelines. We are requesting a 60-day initial waiver to evaluate our ability to comply with the deposit and investment guidelines. If there are any accounts that do not meet the guidelines, the Debtors are requesting the preservation of their ability to seek a further interim waiver or a final waiver of this requirement.

### (g)   *Prepetition Claims of the Banks*

53.   The Debtors further request that, except as provided in any order of this Court (including the order approving the relief sought in the Cash Management Motion), all banks providing and maintaining the Bank Accounts be prohibited from offsetting, freezing, or otherwise impeding the use of, transfer of, or access to, any funds of the Debtors deposited in the Bank Accounts before or after the Commencement Date on account of any prepetition claim of any such bank against the Debtors.

54.   I submit that the Cash Management System is an ordinary course, essential business practice that provides significant benefits to the Debtors' corporate group. In my opinion, any disruption of the Cash Management System at this critical juncture would irreversibly and irreparably harm the Debtors' business operations, and the value thereof. Therefore, I believe the maintenance of the existing Cash Management System, as well as the

23

various related relief requested in the Cash Management Motion, is in the best interests of the Debtors' estates and all parties in interest.

**(iii)** **Debtors' Motion, Pursuant to Sections 105(a), 363(b), 363(c), 507(a)(4), and 507(a)(5) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, for Order (I) Authorizing Payment of Prepetition Employee Obligations and Continuation of Prepetition Employee Benefit Programs, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Scheduling a Final Hearing for Approval of the Debtors' Compensation Plans as to Insiders, and (IV) Granting Certain Other Relief**

55.     The Debtors are requesting authority to pay, in their sole discretion, all obligations and costs incurred in respect of or related to employee obligations, including prepetition Wages, Payroll Taxes, Garnishments, Service Fees, General Business Expense Reimbursements, and other Employee Benefits (collectively, the "Employee Obligations"), *provided however*, that such payments shall not exceed 105% of the amounts set forth on Schedule 1 to the proposed order, and to maintain and continue their prepetition employee-related practices, programs, and policies comprising such Employee Obligations, as may be modified, amended, or supplemented from time to time in the ordinary course.  Additionally, to facilitate the required payments and maintenance of these programs, the Debtors are requesting the Court to authorize applicable banks and other financial institutions (the "Banks") to receive, honor, process, and pay any and all checks and electronic transfers drawn on the Debtors' accounts, to the extent that such checks or transfers relate to any Employee Obligation (except for any payments to insiders).

56.     In the ordinary course of their businesses, the Debtors incur payroll and various other obligations, such as expense reimbursements, and provide healthcare, insurance, incentive and other benefit plans to their employees in exchange for the employees' performance of services.  As of the Commencement Date, the Debtors employ approximately 6,000 individuals in the United States (the "Employees").  The Debtors estimate that the aggregate

24

amount of the prepetition Employee Obligations accrued and unpaid as of the Commencement Date, including all costs incident to such obligations, does not exceed approximately $95 million.

57.     A detailed chart reflecting the Debtors' wage, employee benefits and related obligations is attached to this Declaration as Exhibit B.

58.     Except for obligations relating to the Debtors' paid-time off policy (the "PTO Policy") (which the Debtors seek authority to honor in full notwithstanding the $11,725 statutory cap I understand applies) to the extent there are prepetition amounts outstanding as of the Commencement Date for Employee Obligations, the Debtors believe all the related claims are priority claims that must be paid in full before any general unsecured obligations of the Debtors may be satisfied. Further, for amounts exceeding the priority claim limit of $11,725, the Debtors request authority, but not direction, to pay such prepetition amounts due to the Employees because such payments are essential to the Debtors' operations and the benefits achieved by such payments far exceed the negative effects resulting from failure to make such payments. The Debtors do not believe that any wage or benefit payments subject to the statutory priority cap of sections 507(a)(4) and 507(a)(5) will be made in excess of $11,725 per Employee.

59.     Notably, the Debtors seek only authority to make payments in the ordinary course of business under the Compensation Plans and/or the Severance Plan to Employees who are *not* "insiders". The Debtors do not seek at this time to make any payments on account of the Compensation Plans and/or the Severance Plan with respect to any insiders, but rather will seek approval of such plans as to Insiders at a later time.

60.     In this case, any delay in payment or failure to continue to honor the programs and policies comprising the Employee Obligations, including the PTO policy, would cost the Debtors' estates more than the requested payments due to factors such as the cost of

losing an employee's knowhow and the cost of replacement of some employees who would be inclined to accept other jobs. Failure to make these payments is likely to impair irreparably the Employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with its Employees at a time when the Employees' support is critical to the Debtors' chapter 11 cases and ongoing business operations. Further, absent the relief requested herein, the Employees may suffer undue hardship and, in many instances, serious financial difficulties, as Employees rely on their wages and benefits to meet their personal financial obligations. In addition, it would be inequitable to require the Debtors' Employees to bear personally the cost of any business expenses they incurred prepetition, in the belief such expenses would be promptly reimbursed. I submit that payment of all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in interest and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption.

(iv) **Debtors' Motion, Pursuant to Sections 503(b), 361, 362(d), 363(b), 363(e) and 105(a) of the Bankruptcy Code (I) Authorizing Continuation of Insurance Programs and Payment of Prepetition Insurance Obligations, and (II) Authorizing Banks and Financial Institutions to Honor and Process Related Checks and Transfers**

61.     The Debtors are requesting authority to continue their insurance programs, described below, and pay, in their sole discretion, any prepetition insurance obligations, to renew any insurance policies, and to enter into new insurance arrangements as may be required as the annual terms of existing arrangements expire, in the ordinary course of business, and (ii) authorizing applicable Banks to process, honor, and pay all related checks and electronic fund transfers.

62.     Attached to this Declaration as Exhibit C is a chart setting forth the Debtors' various insurance policies, premium charges and relevant policy expiration dates.

26

### (a) Workers' Compensation Insurance

63.     The laws of the states in which the Debtors operate require the Debtors to maintain workers' compensation programs. In connection therewith, the Debtors maintain both Self-Insured Programs and Insured Programs (each as defined below) depending upon the state in which the covered employees work.

