## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                    :

*In re*                   :    **Chapter 11**

                    :

**NEWPAGE CORPORATION, *et al.*,**    :    **Case No. 11-12804 (  )**

                    :

          **Debtors.**[1]     :    **Joint Administration Requested**

                    :

------------------------------------------------------------x

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364: (I) AUTHORIZING DEBTORS TO (A) OBTAIN POST-PETITION FINANCING, AND (B) GRANT SENIOR LIENS, JUNIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY; (II) APPROVING USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

NewPage Corporation and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this motion (the "Motion") for entry of an interim order and a final order, pursuant to sections 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2002-1, 4001-1, 4001-2, and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing the Debtors to enter into a debtor in possession financing facility, grant senior liens, junior liens and

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: Chillicothe Paper Inc. (6154), Escanaba Paper Company (5598), Luke Paper Company (6265), NewPage Canadian Sales LLC (5384), NewPage Consolidated Papers Inc. (8330), NewPage Corporation (6156), NewPage Energy Services LLC (1838), NewPage Group Inc. (2465), NewPage Holding Corporation (6158), NewPage Port Hawkesbury Holding LLC (8330), NewPage Wisconsin System Inc. (3332), Rumford Paper Company (0427), Upland Resources, Inc. (2996), and Wickliffe Paper Company LLC (8293). The Debtors' corporate headquarters is located at 8540 Gander Creek Drive, Miamisburg, OH 45342.

superpriority administrative expense priority, use cash collateral, provide "adequate protection" to certain prepetition secured parties, pay in the Debtors' discretion certain amounts in respect of interest, fees, and expenses, and scheduling a final hearing with respect to the relief requested herein, all as more fully described herein. This Motion is supported by the *Memorandum of Law in Support of Debtors' Motion Dated September 7, 2011 for Order Authorizing Use of Cash Collateral Pursuant to Bankruptcy Code Section 363(C)(2)* (the "Memorandum of Law"); the *Declaration of Jay Epstein in Support of Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364: (I) Authorizing Debtors to (A) Obtain Post-Petition Financing, and (B) Grant Senior Liens, Junior Liens and Superpriority Administrative Expense Priority; (II) Approving Use of Cash Collateral; (III) Granting Adequate Protection to Certain Prepetition Secured Parties; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Epstein Declaration") and the *Declaration of J. Blake O'Dowd in Support of Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364: (I) Authorizing Debtors to (A) Obtain Post-Petition Financing, and (B) Grant Senior Liens, Junior Liens and Superpriority Administrative Expense Priority; (II) Approving Use of Cash Collateral; (III) Granting Adequate Protection to Certain Prepetition Secured Parties; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "O'Dowd Declaration"), each filed contemporaneously herewith. In further support of the Motion, the Debtors respectfully represent:

2

1.    The Debtors intend to preserve and enhance their business as a going concern through the use of Cash Collateral and a postpetition credit facility consisting of (a) a revolver and (b) a term loan. The revolver is a $350 million superpriority senior secured debtor-in-possession revolving credit facility (the "<u>DIP Revolving Facility</u>," and the loans thereunder, the "<u>DIP Revolving Loans</u>," and the letters of credit thereunder, the "<u>DIP Letters of Credit</u>"). The term loan is a $250 million superpriority senior secured term loan facility (the "<u>DIP Term Loan Facility</u>," and the loans thereunder, the "<u>DIP Term Loans</u>, and the DIP Term Loans together with the DIP Revolving Loans, the "<u>DIP Loans</u>") (the DIP Term Loan Facility, together with the DIP Revolving Facility, the "<u>DIP Credit Facility</u>").[3] The DIP Credit Facility and use of Cash Collateral will provide the Debtors ample liquidity to fund their operations, capital expenditures, and corporate overhead during the course of these chapter 11 cases.

2.    The reasons to approve the Debtors' request for authority to use Cash Collateral and to obtain postpetition financing under the DIP Credit Facility are compelling and simple. First, the new credit facilities replace the Prepetition Senior Secured Revolver that cannot be assumed because it is a financial accommodation. Notably, the liens securing the new

---

[2] Unless indicated otherwise, capitalized terms used but not immediately defined herein have the meanings ascribed to them later in this Motion.

[3] The DIP Credit Facility will be provided by a syndicate of banks, financial institutions and other entities, arranged by J.P. Morgan Securities LLC ("<u>JPMorgan</u>"), Barclays Capital the investment banking division of Barclays Bank PLC ("<u>Barclays</u>"), and Wells Fargo Capital ("<u>WFC</u>"), as the lead arrangers under the DIP Revolving Facility (the "<u>Revolving Arrangers</u>"), and JPMorgan and Barclays, as the lead arrangers under the DIP Term Facility (the "<u>Term Arrangers</u>," and together with the Revolving Arrangers, the "<u>Lead Arrangers</u>") in consultation with the Debtors, including the Lead Arranger or their lending affiliates (such lenders as may become party from time to time, collectively, the "<u>DIP Lenders</u>"). JPMorgan Chase Bank ("<u>JPM</u>") shall serve as Administrative Agent (the "<u>DIP Administrative Agent</u>"), JPM and WFC, as co-collateral agents (the "<u>DIP Collateral Agents</u>"); Barclays, as syndication agent (the "<u>DIP Syndication Agent</u>"), WFC, as documentation agent (the "<u>DIP Documentation Agent</u>," and together with the DIP Administrative Agent, the DIP Collateral Agents, the DIP Syndication Agent, and the DIP Documentation Agent, the "<u>DIP Agents</u>").

facilities do not prejudice any prepetition lien. The new facilities were extensively marketed and are fair-market priced and contain terms and conditions customary for postpetition financings of this size and type. Second, the Debtors' operations have been and will continue to be cash flow positive. Indeed, the Debtors project EBITDA of hundreds of millions of dollars. Therefore, use of cash collateral will regenerate new cash collateral and the holders of prepetition liens against the Cash Collateral are being granted Replacement Liens against new current assets to offset the impact of Bankruptcy Code section 552 which would otherwise deprive such noteholders of continuing liens against the postpetition current assets not constituting proceeds of their prepetition ABL Collateral. The DIP Credit Facility will also substantially enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, raw material vendors, employees, and service providers, allowing the Debtors to, among other things, continue operating their businesses in the ordinary course, thereby preserving value for the benefit of all stakeholders. By this Motion and pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, the Debtors hereby seek entry of two (2) orders—an interim order in the form annexed hereto as Exhibit A (the "Interim Order") and a final order (the "Final Order," the two orders being the "DIP Orders"),[4] following notice and a final hearing (the "Final Hearing") on the relief provided in the Motion approving such relief on a final basis. To satisfy the conditions to borrowing under that certain Superpriority Debtor-In-Possession Credit and Guaranty Agreement, dated as of September [___], 2011 (as hereafter

---

[4] A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing.

amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Agreement"), the Debtors require an order:[5]

(a)     authorizing (i) NewPage Corporation ("NewPage," or the "Borrower") to draw up to $495 million in principal amount of borrowings and the letters of credit in postpetition financing on an interim basis (the "Interim DIP Loans") and, thereafter, an additional $105 million on a final basis (subject to borrowing base availability), consisting of the DIP Revolving Loans, the DIP Letters of Credit and the DIP Term Loans on the terms and conditions set forth in the Interim Order, the Final Order and the DIP Agreement, together with all agreements, documents and instruments delivered or executed in connection therewith, including, without limitation, the budget (in each case as hereafter amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Documents"), among the Borrower, NewPage Group, Inc. ("NewPage Group"), NewPage Holding Corporation ("NewPage Holding"), and each direct and indirect domestic subsidiary of the Borrower, but excluding NewPage Port Hawkesbury Corporation, Consolidated Water Power Co. and Rumford GIPOP, Inc. (collectively, the "DIP Guarantors," and together with the Borrower, the "Loan Parties"), the DIP Lenders and the DIP Agents, and (ii) each of the DIP Guarantors to guaranty NewPage's obligations in respect of the DIP Credit Facility;

(b)     authorizing the Debtors to execute and deliver the DIP Agreement and the other DIP Documents, and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c)     authorizing the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code to the DIP Agents, the DIP Lenders and the holders of Banking Revenues Obligations and Designated Hedging Obligations (each as defined in the DIP Agreement, and together with the DIP Agents and the DIP Lenders, the "DIP Secured Parties") to secure all of the obligations of the Debtors in respect of the DIP Credit Facility and other Obligations (as defined in the DIP Agreement, the "DIP Obligations");

(d)     authorizing the Debtors to use the proceeds of the DIP Credit Facility to pay interest, fees, and expenses in connection with the DIP Loans and to repay the amount outstanding of approximately $131 million in loans made and $101 million in letters of credit issued and outstanding under the Prepetition Senior Secured Revolver (with non-default interest and other non-default fees and charges thereon to the extent payable under the terms of the Prepetition Senior Secured Revolver, in accordance with the terms of the Interim Order;

---

[5] A copy of the DIP Agreement in substantially final form is annexed hereto as Exhibit B (excluding schedules, appendices, and exhibits).

DOCS_DE:172865.1 59998-001

(e) authorizing the Debtors to use cash in which the Prepetition Revolver Lenders and the holders of the Prepetition First Lien Notes (the "Prepetition First Lien Noteholders," and together with the Prepetition Revolver Lenders, the "Prepetition Priority Parties") have an interest (the "Cash Collateral"), in accordance with the terms of the DIP Orders;

(f) authorizing the Debtors to grant adequate protection to the Prepetition First Lien Noteholders for, among other things, the Debtors' use of Cash Collateral, and the Debtors' use, and any resulting diminution in the value of, the other ABL Collateral;

(g) granting, pursuant to the applicable provisions of the Bankruptcy Code, including sections 361 and 363 thereof and the terms of the DIP Orders, and in accordance with the terms of the DIP Documents, to the Prepetition First Lien Noteholders, whose Cash Collateral and other ABL Collateral may be used, sold or leased by the Debtors, replacement liens on any postpetition ABL Collateral of the Debtors, wherever located as adequate protection of their interests (the "Replacement Liens"), subject only to the Carve-Out expenses, the DIP Obligations, and any valid, perfected, enforceable and unavoidable liens (A) existing as of the Commencement Date or (B) pursuant to sections 546 and 362(b)(18) of the Bankruptcy Code, which are otherwise senior to the liens in favor of the Prepetition First Lien Noteholders;

(h) authorizing, but not directing, the Debtors to pay (subject to the terms of the DIP Orders and the DIP Documents) on any date that is the regularly scheduled interest due date under the terms of the Prepetition First Lien Indenture an amount equal to all accrued and unpaid interest on the Prepetition First Lien Notes at the applicable non-default contract rate set forth in the Prepetition First Lien Indenture that would come due on such regularly scheduled interest payment date but for the commencement of the Cases;

(i) authorizing, but not directing, payment (subject to the terms of the DIP Orders and the DIP Documents) of all reasonable costs and expenses of one primary counsel, one appropriate local counsel in Delaware, and one financial advisor to (1) that certain *ad hoc* group of Prepetition First Lien Noteholders represented by Milbank Tweed Hadley & McCloy LLP (the "First Lien Group", including reasonable attorney and advisor fees on a current basis without the need for filing fee applications or fee statements, and (2) that certain *ad hoc* group of Prepetition Second Lien Noteholders represented by Akin Gump Strauss Hauer & Feld LLP (the "Second Lien Group")], including reasonable attorney and advisor fees on a current basis without the need for filing fee applications or fee statements;

(j) authorizing the Debtors to recharacterize any payments made during these cases in the amount of interest that would have come due under the Prepetition First Lien Notes but for the commencement of these cases as payments on account of prepetition principal due and owing as of the Commencement Date if the Prepetition First Lien Notes prove to be undersecured pursuant to section 506(b) of the Bankruptcy Code; and

6

(k)    authorizing the Debtors to recharacterize any payment of fees and expenses made to the First Lien Group or Second Lien Group as payments on account of prepetition principal due and owing as of the Commencement Date to the holders of the Prepetition First Lien Notes and the Prepetition Second Lien Notes who are respectively members of the First Lien Group or Second Lien Group, as applicable, in the event that the First Lien Group or Second Lien Group fails to prove any entitlement to fees and expenses under section 503(b)(3)(D) of the Bankruptcy Code, or under their applicable loan agreements to the extent they are oversecured.

