IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                                            :
*In re*                                     :   Chapter 11
                                            :
NEWPAGE CORPORATION, *et al.*,              :   Case No. 11-12804 (KG)
                                            :
Debtors.[1]                                 :   Jointly Administered
                                            :
------------------------------------------------------------x

> Objection Deadline: September 27, 2011 at 4:30 p.m. (prevailing Eastern time)
> Hearing Date: October 4, 2011 at 2:00 p.m. (prevailing Eastern time)

### DEBTORS' APPLICATION, PURSUANT TO BANKRUPTCY CODE SECTIONS 327(a) AND 328(a), BANKRUPTCY RULE 2014(a), AND LOCAL RULE 2014-1, FOR AUTHORIZATION TO EMPLOY AND RETAIN DEWEY & LEBOEUF LLP AS ATTORNEYS FOR THE DEBTORS, *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

NewPage Corporation ("NewPage") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively with NewPage, the "Debtors") in the above captioned cases, submit this application (the "Application") for an order pursuant to sections 327(a) and 328(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), approving the employment and retention of Dewey & LeBoeuf LLP ("D&L") as their attorneys, under a general retainer, in connection with the commencement and prosecution of their chapter 11 cases (the "Chapter 11 Cases"), *nunc pro tunc* to the date on which the Debtors commenced these cases. This Application is supported by the *Affidavit of Philip M. Abelson in Support of Debtors' Application, Pursuant to Bankruptcy Code Sections 327(a) and 328(a), Bankruptcy*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Chillicothe Paper Inc. (6154), Escanaba Paper Company (5598), Luke Paper Company (6265), NewPage Canadian Sales LLC (5384), NewPage Consolidated Papers Inc. (8330), NewPage Corporation (6156), NewPage Energy Services LLC (1838), NewPage Group Inc. (2465), NewPage Holding Corporation (6158), NewPage Port Hawkesbury Holding LLC (8330), NewPage Wisconsin System Inc. (3332), Rumford Paper Company (0427), Upland Resources, Inc. (2996), and Wickliffe Paper Company LLC (8293). The Debtors' corporate headquarters is located at 8540 Gander Creek Drive, Miamisburg, OH 45342.

*Rule 2014(a), and Local Rule 2014-1, for Authorization to Employ and Retain Dewey & LeBoeuf LLP as Attorneys for the Debtors, Nunc Pro Tunc to the Commencement Date* (the "Abelson Affidavit"), attached hereto as Exhibit A. In further support of this Application, the Debtors respectfully represent:

## Background

1. On September 7, 2011 (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

2. On September 8, 2011, this Court entered an order authorizing the joint administration of the Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Jurisdiction and Venue

3. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Debtors' Businesses

### A. The Company's Organization

4. The Debtors and their non-debtor subsidiaries and affiliates (the "Company") comprise the largest coated paper manufacturer in North America, based on production capacity. NewPage Group Inc. owns 100% of the common stock of NewPage

2

Holding Corporation, which in turn owns 100% of the common stock of NewPage. NewPage is the Company's primary operating subsidiary and directly and indirectly owns the other Debtors (the "Subsidiary Debtors") and various other affiliated non-debtor entities. The Subsidiary Debtors primarily own and operate the various paper mills in the United States. On September 9, 2011, non-debtor NewPage Port Hawkesbury Corp. ("NPPH"), which contemporaneously commenced proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Supreme Court of Nova Scotia, in Halifax, Nova Scotia, Canada (the "Canadian Court," and the filing, the "Canadian Proceeding"), primarily owns and operates a mill in Canada and manages the Debtors' Canadian operations.

### B. The Company's Business

5. Headquartered in Miamisburg, Ohio, the Company's mills primarily produce coated paper, which, unlike common writing or typing paper, is typically used in magazines, magazine covers and inserts, corporate annual reports, high-end advertising brochures, direct mail advertising, coated labels, catalogs, and textbooks. While the Company also manufactures supercalendered paper, uncoated paper, specialty labels, and newsprint, coated paper represented approximately 80% of its net sales for the year ended December 31, 2010.