*Self-Insured Programs*

64.     In Michigan, Ohio and Wisconsin (the "Self-Insured States"), the Debtors maintain self-insured workers' compensation programs (the "Self-Insured Programs") under which the Debtors pay applicable workers' compensation and employer liability claims (the "Self-Insured Claims") as these claims arise, up to a maximum of $750,000 or $1 million per claimant (the "Self-Insured Maximum"). For Self-Insured Claims exceeding the Self-Insured Maximum, the Debtors maintain excess workers' compensation and employer's liability insurance with Safety National Casualty Corporation.

*Zurich Insured Programs*

65.     The Debtors maintain, with Zurich American Insurance Company ("Zurich"), a workers' compensation program and an employers' liability insurance program (the "Zurich Insured Programs," and together with the Self-Insured Programs, the "Workers' Compensation Programs") covering the states in which the Debtors operate except the Self-Insured States (collectively, the "Insured States"). Under the Zurich Insured Programs, insurance coverage is provided by Zurich for (i) employer liability claims in excess of the $1,000,000 deductible per accident or disease, and (ii) workers' compensation claims in amounts in excess of the $1,000,000 deductible per claim. In exchange, the Debtors pay an annual premium (the "Zurich Insured Program Premiums"), and pay certain fees to Sedgwick Claims

Management Services, Inc. ("Sedgwick"), the Debtors' third-party claims processor in respect of claims received (the "Zurich Insured Claims").

### (b) General Insurance Programs

66. In the ordinary course of business, the Debtors maintain several insurance policies (each, an "Insurance Policy" and together with the Workers' Compensation Programs and the Surety Bonds (as defined below), the "Insurance Programs"), which include coverage for property, general and products liability, automobile liability, foreign liability, umbrella liability, underground storage tank liability, marine cargo, directors and officers liability, employment practices, fiduciary liability, employed lawyers, commercial crime, special crime (kidnap, ransom, and extortion), non-owned aviation, pollution and remediation legal liability, wrap-up liability, contractor's pollution, and errors and omissions.

### (c) Premium Financing Agreements

67. In the ordinary course of business, the Debtors finance the premiums on their property, umbrella/excess liability, foreign liability, marine cargo, and excess workers' compensation policies (the "PFA Policies") under premium financing agreements (the "Financing Agreements") with Imperial Credit Corporation (the "ICC") and Premium Financing Specialists Corporation ("PFS"). The Debtors are obligated under the Financing Agreements to pay to ICC and PFS a down payment ranging from 15% to 20% of the total premium, plus monthly installments (the "PFA Premiums").

### (d) Insurance Program Procurement

68. The Debtors employ Aon Risk Services Northeast, Inc. and Aon Reed Stenhouse, Inc. (collectively, "Aon") to assist with the procurement and negotiation of the Insurance Programs and, in most circumstances, to remit payment to the insurance carriers on behalf of the Debtors. Generally, Aon charges a fixed administrative fee per policy, a yearly

28

brokerage fee, and, for Insurance Policies not covered by the brokerage fee, a commission (collectively, the "Fees," and together with the Insurance Program Premiums and the PFA Premiums, the "Insurance Expenses").

### (e)    Surety Bonds

69.    From time to time, the Debtors post certain surety bonds (the "Surety Bonds") as collateral to secure certain of their obligations, including under (a) the Workers' Compensation Programs, (b) obligations related to the Debtors' purchase of timber, and (c) other various items listed in Schedule 2 to the proposed order annexed to this Declaration.

70.    The Debtors pay the premiums (the "Surety Bond Premiums") under each of the Surety Bonds in advance.  Therefore, as of the Commencement Date, the Debtors believe no amounts will be due in respect of the Surety Bond Premiums.  If any amounts are determined to be due, the Debtors request authority to make such payments without further approval from this Court.

71.    I believe that granting the authority to pay the Insurance Programs in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, their estates and all parties in interest and will enable the Debtors to continue to operate their business in chapter 11 without disruption. The nature of the Debtors' businesses makes maintaining the Insurance Programs on an uninterrupted basis essential.  The nonpayment of any Insurance Expense could result in insurance carriers declining to renew the Debtors' existing policies or refusing to enter into new agreements with the Debtors.  If the Insurance Programs lapse, the Debtors could be exposed to substantial liability, to the detriment of the Debtors' estates and all parties in interest, as the Debtors would be required to obtain replacement coverage on an expedited basis, likely at significant additional cost.

NYA 651771.1

**(v)** **Debtors' Motion, Pursuant to Sections 105(a), 363(b), and 507(a)(8) of the Bankruptcy Code, for Order (I) Authorizing Payment of Prepetition Taxes and Business License Fees to Governmental Entities, and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers**

72.     The Debtors request authority (but not direction) to pay certain prepetition (a) sales, use, franchise, and real and personal property taxes; and (b) license and annual reporting fees and other similar charges and assessments (as well as any penalties and interest related to (a) and (b)) to various federal, state, and local authorities in the United States and Canada (collectively, the "Taxing Authorities"), including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Commencement Date, in an amount not to exceed $14 million, without seeking further permission, and to authorize applicable Banks to honor and process related checks and transfers.

*(a)     Sales & Use Taxes*

73.     In the course of their operations, the Debtors remit sales (the "Sales Taxes") and use taxes (the "Use Taxes" and together with Sales Taxes, the "Sales & Use Taxes"). The Debtors include Sales Taxes on all customer invoices, unless the customer has provided the Debtors with an exemption from Sales Taxes under the applicable sales tax law. The Debtors also incur and remit Use Taxes when property or services are purchased from vendors that have no nexus to the resident state of the particular Debtor purchasing the property or services. Such vendors are not obligated to charge or remit Sales Taxes for sales to parties outside the state of the vendor's operations. Nevertheless, a purchaser is obligated to self-assess and pay Use Taxes, when applicable, to the states in which the purchaser operates.

74.     As a result of the commencement of these cases, I believe a portion of the monthly Sales & Use Taxes may remain due for the period before the Commencement Date. Accordingly, the Debtors request authority to make such payments in the same manner as they

would have been paid before the Commencement Date without further approval from this Court, in an aggregate amount not to exceed $1,020,000.