## Background

3.    On the date hereof (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

4.    Contemporaneously herewith, the Debtors filed a motion seeking the joint administration of their chapter 11 cases, for procedural purposes only, pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

## Jurisdiction and Venue

5.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for relief requested herein are sections 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rules 2002-1, 4001-1 and 6004-1.

## The Debtors' Businesses

### A.    The Company's Organization

6.    The Debtors and their non-debtor subsidiaries and affiliates (the "Company") comprise the largest coated paper manufacturer in North America, based on

7

production capacity. NewPage Group Inc. owns 100% of the common stock of NewPage Holding Corporation, which in turn owns 100% of the common stock of NewPage. NewPage is the Company's primary operating subsidiary and directly and indirectly owns the other Debtors (the "Subsidiary Debtors") and various other affiliated non-debtor entities. The Subsidiary Debtors primarily own and operate the various paper mills in the United States. Non-debtor NewPage Port Hawkesbury Corp. ("NPPH"), which is contemporaneously commencing proceedings under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Supreme Court of Nova Scotia, in Halifax, Nova Scotia, Canada (the "Canadian Court," and the filing, the "Canadian Proceeding"), primarily owns and operates a mill in Canada and manages the Debtors' Canadian operations.

## B. The Company's Business

7. Headquartered in Miamisburg, Ohio, the Company's mills primarily produce coated paper, which, unlike common writing or typing paper, is typically used in magazines, magazine covers and inserts, corporate annual reports, high-end advertising brochures, direct mail advertising, coated labels, catalogs, and textbooks. While the Company also manufactures supercalendered paper, uncoated paper, specialty labels, and newsprint, coated paper represented approximately 80% of its net sales for the year ended December 31, 2010.

*Manufacturing*

8. The Company operates 16 papermaking machines at paper mills located in Kentucky, Maine, Maryland, Michigan, Minnesota, and Wisconsin, with distribution centers near major print markets, including New York, Chicago, Minneapolis, and Atlanta. As of June 30, 2011, the Company had production capacity of approximately 3.6 million short tons (one short ton equals 2,000 pounds) of paper, including approximately 2.9 million short tons of coated

8

paper, approximately 500,000 short tons of uncoated paper, and approximately 200,000 short tons of specialty paper.

*Sales, Marketing, and Distribution*

9.     The Company sells paper products primarily in the United States and Canada, using three sales channels: (a) direct sales, which consist of sales made directly to end-use customers (primarily large companies such as publishers, printers, and retailers); (b) merchant sales, which consist of sales made to paper merchants and brokers, who in turn sell to end-use customers; and (c) specialty sales, which consist of sales made to packaging and label manufacturers. As part of its distribution chain, the Company owns one warehouse, leases space in approximately 35 warehouses, and uses third parties to ship its products by truck and rail.

## Events Leading To Chapter 11

10.     Several factors contributed to the commencement of these chapter 11 cases. As with any business, the Debtors' financial performance depends primarily on the demand for its products and the prices at which they can be sold. In the last few years, the Debtors have seen a significant decline in the North American demand for coated paper and, although this decline has impacted many of the markets for the Debtors' key products, it has yet to result in a counterbalancing decrease in the production capacity trying to access those markets.

11.     This decrease in demand has stemmed from a number of factors. These include a general decrease in both advertising spending and magazine/catalog circulation driven largely by the current unrest in the global economy and the preceding "great recession"; increases in the use of electronic data transmission and storage; continued expansion of the Internet as a medium for numerous advertising and marketing applications; an increased demand

9

for electronic reading material; and increased postal rates. These factors have contributed to substantial price competition and volatility in the pulp and paper industry.

12.     In addition, despite the decline in North American demand, foreign imports from Europe and Asia, driven by similar overcapacity in their own markets, continue to have a negative impact on North American coated paper suppliers. This has led to significant levels of market-related downtime and temporary shutdowns, especially during 2008 and 2009.

13.     Finally, the rising costs of raw materials, including significant increases in energy, fuel and chemical costs, have also negatively impacted the Debtors' financial performance, liquidity and stability. These market factors, exacerbated by the Debtors' relatively high level of structured debt, have resulted in the Debtors seeking chapter 11 protection despite their ability to generate significant levels of EBITDA and unlevered cash flow.

14.     By the second quarter of 2011, the Debtors' liquidity position became severely constrained. As a result, the Debtors began to consider various restructuring alternatives, and after considering all available options, the Debtors concluded that seeking chapter 11 relief would be in their best interests, as well as those of their creditors and other parties in interest.

15.     As of July 31, 2011, the Company's aggregate workforce consisted of approximately 6,000 employees, of which approximately 70% are represented by labor unions. As of June 30, 2011, the Company's unaudited consolidated balance sheet reflected total assets of approximately $3.4 billion and total liabilities of approximately $4.2 billion. For the quarter ended June 30, 2011, the Company reported total gross revenue of approximately $888 million and Adjusted EBITDA of $32 million.

10

## Relief Requested

### A.  Prepetition Secured Indebtedness and Capital Structure.

16.  NewPage Group is the direct or indirect parent of each of the other Debtors.  Cerberus Capital Management, L.P., and its affiliates ("Cerberus") own approximately 80%, and Stora Enso Oyj ("SEO") owns the remaining 20%, of the common stock of NewPage Group.

17.  Prior to the Commencement Date, each of the Debtors other than NewPage Group entered into the Revolving Credit and Guaranty Agreement, dated as of December 21, 2007, among NewPage as Borrower, and each of the other Debtors (other than NewPage Group), as Guarantors (collectively, the "Prepetition Revolver Obligors"), WFC, as successor to Goldman Sachs Credit Partners, L.P., as Administrative Agent, Goldman Sachs Credit Partners, L.P., as Sole Lead Arranger and Sole Bookrunner, UBS Securities, LLC, as Co-Syndication Agent and Co-Manager, Barclays Bank, PLC, as Co-Syndication Agent, Barclays Capital as Co-Manager, Wachovia Bank, N.A., as Co-Documentation Agent, Bank of America, N.A., as Co-Documentation Agent, and Wells Fargo Capital Finance, LLC, as successor to JPMorgan Chase Bank, N.A., as Collateral Agent, together with the lenders party thereto from time to time (the "Prepetition Revolver Lenders"), with a total maximum availability of $500 million (as amended from time to time, together with all agreements, documents and instruments delivered or executed in connection therewith, the "Prepetition Senior Secured Revolver") of which there was $131 million of borrowings (excluding letters of credit issued but undrawn) outstanding as of June 30, 2011.

18.  NewPage and each of the of the Prepetition Revolver Obligors granted the Prepetition Revolver Lenders a first priority security interest in, and lien against, present and

11

future cash, deposit accounts, accounts receivable, inventory and intercompany debt (the "ABL Collateral") to secure their obligations under the Prepetition Senior Secured Revolver.

19.    Prior to the commencement of these cases, NewPage was also the issuer of 11.375% senior secured first lien notes due 2014 (the "Prepetition First Lien Notes") pursuant to the indenture dated as of September 30, 2009, among NewPage, and each of NewPage's wholly owned direct and indirect subsidiaries other than Consolidated Water and Power Co. (collectively, the "Subsidiary Guarantors"), as guarantors, and the Bank of New York Mellon, as trustee (as amended from time to time, together with all agreements, documents, and instruments delivered or executed in connection therewith, the "Prepetition First Lien Indenture"). The Prepetition First Lien Notes consist of $1.77 billion in face amount of notes with an effective interest rate of 13.7%. The obligations of NewPage and each of the Subsidiary Guarantors under the Prepetition First Lien Notes are secured by a first priority lien on substantially all assets of NewPage and the Subsidiary Guarantors other than the ABL Collateral (the "Fixed Collateral," and together with the ABL Collateral, the "Prepetition Collateral"), and by a second priority lien against the ABL Collateral.

20.    NewPage is also the issuer of the Prepetition Second Lien Notes consisting of (a) $806 million face amount of 10% fixed rate senior secured second lien notes (the "Prepetition Second Lien Fixed Rate Notes") pursuant to the indenture dated as of May 2, 2005, among NewPage, the Subsidiary Guarantors, as guarantors, and HSBC Bank USA, National Association, as trustee (as amended from time to time, together with all agreements, documents, and instruments delivered or executed in connection therewith, the "Second Lien Fixed Rate Notes Indenture"); and (b) $225 million of floating rate senior secured second lien notes (the "Prepetition Second Lien Floating Rate Notes," and together with the Prepetition

12

Second Lien Fixed Rate Notes, the "Prepetition Second Lien Notes," and the holders of such notes, the "Prepetition Second Lien Noteholders") pursuant to the indenture, dated as of May 2, 2005, among NewPage, the Subsidiary Guarantors, as guarantors, and HSBC Bank USA, National Association, as trustee (as amended from time to time, together with all agreements, documents and instruments delivered in connection therewith, the "Second Lien Floating Rate Notes Indenture"). The obligations of NewPage and each of the Subsidiary Guarantors under the Prepetition Second Lien Notes are secured by a second priority lien on the Fixed Collateral, are subordinated, to the extent of the value of the assets securing the indebtedness to the Prepetition Senior Secured Revolver and the Prepetition First Lien Notes, and are senior in right of payment to the Prepetition Senior Unsecured Notes.

**B.**     **Company Operations and Cash Flow**

21.     The Debtors do not maintain a sufficient inventory of raw material to operate for more than a few days without new deliveries from their suppliers. *See* Epstein Declaration ¶ 3. Without sufficient levels of cash to pay for critical supplies, the Debtors' vendors may stop shipments in route. *Id.* Without the necessary raw materials, the Debtors are unable to produce paper. *Id.* If the Debtors do not produce paper, they generate no cash, which effectively means the business ceases to operate as a going concern. *Id.*

22.     In addition, the Debtors use cash to maintain the equipment at each of their mills in good working condition, providing maintenance and repair once a year. Further, the Debtors are paying the required premium on their various insurance policies to preserve their assets.