*Manufacturing*

6. The Company operates 16 papermaking machines at paper mills located in Kentucky, Maine, Maryland, Michigan, Minnesota, and Wisconsin, with distribution centers near major print markets, including New York, Chicago, Minneapolis, and Atlanta. As of June 30, 2011, the Company had production capacity of approximately 3.6 million short tons (one short ton equals 2,000 pounds) of paper, including approximately 2.9 million short tons of coated paper, approximately 500,000 short tons of uncoated paper, and approximately 200,000 short tons of specialty paper.

3

*Sales, Marketing, and Distribution*

7.   The Company sells paper products primarily in the United States and Canada, using three sales channels: (a) direct sales, which consist of sales made directly to end-use customers (primarily large companies such as publishers, printers, and retailers); (b) merchant sales, which consist of sales made to paper merchants and brokers, who in turn sell to end-use customers; and (c) specialty sales, which consist of sales made to packaging and label manufacturers. As part of its distribution chain, the Company owns one warehouse, leases space in approximately 35 warehouses, and uses third parties to ship its products by truck and rail.

## **Events Leading To Chapter 11**

8.   Several factors contributed to the commencement of these chapter 11 cases. As with any business, the Debtors' financial performance depends primarily on the demand for its products and the prices at which they can be sold. In the last few years, the Debtors have seen a significant decline in the North American demand for coated paper and, although this decline has impacted many of the markets for the Debtors' key products, it has yet to result in a counterbalancing decrease in the production capacity trying to access those markets.

9.   This decrease in demand has stemmed from a number of factors. These include a general decrease in both advertising spending and magazine/catalog circulation driven largely by the current unrest in the global economy and the preceding "great recession"; increases in the use of electronic data transmission and storage; continued expansion of the Internet as a medium for numerous advertising and marketing applications; an increased demand for electronic reading material; and increased postal rates. These factors have contributed to substantial price competition and volatility in the pulp and paper industry.

10.   In addition, despite the decline in North American demand, foreign imports from Europe and Asia, driven by similar overcapacity in their own markets, continue to

have a negative impact on North American coated paper suppliers. This has led to significant levels of market-related downtime and temporary shutdowns, especially during 2008 and 2009.

11. Finally, the rising costs of raw materials, including significant increases in energy, fuel and chemical costs, have also negatively impacted the Debtors' financial performance, liquidity and stability. These market factors, exacerbated by the Debtors' relatively high level of structured debt, have resulted in the Debtors seeking chapter 11 protection despite their ability to generate significant levels of EBITDA and unlevered cash flow.

12. By the second quarter of 2011, the Debtors' liquidity position became severely constrained. As a result, the Debtors began to consider various restructuring alternatives, and after considering all available options, the Debtors concluded that seeking chapter 11 relief would be in their best interests, as well as those of their creditors and other parties in interest.

13. As of July 31, 2011, the Company's aggregate workforce consisted of approximately 6,000 employees, of which approximately 70% are represented by labor unions. As of June 30, 2011, the Company's unaudited consolidated balance sheet reflected total assets of approximately $3.4 billion and total liabilities of approximately $4.2 billion. For the quarter ended June 30, 2011, the Company reported total gross revenue of approximately $888 million and Adjusted EBITDA of $32 million.

**Relief Requested**

14. Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1, the Debtors seek the Court's approval of the employment and retention of D&L, as their general bankruptcy counsel, *nunc pro tunc* to the Commencement Date, to perform the legal services required during the Chapter 11 Cases, in accordance with D&L's normal hourly rates and reimbursement policies in effect when services

5

NY5 5007397.12

are rendered. The Debtors request that the Court approve the employment of D&L in accordance with the terms and conditions set forth in this Application and the Abelson Affidavit.

**Basis for Relief Requested**

15. Pursuant to section 327(a) of the Bankruptcy Code, a debtor in possession is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor in possession] in carrying out [its] duties under [the Bankruptcy Code.]" 11 U.S.C. § 327(a). Section 1107(b) of the Bankruptcy Code modifies section 101(14) (definition of "disinterested person") and section 327(a) of the Bankruptcy Code in chapter 11 cases, by providing "a person is not disqualified for employment under section 327 of [the Bankruptcy Code] by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).