### (b) Canadian Taxes

75.     As part of the Debtors' operations the Debtors may buy and sell goods in Canada directly or through intermediaries, and are required to pay taxes to Canadian taxing authorities. Under Canadian law, consumers located in Canada are required to pay goods and services taxes (the "GST"), which are similar to the Sales Taxes & Use Taxes paid in the United States, to the applicable taxing authorities. In addition to the national Canadian taxes, such as the GST, taxes may be levied by the individual provinces (the "Provincial Sales Tax"). In some of the Canadian provinces, the GST is combined with the Provincial Sales Tax, and collected at a combined rate (the "HST").[8] I believe a portion of the Canadian Taxes owed by the Debtors may remain due for the period before the Commencement Date. Accordingly, the Debtors request authority to make such payments without further approval from this court in an aggregate amount not to exceed $32,000.

### (c) Real and Personal Property Taxes

76.     In the course of their operations, the Debtors pay property taxes (the "Property Taxes," and together with the Canadian Taxes, the Sales & Use Taxes, the "Taxes") in respect of real and personal property owned by the Debtors in certain states. I believe a portion of the Property Taxes may remain due for the period before the Commencement Date. Accordingly, the Debtors request authority to make such payments in the same manner as they would have paid before the Commencement Date without further approval from this Court, in an aggregate amount not to exceed $9,720,000.

---

[8] For purposes of the Tax Motion the HST and GST together or alone will be defined as the "Canadian Taxes."

*(d)*       ***Franchise, Business License & Annual Report Fees***

77.    The Debtors are also required to pay certain fees and taxes (the "Fees") in certain states to (i) operate their business (the "Franchise Fees"), (ii) procure and maintain a business license (the "Business License Fees"), (iii) file required annual reports (the "Annual Report Fees"), and (iv) maintain licenses and permits governing the use of air, water, wastewater, solid and hazardous waste (the "Permit Fees"). The Debtors believe that some amounts may be due on account of the Franchise Fees and request authority to make such payments without further order of this Court, in an aggregate amount not to exceed $200,000. The Debtors do not believe that any Business License Fees should be due and owing as of the Commencement Date, but in case the Debtors do owe any Business License Fees, the Debtors request authority to make such payments without further order of this Court, in an aggregate amount not to exceed $1,000. The Debtors do not believe any Annual Report Fees are due as of the Commencement Date, but if they determine there are Fees owed, they request authority to make such payments without further order of this Court, in an aggregate amount not to exceed $72,000. The Debtors believe certain Permit Fees may be outstanding as of the Commencement Date and request authority to make such payments without further order of this Court, in an aggregate amount not to exceed $1.7 million.

78.    Payment of the prepetition Taxes and Fees is critical to the Debtors' uninterrupted business operations. Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, preventing the Debtors from conducting ongoing business in the applicable jurisdictions, increasing audits, and seeking to lift the automatic stay, all of which would disrupt the Debtors' day-to-day operations. Indeed, paying the Taxes and Fees may reduce the aggregate amount ultimately paid to the Taxing

Authorities because penalties and interest are often severe and will be avoided by prompt payment.

79.     Also, I am advised that nonpayment of these obligations will likely result in unwarranted penalties, audits, and the imposition of personal liability on the officers and directors of the Debtors for Taxes collected but not paid to the applicable authorities. Thus, to the extent any Taxes remain unpaid, the Debtors' officers and directors may be subject to audits, lawsuits, or even criminal prosecution on account of such nonpayment during the pendency of these chapter 11 cases. Such proceedings would constitute a significant distraction for such officers and directors at a time when they should be focused on stabilizing postpetition business operations and developing and implementing a successful reorganization strategy. I am also advised that the Taxes are afforded priority payment status in a chapter 11 case. Therefore, the relief requested will only affect the timing of the payment of Taxes and will not prejudice the rights of general unsecured creditors or other parties in interest. Finally, certain of the Taxes may be so-called "trust-fund" taxes that the Debtors are required to collect from their parties and hold in trust for the benefit of the Taxing Authorities. Such "trust-fund" taxes may not constitute property of the estate.

80.     Based on the foregoing, I submit that paying the Taxes and Fees is well within the Debtors' sound business judgment and is in the best interest of the Debtors' estates.

**(vi)**  **Debtors' Motion, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, for Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Approving the Debtors' Proposed Form of Adequate Assurance, (III) Establishing Procedures for Resolving Objections Thereto by Utility Providers, and (IV) Scheduling a Final Hearing Thereon**

81.     The Debtors are also requesting relief to prohibit their utility providers (the "Utility Providers"), identified on Schedule 1 to the Utilities Motion, from altering, refusing, or discontinuing utility services to the Debtors as a result of the commencement of these chapter 11 cases, or the existence of any unpaid prepetition invoices, including the making of demands for security deposits or accelerated payment terms. The Debtors have proposed adequate assurance for the Utility Providers, and to establish procedures for resolving Utility Providers' objections to such procedures and the proposed adequate assurance.

82.     In connection with their ongoing business operations, the Debtors incur utility expenses in the ordinary course for, among other things, the use of natural gas, electricity, water, sewer service, local and long-distance telephone service, waste disposal, and other similar services (collectively, the "Utility Services"). Uninterrupted Utility Services are essential to the ongoing operation of the Debtors' facilities. Moreover, replacement Utility Providers would be difficult to identify and, in some locations, impossible to find, given that many utilities enjoy a virtual monopoly in certain regions, leaving consumers with no alternatives. The business disruption that would likely result from interruption of the Utility Services would negatively impact the Debtors' manufacturing and related operations, and would adversely affect the Debtors' estates, creditors and employees. Accordingly, to continue as a going concern, it is critical that the Debtors continue to receive uninterrupted Utility Services.