23.     Before the Commencement Date, the Debtors relied on sales of their products and borrowing availability under the Prepetition Senior Secured Revolver to support

their cash requirements. *Id.* at ¶ 4. Although the Debtors are cash-flow positive, the Debtors still require additional available liquidity to compensate for timing issues in generating and collecting their accounts receivable. As of August 31, 2011, the Debtors had $17.3 million in cash on hand and cash equivalents, $48.3 million in available borrowings under the Prepetition Senior Secured Revolver, $231 million in accounts receivable, and $476 million in inventory. *Id.*

24. As described in the Epstein Declaration, at June 30, 2011, the Debtors reported net sales of $888 million compared to $890 million in the second quarter of 2010, down only slightly since the same time last year. *Id.* at ¶ 8. The Debtors also reported Adjusted EBITDA of $32 million in the second quarter of 2011, as compared to $10 million in the second quarter of 2010. *Id.* If certain items related to the controlled shutdown of the Wickliffe, Kentucky mill in response to the Mississippi River flood, and other special charges are further adjusted, the EBITDA was $68 million for the second quarter 2011, as compared to $20 million in the Second Quarter 2010. *Id.* For the first half of 2011, the Debtors had $117 million of Adjusted EBITDA as compared to $35 million of Adjusted EBITDA for the same period 2010. *Id.* Adjusted EBITDA margin for the 6 months ending June 30, 2011 was 9.9%. *Id.* This margin percentage is in line with margins reported by other leading coated paper manufacturers. *Id.* During the first half of 2011, the Debtors reported $65 million revenue from improved sales prices, and improvement of $8 million in product mix, partially offset by lower volume, and a $35 million improvement in operational performance. *Id.* The Debtors have experienced increased sales backlog and order rates for their products during the third quarter 2011 compared to the first half of 2011. *Id.*

25. The Debtors' cash flow projections demonstrate their expectation that performance will continue to improve along these lines, subject to ordinary course seasonal ebbs

14

and flows in paper demand. *Id.* at ¶ 9. The Debtors' 13 Week Cash Flows project a positive

cash position through December 2, 2011. *Id.* Projected EBITDAR shows that subject to

seasonal fluctuations in demand and after eliminating the need to service a large portion of the

long term debt and accounting for the reorganization expenses, the expected value of the ABL

Collateral is not anticipated to decline during these cases, and, in fact, is projected to increase.

*Id.* Positive cash flow will be used to generate additional cash, accounts receivable, and

inventory to further secure the Prepetition First Lien Lenders' interest in the ABL Collateral. *Id.*

**Terms and Conditions of the**
**Postpetition Financing Arrangements**

A.      **Highlighted Provisions Under**
        **Bankruptcy Rule 4001 and Local Rule 4001-2**

   26. The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the

extent applicable, are set out at the following sections of the DIP Agreement and the Interim

Order:

    (i) Grant of Priority or a Lien on Property of the Estate. DIP
      Agreement §2.25; Interim Order ¶¶ 4(c) & 7.

    (ii) Adequate Protection or Priority for a Claim that Arose Before the
      Commencement of the Case. Interim Order ¶12.

    (iii) Determination of the Validity, Enforceability, Priority, or Amount
      of a Claim that Arose Before the Commencement of the Case.
      Interim Order ¶3.

    (iv) Waiver or Modification of the Automatic Stay. DIP Agreement
      §8.01; Interim Order ¶ 8(b).

    (v) Waiver or Modification of Authority to Request Use of Cash
      Collateral or Request Authority to Obtain Credit. DIP Agreement
      §1.01 "CarveOut"; Interim Order ¶ 6(b).

15

(vii) <u>Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien</u>. DIP Agreement §§4.28 & 8.01; Interim Order ¶ 16.

(viii) <u>Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate</u>. DIP Agreement §2.25; Interim Order ¶3.

(ix) <u>Indemnification of Any Entity</u>. DIP Agreement §§2.04(g); 2.20(d)&(e).

(x) <u>Release, Waiver or Limitation on Rights under Section 506(c)</u>. Interim Order ¶25.

(xi) <u>Liens Granted on Claims Arising Under Chapters 5 or 7</u>. DIP Agreement §2.25; Interim Order ¶7(a).

(xii) <u>Prepayment Premium</u>. DIP Agreement §§1.1 "Term Prepayment Fee" & §2.13.

27. In accordance with Local Rule 4001-2(a)(i)(A)-(G), the Debtors also draw the Court's attention to certain material provisions of the DIP Agreement and in the relief set forth in the attached Interim Order:

(i) <u>Binding the Estate to Validity, Perfection or Amount of Secured Debt or Limitations on Investigation (Local Rule 4001-2(a)(i)(B))</u>. DIP Agreement §§4.28 & 8.01; Interim Order ¶¶ 6(b), 16, & 19.

(ii) <u>Waiver of Section 506(c) Surcharge (Local Rule 4001-2(a)(i)(C))</u>. Interim Order ¶ 25.

(iii) <u>Liens on the proceeds of Avoidance Actions (Local Rule 4001-2(a)(i)(D))</u>. DIP Agreement §2.25; Interim Order ¶7(a).

(iv) <u>Roll-Up Provisions (Local Rule 4001-2(a)(i)(E))</u>. DIP Agreement§2.06;Interim Order ¶¶ 5,12.

(v) <u>Disparate Treatment of Professionals (Local Rule 4001-2(a)(i)(F))</u>. DIP Agreement §1.01 "CarveOut"; Interim Order ¶6(b).

(vi) <u>Priming Lien (Local Rule 4001-2(a)(i)(G))</u>. Pursuant to the DIP Credit Facility, the Prepetition First Lien Noteholders will continue to hold a second lien with respect to the ABL Collateral upon entering into the DIP Credit Facility because the obligations under

16

the Prepetition Senior Secured Revolver will be repaid pursuant to the DIP Credit Facility. Out of an abundance of caution, and because the DIP Lenders have required that the Debtors seek this relief, the proposed Interim Order approving the DIP Credit Facility invokes section 364(d) of the Bankruptcy Code, even though no liens are being primed.

28.     The provisions above were heavily negotiated and are necessary for the Debtors to procure the financing made available under the DIP Agreement in a sufficient amount and on a timely basis.

**B.     Summary of Principal Terms of the DIP Agreement**

29.     The significant elements of the DIP Agreement and the DIP Documents are as follows:[6]

| | |
|---|---|
| **Borrower:** | NewPage Corporation. |
| **Guarantors:** | NewPage Group, NewPage Holding, and all direct and indirect material domestic subsidiaries (whether currently existing or subsequently acquired or organized, subject to customary exceptions) of the Borrower, each as debtor and debtor-in-possession under the Bankruptcy Code, but excluding NewPage Port Hawkesbury Corporation, Consolidated Water Power Co. and Rumford GIPOP Inc. |
| **Joint Lead Arrangers and Joint Bookrunners:** | With respect to the DIP Revolving Facility, JPMorgan, Barclays, and WFC. With respect to the DIP Term Loan Facility, JPMorgan and Barclays. |
| **DIP Administrative Agent:** | JPM. |
| **Co-Collateral Agents:** | JPM and WFC. |
| **Syndication Agent:** | Barclays. |

---

[6] This summary is qualified in its entirety by reference to the provisions of the DIP Documents. The DIP Documents will control in the event of any inconsistency between this Motion and the DIP Documents. Unless otherwise defined herein, capitalized terms used in this section have the meanings ascribed to them in the DIP Documents.

17

| | |
|---|---|
| **Documentation Agent:** | WFC. |
| **Lenders:** | JPM, Barclays, WFC and the other institutions selected in consultation with the Borrower that become parties to the financing arrangements as lenders. |
| **Letter of Credit Issuer:** | JPM, Wells Fargo Bank, National Association and other Lenders under the DIP Revolving Facility to be agreed (each in such capacity, the "Issuing Bank"). |
| **Swing Line Lender:** | JPM. |
| **DIP Credit Facility:** | The DIP Credit Facility will consist of the DIP Revolving Facility of $350,000,000 (the "Revolving Commitments") and the DIP Term Loan Facility of $250,000,000 provided to the Borrower upon the Commencement Date, subject to such other limits as the Bankruptcy Court may require. |
| | The DIP Revolving Facility and the DIP Term Loan Facility will be subject to the Collateral Amount. |
| | The DIP Revolving Facility will also be subject to the Borrowing Base with a portion of the DIP Revolving Facility being available for letters of credit issued by the Issuing Bank ("LCs"), with a sublimit on LCs outstanding at any time of $200,000,000 and a portion of the DIP Revolving Facility available as swing line loans ("Swing Line Loans") with a sublimit on Swing Line Loans outstanding at any time of $30,000,000. The DIP Revolving Loans include loans under the DIP Revolving Facility and Swing Line Loans, except as otherwise provided herein. |
| | LCs will be issued by the Issuing Bank and Swing Line Loans will be made available by the Swing Line Lender and each Lender under the DIP Revolving Facility will purchase an irrevocable and unconditional participation in each LC and Swing Line Loan. |
| | DIP Revolving Loans may be drawn, repaid and reborrowed. The DIP Term Loans will be fully drawn on the Closing Date and may not be reborrowed. |
| | Letters of credit currently outstanding under the Prepetition Senior Secured Revolver and issued by a DIP Revolving Lender shall be deemed to be LCs under the DIP Revolving Facility on the Closing Date. |
| **Borrowing Base and Collateral Amount:** | DIP Revolving Loans and LCs shall be provided subject to availability under the Borrowing Base and the Collateral Amount, as set forth under the heading "Conditions to Each Extension of Credit" in the DIP Agreement. The Borrowing Base will be calculated as follows: |
| | (a) 85% of the book value of Eligible Accounts of the Borrower and the Borrowing Base Guarantors; plus |
| | (b) the lesser of: (i) the cost of eligible inventory of the Borrower and the Guarantors multiplied by 75% or (ii) the Cost of Eligible Inventory of Borrower and the Borrowing Base Guarantors multiplied by the advance rate of 85% of the Net |

18

Orderly Liquidation Value; <u>minus</u>

(c) effective immediately upon notification thereof to Borrower by Administrative Agent, (i) Carve Out Reserves, Designated Hedging Reserves and the Notes Payment Reserve (collectively, the "Specified Reserves") and (ii) any other Reserves established from time to time by the Co-Collateral Agents in accordance with the provisions set forth in the definition of "Reserves" set forth in the DIP Agreement.

The "<u>Collateral Amount</u>" will be calculated as follows:

(a) 100% of the book value of the DIP Collateral consisting of Accounts as set forth on the consolidated balance sheet of NewPage Group most recently delivered to the Administrative Agent to the extent held by any Credit Party; <u>plus</u>

(b) 100% of the book value of the DIP Collateral consisting of Inventory as set forth on the consolidated balance sheet of NewPage Group most recently delivered to the Administrative Agent to the extent held by any Credit Party; <u>plus</u>

(c) the aggregate amount of Cash or Cash Equivalents of the Credit Parties in a Collateral Amount Account to cash collateralize Obligations under the DIP Credit Facility in connection with a Collateral Amount Shortfall; *minus*

(d) effective immediately upon notification thereof to Borrower by Administrative Agent, (i) the Specified Reserves and (ii) any other Reserves established from time to time in accordance with the provisions set forth in the definition of "Reserves".