16. Under section 328(a) of the Bankruptcy Code, with the Court's approval a debtor in possession may employ professional persons under section 327(a) of the Bankruptcy Code "on any reasonable terms and conditions of employment, including on retainer, on an hourly basis, on a fixed or percentage basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Pursuant to section 329(a) of the Bankruptcy Code, "an attorney representing a debtor . . . shall file with the court a statement of compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation." 11 U.S.C. § 329(a).

17. As required by Bankruptcy Rule 2014(a), this Application sets forth the following: (a) the specific facts showing the necessity for D&L's employment, (b) the reasons for the Debtors' selection of D&L as their attorneys in connection with these chapter 11 cases,

6

(c) the professional services to be provided by D&L, (d) the arrangement between the Debtors and D&L with respect to D&L's compensation, and (e) to the best of the Debtors' knowledge, the extent of D&L's connections, if any, to certain parties in interest in these chapter 11 cases.

### Retention of D&L is Warranted

18. The Debtors understand that Martin J. Bienenstock, Judy G.Z. Liu, and Philip M. Abelson, each a member of D&L, as well as other members of, counsel to, and associates of D&L who will be employed in these chapter 11 cases, are members in good standing in the jurisdictions in which such attorneys are admitted. Mr. Bienenstock, Ms. Liu, and Mr. Abelson have each been granted *pro hac vice* admission to appear before this Court in connection with the Debtors' chapter 11 cases.

19. The Debtors have selected D&L as their attorneys because of D&L's knowledge of the Debtors' businesses and financial affairs, and D&L's extensive experience and knowledge in, among other areas, business restructurings under chapter 11 of the Bankruptcy Code. D&L and its members currently represent, and have represented, debtors and creditors in multiple large and complex chapter 11 cases, including cases pending in this district.

20. D&L has represented the Debtors since December 2, 2010 in connection with the Debtors' restructuring efforts. Since that time, D&L, working together with Pachulski Stang Ziehl & Jones LLP, as local counsel to the Debtors, was primarily responsible for the preparation of the chapter 11 petitions, initial motions, and applications relating to the Debtors' chapter 11 cases and their commencement. During the course of this representation, D&L has become intimately familiar with the Debtors' businesses, financial affairs, capital structure, and restructuring alternatives. Accordingly, D&L has the necessary background to deal effectively with the potential legal issues and problems that may arise in the context of the Debtors' chapter

7

11 cases and restructuring efforts. The Debtors believe D&L is both well qualified and able to represent them in their chapter 11 cases.

## Scope of Services

21. The employment of D&L under a general retainer is appropriate and necessary to enable the Debtors to execute their duties as debtors and debtors in possession and effect their restructuring efforts. Subject to further order of this Court, it is proposed that D&L be employed to render the following professional services:

    a. advise the Debtors in connection with the legal aspects of a financial restructuring under chapter 11;

    b. prepare on behalf of the Debtors, as debtors in possession, all necessary motions, applications, answers, orders, reports, and other papers in connection with the administration of the Debtors' estates;

    c. take all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions on the Debtors' behalf, the defense of any actions commenced against the Debtors, the negotiation of disputes in which the Debtors are involved, and the preparation of objections to claims filed against the Debtors' estates;

    d. take all necessary actions, including to negotiate and prepare on behalf of the Debtors, a plan or plans and related disclosure statement(s) and all related documents, and such further actions as may be required in connection with the administration of the Debtors' estates; and

    e. perform all other necessary legal services in connection with the prosecution of these chapter 11 cases.

22. It is necessary for the Debtors to employ D&L under a general retainer to render the foregoing professional services, and the Debtors submit a retainer is appropriate here. Therefore, the Debtors have requested that D&L perform the services set forth herein and, subject to this Court's approval of this Application, D&L has stated its desire, willingness, and

8

NY5 5007397.12

ability to act in these Chapter 11 Cases and to render the necessary professional services as attorneys for the Debtors.

### D&L's Disinterestedness

23. To the best of the Debtors' knowledge, the members of, counsel to, and associates of, D&L do not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest, or their respective attorneys and accountants, except as may be set forth in the Abelson Affidavit.