83.     The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating their businesses. To provide adequate assurance of payment to the Utility Providers, the Debtors propose to

NYA 651771.1

deposit, within 20 days of the Commencement Date, an initial sum to be determined by calculating 50% of the Debtors' estimated average monthly cost of cumulative Utility Services obtained from the Utility Providers, but only to the extent that such Utility Providers do not otherwise hold deposits, security, or letters of credit for their Utility Services (such other Utility Providers, the "Secured Utilities"), plus an additional sum calculated at the Debtors' discretion to account for any contingencies or unforeseen circumstances (the "Adequate Assurance Deposit"). The Debtors request that the Secured Utilities be deemed to be adequately assured of the Debtors' continued performance by virtue of their existing letters of credit, deposits, or other security. The Adequate Assurance Deposit will be deposited into an interest-bearing, segregated account (the "Adequate Assurance Account"). The Debtors estimate the initial Adequate Assurance Deposit to be $5 million.

84. The Debtors further propose to maintain this amount in the Adequate Assurance Account until there is a further hearing on this matter. Thereafter, the Debtors propose to adjust the amount of the Adequate Assurance Deposit in the Adequate Assurance Account to maintain an Adequate Assurance Deposit that consistently provides the Utility Providers with coverage for half of an average month's usage of the applicable Utility Services, and any additional amounts deemed necessary to maintain the Utility Services.

85. I believe that the Adequate Assurance Deposit and the Adequate Assurance Account, taken together with the facts and circumstances of the Debtors' chapter 11 cases (together, the "Proposed Adequate Assurance"), constitute sufficient adequate assurance to the Utility Providers. If any Utility Provider believes adequate assurance is required beyond the Proposed Adequate Assurance, however, it must request such different assurance pursuant to the procedures described in the Utilities Motion (the "Adequate Assurance Procedures").

NYA 651771.1

86. The relief requested ensures that the Debtors' business operations will not be disrupted by the lack of critical Utility Services. Absent approval of the proposed Adequate Assurance Procedures, the Debtors could be forced to negotiate with each Utility Provider individually with the attendant risk that a Utility Provider will delay until they have the ability to terminate service. During this critical postpetition period, the Debtors' efforts and resources would unquestionably be more productive if focused on the continuation of its operations.

87. The Debtors request a further hearing on the Utilities Motion to be held within 25 days of the Commencement Date to ensure that, if a Utility Provider argues that it can unilaterally refuse service to any of the Debtors on the 31st day after the Commencement Date, the Debtors will have had the opportunity to request modifications to the proposed Adequate Assurance Procedures to avoid any potential termination of Utility Services.

**(vii) Debtors' Motion Pursuant to Sections 363(b), 503(b)(1), and 105(a) of the Bankruptcy Code (A) Authorizing Debtors to Honor Certain Prepetition Customer Programs, and (B) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

88. The Debtors request authority to perform and honor their prepetition obligations under certain customer programs (the "Customer Programs"), and to continue these Customer Programs in the ordinary course of their businesses, and an authorization of the applicable Banks to honor and process checks and other payment transfers related to such obligations. The Debtors request authorization to pay up to $19.4 million for claims related to the Customer Programs, unless otherwise ordered by the Court.

89. As is customary in the paper industry, the Debtors established certain Customer Programs to promote product sales, build key relationships, maintain goodwill and promote customer loyalty. The benefits under the Customer Programs are available to the Debtors' three types of customers: (i) merchants, which function as wholesalers of the Debtors'

36

products to many printers and end-users (the "Merchants"), (ii) printers, which carry out the physical printing process for certain of the Debtors' paper products (the "Printers"), and (iii) end-users, who order the production of mailings, catalogues, magazines, books etc. using the Debtors' paper products that the Printers process (the "End-Users," and together with the Merchants and Printers, the "Customers").

### *(a)* *Merchant Incentive Programs*

90. The Debtors maintain certain programs (the "Merchant Incentive Programs") designed to promote the sale of, and maintain optimum pricing and product mix for, the Debtors' products to Merchants (the "Merchant Incentive Programs"). Under the Merchant Incentive Programs, certain Merchants receive certain payouts (the "Payouts") for (i) achieving a target volume of purchases (the "Purchase Baseline") in a particular product category, and (ii) making additional purchases beyond the Purchase Baseline in the same product category. As of the Commencement Date, the Debtors estimate that the aggregate amount outstanding under the Merchant Incentive Program is $548,000.

### *(b)* *Performance Rebate Programs*

91. The Debtors also promote their products through the implementation of certain performance rebate programs (the "Performance Rebate Programs"). Under the Performance Rebate Programs, the Debtors, upon receipt from a Customer of a commitment to purchase certain products, agree to extend to that Customer a discounted sales price for the relevant products. The discount is not paid at the time of the purchase, however. Rather the discount is earned when the particular Customer's purchases are invoiced and, to the extent of any committed volume requirements, when such committed volume levels are reached. As of the Commencement Date, the Debtors estimate that the aggregate amounts of rebates outstanding under the Performance Rebate Programs is $12.1 million.

NYA 651771.1

### *(c) True-Up Payments*

92.     The Debtors also make true-up payments (the "<u>True-Up Payments</u>") to compensate Merchants for certain pricing differences for the Debtors' products. The Debtors establish wholesale prices for their products with each of their Merchants that carry such products in their inventories. To encourage and support the purchase of products by certain Printers and End-Users (the "<u>Identified Printers and End-Users</u>"), the Debtors will offer pricing discounts to the Merchants for certain products the Merchants sell to the Identified Printers and End-Users. When such sales are made from the inventories carried by the Merchants, the Debtors make True-Up Payments to the Merchants for the pricing discounts. As of the Commencement Date, the Debtors estimate that the aggregate amounts of rebates outstanding under the True-Up Payments is $254,000.

### *(d) Other Programs*

93.     The Debtors also encourage and support the purchase of certain products by Printers, using various credits and incentives tied to usage of the Debtors' product. As of the Commencement Date, the Debtors estimate the average amount typically credited back to the Printers per month is $3.3 million.

### *(e) Customers Returns and Adjustments Program*

94.     The Debtors also maintain a program that grants Customers credits in exchange for returned products or other administrative corrections to account balances (the "<u>Customer Returns and Adjustments Program</u>").