**Notes Payment Reserves:** The Borrower may, at its option, deposit cash in a restricted account (such restricted account, the "<u>Notes Payment Reserve Account</u>"), (which Notes Payment Reserve Account shall (subject to the provisions with respect to the Notes Payment Reserve described below) be established within five days of the Closing Date at the DIP Administrative Agent) in an amount equal to (i) for the period beginning on October 31 of each year through and including November 29 of such year, 50% of the maximum amount of any payment (other than in respect of reasonable professional fees and expenses) in respect of the Prepetition First Lien Notes (any such payment, a "Notes Debt Payment") authorized or required by the Bankruptcy Court to be made in respect of the Prepetition First Lien Notes on December 31 of such year (the "<u>December Payment</u>"), (ii) for the period beginning on November 30 of each year through and including the date of the applicable December Payment, 100% of the amount of the December Payment, (iii) for the period beginning on April 30 of each year through and including May 30 of such year, 50% of the maximum amount of any Notes Debt Payment authorized or required to be made in respect of the Prepetition First Lien Notes on June 30 of such year (the "<u>June Payment</u>") and (iv) for the period beginning on May 31 of each year through and including the date of the applicable June Payment, 100% of the amount of the June Payment; provided that in no event shall the Borrower make any Notes Debt Payment in respect of the Prepetition First Lien Notes (x) on any date other than the date on which an interest payment date in respect of the Prepetition First Lien Notes would have been due but for the filing of the Cases or (y) in an amount that exceeds the interest payment that would have been due in respect of the Prepetition First Lien Notes (at the non-default contractual rate) on such date but for the filing of the Cases; *provided further* that upon the occurrence and continuation of an event of default under the DIP Credit Facility (an "<u>Event of Default</u>"), any cash deposited in the Notes Payment Reserve Account shall not

19

be available, and shall not be applied, to make any payment in respect of the Prepetition First Lien Notes but instead shall be applied to repay the DIP Credit Facility as set forth more fully in the DIP Agreement. The Notes Payment Reserve Account and the amounts therein shall be subject to cash dominion by the DIP Administrative Agent, which shall include being at all times subject to the sole and exclusive dominion of the DIP Administrative Agent, including the exclusive right of withdrawal. If at any time the Bankruptcy Court authorizes or requires any Notes Debt Payment to be made in respect of the Prepetition First Lien Notes (or if the Borrower makes a Borrower's Reinstatement Application) and Borrower does not deposit cash in the Notes Payment Reserve Account as set forth above, Administrative Agent shall establish a reserve (the "**Notes Payment Reserve**") such that the sum of the Notes Payment Reserve and cash deposited in the Notes Payment Reserve Account shall equal the aggregate amount permitted to be in the Notes Payment Reserve Account at such time as set forth in the first sentence under the heading "Notes Payment Reserve" above. Following any interest payment on the Prepetition First Lien Notes, the reserve will be reset to zero. Notwithstanding the foregoing, in the event the Borrower is not authorized by the Bankruptcy Court to make the applicable Notes Debt Payment in respect of which funds were previously set aside in accordance with clause (a) above or in respect of which a reserve was previously established in accordance with clause (b) above, or (y) Borrower's authorization to make the applicable Notes Debt Payment is terminated pursuant to the terms of the Interim Order or the Final Order (as applicable) as a result of Borrower having given written notice of its intent not to make such payment in accordance with the terms of the Interim Order or the Final Order (as applicable) then, unless at such time the Bankruptcy Court shall have separately ordered Borrower to make such payment (i) any reserve previously established with respect to such payment shall be credited to the Borrowing Base and (ii) so long as no Event of Default has occurred and is continuing, any cash deposited in the Notes Payment Reserve Account with respect to such payment shall be promptly returned to Borrower upon Borrower's request. It is understood and agreed that if the Bankruptcy Court does separately order a Notes Debt Payment after the authorization to make such Notes Debt Payment is terminated or if Borrower seeks such order from the Bankruptcy Court after the authorization to make a Notes Debt Payment is terminated (the "Borrower's Reinstatement Application"), the Notes Payment Reserve provisions requiring the Agent to establish a Notes Payment Reserve Account will immediately become operative.

20

**Mandatory Prepayments:** The Borrower will be required to repay Protective Advances, DIP Revolving Loans (including Swing Line Loans) and cash collateralize outstanding LCs (in accordance with the DIP Agreement) to the extent that outstanding Revolving Loans and LCs exceed an amount equal to (x) the lesser of the Borrowing Base or the Revolving Commitments then in effect minus (y) $35,000,000 (such amount, the "Availability Block"), the amount of such shortfall (a "Borrowing Base Shortfall") (in cash without any prepayment premium or penalty, but including all LIBOR breakage costs); *provided further* that if at any time following the occurrence of a Borrowing Base Shortfall (x) such event ceases to be continuing (as a result of an increase in the Borrowing Base Amount, Borrower's prepayment of Revolving DIP Loans or otherwise) and (y) so long as no Event of Default shall have occurred and be continuing, Administrative Agent shall, upon the written request of Borrower, promptly return any remaining cash collateral deposited by Borrower as a result of such Collateral Amount Shortfall to Borrower.

The Borrower will be required to repay Protective Advances, the DIP Revolving Loans (including Swing Line Loans), cash collateralize outstanding LCs and repay DIP Term Loans to the extent that outstanding DIP Loans and LCs exceed (x) the Collateral Amount minus (y) to the extent Facility Excess Availability is less than the Availability Block, the amount of such shortfall (a "**Collateral Amount Shortfall**"), (in cash without any prepayment premium or penalty, but including all LIBOR breakage costs); *provided further* that if at any time following the occurrence of a Collateral Amount Shortfall (x) such event ceases to be continuing (as a result of an increase in the Collateral Amount, Borrower's prepayment of DIP Loans or otherwise) and (y) so long as no Event of Default shall have occurred and be continuing, Administrative Agent shall, upon the written request of Borrower, promptly return any remaining cash collateral deposited by Borrower as a result of such Collateral Amount Shortfall to Borrower.

The Borrower will also be required to prepay the DIP Loans with (i) 100% of the net cash proceeds received from the incurrence of indebtedness by the Loan Parties (other than indebtedness permitted under the DIP Credit Facility); (ii) an amount equal to the greater of 100% of (x) the net cash proceeds of all non-ordinary course sales or other dispositions of DIP Collateral by the Loan Parties in which the Lenders have either (A) at least a first-priority, perfected security interest as to which no other person has a *pari passu* or senior Lien (any such DIP Collateral, "First Lien DIP Collateral") or (B) a junior, perfected security interest (any such DIP Collateral, "Junior DIP Collateral"), provided that any senior indebtedness secured by a first-priority, perfected security interest in such DIP Collateral has been repaid in full and any commitments with respect thereto terminated (including insurance and condemnation proceeds related to such DIP Collateral) as described in the DIP Agreement; *provided that* in the event of any Asset Sale or series of related Asset Sales that includes First Lien DIP Collateral, then for purposes of the DIP Credit Agreement, the proceeds of such Asset Sale or series of related Asset Sales attributable to the First Lien DIP Collateral shall be deemed to be no less than the greater of (x) market value of such First Lien DIP Collateral and (y) book value of such First Lien DIP Collateral. It is understood and agreed that, so long as any Prepetition First Lien Notes or Prepetition Junior Lien Notes remain outstanding, Borrower may deposit and maintain any Net Asset Sale Proceeds of any Junior DIP Lien Collateral in a segregated account not subject to the control of Administrative Agent (the "Junior Lien Collateral Proceeds Account") and (iii) 100% of the net cash proceeds of all sales of unencumbered assets and (iv) casualty and other insured damage proceeds. The proceeds from such sales or dispositions shall be applied, first, to prepay Protective Advances,

21

second, to prepay amounts owed under the DIP Revolving Facility, third, to cash collateralize LC utilizations and, fourth, to prepay amounts owed under the DIP Term Loan Facility.

For the avoidance of doubt, any disposition of accounts receivable and inventory in the ordinary course of business and the net cash proceeds from such dispositions shall not be subject to a mandatory prepayment; *provided* that any such accounts receivable sold in the ordinary course of business shall consist solely of delinquent accounts receivable with a face amount not to exceed an aggregate of $3.0 million in any month.

**Optional Prepayments:** The DIP Loans may be prepaid in whole or in part from time to time without penalty or premium, subject to the payment of any applicable Term Prepayment Fee, but including all LIBOR breakage costs; *provided* that any voluntary prepayment of the DIP Term Loans may not be made *unless* (a) all outstanding DIP Revolving Loans have been paid in full, (b) all commitments under the DIP Revolving Facility have been terminated, and (c) all outstanding LCs have been cash collateralized.

**Term Prepayment Fee:** In the event that all or any portion of the DIP Term Loan Facility is repaid through voluntary repayments from the incurrence by the Borrower or any of its Restricted Subsidiaries of indebtedness (other than (a) in connection with a repayment pursuant to, and on the effective date of, a Reorganization Plan or (b) to the extent repaid from proceeds of a sale of the Borrower or a sale of all or substantially all assets of the Borrower under section 363 of the Bankruptcy Code), having a lower cost of financing than, or any amendment to the Credit Documents that has the effect of reducing the interest rate margin or weighted average yield then applicable to, the DIP Term Loans (a "Repricing Transaction") , each DIP Term Lender will be paid a fee equal to 1% of the principal amount of any DIP Term Loans prepaid prior to the first anniversary of the Closing Date in connection with a Repricing Transaction.

**Interest Rate Options:** The Borrower may elect that the DIP Loans (other than Swing Line Loans) bear interest at a rate per annum equal to (a) the Alternate Base Rate[7] plus the Applicable Margin[8] or (b) the Adjusted Eurodollar Rate[9] plus the Applicable Margin.

---

[7] "Base Rate" means the highest of (i) the rate of interest publicly announced by JPM as its "prime rate", subject to each increase or decrease in such prime rate, effective as of the day any such change is publicly announced, (ii) the three month Adjusted Eurodollar Rate (which rate shall be determined on a daily basis), plus 1% or (iii) the Federal Funds Effective Rate on the date of determination plus 0.50%.

[8] "Applicable Margin" means, (i) 2.25% as to the DIP Revolving Loans bearing interest using the Base Rate and 3.25% as to the DIP Revolving Loans bearing interest using the Eurodollar Rate and (ii) 7.50% as to the DIP Term Loans bearing interest using the Base Rate and 7.50% as to the DIP Term Loans bearing interest using the Eurodollar Rate, *provided, however,* that with respect to clause (ii) above at no time will the Base Rate be deemed to be less than 2.50% per annum or the Eurodollar Rate be deemed to be less than 1.50% per annum.

[9] "Eurodollar Rate" means the rate of interest (rounded upwards, if necessary, to the nearest 1/100th) appearing on the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service as determined by the DIP Administrative Agent) as the London interbank offered rate for deposits in US Dollars for a term comparable to the applicable period of one, two, three or six months as selected by the Borrower, and in each case subject to the reserve percentage prescribed by governmental authorities.

22

Swing Line Loans will bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin for Revolving Loans that are ABR Loans.

Protective Advances will bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin for Revolving Loans that are ABR Loans *plus* 2.00%..

**Unused Line Fee:** The Borrower shall pay to the DIP Administrative Agent, for the account of the DIP Lenders under the DIP Revolving Facility an unused line fee calculated at 0.50% per annum multiplied by the average of the daily difference between the Revolving Commitments and the Total Utilization of Revolving Commitments, payable quarterly in arrears. "Total Utilization of Revolving Commitments" means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Revolving Loans (other than Revolving Loans made for the purpose of repaying any Refunded Swing Line Loans or reimbursing Issuing Bank for any amount drawn under any Letter of Credit, but not yet so applied), (ii) the aggregate principal amount of all outstanding Swing Line Loans, and (iii) the Letter of Credit Usage.