24. In view of the foregoing, the Debtors submit that D&L is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

### Compensation of D&L

25. The Debtors understand that D&L intends to apply to the Court for allowances of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and orders of this Court and guidelines established by the Office of the United States Trustee (the "Guidelines")

26. Prior to the Commencement Date, D&L received certain amounts (as set forth in the Abelson Affidavit) from the Debtors as compensation for professional services relating to the potential restructuring of the Debtors' financial obligations and additional amounts for the reimbursement of reasonable and necessary expenses incurred in connection therewith. D&L also has received retainer fees and advances against expenses for services to be performed in the preparation for and prosecution of these chapter 11 cases, in the amount of approximately $3.5 million, as disclosed in the Abelson Affidavit.

27. D&L will seek interim and final allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, applicable Bankruptcy Rules, and Local Rules, and any procedures as may be fixed by order of the Court.

28. The Debtors respectfully request that all fees and related costs and expenses incurred by the Debtors on account of services rendered by D&L in these cases be paid as administrative expenses of the estates pursuant to sections 328, 330(a), 331, 503(b), and 507(a)(1) of the Bankruptcy Code. Subject to this Court's approval, D&L will charge for its legal services on an hourly basis in accordance with its ordinary and customary hourly rates in effect on the date such services are rendered, subject to sections 328(a) and 330 of the Bankruptcy Code. The current hourly rates charged by D&L for professionals and paraprofessionals expected to be employed on this matter are provided below:

| **Billing Category** | **Range** |
|---|---|
| Partners | $700-$1,000 |
| Counsel | $675 |
| Associates | $385-$650 |
| Paraprofessionals | $200-295 |

29. These hourly rates are subject to periodic adjustments to reflect economic and other conditions. D&L will maintain detailed records of actual and necessary costs and expenses incurred in connection with the legal services described above. D&L reserves its right to file an application for allowance of an enhanced fee award at the end of these cases.

30. Pursuant to section 328(a) of the Bankruptcy Code, the Debtors may retain D&L on any reasonable terms and conditions. The Debtors, subject to the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any orders of this Court, propose to pay D&L its customary hourly rates for services rendered that are in effect from time to time,

as set forth in the Abelson Affidavit, and to reimburse D&L according to its customary reimbursement policies, and respectfully submit that such rates and policies are reasonable.

31. The Debtors understand that D&L is customarily reimbursed for all expenses incurred in connection with the representation of a client in a given matter, including, but not limited to, photocopying services, printing, delivery charges, filing fees, postage, and computer research time.

32. The Debtors further submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors, their estates, their creditors, and all parties in interest and should be granted in all respects.

## Notice

33. No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided by facsimile, electronic mail transmission, overnight delivery and/or hand delivery to the following parties: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to JPMorgan Chase, N.A., as administrative agent for the proposed debtor in possession financing; (iii) counsel to Wells Fargo Capital Finance LLC, as administrative agent for the prepetition senior secured revolver; (iv) counsel to Bank of New York Mellon, as indenture trustee for the 11.375% senior secured first-lien notes due 2014; (v) counsel to HSBC Bank USA, National Association, as indenture trustee for (a) the 10% fixed rate senior secured second lien notes due 2012, (b) the floating rate senior secured second lien notes due 2012, (c) the 12% senior unsecured subordinated notes due 2013, (d) the floating rate senior unsecured PIK notes due 2013, and (e) the floating rate senior unsecured PIK notes due 2015; (vi) counsel to the informal group of certain holders of the 10% fixed rate senior secured second lien notes and floating rate senior secured second lien notes; (vii) counsel to the *ad hoc* steering committee of certain holders of 11.375% senior secured first lien notes; (viii) those

creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis), and (ix) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b). The Debtors submit that no other or further notice need be provided.

WHEREFORE the Debtors respectfully request an order (i) approving the employment and retention of D&L as their attorneys, under a general retainer, *nunc pro tunc* to the Commencement Date, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: September 20, 2011

                NewPage Corporation
                (for itself and on behalf of its affiliated debtors and debtors in possession)

                /s/ George F. Martin
                George F. Martin
                President and CEO

NY5 5007397.12