95.     Because the Debtors' business depends on the satisfaction and the continued loyalty of its Customers, it is essential to the Debtors' reorganization efforts that the Debtors maintain the Customer Programs and honor their prepetition obligations thereunder. Additionally, the Debtors believe the Customer Programs generate significant net revenue for the

NYA 651771.1

Debtors--approximately $1.8 billion net of all costs associated with such programs in 2010. Prohibiting the Debtors from continuing the Customer Programs would deprive the Debtors of a significant source of revenue (which is generated at minimum cost) and impair the Debtors' relationships with their Customers, thereby significantly harming the Debtors' operations and impeding the Debtors' reorganization efforts. As of the Commencement Date, the Debtors estimate the aggregate amount owed in credits under the Customer Returns and Adjustments Program is $3.1 million.

96. Most, if not all, of the Customer Programs are standard practice in the paper industry. Therefore, Customers have all come to expect that paper manufacturers like the Debtors will offer such programs. The Debtors' inability to honor the Customer Programs would place them at a significant disadvantage relative to their competitors in the highly competitive paper manufacturing industry, and lead to Customers fulfilling their purchasing needs elsewhere. Therefore, it is my firm belief that continuation of the Customer Programs is in the best interests of the Debtors, their estates and all parties in interest.

**(viii) Debtors' Motion for Order Pursuant to Sections 1107(a), 1108, 363(b), and 105(a) of the Bankruptcy Code (I) Authorizing Payment of Prepetition Claims of Shippers, Warehousemen, Subcontractors, and Technicians and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers**

97. The Debtors request authority, but not direction, to pay, in the ordinary course of business, certain prepetition claims of shippers, warehousemen, subcontractors, and technicians, and (ii) an authorization of the Banks to receive, process, honor, and pay all checks and electronic funds transfer requests relating to such authorized payments.

98. The Debtors' operations depend heavily on an extensive shipping, warehousing, and distribution network for transferring raw materials and shipping the Debtors' products to customers. This network includes: (i) various transportation companies (the

"Shippers"), (ii) third-party warehouse providers (the "Warehousemen") to store the Debtors'

products while in transit and to transport them to their final destination, (iii) a number of

subcontractors who prepare the Debtors' products for delivery and shipment (the

"Subcontractors"), and (iv) other third parties, such as mechanics, and repairmen, who are

essential to ensuring timely production and delivery of the Debtors' paper products (the

"Technicians," and together with the Shippers, Warehousemen, and Subcontractors, the

"Logistics Providers").

99.     It is essential for the Debtors' continuing business viability and the

success of their restructuring efforts that the Debtors' mills remain fully operational at all times

and that they maintain a constant, reliable, and efficient supply and delivery system.  I am

advised that many of the Debtors' Logistics Providers may hold prepetition claims, including

claims relating to goods currently in transit or being held by such providers as of the

Commencement Date.  If the Logistics Providers' prepetition claims are not timely satisfied,

such claimants may assert liens and/or withhold delivery of the Debtors' goods.  If this occurs,

the Debtors' operations will be immediately disrupted, which will result in a significant loss in

production and irreparable economic harm.  In addition, if the Debtors' customers do not timely

receive delivery of the Debtors' products, the Debtors' reputation will suffer, which will have a

deleterious impact on future demand for the Debtors' products.  Accordingly, authorizing, but

not directing, the Debtors to immediately pay the Logistics Providers' prepetition claims is

necessary to prevent immediate and irreparable harm to the Debtors, their businesses, and their

reorganization efforts.

### (a)     Shippers

100.     In certain circumstances, the Debtors are responsible for the payment of

inbound transportation costs for raw materials necessary for the paper making process.  For

outbound transportation, the Debtors primarily use truck, rail, less-than-truckload, and intermodal carriers to transport (a) products to warehouses and customers, (b) pulp between mills, and (c) rolls of paper to the Debtors' Subcontractors for further processing. In addition, the Debtors incur costs associated with exporting the Debtors' products, including freight forwarder fees, containerization, vessel shipping, customs brokerage fees, and destination inland transportation fees. Absent payment of prepetition invoices for inbound or outbound transportation, the Shippers may refuse to deliver the raw materials and/or products to their warehouses and/or customers. Replacement of outbound Shippers is either simply not feasible or would result in a costly delay in the delivery of the Debtors' products that the Debtors cannot afford at this early, but critical, stage of their reorganization. As of the Commencement Date, the Debtors estimate that $28.5 million is outstanding in prepetition amounts due to the Shippers with respect to inbound and outbound freight transportation.

### (b) Warehousemen

101. The Debtors pay monthly fees to 35 Warehousemen for the use of their warehouse facilities. In certain cases, the Warehousemen arrange and pay a portion of the Debtors' outbound transportation costs. If the Debtors fail to pay any portion of the monthly fees as a result of the commencement of these cases, the Warehousemen may choose to either not load and/or ship, assert liens, or otherwise prevent access to, the Debtors' goods, causing customer orders to go unfulfilled, to the great detriment of the Debtors' business. As of the Commencement Date, the Debtors estimate that $2 million is outstanding with respect to prepetition services provided by the Warehousemen.

### (c) Subcontractors

102. In the ordinary course of their business, the Debtors employ Subcontractors for ancillary work performed in connection with preparing the Debtors' paper

41

products for delivery to their customers. At any given time, at least one of these Subcontractors will have the Debtors' products in its possession for processing and delivery. In addition to preparing the Debtors' products for delivery, the Subcontractor is responsible for arranging outbound transportation for the product, and is subsequently reimbursed by the Debtors. As a result of the commencement of these cases, the Subcontractors may hold prepetition claims for services provided and reimbursable expenses. Should the Debtors fail to pay such outstanding invoices, Subcontractors may decide to not process and/or deliver the Debtors' paper or even release unprocessed paper to the Debtors, leaving the Debtors unable to fulfill customer orders. As of the Commencement Date, the Debtors estimate that $400,000 is outstanding in amounts due to the Subcontractors for prepetition services provided.

### *(d)* *Technicians*

103. Technicians, who perform maintenance and repair work on the Debtors' machinery, could assert statutory liens (the "Mechanics' Liens") or even retain the Debtors' property, if the amounts due and owing to these Technicians go unpaid. I am advised that the automatic stay does not block the perfection of the Mechanics' Liens.