**Letter of Credit Fees:** The Borrower shall pay to (a) the DIP Administrative Agent, for the account of the DIP Lenders under the DIP Revolving Facility, on the average aggregate daily maximum amount available to be drawn under all outstanding LCs, a letter of credit fee calculated at a rate per annum based on the then Applicable Margin for DIP Revolving Loans using the Eurodollar Rate and (b) to Issuing Bank, a fronting fee equal to 0.25% per annum times the average aggregate daily maximum amount available to be drawn under all outstanding, in each case under clauses (a) and (b), payable quarterly in arrears. In addition, the Borrower shall pay customary issuance, arranging and other fees of the Issuing Bank.

**Default Rate:** After an Event of Default and for so long as the same is continuing, the applicable rates of interest and rate for letter of credit fees shall be increased by 2% per annum above the otherwise then applicable rates.

**Rate and Fee Basis; Payment Dates:** All per annum rates and fees will be computed on basis of actual days elapsed over a 360 day year (or 365/366 days, in the case of the DIP Loans for which the Base Rate determined by reference to the "prime rate" is used).

**Collateral:** The obligations of the Borrower and each Guarantor under the DIP Credit Facility shall, at all times, be secured by (subject to certain specified permitted Liens and certain customary exceptions) (a) first-priority, perfected Lien upon, all personal, tangible and intangible property of the Credit Parties consisting of accounts receivables, trade receivables, inventory, deposit accounts, securities accounts, chattel paper and other current assets subject to an existing Lien securing all outstanding debt under the Prepetition Senior Secured Revolver; (b) first-priority, perfected Lien upon, all real, personal, tangible and intangible property of the Credit Parties' respective estates (including, without limitation, all of the outstanding shares of capital stock of Subsidiaries of Borrower) that is not subject to valid, perfected and non-avoidable Liens as of the Commencement Date, (excluding avoidance actions and, prior to entry of the Final Order, the proceeds of avoidance actions) (notwithstanding such exclusion of avoidance actions, the proceeds of such actions (including, without limitation, assets as to which Liens are

23

avoided) shall, after entry of the Final Order, be subject to such Liens under section 364(c)(2) of the Bankruptcy Code and available to repay the Obligations of the Credit Parties under the DIP Credit Facility); and (c) perfected junior Lien upon, all real, personal, tangible and intangible property of the Credit Parties' respective estates (other than the assets and properties described in clause (a) above) that is subject to (i) valid, perfected and non-avoidable Liens in existence at the time of the Commencement Date or (ii) valid Liens in existence on the Commencement Date that are perfected subsequent to the Commencement Date as permitted by section 546(b) of the Bankruptcy Code. Clauses (a) through (c) above collectively being referred to herein as the "DIP Collateral").

Notwithstanding anything contained herein to the contrary, the Loan Parties shall not be required to pledge to the DIP Agents (a) in excess of 65% of the voting capital stock of NewPage Port Hawkesbury Corporation (if, in the reasonable judgment of Borrower, a pledge of a greater percentage of such stock could reasonably be expected to result in material adverse tax consequences to the Borrower or any of its Consolidated Subsidiaries) and (b) capital stock of Consolidated Water Power Company to the extent the Borrower determines in good faith that a pledge of such stock would be prohibited by law or require the consent of any regulatory authority.

For purposes of the DIP Credit Facility, the DIP Collateral will include (a) all present and future claims, rights, interests, assets and properties constituting DIP Collateral recovered by or on behalf of each Credit Party or any trustee of any Credit Party (whether in the Cases or any subsequent case to which the Cases may be converted) and (b) assets of each Credit Party of the type constituting DIP Collateral existing on the Commencement Date and arising or acquired after the Commencement Date.

For purposes of the DIP Credit Facility, the security interests of the DIP Agents granted under the DIP Credit Facility will be subject to, in each case, the following (collectively, the "Carve-Out"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930 of title 28 of the United States Code; (b) any and all allowed and unpaid claims of professionals whose retention is approved by the Bankruptcy Court during the Cases pursuant to sections 327 and 1103 of the Bankruptcy Code for unpaid fees and expenses incurred (i) prior to the occurrence of an Event of Default and (ii) upon the occurrence and during the continuation of an Event of Default in an aggregate amount not to exceed $7,500,000 (the "Carve Out Cap"); which (A) shall be used to pay the fees and expenses incurred by the Credit Parties' professionals retained in the cases, and (B) no more than $1,500,000 of the Carve Out Cap shall be used to pay the fees and expenses incurred by the professionals of any official committee (the "Committee") (including the reimbursement of the out-of pocket expenses of such committee members) appointed in these cases; and (c) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $50,000. Any payments of the allowed professional fees incurred after an Event of Default shall reduce the amount of the Carve-Out by the amount of any such payment.

For the avoidance of doubt the Carve Out Caps shall neither be reduced nor increased by the amount of compensation or reimbursement of allowed fees and/or expenses incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carve-Out is invoked, and nothing herein shall be construed to impair the ability of any

24

party to object to the fees, expenses, reimbursement or compensation described herein.

The Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Borrower or any Guarantor, any Committee, unofficial committee or any professional, in connection with (1) the investigation, initiation or prosecution of any claims (including for the avoidance of Liens) against any DIP Agent, any DIP Lender or Issuing Bank under the Prepetition Senior Secured Revolver and/or the DIP Credit Facility, or preventing, hindering, or delaying the assertion of enforcement of any Lien, claim, right or realization upon any DIP Collateral by any DIP Agent, any DIP Lender or Issuing Bank, (2) a request to use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior consent of the DIP Administrative Agent, (3) a request, without the prior consent of the DIP Administrative Agent, for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly repay in full in cash the obligations (including cash collateralizing any LCs) under the DIP Credit Facility on terms and conditions acceptable to Administrative Agent, or (4) any act which has the effect of materially or adversely modifying or compromising the rights and remedies of the DIP Administrative Agent, any DIP Collateral Agent or any DIP Lender as set forth herein and in the other DIP Documents, or which results in the occurrence of an Event of Default, unless otherwise agreed in writing by the DIP Administrative Agent in its sole discretion.

Pursuant to section 364(c)(1) of the Bankruptcy Code, all Obligations of the Credit Parties under the DIP Credit Facility at all times will be joint and several and will constitute allowed super-priority administrative expense claims in the Cases having priority over all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out to the extent provided in any Financing Order.

For purposes of the DIP Credit Facility, all of the security interests and Liens described herein shall be effective and fully perfected as of the entry of the interim financing order as entered by the Bankruptcy Court authorizing the secured financing under the DIP Credit Facility on the terms and conditions contemplated by the Term Sheet and otherwise acceptable to the DIP Lead Arrangers in their sole discretion (it being understood and agreed that an order in the form that is agreed to in connection with the execution of definitive documentation with respect to the DIP Credit Facility shall, if entered by the Court, be deemed to be acceptable to the DIP Lead Arrangers) (the "Interim Financing Order") and without the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements.

The Interim Financing Order and the Final Financing Order *inter alia* shall provide that proceeds realized from the liquidation by the DIP Administrative Agent in consultation with the DIP Collateral Agents of the DIP Collateral will be applied to repay outstanding DIP Revolving Loans and cash collateralize LC utilizations in full before any amounts are applied to the repayment of the DIP Term Loans and shall vacate the automatic stay to the extent necessary to allow the DIP Administrative Agent, the DIP Collateral Agents and the Lenders to exercise any rights or remedies they have upon an Event of Default; *provided* that with respect to the enforcement of Liens or other remedies in respect of the DIP Collateral, including, but not limited to the right to use Cash Collateral, the DIP Lenders shall provide the Loan Parties with no less than five days' notice prior to

25

exercising such right or remedy; *provided further* that, notwithstanding anything to the contrary in the foregoing, any action taken to (i) terminate the commitments under the DIP Credit Facility, (ii) accelerate the DIP Loans, (iii) send blocking notices or a Cash Dominion Notice, (it being understood and agreed that during the 5 day period following the delivery of any such notice, the Loan Parties shall be permitted to use cash collateral in accordance with the budget provided in accordance with the terms of the DIP Credit Facility), (iv) repay any amounts owing in respect of the DIP Revolving Facility (including, without limitation, fees, indemnities and expense reimbursements) and (v) cash collateralize LC utilizations, in each case, shall not require any advance notice to the Loan Parties.

The obligations secured on a *pari passu* basis with the obligations under the DIP Credit Facility may include hedging and bank product obligations of the Borrower and Guarantors where a DIP Lender or an affiliate of a DIP Lender is a counterparty; *provided* that each hedging obligation so secured shall be designated by the Borrower and the counterparty to the DIP Administrative Agent and include a maximum exposure so secured for such hedging obligation (it being understood that such maximum exposure shall be included in the reserve for the Borrowing Base and the Collateral Amount), subject to an aggregate maximum exposure for all such hedging obligations of $25,000,000 (such hedging obligation, collectively, "Designated Hedging Obligations"); *provided further* that any hedging programs must be approved by order of the Bankruptcy Court and be in form and substance satisfactory to the DIP Administrative Agent.

**Guarantees:**
Each Guarantor shall unconditionally guarantee all of the indebtedness, obligations and liabilities of each other Credit Party arising under or in connection with the DIP Documents.

**Use of Proceeds:**
The proceeds of the DIP Credit Facility will be used for the repayment of all amounts outstanding under the Prepetition Senior Secured Revolver (other than the Existing Letters of Credit, which shall be deemed to be LCs under the DIP Revolving Facility) and the termination of the commitments thereunder, working capital and general corporate purposes of NewPage Group and its Restricted Subsidiaries, including allowed administrative expenses incurred during the Cases or as have otherwise been approved by the Bankruptcy Court and for the purposes set forth in the Financing Orders. The proceeds of the DIP Credit Facility may not be used in connection with the investigation, initiation or prosecution of any claims against any DIP Agent, any DIP Lender or Issuing Bank under the Prepetition Senior Secured Revolver and/or the DIP Credit Facility, provided that, advisors to the Committee may investigate the Liens granted pursuant to the Prepetition Senior Secured Revolver at an aggregate expense for such investigation not to exceed $100,000.

**Closing Date:**
The date on or before October 31, 2011 on which the initial borrowings under the DIP Credit Facility are made (the "Closing Date").

**Term:**
The DIP Credit Facility shall be for a term ending on the earliest of: (a) the date that is 18 months after the Commencement Date, (b) 45 days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 45-day period, (c) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a Reorganization Plan that is confirmed pursuant to an order entered by the Bankruptcy Court for the Borrower

26

or any Guarantor in the Cases, and (d) the acceleration of the DIP Loans and termination of the Commitments in accordance with the DIP Credit Facility (such earliest date, the "Termination Date").