104. Moreover, certain Technicians may refuse to return repaired equipment or otherwise fulfill their ongoing obligations to the Debtors, including installation, servicing, maintenance, and repair obligations, if prepetition claims remain outstanding. Such disruption to the coordinating schedules of equipment servicing, maintenance and repairs may cause irreparable harm to the Debtors and their manufacturing equipment. Further, many of the Technicians provide specialty services or parts that are specific and unique to the Debtors' operations and machines and cannot be easily replaced. As of the Commencement Date, the Debtors estimate that $10 million is outstanding with respect to amounts due by the Debtors for prepetition services performed by the Technicians.

42

### (e) The Logistics Providers' Claims

105. Based on the foregoing, as of the Commencement Date, the Debtors estimate that approximately $40.5 million in the aggregate, is outstanding with respect to claims held by the Logistics Providers as of the Commencement Date (the "Logistics Providers' Claims"). To avoid undue delay, facilitate the continued operation of the Debtors' business, maintain their facilities and equipment, and ensure the uninterrupted shipping and warehousing of their goods and materials, the Debtors seek immediate authority to pay, on a case-by-case basis and in their sole discretion, the Logistics Providers' Claims, up to an aggregate of $45 million. The Debtors will, in their discretion, attempt to condition any payment on account of any Logistics Providers' Claim on the written acknowledgment from the applicable Logistics Provider that it will continue to provide its services on the same terms as provided to the Debtors before the Commencement Date, or under such other trade practices and programs that are at least as favorable as those in effect before the Commencement Date. The Debtors request that upon their payment, any lien and/or interest held by a Logistics Provider shall be deemed released and expunged without necessity of further action.

106. As illustrated above, I submit that the relief requested in the Logistics Providers Motion is in the best interests of the Debtors, their estates, and all parties in interest, and should be granted in its entirety.

### (ix) Debtors' Motion for Order, Pursuant to Sections 546, 105(a), and 362 of the Bankruptcy Code and Bankruptcy Rule 9019, (I) Establishing Procedures for Resolution of Reclamation Claims, (II) Authorizing Debtors to Return Goods, and (III) Prohibiting Interference with Delivery of Debtors' Goods

107. To protect against the potential chaos attendant to the demands of suppliers and vendors seeking the return of goods delivered before the Commencement Date, the Debtors seek to establish procedures for reconciling reclamation claims anticipated to be asserted

43

by vendors and suppliers (collectively, the "Vendors") and to obtain authority, but not direction, to return to Vendors certain Goods (as defined below) purchased prior to the Commencement Date, and prohibit Vendors or other third parties from interfering with delivery of the Debtors' Goods.

108.     Prior to the Commencement Date, the Debtors purchased a wide variety of goods used in their daily operations (collectively, the "Goods"). As of the Commencement Date, the Debtors were in possession of Goods for which payment to Vendors had not yet been made. As a result of the commencement of these cases, the Debtors expect to receive numerous written reclamation demands from Vendors with respect to the Goods under section 2-702 of the relevant states' versions of the Uniform Commercial Code. The Debtors also anticipate that a number of Vendors, after learning of the commencement of these cases, may attempt to interfere with the delivery of Goods to the Debtors or attempt forcibly to repossess delivered Goods from the Debtors' facilities pursuant to their alleged reclamation rights.

109.     I believe that, in order to avoid severe disruption to the Debtors' business operations, it is essential to establish the proposed reclamation procedures (the "Reclamation Procedures") before allowing Vendors to exercise reclamation rights. Further, if the Reclamation Procedures are not approved, the Debtors will wind up facing and litigating reclamation claims on an *ad hoc* basis and, as a result, find the attention of their management and operational personnel diverted away from day-to-day business operations.

110.     Further, to the best of the Debtors' knowledge, a substantial portion of the Goods are likely commingled with the Debtors' existing supplies and, as a result, the Debtors may be unable to identify specific Goods allegedly subject to reclamation. Any attempt to do so would be overwhelmingly burdensome to the Debtors and undoubtedly unwarranted by the

purported value of the claim. Indeed, most reclamation claims will be of *de minimis* value, as the Debtors likely will have already used or sold the Goods at issue, and such Goods are subject to the liens in respect of the Debtors' pre-petition secured credit facilities and notes, and the Debtors' proposed post-petition credit facility.

111.  The Debtors propose the Reclamation Procedures as the standard for processing and reconciling reclamation claims (each, a "Reclamation Claim"), and the sole and exclusive method of resolving a written reclamation demand (a "Reclamation Demand") by any Vendor asserting a Reclamation Claim. Accordingly, the Debtors request all Vendors be prohibited from seeking any other means for the resolution or other treatment of Reclamation Demands.

112.  While it is not feasible for the Debtors to return all Goods for which Reclamation Demands are made, in some cases it may be advantageous to honor a Reclamation Demand. The Debtors therefore request the Court authorize, but not direct, the Debtors to return Goods in certain situations specified in the Reclamation Motion, subject to the prior rights of holders of security interests in the Goods.

113.  Absent the relief requested in the Reclamation Motion, the Debtors will expend substantial time and limited resources establishing their right to retain Goods, and contesting or litigating Reclamation Demands. The inevitable result will be delay and disruption in the continuous flow of Goods to the Debtors, as well as considerable harm to the Debtors' business operations and Debtors' restructuring efforts. Consequently, I believe that the relief requested in the Reclamation Motion is in the best interests of the Debtors, their estates, and all parties in interest.