On the Termination Date, the DIP Loans and other obligations shall be repaid, and the proceeds from, and recoveries on, the DIP Collateral, if applicable, will be applied: first, to the amounts owing in respect of the DIP Revolving Facility (including, without limitation, fees, indemnities and expense reimbursements); second, to cash collateralizations of LC utilizations; and third, to amounts owing in respect of the DIP Term Loan Facility.

| | |
|---|---|
| **Affirmative Covenants:** | Usual and customary affirmative covenants for bankruptcy cases, including: |

- o not later than the earlier of (i) the expiration of the Interim Order and (ii) 45 days after the entry of the Interim Order, the Final Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been (A) vacated, stayed or reversed or (B) modified or amended except as otherwise agreed to in writing by the Administrative Agent in its sole discretion and as reasonably acceptable to the Lead Arrangers. "**Final Order**" means an order entered by the Bankruptcy Court in form and substance satisfactory to the DIP Lead Arrangers in their sole discretion (it being understood that an order in the form of Exhibit M to the DIP Credit Agreement (with such changes that are, in the Lead Arrangers' sole discretion, customarily applicable to a final order or indicated in the Commitment Letter) shall, if entered by the Court, be deemed to be acceptable to the DIP Lead Arrangers), which order shall not have been (i) vacated, reversed, or stayed, or (ii) amended or modified except as otherwise agreed to in writing by the Administrative Agent in its sole discretion and reasonably acceptable to the Lead Arrangers(the Final Order, together with Interim Order, collectively, "Orders" and individually, an "Order");
- o prior to the entry of the Final Order, the Credit Parties shall have executed and delivered to Administrative Agent the Pledge and Security Agreement;
- o prior to the entry of the Final Order(or such later date as agreed by Administrative Agent in its reasonable discretion), the Credit Parties shall have executed and delivered to the Administrative Agent each Collateral Document (other than the Pledge and Security Agreement or any mortgages) reasonably requested by Administrative Agent in form and substance reasonably satisfactory to the Administrative Agent.
- o within forty-five days after the Closing Date (or such later date as agreed by Administrative Agent in its reasonable discretion), each applicable Credit Party shall enter into and deliver to Administrative Agent a Deposit Account Control Agreement with respect to each Blocked Account, duly executed by each party thereto.

| | |
|---|---|
| **Negative Covenants:** | Usual and customary negative covenants for bankruptcy cases (taking into account the Cases) |
| **Financial Covenants:** | Shall be limited to the following: |

(a) Minimum Consolidated Adjusted EBITDA for the most recently ended twelve month period as of the last day of each month (starting with the month ending

27

December 31, 2011) of at least $275 million (calculated to give pro forma effect to any sale or cessation of the operations of NewPage Port Hawkesbury Corporation.)

(b) NewPage Group and its Restricted Subsidiaries shall not make or incur Consolidated Capital Expenditures in an amount greater than (i) with respect to the first fiscal quarter ended subsequent to the Closing Date, $40,000,000 and (ii) with respect to each fiscal quarter ended thereafter, $25,000,000; provided that if the aggregate amount of Consolidated Capital Expenditures in any fiscal quarter is less than the cap for such fiscal quarter, then such shortfall may be carried forward consistent with the terms of the DIP Credit Facility.

(c) Borrower shall not permit (x) during any period other than a Dominion Period unrestricted Cash and Cash Equivalents of the Credit Parties to be less than $15,000,000 at any time and (y) during any Dominion Period, the sum of (i) unrestricted Cash and Cash equivalents of the Credit Parties, (ii) Cash and Cash Equivalents of the Credit Parties subject to the DIP Administrative Agent's full dominion as set forth in the DIP Agreement (excluding any amounts held in the Collateral Amount Account and the Notes Payment Reserve Account) and (iii) the amount, if any, by which Revolver Excess Availability exceeds the Availability Blocking Amount to be less than $15,000,000 at any time.

| | |
|---|---|
| **Events of Default:** | Usual and customary events of default for bankruptcy cases. |
| **Fees:** | DEBTORS REQUESTING APPROVAL TO FILE UNDER SEAL |
| **Expenses and Indemnity:** | The Credit Parties will pay all of the actual and reasonable costs and expenses and customary and reasonable administrative charges incurred by the DIP Agents, including, without limitation, syndication expenses, appraisal fees, legal costs of one primary counsel retained by the DIP Agents in consultation with the Borrower (and appropriate local counsel in applicable local jurisdictions, including without limitation, Delaware and Canada and regulatory counsel as needed (and in the event of conflicts, additional primary and local counsel may be retained in consultation with Borrower at the Credit Parties' reasonable expense), reasonable costs and expenses of creating and perfecting Liens in favor of the Administrative Agent, including filing, search and recording fees and taxes and reasonable field examination charges and appraisal charges and expenses and, after the occurrence of an Event of Default, (all expenses of the DIP Lenders in connection with collecting any payment of the Obligations and otherwise enforcing the provisions of the DIP Documents,. |

The Loan Parties shall indemnify and hold harmless the DIP Agents, the DIP Lenders and the Issuing Bank (and their affiliates and their respective officers, directors, partners, trustees, employees, advisors, agents and sub-agents) against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof; provided that the Credit Parties shall have no obligation to indemnify any indemnified person against any such loss, liability cost or expense (x) to the extent they are found by a non appealable final judgment of a court of competent jurisdiction to arise from the gross negligence, or willful misconduct of such indemnified party or (y) to the extent arising from any dispute solely among indemnified persons other than (i) any claims against the DIP Agents or the DIP Lead Arrangers acting in such capacity or in fulfilling such role or any similar role under the DIP Facility and (ii) any

28

claims arising out of any act or omission on the part of the Borrower or its subsidiaries. None of the Credit Parties shall assert any claim against any DIP Agent, Issuing Bank or for special, indirect, consequential or punitive damages.

**Governing Law:** New York and, as applicable, the Bankruptcy Code but excluding any principles of conflict of laws or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York.

## C. Use of Cash Collateral

30.     The Debtors generate cash from the sale of the Debtors' products and the use of the cash pledged under the Prepetition Senior Secured Revolver and the Prepetition First Lien Indenture. The Debtors use Cash Collateral to finance their operations and to make essential payments, such as employee payroll, taxes and maintaining inventory of raw materials. As of August 31, 2011, the Debtors' books reflect a cash balance of approximately $17.3 million. Without the use of Cash Collateral together with the borrowing availability under the DIP Credit Facility, the Debtors will be unable to operate. Pursuant to the Interim Order, and in accordance with the terms of the DIP Credit Facility, the Debtors shall use proceeds of collateral and any Prepetition Secured Parties' Cash Collateral to fund the Debtors' operation of their businesses, and on a final basis, in accordance with the terms of the DIP Credit Facility and the Final Order.

## D. Adequate Protection

31.     The DIP Credit Facility is a senior loan that leaves each of the Debtors' secured claimholders in the same position they were in prior to the Commencement Date. The First Lien Noteholders held a second lien against the ABL Collateral before the chapter 11 cases commenced and will continue to do so after the DIP Credit Facility is established. To offset the cutoff of liens provided by Bankruptcy Code section 552, the Prepetition First Lien Noteholders will obtain the Replacement Liens against the postpetition ABL Collateral that otherwise would

29

not constitute proceeds of the ABL Collateral. Thus, in exchange for authority to use Cash

Collateral and to enter into the DIP Credit Facility, the Debtors shall provide to the Prepetition

First Lien Noteholders (the only party with an interest in the Cash Collateral other than the

Prepetition Revolver Lenders, who are being repaid) Replacement Liens on the postpetition ABL

Collateral pledged to the DIP Agents, which adequate protection liens shall have a priority

immediately junior to the liens granted to the DIP Secured Parties, in an amount equal to the

aggregate diminution in value, if any, of such collateral (collectively, the "Adequate

Protection"), subject to the Carve-Out.

### E. Payment of Interest, Fees and Other Expenses

32. By this Motion, the Debtors also seek authority, but not direction to pay

(a) such amounts as would have come due but for the commencement of these cases to the

Prepetition First Lien Noteholders equal to accrued and unpaid interest owing on the loans

constituting Prepetition First Lien Notes at the non-default rate under the Prepetition First Lien

Indenture,[10] and (b) to the First Lien Group and the Second Lien Group the reasonable and

documented fees and expenses of one primary counsel, one local counsel in Delaware, and one

financial advisor to each of the First Lien Group and Second Lien Group, respectively.

33. At any time during these cases, the Debtors reserve the right to determine

in their sole discretion and business judgment not to remit any of the payments noted above. If

at any time the Debtors notify the First Lien Group and the DIP Administrative Agent that they

do not intend to make any payment described in clause (a) of paragraph 23 above, the Debtors'

authorization to make such payment shall terminate automatically immediately upon the giving

---

[10] The next scheduled payment under the Prepetition First Lien Indenture is $100,668,750.00 on December 31, 2011 and $100,668,750.00 on June 30, 2011.

of such notice. Additionally, in no event shall any payment described in paragraph 23 above be made at any time at which a Default or Event of Default (each as defined in the DIP Agreement) shall have occurred or be continuing (or would be caused by such payment) under the DIP Documents. All payments made pursuant to the foregoing authorizations may be recharacterized as repayment of principal due and outstanding as of the Commencement Date. In respect of payments on account of fees to professionals for the Second Lien Group, the estates do not forfeit their rights to disgorgement if the payments are not ultimately deemed to be made for allowable claims in appropriate amounts.

**Basis for Relief**

A.     **Approval Pursuant to Section 364(c) of the Bankruptcy Code**

    34.     The Debtors propose to obtain financing under the DIP Credit Facility by providing security interests and liens as set forth above pursuant to sections 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . " 11 U.S.C. § 364(c). In satisfying the standards of section 364(c), a debtor need not seek credit from every available source but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. Financing pursuant to section 364(c) of the Bankruptcy Code is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured

31

credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

35.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative expense claim;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores*, 115 B.R. at 37-39; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. at 549.

36.     As set forth in the O'Dowd Declaration, Lazard conducted a marketing process directed at maintaining confidentiality and minimizing disruption of the Debtors' business operations.  *See* O'Dowd Declaration ¶ 5.  Lazard initially identified 5 potential DIP financing sources.  *Id.*  The Debtors signed confidentiality agreements with each of the 5 interested financing sources.[11]  *Id.*  Of these, 3 engaged in active diligence with the Debtors, and submitted proposals.  *Id.*  After exchanging term sheets with each of the 3 prospective postpetition financing sources, initially only JPM engaged in active negotiations with the Debtors.  *Id.* at ¶ 6.  Over roughly a two week period, JPM engaged in extensive diligence and negotiations with the Debtors and their advisors to arrive at the best available offer.  *Id.*  The

---

[11] An additional party reached out to Lazard, met with management, and submitted a proposal, but the proposal was rejected by the Debtors, and no additional conversations ensued.  *Id.*

32

other two interested sources ultimately determined to participate in the proposed facility as co-agents and arrangers. *Id.*

37.     Through these efforts, Lazard assisted the Debtors in reaching the terms of a $600 million DIP Credit Facility (the "DIP Term Sheet") *Id.* at ¶ 9. The DIP Agents entered into a commitment letter to provide postpetition financing upon the terms and conditions set forth in the DIP Term Sheet, and subject to definitive documentation and the commencement of the Debtors' chapter 11 cases prior to October 31, 2011. *Id.* at ¶ 10. After signing the commitment letter, Lazard was approached by 5 additional financing sources. *Id.* at ¶ 11. In each instance, Lazard informed such parties that the Debtors were willing to entertain any reasonable offer presented and would determine whether the terms of that offer were better than the terms agreed to with the DIP Agents in the DIP Term Sheet. *Id.* Only one party submitted a proposal after the Debtors signed the Commitment Letter. *Id.* That proposal was on lesser terms than those set forth in the DIP Term Sheet. *Id.* No other offers or proposals materialized after the signing of the commitment letter. *Id.*

38.     The Debtors did not obtain a proposal for postpetition financing on a junior lien basis in respect of the Debtors' cash, accounts receivable, and inventory, and they could not attract any credit without providing a superpriority claim. *Id.* at ¶ 7. None of the proposals made by other parties were on overall better terms than those proposed by the DIP Agents. *Id.* In fact, each proposal sought superpriority administrative status for its claims, a first priority lien on the Debtors' unencumbered assets, and a senior lien on the ABL Collateral. *Id.* In addition, some proposals sought a superpriority lien on the Fixed Collateral. *Id.*

33

**B.      The Postpetition Liens Securing the
         DIP Credit Facility Do Not Prime Existing Lienholders**

39.      Section 364(d)(1) of the Bankruptcy Code, provides that after notice and a

hearing, the Court may authorize the obtaining of credit or the incurring of debt secured by a

senior or equal lien on property of the estate that is subject to a lien only if—

> (a)      the trustee is unable to obtain credit otherwise; and
>
> (b)      there is adequate protection of the interest of the holder of the lien
>          on the property of the estate on which such senior or equal lien is
>          proposed to be granted.