**(x)  Debtors' Motion for Order Pursuant to Sections 363(b), 503(b)(9), and 105(a) of the Bankruptcy Code Authorizing (I) the Debtors to Pay the Prepetition**

**Claims of Certain Critical Vendors and Administrative Claimholders; and (II) Financial Institutions to Honor and Process Prepetition Checks and Transfers to Certain Critical Vendors**

114.     The Debtors request authority to pay, in their discretion, the prepetition claims of critical vendors (the "Critical Vendors") that delivered goods or provided services to the Debtors before the Commencement Date (the "Critical Vendor Claims") and authorization of the applicable Banks to honor and process prepetition payments, checks and transfers to the Critical Vendors whose claims the Debtors determine to pay. The Debtors estimate that the Critical Vendor Payments will not exceed approximately $20 million in the aggregate ("Critical Vendor Cap"), but reserve the right to seek an increase of the Critical Vendor Cap, subject to this Court's approval. The Debtors propose making such prepetition payments to such entities that agree to supply goods and/or services postpetition to the Debtors according to the ordinary course trade terms (including pricing) that existed before the Commencement Date, or on such other terms that are acceptable to the Debtors.

115.     The manufacturing of the Debtors' paper products is a process that requires hundreds of different materials, as well as continued operation and constant maintenance of sophisticated heavy machinery. The Critical Vendors provide the Debtors with the following three general categories of goods and services: (a) supply of raw materials for the papermaking process including, among others, wood, pulp, recovered paper, chemicals, and energy; (b) operating supplies and services related to the papermaking machines; and (c) supplies and services related to the Debtors' certain committed projects. Any unplanned disruption in the supply of raw materials and operations of the paper machinery can result in the manufacture of unsatisfactory products or a cessation of production entirely. Further, the Debtors' papermaking machines are sophisticated heavy machinery that needs to be maintained and repaired on a

regular and continuous basis so they can run continuously without any interruption that could disrupt production.

116. The Debtors believe the payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because, in various instances, the Critical Vendors are the only source from which the Debtors can procure certain goods and services of paramount importance within a time frame and at a price that will permit the Debtors to continue operating their businesses. A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtors postpetition and may force the Debtors to obtain such goods and services elsewhere at a higher price or in an inadequate quantity or quality.

117. Absent uninterrupted supplies of raw materials, the Debtors' mills would have to be shut down, severely impacting the Debtors' business. Notably, each day the mills are idle, the Debtors incur aggregate costs and loss of revenues of more than $5 million a day. Thus, if the mills are forced to close, for even a short period of time, the Debtors will suffer far more economic hardship, as compared with paying certain vendors under the Critical Vendor Motion some or all of the prepetition debt for which payment authorization is sought, in exchange for a stable flow of goods and equal or better trade credit terms.

118. The Debtors have undertaken an analysis, described in the Critical Vendor Motion, to identify those vendors who are truly essential to the Debtors' operations and whose claims must be paid to avoid irreparable harm and ensure access to adequate amounts of trade credit on a postpetition basis. In addition, the Debtors seek approval for certain procedures that, when implemented, will ensure that vendors receiving payment of Critical Vendor Claims will

continue to supply trade credit postpetition on the terms of the parties' prepetition dealings, or on terms otherwise acceptable to the Debtors.

119.    The Debtors also propose that all payments of Critical Vendor Claims shall be applied first to the Critical Vendor's claims for goods received by the Debtors within 20 days prior to the Commencement Date. I am advised that these claims are entitled, in most instances, to priority as administrative claims. Accordingly, such payments will only affect the timing of the distribution, but not the amount, of the Critical Vendor Claims.

120.    If a Critical Vendor accepts a payment on account of a prepetition obligation of the Debtors (a "Vendor Payment") and thereafter fails to provide the Debtors with the requisite Customary Trade Terms, the Debtors seek authority to (a) treat any Vendor Payment received by the Critical Vendor as an unauthorized postpetition transfer that the Debtors may (i) recover from the Critical Vendor in cash or goods, or (ii) at the Debtors' option, apply as a credit against any outstanding postpetition claims held by such Critical Vendor, or (b) upon recovery of any Vendor Payment under (i) or (ii), reinstate the prepetition claim of the Critical Vendor in the amount recovered by the Debtors, less the Debtors' reasonable costs incurred in recovering such amounts.

**(xi)    Debtors' Motion for Order Enforcing Sections 362 and 525 of the Bankruptcy Code**

121.    By this motion, the Debtors seek an order confirming the applicability of, and enforcing, the automatic stay and other antidiscrimination provisions that protect chapter 11 debtors.

122.    The papermaking process, especially the operation of the papermaking machinery, requires tremendous amounts of water and energy. The Debtors maintain certain licenses and permits issued by various governmental authorities to authorize the use of river

water in the production of energy. Absent continued authorization to use water as contemplated by the permits and licenses, the Debtors' mills would immediately shut down, severely impacting the Debtors' ability to reorganize as a going concern.

123.     Therefore, the Debtors must have the assurance they will enjoy uninterrupted authorization under the governmental licenses and permits critical to the continued operation of their paper mills in the ordinary course of business. The Debtors run the risk that parties unfamiliar with the effect and scope of the Bankruptcy Code's automatic stay provisions will take impermissible collection activities on account of the Debtors' prepetition obligations or terminate licenses and permits merely because of the commencement of these cases. The Debtors believe the requested relief is important to ensure that such licenses and permits are maintained notwithstanding the commencement of these cases, and will maximize the chapter 11 protections to which they are entitled.

**(xii)     Debtors' Motion for Interim and Final Orders Pursuant to Sections 105, 362 and 541 of the Bankruptcy Code and Bankruptcy Rule 3001 Establishing Notification and Hearing Procedures for (I) Transfer of Claims, (II) Transfers of Equity Securities, (III) Claiming a Worthless Securities Deduction and (IV) Scheduling a Final Hearing and Approving Notice Procedures**

124.     The Debtors request an order that establishes procedures (the "Procedures") related to (i) transfers of certain beneficial interests in equity securities in NewPage Group ("NewPage Group Stock"), or claims against the Debtors (the "Claims"), and (ii) any claim by a holder of 50-percent or more of the NewPage Group Stock of a worthless securities deduction under section 165(g) of the Internal Revenue Code of 1986, as amended (the "IRC"), with respect to such stock (a "Worthless Securities Deduction"). In addition, the Debtors request a final hearing to consider granting the relief requested on a final basis.