11 U.S.C. § 364(d).

40.      As of the Commencement Date, the Debtors' obligations arising under the

Prepetition First Lien Notes are secured by a second lien in favor of the Prepetition First Lien

Noteholders against the ABL Collateral and a first lien against the Debtors' Fixed Collateral.

The Prepetition First Lien Noteholders' second lien is junior to a first lien against the ABL

Collateral securing the obligations under the Prepetition Senior Secured Revolver.  Pursuant to

the proposed DIP Credit Facility, the proceeds of the DIP Term Loan Facility will be used

immediately to repay the Prepetition Senior Secured Revolver.  The liens on the ABL Collateral

currently securing the Debtors' obligations under the Prepetition Senior Secured Revolver will

be released, and the Debtors will simultaneously grant new liens against the ABL Collateral to

the DIP Lenders to secure the Debtors' obligations under the DIP Credit Facility.  The newly

granted liens against the ABL Collateral will have the exact same priority on the ABL Collateral

as did the liens securing the repaid Prepetition Senior Secured Revolver.  Accordingly, the First

Lien Noteholders start and end with a second lien against the ABL Collateral, and the liens

granted to the DIP Lenders under the DIP Credit Facility do not impact the relative priority of

the Prepetition First Lien Noteholders' liens against the ABL Collateral.  Also, the second lien

securing the Prepetition First Lien Notes has always been subject and subordinate to any advances under and amendments of the Prepetition Senior Secured Revolver that the holders thereof made. Therefore, the prepetition contractual rights of the Prepetition First Lien Noteholders are not impacted at all. Nonetheless, out of an abundance of caution, and because the DIP Lenders have required that the Debtors seek this relief, the proposed Interim Order approving the DIP Credit Facility invokes section 364(d) of the Bankruptcy Code to ensure that the liens the Debtors propose to grant to secure the DIP Credit Facility are senior to the liens of the Prepetition First Lien Noteholders. Although the Prepetition Senior Secured Revolver will be taken out with the first funds advanced under the DIP Credit Facility, the overall transaction, including the granting of liens, is approved before the actual repayment of the Prepetition Senior Secured Revolver. Nevertheless, the substance of the transaction does not prejudice the First Lien Noteholders, for the reasons stated above. Accordingly, the First Lien Noteholders are adequately protected as section 364(d) requires, for the reasons explained more fully in the accompanying Memorandum of Law.

C.     **No Comparable Alternative to the DIP Credit Facility is Currently Available**

41.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). As noted above, the Debtors, through Lazard, contacted a number of, and received a number of unsolicited proposals from, potential financing sources. *See* O'Dowd Declaration ¶ 5. None of the proposals made were on terms as beneficial to the Debtors as the terms of the DIP Credit Facility. *Id.* at ¶ 7.

35

42.     First, the proposed DIP Credit Facility will replace the Prepetition Senior Secured Revolver and provide the Debtors with the liquidity they need to operate successfully. *See* Epstein Declaration ¶ 5. The DIP Credit Facility provides the Debtors with up to $600 million in availability, whereas the other proposals received by the Debtors sought to provide only up to $500 million in commitments, serving merely as a replacement of the Debtors' existing Prepetition Senior Secured Revolver. *Id.* This enhancement of the Debtors' current available financing will augment the Debtors' ability to instill confidence in their various creditor constituencies in the continued operation of their businesses during these cases, including customers, raw material vendors, employees, and service providers. *Id.*

43.     Second, the DIP Credit Facility provides the Debtors with a $250 million term loan to be used to pay down the obligations under the Prepetition Senior Secured Revolver on the first day of its availability and to provide the Debtors with sufficient cash to pay the Debtors' employees, vendors, and shippers to the extent necessary to maintain optimal performance of the Debtors' operations in chapter 11. *Id.* The Debtors believe the obligations under the Prepetition Senior Secured Revolver are valid fully secured claims. However, nothing in this transaction would prevent disgorgement if it is determined to be invalid in whole or part after a challenge is successfully brought in accordance with the terms of the DIP Orders. Additionally, repayment of the Prepetition Senior Secured Revolver was required by the DIP Agents as a condition of their agreement to provide the DIP Credit Facility.

44.     Third, unlike the other proposals the Debtors received, the DIP Credit Facility replicates the prepetition capital structure and thus does not impose greater or different risk upon prepetition secured creditors. *Id.* By providing for the immediate satisfaction in full of the Prepetition Senior Secured Revolver, and the granting to the DIP Lenders of a first priority

36

lien against only the Debtors' unencumbered assets and ABL Collateral, and junior liens on the Debtors' Fixed Collateral, the DIP Lenders will effectively step into the shoes of the Prepetition Revolver Lenders, provide additional cash availability to the Debtors, and not diminish the Prepetition First Lien Noteholders' or Second Lien Noteholders' relative rights in the Prepetition Collateral. *Id.* By contrast, other proposals received sought to use certain baskets under the Prepetition First Lien Indenture to provide additional liquidity through a superpriority security interest in, and lien against, the Debtors' Fixed Collateral. *Id.*

45.     Fourth, the DIP Agents have agreed to infuse new funding and to take the full risk of syndicating the DIP Credit Facility. *Id.* Having a fully underwritten facility is demonstrative of the DIP Agents' commitment to the Debtors and provides substantial benefits for the Debtors' reorganization efforts. *Id.*

46.     Fifth, all the terms of the DIP Credit Facility convinced the Debtors that the DIP Credit Facility is superior to all other proposals received in almost all material respects. *Id.*

47.     Thus, the Debtors submit the requirements of sections 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was otherwise unavailable to the Debtors is satisfied.

**D.     The DIP Credit Facility Terms are Fair, Reasonable and Adequate**

48.     The DIP Credit Facility provides the Debtors with sufficient working capital and liquidity on suitable terms to permit the Debtors to accomplish a successful restructuring and to emerge from chapter 11. The proposed terms of the DIP Credit Facility are fair, reasonable and adequate given today's market and the facts of these cases.

37

49.     The repayment of the Prepetition Senior Secured Revolver should be approved, where, as is the case here (a) failure to obtain approval of the DIP Credit Facility would cause immediate and irreparable harm; (b) the DIP Agents' required inclusion of the repayment as a condition to providing the DIP Credit Facility; (c) the repayment is not a defensive "roll up" where prepetition lenders are attempting to convert their prepetition debt into postpetition debt; (d) the DIP Agents have agreed to refinance the Debtors' Prepetition Senior Secured Revolver and provide significant incremental liquidity to the Debtors; (e) the Prepetition Senior Secured Revolver is oversecured; and (f) the DIP Agents represent only a portion of the lenders under the Prepetition Senior Secured Revolver and thus, if the Prepetition Revolver Lenders were not fully satisfied, the balance of control would be in different hands under each of the respective facilities, which would add to the risk inherent in the financing. Moreover, repayment of the Prepetition Senior Secured Revolver saves the estate default interest and compound interest on that debt.

E.     **The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e).**

50.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on postpetition loans extended to a debtor, and its right in any lien securing those loans, even if the order allowing the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. *See* 11 U.S.C. § 364(e). Section 364(e) provides that: "The reversal or modification on appeal of an authorization under this section 364 of the Bankruptcy Code to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the

38

appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e).

51.     As explained in detail herein and in the O'Dowd Declaration, the terms and conditions of the DIP Credit Facility were negotiated in good faith and at arm's length among the Debtors, the DIP Agents, the DIP Lenders, and each of their respective advisors. *See* O'Dowd Declaration ¶ 8. The process was full and fair, comprehensive, and produced the best available financing option given the circumstances. *Id.* No consideration is being provided to any party to the DIP Credit Facility other than as described in the Motion and as supplemented by the Fee Letters (as defined below). *Id.* Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

F.     **The Debtors Should be Authorized to Pay the Fees Required by the Lenders and Honor Obligations Under the Commitment Letter.**

52.     Prior to the Commencement Date, the Debtors entered into a commitment letter, which formalized the DIP Agents' commitments to syndicate the DIP Credit Facility. As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agents in exchange for their commitments under the DIP Credit Facility and their roles in arranging and administering the DIP Credit Facility. As was required by the DIP Agents, the Debtors agreed to keep such fees confidential. The Debtors have filed with the Court a separate motion seeking to file under seal copies of certain letter agreements providing for the various fees the Debtors agreed to pay (the "Fee Letters") and will share the full terms of the Fee Letters with the United States Trustee for the District of Delaware. Based on current expectations, the aggregate fees estimated to be incurred in connection with the DIP Credit Facility are an amount equal to approximately 4% of the commitments under the DIP Credit Facility.

39

53.     The fees the Debtors have agreed to pay to the DIP Agents and other

obligations under the DIP Agreements represent the most favorable terms on which the Lenders

would agree to make the DIP Credit Facility available. The Debtors considered the fees

described above when forming their business judgment that the DIP Documents constituted the

best terms on which the Debtors could obtain the postpetition financing necessary to continue

their operations and prosecute their chapter 11 cases.

54.     Courts routinely authorize debtors to pay fees similar to those the Debtors

propose to pay, where the associated financing is, in the debtor's business judgment, beneficial

to the debtors' estates. *See, e.g., In re Aleris Int'l, Inc.,* No. 09-10478 (BLS) (Bankr. D. Del.

Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's

initial commitment); *In re Dura Auto. Sys., Inc.,* No. 06-11202 (KJC) (Bankr. D. Del. Jan. 30,

2008) (approving a 2.5% fees related to refinancing and extending a postpetition financing

facility); *see also In re Great Atl. & Pac. Tea Co.,* Case No. 10-24549 (RDD) (Bankr. S.D.N.Y.

Jan. 11, 2011) (approving 3% letter of credit fee); *In re InSight Health Servs. Holdings Corp.,*

Case No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.0% DIP closing fee); *In*

*re NR Liquidation III Co. (f/k/a Neff Corp.),* Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June

30, 2010) (approving 3.1% DIP and exit facility fee); *In re The Reader's Digest Assoc.,* No. 09-

23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3% exit fee), *In re Lear Corp.,* No. 09-

14326 (ALG) (Bankr. S.D.N.Y. August 4, 2009) (approving 5.0% up front fee and a 1.0%

exit/conversion fee); *In re Gen. Growth Props., Inc.,* No. 09-11977 (ALG) (Bankr. S.D.N.Y.

May 14, 2009) (approving 3.75% exit fee); *In re Tronox Inc.,* No. 09-10156 (ALG) (Bankr.

S.D.N.Y. Feb. 9, 2009) (approving an up-front 3% facility fee).  Accordingly, the Court should

40

authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

### G. Use of Cash Collateral

55. Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[12] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

56. Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code. Specifically, a trustee or debtor in possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A) each entity that has an interest in such collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [section 363 of the Bankruptcy Code].