NYA 651771.1

125.     The purpose of the Procedures is to protect and preserve the Debtors' tax attributes (the "Tax Attributes"), which include net operating losses ("NOLs") and tax credits (the "Tax Credits").  Absent implementation of the Procedures, transfers of NewPage Group Stock, transfers of Claims, or Worthless Securities Deductions claimed in respect of NewPage Group Stock, could severely limit or even eliminate the Debtors' ability to use their Tax Attributes to reduce future income.

126.     Under the tax rules, a corporation may carry forward tax attributes to offset future income, thereby reducing tax liability in future periods.  A reduction in tax liability generally has a positive effect on a corporation's tax position.  Tax attributes, accordingly, are valuable assets.  As of December 31, 2010, the Debtors had, for U.S. federal income tax purposes, NOLs and capital loss carryforwards of approximately $2.3 billion and Tax Credits of approximately $105 million.  Further, the Debtors project significant additional NOLs for their 2011 taxable year.  These Tax Attributes are valuable assets of the Debtors' estates and will inure to the benefit of their stakeholders and facilitate the Debtors' reorganization.  A restriction on the Debtors' ability to use their Tax Attributes would jeopardize these assets and impair their value for the Debtors' stakeholders at large.  The requested Procedures preserve the opportunity for the Debtors to seek substantive relief at the appropriate time, if transfers of Claims or NewPage Group Stock, or Worthless Securities Deduction claims, pose a significant risk to their Tax Attributes.

127.     The requested relief is narrowly tailored. It does not bar transfers of Claims and NewPage Group Stock and will only be in effect until the Debtors emerge from chapter 11 protection.  Moreover, the Procedures ultimately would permit most transfers of Claims and NewPage Group Stock, subject only to Bankruptcy Rule 3001(e) and other

applicable laws. In addition, the requested relief does not bar all shareholders from claiming a Worthless Securities Deduction and will only be in effect until NewPage Group emerges from chapter 11 protection. The Debtors believe that, as of the Commencement Date, certain related entities owned approximately 78% of the NewPage Group Stock.

128.    Entering an interim order approving the Procedures *nunc pro tunc* to the Commencement Date will prevent the loss of Tax Attributes pending determination of final approval of the Procedures while allowing holders of Claims and NewPage Group Stock ample time to consider the Procedures. Absent a grant of the interim relief requested on a *nunc pro tunc* basis, the Debtors may be irreparably harmed by the mere filing of this Motion. It is possible that a flurry of trading of NewPage Group Stock or Claims against the Debtors would follow. That is, holders of NewPage Group Stock or Claims against the Debtors might rush to transfer their shares or Claims before an interim order is entered, which might result in an ownership change that would jeopardize the Debtors' Tax Attributes. In addition, a holder might attempt to claim a Worthless Securities Deduction with respect to its NewPage Group Stock, which might result in a pre-effective date ownership change that would jeopardize the Debtors' Tax Attributes. Thus, the Debtors request that the Court enter the Interim Order *nunc pro tunc* to the Commencement Date and schedule a hearing to consider entry of a final order.

**B.    Motions Related to Retention and Payment of Professionals**

**(i)    Debtors' Motion, Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code, for Authority to Employ and Compensate Ordinary Course Professionals *Nunc Pro Tunc* to the Commencement Date**

129.    The Debtors request authority to retain and compensate professionals utilized by the Debtors in the ordinary course of business (the "Ordinary Course Professionals") without the submission of separate employment applications or retention orders, but subject to the filing of retention affidavits and data showing eligibility for retention, as of the

Commencement Date. The OCP Motion proposes a $65,000 per month cap for an Ordinary Course Professional.

130.     I believe it is essential that the employment of the Ordinary Course Professionals, many of whom are already familiar with the Debtors' businesses and financial affairs, be continued to avoid disruption of the Debtors' normal business operations during this critical time. Also, I believe the relief requested will save the estates substantial costs that would arise from preparing separate applications for the employment of each Ordinary Course Professional. The relief requested will also avoid additional fees relating to the preparation and prosecution of voluminous interim fee applications. In light of the additional costs associated with the preparation of multiple employment applications for the Ordinary Course Professionals who will receive relatively small fees, I submit that it is impractical and inefficient for the Debtors to submit individual retention applications for each Ordinary Course Professional.

**(ii)     Debtors' Motion, Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, and Bankruptcy Rule 2016(a) and Local Rule 2016-2 for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals**

131.     The Debtors request approval of a proposal establishing an orderly and regular process (the "Interim Compensation Procedures") for the allowance and payment of interim compensation and reimbursement of expenses for attorneys and other professionals whose services are authorized by this Court, and who will be required to file fee applications for allowance of compensation and reimbursement of expenses.

132.     The Debtors' chapter 11 cases will add further complexities to the day-to-day administrative burden already being shouldered by the Debtors' management, employees, and resources. It is anticipated that the professionals retained will provide integral advice and services to the Debtors during these cases. Absent streamlined compensation procedures, the

52

professional fee application and review process would be exceptionally burdensome on the Debtors, their professionals, the Court, and other parties in interest. In my opinion, therefore, the proposed Interim Compensation Procedures are in the best interests of the Debtors, their estates, and all parties in interest.

      **(iii)    Debtors' Application, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002 and Local Rule 2002-1(f), for Order (I) Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors and (II) Appointing Kurtzman Carson Consultants LLC as an Agent of the Bankruptcy Court**

     133.    The Debtors request authority to employ and retain Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent for the Debtors and to appoint KCC as agent of this Court.

     134.    The Debtors estimate they have tens of thousands of creditors, many of whom are expected to file proofs of claim. Noticing, receiving, docketing and maintaining proofs of claim from such a large number of creditors may be unduly time consuming and burdensome for the Clerk of the Court.

     135.    I am advised that KCC is a bankruptcy administration provider that specializes in comprehensive chapter 11 administrative services including noticing, claims processing, balloting and other related services critical to the effective administration of chapter 11 cases. Indeed, KCC has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest. Further, KCC will work with the Clerk to ensure that such methodology conforms with all of the Court's procedures, the Local Rules and the provisions of any orders entered by this Court.

NYA 651771.1

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  September 7, 2011.

_George P. Martin_

George P. Martin

NY3 3082006.35