11 U.S.C. § 363(c)(2).

---

[12] Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

41

57.     For each of the reasons set forth in the Memorandum of Law, the Debtors submit that, under the circumstances of these cases, their request to use Cash Collateral should be approved.

**H.      Payment of Interest, Fees & Expenses to the Prepetition Secured Parties**

58.     The Debtors also seek authority, but not direction to pay (a) such amounts as would have come due but for the commencement of these cases to the Prepetition First Lien Noteholders equal to all accrued and unpaid interest owing on the loans constituting Prepetition First Lien Notes at the non-default rate under the Prepetition First Lien Indenture, and (b) to the First Lien Group and the Second Lien Group the reasonable and documented fees and expenses of one primary counsel, one local counsel in Delaware, and one financial advisor to each of the First Lien Group and Second Lien Group, respectively. All such payments would be subject to recharacterization as repayment of principal due and outstanding as of the Commencement Date.

59.     For each of the reasons set forth in the Memorandum of Law, the Debtors submit that authority to pay in the Debtors' discretion, interest, fees, and expenses in the manner set forth above, will not only allow the Debtors to avoid default interest and compound interest claims when they have sufficient liquidity, but also provide the Debtors with a meaningful tool for facilitating a consensual reorganization with the Prepetition Secured Parties, whose liens encumber virtually all property of the estates.

**I.      The Section 506(c) Waiver in the Final Order Should Be Approved**

60.     The Final DIP Order shall provide that except to the extent of the Carve Out (as defined above), no claim may be asserted against any of the DIP Agents, the Lead Arrangers or the DIP Secured Parties (as defined in the DIP Orders), each in their capacity as such, to charge any expenses of administration of these cases or any future proceeding that may

42

result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, against the DIP Collateral or recover such expenses from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Administrative Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Agent or the DIP Secured Parties.

61.     Such waivers and provisions are standard and customary under financings between sophisticated parties.  As one court noted in discussing the enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)."  *In re Molten Metal Tech., Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000).  *See also In re Nutri/System of Fla. Assocs.*, 178 B.R. 645, 649 (E.D. Pa. 1995) (noting that debtor had waived section 506(c) rights in obtaining debtor in possession financing); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 549 (Bankr. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

**J.     Modification of Automatic Stay.**

62.     The DIP Agreement contemplates a modification of the automatic stay to the extent applicable and necessary, to permit the parties to implement the terms of the DIP Orders and, upon the occurrence and during the continuance of an Event of Default, to exercise all rights and remedies in the DIP Agreement as set forth in the Interim Order.  Provisions of this kind are standard in debtor in possession financing and are reasonable under the circumstances. However, the DIP Agent must provide the Debtors and various other parties, including the U.S.

43

Trustee, with five (5) business days written notice prior to exercising any foreclosure rights in respect of the DIP Collateral and/or the right to use Cash Collateral.

**K.     The Debtors Require Immediate Access**
**to the Cash Collateral and DIP Facility.**

63.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

64.     In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores,* 115 B.R. at 37-38; *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985). Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate. Moreover, courts in this jurisdiction have granted similar relief in other chapter 11 cases. *See e.g., In re Corrozi-Fountainview, LLC,* Case No. 10-11090 (KG) (Bankr. D. Del. June 6, 2011) [Docket No. 172]; *In re Ambassadors Int'l, Inc.,* Case No. 11-11002 (KG) (Bankr. D. Del. Apr. 28, 2011) [Docket No. 160]; *In re Atrium Corp.,* Case No. 10-10150 (BLS) (Bankr. D. Del. Mar. 18, 2010) [Docket No. 400]; *In re Constar Int'l Inc.,* Case No. 11-10109 (CSS) (Bankr. D. Del Mar. 10, 2011) [Docket No. 258]; *In re Appleseed's Intermediate Holdings LLC,* Case No. 11-10160 (KG) (Bankr. D. Del. Feb. 23,

44

2011) [Docket No. 315]; *In re ACG Holdings, Inc.,* Case No. 08-11467 (CSS) (Bankr. D. Del. Jul. 16, 2008) [Docket No. 40]; *In re Hilex Poly Holding Co.,* Case No. 08-10890 (KJC) (Bankr. D. Del. May 31, 2008) [Docket No. 139]; *In re Holley Performance Prods. Inc.,* Case No. 08-10256 (PJW) (Bankr. D. Del. March 5, 2008) [Docket No. 108]; *In re Remy Worldwide Holdings, Inc.,* Case No. 07-11481 (KJC) (Bankr. D. Del. Oct. 10, 2007) [Docket No. 39]; *In re Foamex Int'l Inc.,* Case No. 05-12685 (PJW) (Bankr. D. Del. Oct. 18, 2005) [Docket No. 197.

65.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including the authorization of the Debtors to use Cash Collateral and to borrow up to $495 million under the DIP Credit Facility, is not granted promptly after the Commencement Date. The Debtors have no material source of liquidity other than the DIP Credit Facility. Substantially all the Debtors' cash on hand is subject to the dominion of the Prepetition Priority Parties.

66.     The proposed DIP Credit Facility is critical to ensuring the Debtors will be able to meet their payroll and vendor obligations without interruption. As explained in greater detail in the Epstein Declaration, the DIP Credit Facility will be used to provide liquidity for working capital and other general corporate purposes of the Debtors. *See* Epstein Declaration ¶ 4. The Debtors comprise a $3 billion company. On a daily basis, the Debtors spend $10.7 million in vendor, wages, and other operational obligations. In return, on a daily basis, the Debtors' generate $12.7 million in realized receivables. Accordingly, the Debtors move approximately $23.4 million in cash daily. Without the DIP Credit Facility and use of Cash Collateral the Debtors will not be able to operate as a going concern and will suffer immediately.

67.     In addition to allowing the Debtors to meet vendors' demands immediately, a fully committed DIP Credit Facility demonstrates to suppliers that the Debtors

45

have the liquidity and ability to satisfy postpetition liabilities and will encourage them to provide

trade credit. Accordingly, the approval of the DIP Credit Facility will substantially enhance the

Debtors' ability to instill confidence in their various constituencies constituting their lifelines,

including customers, raw material vendors, employees, and service providers, allowing the

Debtors to, among other things, continue operating their businesses, thereby preserving and

enhancing value for the benefit of all stakeholders.

### L.      Notice Procedures and the Final Hearing

68.      Pursuant to Local Rule 4001-2(c), the Final Order may only be entered

after notice and a hearing and the Debtors may not schedule a hearing to consider the Final Order

until at least seven (7) days after the organizational meeting of the creditors' committee. The

Debtors respectfully request that the Court schedule the Final Hearing on this Motion no later

than 30 days after the date of entry of the Interim Order, as the DIP Lenders' commitment will

terminate unless the Final Order is entered within 45 days of entry of the Interim Order. Such

relief is necessary to maintain ongoing operations and to avoid immediate and irreparable harm

and prejudice to the Debtors' respective estates. The Debtors shall, within three (3) business

days of the entry of the Interim Order by the Court, serve by overnight mail, a copy of the

Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to consider entry of

the Final Order on the date established by the Court.

69.      Any party in interest objecting to the relief sought at the Final Hearing

shall serve and file objections, which objections shall: (i) be in writing; (ii) conform to the

Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the United States

Bankruptcy Court for the District of Delaware by 4 p.m. on the day that is no less than five (5)

business days before the Final Hearing (the "Objection Deadline") and (iv) be served upon the

46

following parties so as to be received by the Objection Deadline: (a) counsel to the Debtors, (i) Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Martin J. Bienenstock, Esq.; Judy G.Z. Liu, Esq.; and Philip M. Abelson, Esq.; and (ii) Pachulski, Steng, Ziehl, & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Laura Davis Jones, Esq. (b) NewPage Corporation, 8540 Gander Creek Drive, Miamisburg, Ohio 45342, Attn: Douglas Cooper, Esq. (c) The Office of United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801; (d) counsel to JPMorgan Chase Bank, N.A., as DIP Administrative Agent under the DIP Agreement, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall Huebner, Esq.; (e) Barclays Capital, as Syndication Agent under the DIP Agreement, 745 Seventh Avenue, 20th Floor, New York, NY 10019, Attention: Joel S. Moss, Esq.; (f) counsel to Wells Fargo Capital Finance LLC, as administrative agent for the Prepetition Senior Secured Revolver, Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169, Attn: Jonathan Helfat, Esq. and Daniel Fiorillo, Esq.; (g) counsel to Bank of New York Mellon, as indenture trustee for the Prepetition First Lien Notes, Emmet, Marvin & Martin, LLP, 120 Broadway, 32nd Floor, New York, New York 10271, Elizabeth Frayer, Esq. and Elizabeth Clark, Esq.; (h) counsel to HSBC Bank USA, National Association, as indenture trustee for (i) Prepetition Second Lien Fixed Rate Notes, (ii) the Prepetition Second Lien Floating Rate Notes, (iii) the Prepetition Senior Unsecured Notes, (iv) the NewPage Holding PIK Notes, and (v) the NewPage Group PIK Notes, Pryor Cashman LLP, 7 Times Square, New York, New York 10036, Attn: Michael Fruchter, Esq. and Sean Connery, Esq.; (j) counsel to the Second Lien Group, Akin Gump Strauss Hauer & Feld, LLP, One Bryant Park, New York, NY 10036, Attn: Ira S. Dizengoff, Esq. and Philip Dublin, Esq.; (k) counsel to the First Lien Group, Milbank, Tweed,

Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY 10005, Attn: Dennis Dunne, Esq.; and (l) counsel to any statutory committee appointed in these chapter 11 cases.

## NOTICE

70.      Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to JPMorgan Chase Bank, N.A., as Administrative Agent for the proposed debtor in possession financing; (c) counsel to Wells Fargo Capital Finance LLC, as administrative agent for the Prepetition Senior Secured Revolver; (d) counsel to Bank of New York Mellon, as indenture trustee for the Prepetition First Lien Notes; (e) counsel to HSBC Bank USA, National Association, as indenture trustee for (i) Prepetition Second Lien Fixed Rate Notes, (ii) the Prepetition Second Lien Floating Rate Notes, (iii) the Prepetition Senior Unsecured Notes, (iv) the NewPage Holding PIK Notes, and (v) the NewPage Group PIK Notes; (f) Akin Gump Strauss Hauer & Feld, LLP, counsel to the Second Lien Group; (g) Milbank, Tweed, Hadley & McCloy LLP, counsel to the First Lien Group; and (h) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis; (k) the taxing authorities with jurisdiction over the Debtors' assets as of the Commencement Date; and (l) those parties known to have asserted a lien against the Debtors' assets. The Debtors submit that, under the circumstances, no other or further notice is required.

DOCS_DE:172865.1 59998-001

## Conclusion

WHEREFORE the Debtors respectfully request (i) entry of an order substantially in the form of the proposed Interim Order annexed hereto as Exhibit A; (ii) after the Final Hearing, entry of the Final Order substantially in the form that shall be filed with the Court; and (iii) such other and further relief as is just.

Dated: ___9/7___, 2011
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Michael R. Seidl (Bar No. 3889)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302.652.4100
Facsimile: 302.652.4400

-and-

Martin J. Bienenstock
Judy G.Z. Liu
Philip M. Abelson
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333
*Proposed Attorneys for the Debtors and Debtors in Possession*

49