## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x

*In re*                                                   :    **Chapter 11**
                                                          :
**NEWPAGE CORPORATION,** *et al.,*                        :    **Case No. 11-12804 (KG)**
                                                          :
      **Debtors.** [1]                                    :    **Jointly Administered**
                                                          :
------------------------------------------------------------x    **Related Docket No. 19**

### FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364

Upon the motion (the "**Motion**"), dated September 7, 2011, of NewPage Corporation (the "**Borrower**") and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "**Debtors**"), in the above-captioned cases (the "**Cases**") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking a final order (this "**Final Order**") among other things:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Chillicothe Paper Inc. (6154), Escanaba Paper Company (5598), Luke Paper Company (6265), NewPage Canadian Sales LLC (5384), NewPage Consolidated Papers Inc. (8330), NewPage Corporation (6156), NewPage Energy Services LLC (1838), NewPage Group Inc. (2465), NewPage Holding Corporation (6158), NewPage Port Hawkesbury Holding LLC (8330), NewPage Wisconsin System Inc. (3332), Rumford Paper Company (0427), Upland Resources, Inc. (2996), and Wickliffe Paper Company LLC (8293). The Debtors' corporate headquarters is located at 8540 Gander Creek Drive, Miamisburg, OH 45342.

(1)  authorizing the Borrower to obtain, and be obligated in respect of, post-petition financing (the "**Financing**"), and all of the other Debtors to guarantee and be jointly and severally obligated to pay, the Borrower's obligations in connection with the Financing, up to the aggregate principal amount of $600,000,000 (the actual available principal amount at any time being subject to those conditions set forth in the DIP Documents (as defined below)), from JPMorgan Chase Bank, N.A. ("**JPMCB**"), Barclays Bank PLC ("**Barclays Bank**"), Wells Fargo Capital Finance, LLC ("**Wells Fargo Capital**") and any future syndicate of financial institutions (together with JPMCB, Barclays Bank and Wells Fargo Capital and including the fronting and issuing banks for the letters of credit issued thereunder, the "**DIP Lenders**") to be arranged by J.P. Morgan Securities LLC ("**JPMorgan**"), Barclays Capital, the investment banking division of Barclays Bank ("**Barclays Capital**"), and Wells Fargo Capital, acting as joint lead arrangers and joint bookrunners with respect to the Revolving Facility (as defined below) (in such capacities, the "**Revolving Arrangers**"), and by JPMorgan and Barclays Capital acting as joint lead arrangers and joint bookrunners with respect to the Term Loan Facility (as defined below) (in such capacities, the "**Term Loan Arrangers**" and, together with the Revolving Arrangers, the "**Lead Arrangers**") for which Financing JPMCB shall act as Administrative Agent (in such capacity, the "**Administrative Agent**"), Wells Fargo Capital shall act as documentation

2

agent for the Revolving Facility, Barclays Capital shall act as Syndication

Agent (in such capacity the "**Syndication Agent**"), and JPMCB and Wells

Fargo Capital shall act as Co-Collateral Agents (in such capacities, the

"**Co-Collateral Agents**", and, together with the Administrative Agent, the

"**DIP Agents**");

(2)  authorizing the Debtors to execute and enter into the DIP

Documents and to perform such other and further acts as may be required

in connection with the DIP Documents;

(3)  granting adequate protection to The Bank of New York

Mellon, as collateral trustee (in such capacity the "**First Lien Notes**

**Collateral Trustee**") under the Priority Lien Debt Pledge and Security

Agreement (the "**First Lien Notes Pledge Agreement**") dated as of

December 21, 2007 between each of the grantors party thereto and the

First Lien Notes Collateral Trustee, for its benefit and for the benefit of the

holders (the "**First Lien Noteholders**") of the Borrower's 11.375% Senior

Secured Notes due 2014 (the "**First Lien Notes**") issued under or in

connection with that certain Indenture dated as of September 30, 2009 (as

supplemented by the Supplemental Indenture dated as of February 24,

2010, the "**First Lien Notes Indenture**" and, collectively with the First

Lien Notes Pledge Agreement and the mortgages and all other

documentation executed in connection therewith, the "**First Lien Notes**

**Agreements**") among the Borrower, each of the guarantors party thereto

3

and The Bank of New York Mellon, as trustee (the "**First Lien Notes Indenture Trustee**");

(4) granting adequate protection to The Bank of New York Mellon, as collateral trustee (in such capacity, the "**Second Lien Notes Collateral Trustee**" and, together with the First Lien Notes Collateral Trustee, the "**Notes Collateral Trustees**") under the Parity Lien Debt Pledge and Security Agreement (the "**Second Lien Notes Pledge Agreement**") dated as of May 2, 2005 between each of the grantors party thereto and the Second Lien Notes Collateral Trustee, for its benefit and for the benefit of the holders (the "**Second Lien Noteholders**" and, together with the First Lien Noteholders, the "**Secured Noteholders**") of (A) the 10.0% Senior Secured Notes due 2012 (the "**10% Second Lien Notes**") issued under or in connection with that certain Indenture (the "**10% Second Lien Notes Indenture**") dated as of May 2, 2005 among the Borrower, the guarantors party thereto and HSBC Bank USA, National Association ("**HSBC Bank**"), as trustee (together with its successors and assigns, including Wilmington Trust Company, the "**10% Second Lien Notes Indenture Trustee**") and (B) the Floating Rate Senior Secured Notes due 2012 (the "**Floating Second Lien Notes**" and, together with the 10% Second Lien Notes, the "**Second Lien Notes**") issued under or in connection with that certain Indenture (the "**Floating Second Lien Notes Indenture**" and, together with the 10% Second Lien Notes Indenture, the

4

"**Second Lien Notes Indentures**" and, together with the Second Lien

Notes Pledge Agreement and all other documentation executed in

connection therewith are collectively referred to as the "**Second Lien**

**Notes Agreements**" and, together with the First Lien Notes Agreements,

the "**Indenture Agreements**") dated as of May 2, 2005 among the

Borrower, the guarantors party thereto and HSBC Bank, as trustee

(together with its successors and assigns, including Wilmington Trust

Company, the "**Floating Second Lien Notes Indenture Trustee**" and,

together with the 10% Second Lien Notes Indenture Trustee, the "**Second**

**Lien Notes Indenture Trustees**" and, together with the First Lien Notes

Indenture Trustee, the "**Notes Indenture Trustees**");

(5) authorizing the Debtors to use cash collateral (as such term is

defined in Section 363 of the Bankruptcy Code) in which the lenders

(collectively, the "**Pre-Petition ABL Lenders**") under or in connection

with that certain Revolving Credit and Guaranty Agreement dated as of

December 21, 2007 (as heretofore amended, supplemented or otherwise

modified, the "**Pre-Petition ABL Credit Agreement**"), by and among the

Borrower, certain affiliates of the Borrower, Wells Fargo Capital, as

successor administrative agent and successor collateral agent (in such

capacities, the "**Pre-Petition ABL Agent**"), and the lenders from time to

time party thereto, and that certain Revolving Credit Pledge and Security

Agreement dated as of December 21, 2007, between each of the grantors

party thereto and Wells Fargo Capital as successor collateral agent (as heretofore amended, supplemented or otherwise modified, the "**Pre-Petition ABL Security Agreement**" and, collectively with the Pre-Petition ABL Credit Agreement and all other documentation executed and/or delivered in connection therewith and/or in accordance with the terms thereof, the "**Pre-Petition ABL Agreements**") had an interest prior to the repayment of the Pre-Petition ABL Debt, in which the DIP Lenders now have an interest and in which the First Lien Notes Collateral Trustee also has an interest, and the granting of adequate protection in connection with such use of cash collateral to the First Lien Notes Collateral Trustee on account of its interests therein;

(6)  approving certain stipulations by the Debtors as set forth in this Final Order with respect to the Pre-Petition ABL Agreements, the First Lien Notes Agreements and the Second Lien Notes Agreements and the liens and security interests arising therefrom;

(7)  granting superpriority claims under section 364(c)(1) of the Bankruptcy Code to the DIP Lenders, the DIP Agents, the Syndication Agent and the holders of Banking Services Obligations (as defined in the DIP Credit Agreement) and Designated Hedging Obligations (as defined in the DIP Credit Agreement) (the foregoing parties, collectively, the "**DIP Secured Parties**") payable from, and having recourse to, all pre-petition and post-petition property of the Debtors' estates and all proceeds

6

thereof (including any Avoidance Proceeds (as defined below)), subject only to the Carve Out (as defined below); and

(8) limiting the Debtors' right to assert claims to surcharge against the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 10 below;

Each of the Debtors having filed separate voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware on September 7, 2011 (the "**Petition Date**"), commencing the Cases;

Due and appropriate notice of the Motion, the relief requested therein and the interim hearing (the "**Interim Hearing**") on the Motion before this Court having been served by the Debtors on the thirty largest unsecured creditors of the Debtors, on the DIP Agents, the Lead Arrangers, the Pre-Petition ABL Agent, the Notes Indenture Trustees, the Notes Collateral Trustees, the United States Trustee for the District of Delaware and all other parties known to have asserted a lien on the Debtors' assets;

The Interim Hearing having been held by this Court on September 8, 2011, and this Court having entered the interim order (the "**Interim Order**") on September 8, 2011 that, among other things, (a) authorized the Debtors to (i) enter into the DIP Credit Agreement (as defined below) with the DIP Lenders pursuant to which the Borrower was authorized to obtain, and the Guarantors were authorized to guarantee, up to $495,000,000 in loans and letters of credit (comprised of up to $245,000,000 of borrowings and letters of credit under the revolving facility (the "**Revolving Facility**") and a term loan borrowing (the "**Term Loan Facility**") in the amount of $250,000,000)

7

from the DIP Lenders on a senior secured, superpriority claim basis (subject only to certain permitted liens and claims as set forth in the Interim Order); (ii) repay in full the Pre-Petition ABL Debt (as defined below) simultaneously with the initial borrowing under the Term Loan Facility (the date of the initial borrowings under the DIP Credit Agreement, the "**Closing Date**"); (iii) deem the letters of credit outstanding under the Pre-Petition ABL Credit Agreement that are issued by any entity that is a DIP Lender or an affiliate thereof as of the Closing Date (the "**Existing Letters of Credit**") and the Banking Services (as defined in the Pre-Petition ABL Credit Agreement) provided by Wells Fargo Bank, N.A. or any other Banking Services Provider (as defined in the Pre-Petition ABL Credit Agreement) that is a DIP Lender or an affiliate thereof as of the Closing Date (the "**Existing Banking Services**") to have been issued and/or provided (as applicable) under the DIP Documents; and (iv) use the proceeds of the Revolving Credit Facility to provide operating cash for the Debtors; (b) authorized the Debtors' use of Cash Collateral (as defined below); (c) granted the adequate protection as described in the Interim Order; and (d) scheduled a final hearing (the "**Final Hearing**") to consider entry of this Final Order authorizing the balance of the borrowings and letter of credit issuances under the Revolving Credit Facility on a final basis, as set forth in the Motion and the DIP Documents;

Due and appropriate notice of the final relief requested in the Motion and the Final Hearing, as well as the Interim Order, having been served by the Debtors on the thirty largest unsecured creditors of the Debtors, on the DIP Agents, the Lead Arrangers, the Pre-Petition ABL Agent, the Notes Indenture Trustees, the Notes Collateral Trustees,

8

the Official Unsecured Creditors Committee (the "**Creditors' Committee**"), the United States Trustee for the District of Delaware, the Internal Revenue Service, the Securities and Exchange Commission and those parties who have requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**");

The Debtors having continued in the management and operation of their businesses and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, no trustee or examiner having been appointed in these cases and the United States Trustee having appointed the Creditors' Committee in these Cases on September 21, 2011;

The Court having considered all of the objections, if any, to the Motion; and

Upon the record made by the Debtors at the Interim Hearing and the Final Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Disposition.* The Motion is granted on a final basis in accordance with the terms of this Final Order. Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.    *Jurisdiction.* This Court has subject matter jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. *Notice.* Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, the Interim Hearing, the Interim Order, the Final Hearing, and the relief to be requested at the Final Hearing constitutes appropriate, due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c), and no further notice of any of the foregoing is necessary or required.

4. *Debtors' Stipulations.* The Debtors admit, stipulate and agree (subject to the rights of other parties solely to the extent set forth in paragraphs 26 and 27 below and provided that no such stipulations or agreements shall limit, impair, or modify in any way the rights, protections or remedies of the DIP Secured Parties under this Final Order or the DIP Documents, including, without limitation, with respect to any Event of Default (as defined in the DIP Documents, an "**Event of Default**")) that:

(a)    (i) as of the Petition Date, the Borrower and certain of its affiliates were indebted and jointly and severally liable to the Pre-Petition ABL Lenders, without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of approximately $131,000,000 (as of June 30, 2011) in respect of revolving loans made and in the aggregate principal amount of approximately $101,000,000 (as of June 30, 2011) in respect of letters of credit issued and outstanding, in each case, by the Pre-Petition ABL Lenders pursuant to, and in accordance with the terms of, the Pre-Petition ABL Agreements, plus, in each case, interest thereon at the applicable non-default contract rate and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Pre-Petition ABL Agreements), charges, obligations relating to the Existing Banking Services

10

and other Obligations (as defined in the Pre-Petition ABL Credit Agreement) incurred in connection therewith as provided in the Pre-Petition ABL Agreements (collectively, the **"Pre-Petition ABL Debt"**), (ii) the Pre-Petition ABL Debt constitutes the legal, valid and binding obligation of the Debtors and certain of their non-Debtor affiliates (NewPage Port Hawkesbury Corp. and Rumford GIPOP Inc.), enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code) and (iii) no portion of the Pre-Petition ABL Debt or any payment on account thereof is subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and the Debtors do not have, hereby forever release, and are forever barred from bringing, any claims, counterclaims, cross claims, causes of action, defenses, recoupment or setoff rights, whether arising under the Bankruptcy Code or otherwise, against the Pre-Petition ABL Lenders, the Pre-Petition ABL Agent and their respective affiliates, agents, officers, directors, employees and attorneys arising from the Pre-Petition ABL Agreements;

    (b)  the liens and security interests granted to the Pre-Petition ABL Agent pursuant to and in connection with the Pre-Petition ABL Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors or their affiliates in favor of the Pre-Petition ABL Agent, for its benefit and for the benefit of the Pre-Petition ABL Lenders and other holders of Obligations (as defined in the Pre-Petition ABL Credit Agreement)) in connection with the Pre-Petition ABL Agreements, were, as of the date of repayment of the Pre-Petition ABL Debt (i) valid, binding, perfected, enforceable (other

than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), first-priority liens and security interests in the "Collateral" as defined in the Pre-Petition ABL Agreements (the "**Pre-Petition ABL Collateral**") and (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

      (c)     the aggregate value of the Pre-Petition ABL Collateral exceeds the amount of the Pre-Petition ABL Debt;

      (d)     a portion of the Debtors' borrowings from the DIP Lenders under the DIP Credit Agreement and the Interim Order has been used to repay in full the Pre-Petition ABL Debt and the Existing Letters of Credit and Existing Bank Services are deemed to have been issued and/or provided (as applicable) under the DIP Documents, each in accordance with the terms and conditions set forth in the Interim Order;

      (e)     as of the Petition Date, the Borrower and certain of its affiliates were indebted and jointly and severally liable to the First Lien Noteholders, without defense, counterclaim, recoupment or offset of any kind, in respect of obligations under the First Lien Notes Agreements for (i) an aggregate principal amount of approximately $1.77 billion in respect of the obligations under the First Lien Notes Indenture (plus accrued and unpaid interest thereon) and (ii) unpaid fees (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the First Lien Notes Agreements), expenses, disbursements, indemnifications, obligations, and charges or claims of whatever nature, whether or not contingent,

whenever arising, due or owing under the First Lien Notes Agreements or applicable law (collectively, the "**First Lien Indenture Obligations**");

(f)     as of the Petition Date, the Borrower and certain of its affiliates were indebted and jointly and severally liable to the Second Lien Noteholders, without defense, counterclaim, recoupment or offset of any kind, in respect of obligations under the Second Lien Agreements for (i) an aggregate principal amount of approximately $1,031,000,000 in respect of the obligations under the Second Lien Notes Indenture (plus accrued and unpaid interest thereon) and (ii) unpaid fees (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Second Lien Notes Agreements), expenses, disbursements, indemnifications, obligations, and charges or claims of whatever nature, whether or not contingent, whenever arising, due or owing under the Second Lien Notes Agreements or applicable law (collectively, the "**Second Lien Indenture Obligations**" and, together with the First Lien Indenture Obligations, the "**Indenture Obligations**");

(g)     as of the Petition Date, the Indenture Obligations constitute the legal, valid and binding obligations of the Borrower and certain other Debtors and non-Debtor affiliates, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code);

(h)     no portion of the Indenture Obligations or any payment on account thereof is subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and the Debtors do not have, hereby forever release, and are forever barred from bringing or asserting, any claims,

13

counterclaims, cross claims, causes of action, defenses, recoupment or setoff rights, whether arising under the Bankruptcy Code or otherwise, against any of the Secured Noteholders, the Notes Indenture Trustees, the Notes Collateral Trustees, and their respective affiliates, agents, officers, directors, employees and attorneys arising from the Indenture Obligations; and

(i)    each of (i) the junior-priority liens and security interests in the Pre-Petition ABL Collateral granted to the First Lien Notes Collateral Trustee for its benefit and for the benefit of the First Lien Noteholders and other holders of First Lien Indenture Obligations in connection with the First Lien Notes Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors or their affiliates) and (ii) the liens and security interests in the Shared Collateral (as defined in the ICA) (together with any proceeds, products, offspring or profits derived therefrom, the "**Pre-Petition PPE Collateral**" and, together with the Pre-Petition ABL Collateral and the Cash Collateral, the "**Noteholder Collateral**") granted to each of the Notes Collateral Trustees for their respective benefit and for the benefit of, as applicable, the First Lien Noteholders, the other holders of the First Lien Indenture Obligations, the Second Lien Noteholders and the other holders of the Second Lien Indenture Obligations pursuant to and in connection with the Indenture Agreements are (A) valid, binding, perfected, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code) liens in the Noteholder Collateral, as applicable, and (B) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable

14

nonbankruptcy law; *provided* that (1) notwithstanding anything to the contrary in this

Final Order, (I) at no time shall the Pre-Petition PPE Collateral include any property

acquired on or after the Petition Date unless such after-acquired property is, or is derived

from, the proceeds, products, offspring or profits derived from the Shared Collateral and

(II) so long as, and only so long as, there are any borrowings or letters of credit or other

amounts outstanding (other than contingent indemnity obligations as to which no claim

has been asserted when all other DIP Obligations have been paid in full and no letters of

credit are outstanding), or the DIP Lenders have any Commitment (as defined in the DIP

Credit Agreement) under the DIP Credit Agreement, any proceeds, products, offspring or

profits derived from the Shared Collateral (other than proceeds from the sale, lease,

license, exchange, or other disposition of any Shared Collateral and any insurance

proceeds received in respect of any Shared Collateral that are not reinvested in such

Shared Collateral to be segregated in accordance with paragraph 34(a) of this Final Order

and property purchased with such segregated proceeds (the "**Segregated PPE**

**Proceeds**")) (such proceeds, products, offspring or profits derived from the Shared

Collateral other than the Segregated PPE Proceeds, the "**Other PPE Proceeds**") shall be

excluded from the definition of Pre-Petition PPE Collateral and instead included in the

definition of Pre-Petition ABL Collateral; *provided, however*, that the foregoing shall in

no way prejudice or have any effect that prejudices the interests of any of the Notes

Collateral Trustees, Notes Indenture Trustees and/or Secured Noteholders in the Other

PPE Proceeds as Pre-Petition PPE Collateral after there are no longer any borrowings or

letters of credit or other amounts outstanding (other than contingent indemnity

obligations as to which no claim has been asserted when all other DIP Obligations have been paid in full and no letters of credit are outstanding) and the DIP Lenders no longer have any Commitment under the DIP Credit Agreement, including, without limitation, by enhancing the scope of Pre-Petition ABL Collateral or reducing the scope of Pre-Petition PPE Collateral; *provided further* that each of the Debtors, the First Lien Group and the Second Lien Group reserve all rights as to whether Other PPE Proceeds constitute Pre-Petition PPE Collateral or Pre-Petition ABL Collateral solely for the purposes of determining whether such Other PPE Proceeds constitutes collateral securing the Second Lien Notes and (2) the First Lien Notes Collateral Trustee's interests in the Pre-Petition PPE Collateral are senior to the Second Lien Notes Collateral Trustee's interests in the Pre-Petition PPE Collateral.

5.    *Findings Regarding the Financing.*

(a)    Good cause has been shown for the entry of this Final Order.

(b)    The Debtors need to obtain the full amount of the Financing and use Cash Collateral (as defined below) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

16

(c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors (i) granting to the DIP Secured Parties, subject to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (each as defined below) under the terms and conditions set forth in the Interim Order, this Final Order and in the DIP Documents and (ii) repaying the Pre-Petition ABL Debt in full (and in the case of the Existing Letters of Credit and the Existing Banking Services, deeming them to have been issued and/or provided (as applicable) under the DIP Documents) upon entry of the Interim Order, such repayment being a requirement by the DIP Agents and the DIP Lenders for the Financing.

(d)    The terms of the Financing and the use of Cash Collateral appear to be fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)    The Financing (including with respect to the repayment of the Pre-Petition ABL Debt pursuant to the Interim Order) has been negotiated in good faith and at arm's length among the Debtors, the DIP Agents, the Syndication Agent, the Lead Arrangers and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents

17

and the rights granted in the Interim Order and this Final Order, including without limitation, (i) all loans made to, and all letters of credit issued for the account of, the Debtors pursuant to the credit agreement dated as of September 8, 2011 (as amended or amended and restated from time to time in accordance with the terms of this Final Order, the "**DIP Credit Agreement**") among the Borrower, the Guarantors, the lenders party thereto, the Administrative Agent, the Co-Collateral Agents and the Syndication Agent, (ii) any Obligations (as defined in the DIP Credit Agreement), including all obligations relating to the Existing Banking Services and the Banking Services (as defined in the DIP Credit Agreement) including credit extended in respect of overdrafts and related liabilities and other depository, treasury, and cash management services and other clearing services provided by Wells Fargo Capital or any other DIP Lender or any of their respective affiliates in accordance with the terms of the DIP Documents, the Interim Order and this Final Order and (iii) any Designated Hedging Obligations (as defined in the DIP Credit Agreement) in each case owing to any entity that is a DIP Lender or an affiliate thereof when the underlying hedging arrangement is entered into by a Debtor (all of the foregoing in clauses (i) through (iii) collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agents, the Syndication Agent, the Lead Arrangers and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agents, the Syndication Agent, the Lead Arrangers and the DIP Lenders (and the successors and assigns of each of the foregoing) shall be entitled to the full protection of section 364(e) of the

18

Bankruptcy Code in the event that the Interim Order or this Final Order or any provision thereof or hereof is vacated, reversed or modified, on appeal or otherwise.

(f)    Based upon the record before the Court, the terms of the use of Cash Collateral and the adequate protection granted in the Interim Order and this Final Order have been negotiated at arms' length and in "good faith" and are in the best interests of the Debtors, their estates and creditors.

(g)    The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent granting the relief set forth in this Final Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the Financing and the use of Cash Collateral and the Pre-Petition PPE Collateral in accordance with the Interim Order, this Final Order and the DIP Documents, as applicable, are therefore in the best interest of the Debtors' estates.

6.    *Authorization of the Financing, the DIP Documents and the Repayment of the Pre-Petition ABL Debt.*

(a)    The Borrower was by the Interim Order and is hereby authorized to borrow money and obtain letters of credit pursuant to the DIP Credit Agreement, and the other Debtors were by the Interim Order and are hereby authorized to guarantee such borrowings and letters of credit and the Borrower's obligations with respect to such borrowings and letters of credit up to an aggregate principal or face amount of $600,000,000 (which amount is inclusive of the Term Loan Facility and the Revolving Facility amount authorized by the Interim Order), plus interest, fees and other expenses and amounts provided for in the DIP Documents, in accordance with the terms of the

Interim Order, this Final Order and the DIP Documents, which borrowings and letters of credit shall be used for all purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors, for other general corporate purposes and to pay interest, fees and expenses in accordance with the Interim Order, this Final Order and the DIP Documents. The repayment of the Pre-Petition ABL Debt pursuant to the Interim Order is hereby ratified and confirmed (subject to the provisions of paragraph 27 hereof). In addition to such loans and obligations, the Debtors are authorized to incur Banking Services Obligations and Designated Hedging Obligations (each as defined in the DIP Credit Agreement); *provided, however*, that nothing herein shall require Wells Fargo Bank, N.A. or any other party to provide banking services or hedging services to the Debtors.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor was by the Interim Order and is hereby authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)     the execution, delivery and performance of the Credit Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Pledge and Security Agreement (as defined in the DIP Credit Agreement) and all related documents

20

contemplated thereby (collectively, and together with the letter agreements referred to in clause (iii) below, the "**DIP Documents**"),

(ii)    the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Administrative Agent and the DIP Lenders (or any portion thereof as provided in the DIP Documents) may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Credit Agreement (and any fees paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the commitments thereunder; provided that the Debtors shall give reasonable prior notice of any such amendment that materially changes the terms of the DIP Documents in a manner adverse to the interests of the Debtors or in connection with which fees are to be paid to the DIP Lenders to counsel to the Creditors' Committee, the First Lien Group and the Second Lien Group; and all such parties reserve their respective rights to contest any such amendment.  Notwithstanding any other provision hereof, without further approval of this Court, amendments to the DIP Documents may be made at any time prior to the earlier of (A) the date that (1) each of (x) JPMCB and its affiliates and (y) Barclays Bank and its affiliates shall hold commitments with respect to, or loans under, the Term Loan Facility of not more than $0 and (2) each of (x) JPMCB and its affiliates, (y) Barclays Bank and its affiliates and (z) Wells Fargo Capital and its affiliates shall hold commitments with respect to the Revolving Facility of not more than

21

$75,000,000 (collectively, a "**Successful Syndication**") and (B) the date that is 90 days following the Closing Date if and to the extent JPMorgan reasonably determines that (I) any such change is necessary to ensure a Successful Syndication or (II) that a Successful Syndication cannot be achieved by the date that is 90 days following the Closing Date; *provided*, that no such amendments or waivers shall prejudice any rights of the Notes Collateral Trustees, the Notes Indenture Trustees or the Secured Noteholders with respect to the Pre-Petition PPE Collateral,

(iii)    the non-refundable payment to any of the DIP Agents, the Lead Arrangers, the Syndication Agent or the DIP Lenders, as the case may be, of the fees and any amounts due in respect of indemnification obligations referred to in the DIP Credit Agreement (and in the Commitment Letter and the Administrative Agent Fee Letter (each as defined in the DIP Credit Agreement) and that certain Amended and Restated Fee Letter dated as of September 6, 2011 by and among the Borrower, JPMCB, JPMorgan, Barclays Bank and Wells Fargo Capital) and costs and expenses as may be due from time to time, including, without limitation, reasonable fees and expenses of the professionals retained, in each case as provided for in the DIP Documents, without the need for any further order of the Court or notice to any party, and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents and

22

this Final Order. No obligation, payment, transfer or grant of security under the DIP

Documents or this Final Order shall be stayed, restrained, voidable, or recoverable under

the Bankruptcy Code or under any applicable law (including without limitation, under

section 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff,

recoupment or counterclaim of or by the Debtors.

      7.    *DIP Superpriority Claims.*

      (a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the

DIP Obligations shall constitute allowed claims against the Debtors (without the need to

file any proof of claim) with priority over any and all administrative expenses, diminution

claims (including all First Lien Notes Adequate Protection Obligations and all Second

Lien Notes Adequate Protection Obligations) and all other unsecured claims against the

Debtors, now existing or hereafter arising, of any kind whatsoever, including, without

limitation, all administrative expenses of the kind specified in sections 364, 503(b) and

507(b) of the Bankruptcy Code, and over any and all administrative expenses or other

claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b),

726, 1113 or 1114 of the Bankruptcy Code (the "**DIP Superpriority Claims**"), whether

or not such expenses or claims may become secured by a judgment lien or other non-

consensual lien, levy or attachment, which allowed claims shall be payable from and

have recourse to all pre- and post-petition property of the Debtors and all proceeds

thereof, subject only to the payment of the Carve Out to the extent specifically provided

for herein.

(b)        For purposes hereof, the "**Carve Out**" means (i) all fees required

to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States

Trustee under section 1930 of title 28 of the United States Code, (ii) all reasonable fees

and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to

exceed $50,000 and (iii) any and all allowed and unpaid claims of professionals whose

retention is approved by the Bankruptcy Court during the Chapter 11 Cases pursuant to

Sections 327 and 1103 of the Bankruptcy Code for unpaid fees and expenses incurred (A)

prior to the occurrence of an Event of Default and (B) after the occurrence and during the

continuance of an Event of Default in an aggregate amount not to exceed $7,500,000 (the

"**Professional Fee Cap**"), which amount may be used subject to the terms of this Final

Order, including, without limitation, paragraph 27 hereof, to pay any fees or expenses

incurred by the Debtors and any official committee appointed in these cases (the

"**Committee**") that remain unpaid subsequent to the payment, pro rata with other

nonpriority administrative creditors, of such fees and expenses from available funds

remaining in the Debtors' estates for such creditors, in respect of (x) allowances of

compensation for services rendered or reimbursement of expenses awarded by the

Bankruptcy Court to the Debtors' or the Committee's professionals and (y) the

reimbursement of expenses allowed by the Bankruptcy Court incurred by the Committee

members in the performance of their duties (but excluding fees and expenses of third

party professionals employed by such members) excluding, in each case, any transaction

based fees payable to financial advisors. Any payments of obligations benefitting from

the Carve Out that are incurred after an Event of Default shall reduce the amount of the

24

Carve Out by the amount of any such payment.  For the avoidance of doubt, the dollar

limitation in clause 7(b)(iii)(B) on fees and expenses shall neither be reduced nor

increased by the amount of compensation or reimbursement of allowed fees and/or

expenses incurred, awarded or paid prior to the occurrence of an Event of Default in

respect of which the Carve Out is invoked, and nothing herein shall be construed to

impair the ability of any party to object to the fees, expenses, reimbursement or

compensation described herein.  Subject to the provisions of paragraph 27, the Carve Out

shall not include, apply to, or be available for any fees or expenses incurred by any party,

including any Debtor, any committee or any professional, in connection with (1) the

investigation, initiation or prosecution of any claims (including for the avoidance of liens

or security interests) against any DIP Agent, any Lead Arranger, any DIP Lender, the

Syndication Agent, the Pre-Petition ABL Agent, any Pre-Petition ABL Lender, any Notes

Collateral Trustee, any Notes Indenture Trustee or any Secured Noteholder, in connection

with or related to the Pre-Petition ABL Agreements, the Indenture Agreements and/or the

Financing, or preventing, hindering or delaying the assertion of enforcement of any lien,

claim, right or security interest or realization upon any Collateral by any DIP Agent, the

Syndication Agent or any DIP Lender, or any Notes Collateral Trustee, (2) a request to

use cash collateral (as such term is defined in Section 363 of the Bankruptcy Code)

without the prior consent of the Administrative Agent or the First Lien Group (as defined

below) except in connection with any proceeding or dispute contemplated by paragraph

17 below, (3) a request, without the prior consent of the Administrative Agent, for

authorization to obtain debtor-in-possession financing or other financial accommodations

pursuant to Section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly repay

in full in cash the DIP Obligations (including cash collateralizing any letters of credit)

and is not on terms and conditions acceptable to the Administrative Agent, or (4) any act

that has the effect of materially or adversely modifying or compromising the rights and

remedies of any DIP Agent, the Syndication Agent or any DIP Lender as set forth herein

and in the other DIP Documents or any act that has the effect of materially or adversely

modifying or compromising the rights and remedies of any Notes Collateral Trustee,

Notes Indenture Trustee or Secured Noteholder (except in connection with any

proceeding or dispute contemplated by paragraph 17 below), or that results in the

occurrence of an Event of Default, unless otherwise agreed to by the Administrative

Agent; *provided*, that no required consent of the Administrative Agent, the First Lien

Group or the Second Lien Group (each as defined below) to any of the actions, as

applicable, described in the foregoing clauses (2) through (4) shall be deemed a consent

by any DIP Lender or Secured Noteholder to the relief sought by the Debtors or a waiver

of the rights of any DIP Lender or Secured Noteholder to object to any such actions of

the Debtors.

8.    *DIP Liens.*

As security for the DIP Obligations, effective and perfected upon the date of entry

of the Interim Order and without the necessity of the execution, recordation of filings by

the Debtors of mortgages, security agreements, control agreements, pledge agreements,

financing statements or other similar documents, or the possession or control by any DIP

Agents of, or over, any Collateral, the following security interests and liens were by the

Interim Order and are hereby granted to the Administrative Agent for its own benefit and

the benefit of the DIP Secured Parties (all property identified in clauses (a), (b) and (c)

below being collectively referred to as the "**Collateral**"),[2] subject, only in the event of the

occurrence and during the continuance of an Event of Default, to the Carve Out (all such

liens and security interests granted to the Administrative Agent, for its benefit and for the

benefit of the DIP Secured Parties pursuant to this Final Order and the DIP Documents,

the "**DIP Liens**"):

      (a)    First Lien on Cash Balances and Other Unencumbered Property.

Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing,

enforceable, fully-perfected first priority senior security interest in and lien upon all pre-

and post-petition property of the Debtors, whether existing on the Petition Date or

thereafter acquired, that, on or as of the Petition Date (or as a result of the repayment of

the Pre-Petition ABL Debt) or the date acquired (if acquired after the Petition Date) is not

subject to valid, perfected and non-avoidable liens (collectively, "**Unencumbered**

**Property**"), including, without limitation, all cash and cash collateral of the Debtors

(whether maintained with the DIP Agents or otherwise) and any investment of such cash

and cash collateral, inventory, accounts receivable, other rights to payment whether

arising before or after the Petition Date (including, without limitation, post-petition

intercompany claims against Debtors and non-Debtor affiliates) contracts, properties,

plants, equipment, general intangibles, documents, instruments, interests in leaseholds,

---

[2] Notwithstanding anything contained herein to the contrary, the Debtors shall not be required to pledge to the Administrative Agent in excess of 65% of the voting capital stock of their respective first tier foreign subsidiaries (if, in the reasonable judgment of the Borrower, a pledge of a greater percentage could result in material adverse tax consequences to the Borrower).

real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries subject to exceptions as provided for under the DIP Documents, and the proceeds, product or offspring of all the foregoing. Unencumbered Property shall exclude the Debtors' claims and causes of action under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**").

(b)     Liens Senior to Pre-Petition ABL Lenders' and First Lien Noteholders' Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and post-petition property of the Debtors, whether now existing or hereafter acquired, of the same nature, scope and type as the Pre-Petition ABL Collateral (other than any Segregated PPE Proceeds). Such security interests and liens shall be senior in all respects to the interests in such property of the Pre-Petition ABL Lenders, the First Lien Notes Collateral Trustee and the First Lien Noteholders arising from current and future liens of the Pre-Petition ABL Lenders, the First Lien Notes Collateral Trustee and the First Lien Noteholders (including, without limitation, adequate protection liens granted hereunder), but shall not be senior to any valid, perfected and unavoidable interests of any other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date that were senior in priority to the liens of the Pre-Petition ABL Agent, the First Lien Notes Collateral Trustee and the First Lien

Noteholders, or to any valid, perfected and unavoidable interests in such property arising out of liens arising subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code that are senior in priority to the liens of the Pre-Petition ABL Lenders, the First Lien Notes Collateral Trustee and the First Lien Noteholders.

(c)    Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 8, as to which the liens and security interests in favor of the Administrative Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, the Pre-Petition PPE Collateral, which security interests and liens in favor of the Administrative Agent are junior to such valid, perfected and unavoidable liens as well as any adequate protection liens granted to the First Lien Notes Collateral Trustee and Second Lien Notes Collateral Trustee in the Pre-Petition PPE Collateral. Notwithstanding anything to the contrary in this Final Order, security interests and liens in favor of the Administrative Agent are junior to (i) any statutory liens in existence prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and (ii) any statutory liens that were

29

valid, perfected and unavoidable immediately prior to the Petition Date and the fixing of

which is not avoidable pursuant to section 545 of the Bankruptcy Code.

      (d)    <u>Liens Senior to Certain Other Liens</u>. The DIP Liens, the First Lien

Notes Adequate Protection Liens and the Second Lien Notes Adequate Protection Liens

(each as defined below) shall not be subject or subordinate to (i) any lien or security

interest that is avoided and preserved for the benefit of the Debtors and their estates under

section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date

including, without limitation, any liens or security interests granted in favor of any

federal, state, municipal or other governmental unit, commission, board or court for any

liability of the Debtors.

      9.    *Protection of DIP Lenders' Rights.*

      (a)    So long as there are any borrowings or letters of credit or other

amounts outstanding (other than contingent indemnity obligations as to which no claim

has been asserted when all other DIP Obligations have been paid in full and no letters of

credit are outstanding), or the DIP Lenders have any Commitment (as defined in the DIP

Credit Agreement) under the DIP Credit Agreement, subject to the terms of the Payoff

Letter (as defined below), the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the

First Lien Notes Collateral Trustee, the First Lien Notes Indenture Trustee, the First Lien

Noteholders, the Second Lien Notes Collateral Trustee, the Second Lien Notes Indenture

Trustee and the Second Lien Noteholders shall (i) have no right to and shall take no

action to foreclose upon or recover in connection with the liens granted thereto pursuant

to the Pre-Petition ABL Agreements, the Indenture Agreements, the Interim Order or this

Final Order, or otherwise exercise or seek to exercise any enforcement rights or remedies against any Collateral or in connection with the First Lien Notes Adequate Protection Liens or the Second Lien Notes Adequate Protection Liens or in connection with any other stipulation or order relating to the provision of adequate protection to the Notes Collateral Trustees or the Secured Noteholders, including, without limitation, in respect of the occurrence or continuance of any "Event of Default" (as defined in the Pre-Petition ABL Credit Agreement, the First Lien Notes Indenture or the Second Lien Notes Indenture, as applicable), except to the extent authorized by a further order of this Court entered after the date hereof, (ii) be deemed to have consented to any release of Collateral authorized under the DIP Documents, the Interim Order and this Final Order, (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the Collateral unless, solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the Interim Order and this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the date of filing and (iv) deliver or cause to be delivered, at the Debtors' cost and expense (for which the relevant parties shall be reimbursed upon submission to the Debtors of reasonable invoices or billing statements), any termination statements, releases and/or assignments (to the extent provided for herein) in favor of the DIP Secured Parties or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of the First Lien Notes Adequate Protection Liens (as defined below) or the

31

Second Lien Notes Adequate Protection Liens (as defined below) on any portion of the Collateral subject to any sale or disposition approved or arranged for by the Administrative Agent, it being understood and agreed that the DIP Agents shall not have the right to control or direct the disposition of the Pre-Petition PPE Collateral.

        (b)      The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Administrative Agent and the DIP Lenders to exercise, (i) immediately upon the occurrence of an Event of Default, all rights and remedies under the DIP Documents other than those rights and remedies against the Collateral as provided in clause (ii) below; and (ii) upon the occurrence and during the continuance of such an Event of Default and after the giving of five days' prior written notice to the extent provided for in the DIP Credit Agreement (the "**Default Notice Period**") to the Debtors, all rights and remedies against the Collateral provided for in the DIP Documents as requiring such notice (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with any DIP Agent or any DIP Lender). Upon receipt of any notice of a Default (as defined in the DIP Documents) or Event of Default under the DIP Documents, the Debtors shall promptly provide the First Lien Group, the Second Lien Group and any Committee with a copy of any such notice. Further, any liquidation of Collateral (excluding the Pre-Petition PPE Collateral prior to the repayment in full of the obligations under the First Lien Notes and the Second Lien Notes) shall be conducted by the Administrative Agent in consultation with the Co-Collateral Agents and the proceeds of any such liquidation shall be applied in the manner set forth in the DIP Documents. Notwithstanding anything to the contrary in

this Final Order, (i) unless the obligations under the First Lien Notes and the Second Lien Notes shall have been repaid in full, any liquidation of any Pre-Petition PPE Collateral shall require further court order or the written consent of the First Lien Notes Collateral Trustee or the Second Lien Notes Collateral Trustee, as applicable and subject to the terms of the CTA (as defined below), and (ii) any action taken to (A) terminate the commitments under the Financing, (B) accelerate the Loans, (C) send blocking notices or an Activation Notice (as defined in the DIP Credit Agreement) (it being understood and agreed that during the 5 day period following the delivery of any such notice, the Debtors shall be permitted to use Cash Collateral in accordance with the Budget (as defined in the DIP Credit Agreement) and the terms of the DIP Credit Agreement), (D) repay any amounts owing in respect of the Revolving Facility (including, without limitation, fees, indemnities and expense reimbursements) in accordance with Section 9.01(f) of the DIP Credit Agreement and (E) cash collateralize letters of credit issued pursuant to the DIP Credit Agreement in accordance with Section 9.01(f) of the DIP Credit Agreement, in each case, shall not require any advance notice to the Debtors. In any hearing regarding any exercise of rights or remedies (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and no party shall be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agents, the Syndication Agent or the DIP Lenders set forth in the Interim Order, this Final Order or the DIP Documents. In no event shall the DIP

33

Agents, the DIP Secured Parties, the Pre-Petition ABL Agent, the Pre-Petition ABL

Lenders, the First Lien Notes Collateral Trustee, the First Lien Notes Indenture Trustee

or the First Lien Noteholders be subject to the equitable doctrine of "marshaling" or any

similar doctrine with respect to their respective liens and security interests upon and in

the Collateral; *provided*, that (1) unless the obligations under the First Lien Notes and the

Second Lien Notes shall have been repaid in full, any liquidation of any Pre-Petition PPE

Collateral shall require further court order or the written consent of the First Lien Notes

Collateral Trustee or the Second Lien Notes Collateral Trustee, as applicable and subject

to the terms and conditions of the CTA and (2) to the extent reasonably practicable

without material delay in the payment in full of such obligations, each of the DIP

Obligations, the Indenture Obligations, the First Lien Notes Adequate Protection

Obligations and the Second Lien Notes Adequate Protection Obligations shall be satisfied

(I) first with the proceeds of the respective collateral securing such obligations other than

the Avoidance Proceeds and the PM 35 Proceeds (as defined below) and (II) second with

the PM 35 Proceeds and (III) third with the Avoidance Proceeds.  Further, in no event

shall the "equities of the case" exception of section 552(b) of the Bankruptcy Code apply

to the security interests of the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the

Notes Collateral Trustees, the Notes Indenture Trustees or the Secured Noteholders.  For

the avoidance of doubt, no recharacterization of or other challenge to the Canadian

Transition Services Agreement (as defined in the DIP Credit Agreement) by the

Creditors' Committee, the effects of which are not adverse, directly or indirectly, to the

interests of the DIP Lenders, shall give rise to an Event of Default under Section 6.15 of the DIP Credit Agreement.

(c)    No rights, protections or remedies of the DIP Agents, the Syndication Agent or the DIP Secured Parties granted by the provisions of the Interim Order, this Final Order or the DIP Documents shall be limited, modified or impaired in any way by (i) any actual or purported withdrawal of the consent of any party to the Debtors' use of Cash Collateral, (ii) any actual or purported termination of the Debtors' authority to use Cash Collateral or (iii) the terms of the Interim Order, this Final Order or any other order or stipulation related to the Debtors' use of Cash Collateral or the provision of adequate protection to any party.

10.    *Limitation on Charging Expenses Against Collateral.*  Except to the extent of the Carve Out, no claim may be asserted against any of the DIP Agents, the Syndication Agent, the Lead Arrangers, the DIP Secured Parties, the Notes Collateral Trustees, the Notes Indenture Trustees or the Secured Noteholders, each in their capacity as such, to charge any expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, against the Collateral or recover such expenses from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Administrative Agent, the First Lien Notes Collateral Trustee and the Second Lien Notes Collateral Trustee, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Agent, the Syndication Agent, the DIP Secured Parties, any Notes Collateral Trustee,

35

any Notes Indenture Trustee or any Secured Noteholder; *provided*, that with respect to the Second Lien Notes the foregoing waivers and limitations shall apply only to Pre-Petition PPE Collateral.

11.    *The Cash Collateral.* The Pre-Petition ABL Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code. Any proceeds of the Pre-Petition ABL Collateral (including any funds on deposit at the Pre-Petition ABL Lenders or at any other institution as of the Petition Date) are additionally cash collateral within the meaning of section 363(a) of the Bankruptcy Code. All cash collateral in which the DIP Lenders have an interest and in which the First Lien Noteholders also have an interest, in each case within the meaning of section 363(a) of the Bankruptcy Code (including, without limitation, all cash proceeds of Pre-Petition ABL Collateral and the Collateral (excluding the Pre-Petition PPE Collateral prior to the repayment in full of the obligations under the First Lien Notes and the Second Lien Notes), as applicable) are collectively referred to herein as the "**Cash Collateral**."

12.    *Use of Cash Collateral.* Pursuant to the terms of that certain Payoff Letter, dated as of the Closing Date (the "**Payoff Letter**") by and among Debtors, the Pre-Petition ABL Agent and the Administrative Agent, the liens of the Pre-Petition ABL Lenders on the Cash Collateral were terminated and the Pre-Petition ABL Lenders were directed promptly to turn over to the Debtors all Cash Collateral received or held by them, and to the extent the First Lien Notes Collateral Trustee, the First Lien Notes Indenture Trustee or any First Lien Noteholder held any Cash Collateral on account of the First Lien Notes Collateral Trustee's junior-priority lien on the Cash Collateral, all

such parties were directed promptly to turn over to the Debtors all Cash Collateral received or held by them. The Debtors were by the Interim Order and are hereby authorized, subject to the terms and conditions of the DIP Documents and this Final Order, to use all Cash Collateral. The Debtors' right to use any such Cash Collateral shall be in accordance with Section 9.01 of the DIP Credit Agreement and shall terminate automatically (i) on the earlier of (A) the Termination Date (as defined in the DIP Credit Agreement) and (B) the occurrence of an Event of Default under the DIP Credit Agreement and the Administrative Agent giving five days' prior written notice (which shall run concurrently with any notice provided under the DIP Documents) to the Debtors or (ii) if terminated by the Court in accordance with paragraph 17 .

13.    *Pre-Petition ABL Debt Adequate Protection.*

(a)    Repayment of the Debt. Immediately following the entry of the Interim Order and as part of the initial borrowing under the Financing, the Debtors used a portion of the proceeds from the borrowings under the Financing in accordance with the DIP Documents and the Interim Order to repay in full the Pre-Petition ABL Debt then outstanding (and to deem the Existing Letters of Credit and the Existing Banking Services to have been issued and/or provided (as applicable) under the DIP Documents), upon which repayment and transfer, the existing liens on the Pre-Petition ABL Collateral were released and terminated simultaneously with such repayment, all in accordance with the terms of the Payoff Letter and the Interim Order. After the repayment in full of the Pre-Petition ABL Debt and the transfer of the Existing Letters of Credit, the Debtors were authorized to file any termination statements, releases or other documents necessary

37

to effectuate and/or evidence the release and termination of the Pre-Petition ABL Agent's liens on or security interests in any portion of the Pre-Petition ABL Collateral.

(b)    Fees and Expenses.  Contemporaneously with the repayment of the Pre-Petition ABL Debt authorized by the foregoing subparagraph (a), the Debtors deposited $300,000 (the "**Expenses Deposit**") with the Pre-Petition ABL Agent, to be held in escrow on account of claims of the Pre-Petition ABL Agent under and in accordance with this paragraph 13(b).  To the extent actually incurred after the repayment in full of the Pre-Petition ABL Debt authorized by the foregoing subparagraph (a), the Pre-Petition ABL Agent shall receive from the Debtors, and the Debtors are authorized and directed, subject to the provisions of paragraph 23(d) to pay as an administrative expense, current cash payments of all reasonable and documented fees and expenses payable to the Pre-Petition ABL Agent under the Pre-Petition ABL Agreements, promptly upon receipt of invoices therefor; *provided,* that (i) any such claims shall be satisfied first by application of the Expenses Deposit upon two business Days' notice to the Debtors and the Debtors shall not be required to make any payments on account of such claims to the Pre-Petition ABL Agent until the Expenses Deposit has been exhausted and (ii) the Pre-Petition Agent shall return to the Debtors any unused portion of the Expenses Deposit promptly upon the earlier of (A) the expiration of the Challenge Period (as defined below) with no challenge to the repayment of the Pre-Petition ABL Debt having been brought and (B) the final resolution or conclusive settlement of any Claims and Defenses (as defined below).

14.    *Notes Adequate Protection.*

(a)     The First Lien Notes Collateral Trustee was by the Interim Order and is hereby granted, for its benefit and for the benefit of the First Lien Noteholders, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, adequate protection of its interests in the Noteholder Collateral, for and equal in amount to the aggregate diminution in value of the First Lien Notes Collateral Trustee's interests in the Noteholder Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Noteholder Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "**First Lien Notes Adequate Protection Obligations**").  Subject to the last sentence of this paragraph 14(a), the First Lien Notes Collateral Trustee, for its benefit and for the benefit of the First Lien Noteholders, was by the Interim Order and is hereby granted valid, binding, continuing, enforceable, fully-perfected junior-priority security interests in and liens upon the Collateral other than Avoidance Proceeds with the exception of proceeds of any causes of action under Section 549 of the Bankruptcy Code (the "**First Lien Notes Adequate Protection Liens**"), without the need to take any further action to perfect such liens, subject and subordinate only to (x) the security interests and liens granted to the Administrative Agent for the benefit of the DIP Secured Parties in the Interim Order, this Final Order and pursuant to the DIP Documents and any liens on the Collateral to which such liens of the Administrative Agent are junior and (y) the Carve Out.  Without limiting the generality of the foregoing, subject to the last sentence of this paragraph 14(a), (i) the First Lien Notes Adequate Protection Liens shall be junior and subordinate in all respects to the DIP Secured Parties' liens and security interests

39

(including, without limitation, the DIP Liens) upon and in the Collateral and the Carve Out and (ii) the First Lien Notes Adequate Protection Obligations shall be junior and subordinate in right of payment to all DIP Obligations and the Carve Out. Notwithstanding anything contained herein to the contrary, the First Lien Notes Adequate Protection Liens in the Pre-Petition PPE Collateral shall be senior to the DIP Secured Parties' liens and security interests (including, without limitation, the DIP Liens) upon and in the Pre-Petition PPE Collateral.

      (b)    The Second Lien Notes Collateral Trustee was by the Interim Order and is hereby granted, for its benefit and for the benefit of the Second Lien Noteholders, pursuant to sections 361 and 363(e) of the Bankruptcy Code, adequate protection of its junior interest in the Pre-Petition PPE Collateral, for and equal in amount to the aggregate diminution in value of the Second Lien Notes Collateral Trustee's interests in the Pre-Petition PPE Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Pre-Petition PPE Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "**Second Lien Notes Adequate Protection Obligations**"). Subject to the last sentence of this paragraph 14(b), the Second Lien Notes Collateral Trustee, for its benefit and for the benefit of the Second Lien Noteholders, was by the Interim Order and is hereby granted valid, binding, continuing, enforceable, fully-perfected junior-priority security interests in and liens upon the Collateral (the "**Second Lien Notes Adequate Protection Liens**") subject and subordinate only to (w) the security interests and liens granted to the Administrative

Agent for the benefit of the DIP Secured Parties in the Interim Order, this Final Order

and pursuant to the DIP Documents and any liens on the Collateral to which such liens of

the Administrative Agent are junior; (x) the First Lien Notes Collateral Trustee's liens in

the Pre-Petition ABL Collateral; (y) the First Lien Notes Adequate Protection Liens and

(z) the Carve Out.  Without limiting the generality of the foregoing, subject to the last

sentence of this paragraph 14(b), (i) the Second Lien Notes Adequate Protection Liens

shall be junior and subordinate in all respects to the DIP Secured Parties' liens and

security interests (including, without limitation, the DIP Liens) upon and in the Collateral

and the Carve Out and (ii) the Second Lien Notes Adequate Protection Obligations shall

be junior and subordinate in right of payment to all DIP Obligations and the Carve Out.

Notwithstanding anything contained herein to the contrary, the Second Lien Notes

Adequate Protection Liens in the Pre-Petition PPE Collateral shall be senior to the DIP

Secured Parties' liens and security interests (including, without limitation, the DIP Liens)

upon and in the Pre-Petition PPE Collateral, but junior to the First Lien Notes Adequate

Protection Liens in the Pre-Petition PPE Collateral.

        (c)     Notwithstanding anything to the contrary in the Interim Order or

this Final Order, with respect to property to which both the First Lien Notes Adequate

Protection Liens and the Second Lien Notes Adequate Protection Liens attach, (i) the

Second Lien Notes Collateral Trustee shall be bound to and be deemed to have consented

to any decision regarding the exercise or non-exercise of remedies made by the First Lien

Notes Collateral Trustee as to Collateral other than the Pre-Petition PPE Collateral and (ii)

any actions relating to the Pre-Petition PPE Collateral taken by the Second Lien Notes

41

Collateral Trustee or the First Lien Notes Collateral Trustee must be in accordance with the terms of that certain Collateral Trust Agreement, dated as of May 2, 2005, among the Borrower, the other Pledgors from time to time as party thereto, the Second Lien Notes Indenture Trustee, and The Bank of New York Mellon, as First Lien Notes Indenture Trustee and Notes Collateral Trustees (the "CTA"). All parties hereby reserve all of their rights and arguments related to the relative rights between the First Lien Notes Collateral Trustee and the Second Lien Notes Collateral Trustee, including, without limitation, all arguments related to the effect of the CTA and nothing contained herein, including in connection with any consent to the Interim Order, this Final Order, and the use of Noteholder Collateral authorized thereby and hereby, shall be deemed a waiver of any such rights.

15.    Pursuant and subject to all applicable sections of the Bankruptcy Code, and subject and junior in all respects to the DIP Superpriority Claims, the Carve Out and any intercompany liens or claims that are given priority senior to the Notes Superpriority Claims by this Court in connection with the Debtors' Cash Management systems, all of the First Lien Notes Adequate Protection Obligations and all Second Lien Notes Adequate Protection Obligations shall constitute allowed claims against the Debtors (without the need to file any proof of claim) with priority over any and all administrative expenses, diminution claims (with the First Lien Notes Adequate Protection Obligations being senior in right to payment to the Second Lien Notes Adequate Protection Obligations) and all other unsecured claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses

of the kind specified in sections 364, 503(b) and 507(b) of the Bankruptcy Code, and

over any and all administrative expenses or other claims arising under sections 105, 326,

328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code

(the "**Notes Superpriority Claims**"), whether or not such expenses or claims may

become secured by a judgment lien or other non-consensual lien, levy or attachment,

which allowed claims shall be payable from and have recourse to all pre- and post-

petition property of the Debtors and all proceeds thereof, subject and junior in all events

only to the payment of the DIP Superpriority Claims, the Carve Out and any

intercompany liens or claims that are given priority senior to the Notes Superpriority

Claims by this Court in connection with the Creditors' Committee's pending motion

seeking reconsideration of this Court's approval of the Debtors' Cash Management

systems.

16.    An *ad hoc* group of certain First Lien Noteholders representing a majority

in principal amount of the First Lien Notes (the "**First Lien Group**") is represented by (i)

Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**"), as counsel, (ii) Morris, Nichols,

Arsht & Tunnel LLP,  as local Delaware counsel, (iii) Blackstone Advisory Partners LP,

as financial advisor ("**Blackstone**"), and (iv) Bennett Jones LLP, as Canadian counsel

(collectively, the "**First Lien Advisors**").  The Debtors are authorized, without further

notice or order, as part of the First Lien Adequate Protection Obligations, to use Cash

Collateral to pay interest under the First Lien Notes Agreements, on the regularly

scheduled interest payment dates (each, a "**First Lien Interest Payment**"), and to pay

the reasonable and documented professional fees and expenses of the First Lien Advisors

43

and the First Lien Notes Collateral Trustee and the First Lien Notes Indenture Trustee[3]

(limited to the reasonable and documented fees and expenses of one counsel acting on

behalf of both the First Lien Notes Collateral Trustee and the First Lien Notes Indenture

Trustee) (the "**First Lien Group Fees**"), including payment of fees to Milbank in

accordance with the terms set forth in its engagement letter dated as of August 17, 2011

(the "**Milbank Engagement Letter**") and a retainer of $300,000 for the benefit of

Milbank.

17.    If the Debtors determine not to pay a First Lien Interest Payment when

due, the Debtors shall provide Milbank with at least 20 days' prior notice of such

determination (a "**Termination Notice**"); *provided, however*, that the Debtors shall pay

all accrued and unpaid First Lien Group Fees owed to the First Lien Advisors and the

First Lien Notes Collateral Trustee and the First Lien Notes Indenture Trustee through

and including the date that is 20 days after such Termination Notice is received by

Milbank.  If Milbank receives such a Termination Notice, the First Lien Group and the

First Lien Notes Collateral Trustee are authorized to request adequate protection and

relief from the automatic stay on ten days' prior notice to the Debtors, the Administrative

Agent, the Second Lien Group and any Committee, subject to the Court's schedule.  If

the Debtors do not deliver to Milbank a timely Termination Notice, the Debtors shall

timely remit the First Lien Interest Payment for which no notice was given.  If the First

---

[3] If the First Lien Advisors are retained by the First Lien Notes Indenture Trustee after the entry of this Final Order, the Debtors' obligations to pay the reasonable and documented professional fees and expenses of the First Lien Advisors shall continue in the First Lien Advisors' capacity as advisors to the First Lien Notes Indenture Trustee and the First Lien Group shall have no right to payment of the fees and expenses of any separate professionals.

Lien Group determines to withdraw its consent to the use of Cash Collateral, Milbank shall provide the Debtors, the Administrative Agent, the First Lien Notes Collateral Trustee, the Second Lien Group and any Committee at least 20 days' prior notice of such determination (a "**Withdrawal Notice**"); *provided, however*, that (i) if the Debtors file a motion for authorization to use Cash Collateral (an "**Authorization Motion**") on or before the tenth day after receiving a Withdrawal Notice, the Debtors shall be authorized to use Cash Collateral in accordance with the budget approved by this Final Order or any other budget then in effect as contemplated under the DIP Documents (the "**DIP Financing Budget**") in effect immediately prior to such receipt through and including the fifth business day after the Court rules on the Debtors' motion or any longer period as may be ordered by the Court and (ii) within ten business days of the filing by the Debtors of an Authorization Motion, subject to the Court's schedule, there shall be held either an interim hearing or a status conference with respect to such Authorization Motion.  The Debtors will not be required to make any First Lien Interest Payment or pay any First Lien Group Fees that accrue after receipt of a Withdrawal Notice unless otherwise agreed to by the parties or as otherwise required by order of this Court.  In all events consistent with the DIP Documents and this Final Order, the Debtors shall, at all times, use their best efforts to maintain sufficient cash, marketable securities, and borrowing capacity to enable them to make the First Lien Interest Payments and pay the First Lien Group Fees when due, without acceleration.  All parties reserve all rights in connection with any request for additional adequate protection and any purported withdrawal of consent referenced in the foregoing, specifically including, but without limitation, all arguments

related to the effect, if any, of the Intercreditor Agreement (the "**ICA**"), dated as of May 2, 2005 by and among the Borrower and certain of its affiliates, Wells Fargo Capital as successor collateral agent under the Pre-Petition ABL Credit Agreement, the First Lien Notes Collateral Trustee, the First Lien Notes Indenture Trustee, the First Lien Noteholders, the Second Lien Notes Collateral Trustee, the Second Lien Notes Indenture Trustee and the Second Lien Noteholders.

18.    The Debtors will not propose any chapter 11 plan that does not provide for payment to Blackstone, on such plan's effective date, of the transaction fee set forth in its engagement letter with the First Lien Group dated August 8, 2011.

19.    An *ad hoc* group of certain Second Lien Noteholders representing a majority in principal amount of the Second Lien Notes  (the "**Second Lien Group**") is represented by (i) Akin Gump Strauss Hauer & Feld LLP,  as counsel, (ii) Blank Rome LLP, as local Delaware counsel, (iii) Houlihan Lokey Capital, Inc., as financial advisor ("**Houlihan Lokey**"), and (iv) Goodmans, as Canadian counsel (collectively, the "**Second Lien Advisors**").  The Debtors are authorized, without further notice or order, as part of the Second Lien Notes Adequate Protection Obligations, to use Cash Collateral to pay the reasonable and documented professional fees and expenses of the Second Lien Group and the Second Lien Notes Indenture Trustee[4] (the "**Second Lien Group Fees**"). The Debtors will not propose any chapter 11 plan that does not provide for the payment

---

[4] If the Second Lien Advisors are retained by the Second Lien Notes Indenture Trustee after the entry of this Final Order, the Debtors' obligations to pay the reasonable and documented professional fees and expenses of the Second Lien Advisors shall continue in the Second Lien Advisors' capacity as advisors to the Second Lien Notes Indenture Trustee and the Second Lien Group shall have no right to payment of the fees and expenses of any separate professionals.

to Houlihan Lokey, on such plan's effective date, of the transaction fee set forth in its engagement letter dated as of July 15, 2011 (the "**Houlihan Lokey Engagement Letter**"). For the avoidance of doubt, the foregoing does not constitute and shall not be deemed to be an assumption by any of the Debtors of the Houlihan Lokey Engagement Letter under Section 365 of the Bankruptcy Code.

20.    *Findings Regarding First Lien Notes and Second Lien Notes.*

(a)    Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, the Court finds that the adequate protection provided herein is reasonable and sufficient to adequately protect the interests of the Notes Collateral Trustees, the Notes Indenture Trustees and the Secured Noteholders, and accordingly, the authorization to use Cash Collateral in paragraph 12 above is appropriate; and

(b)    For the avoidance of doubt, the DIP Agents stipulate and agree that entry of this Final Order and the provision of adequate protection hereunder shall not give rise to an Event of Default.

(c)    Each of the First Lien Group and the Second Lien Group have consented to the Interim Order, this Final Order, the Financing and the use of Cash Collateral and Pre-Petition PPE Collateral authorized thereby and hereby, and each of the First Lien Notes Collateral Trustee and the Second Lien Notes Collateral Trustee does not object to the Interim Order, this Final Order, the Financing, or the use of Cash Collateral or Pre-Petition PPE Collateral authorized thereby or hereby.

47

21.    For all adequate protection and stay relief purposes throughout the Debtors' chapter 11 cases, the Notes Collateral Trustees, the Secured Noteholders, the First Lien Group and/or the Second Lien Group shall be deemed to have requested relief from the automatic stay and adequate protection as of the Petition Date. For the avoidance of doubt, such request will survive termination of this Final Order by any means and be applicable to any dispute between the First Lien Notes Collateral Trustee, the Second Lien Notes Collateral Trustee, the First Lien Noteholders or the Second Lien Noteholders and the Debtors, as well as any dispute between the First Lien Notes Collateral Trustee, the Second Lien Notes Collateral Trustee, the First Lien Noteholders, the Second Lien Noteholders, the First Lien Group, or the Second Lien Group and the Debtors, as well as any dispute between the First Lien Notes Collateral Trustee, the Second Lien Notes Collateral Trustee, the First Lien Noteholders or the Second Lien Noteholders and any party-in-interest relating to the First Lien Notes Collateral Trustee's, the Second Lien Notes Collateral Trustee's, the First Lien Noteholders', the Second Lien Noteholders', the First Lien Group's, or the Second Lien Group's request for relief from the automatic stay and adequate protection.

22.    For purposes of any request of a Notes Collateral Trustee, any Secured Noteholders, the First Lien Group and/or the Second Lien Group for relief from the automatic stay or adequate protection, the Debtors stipulate they have no equity in the Noteholder Collateral. For the avoidance of doubt, such stipulation will survive termination of this Final Order by any means and be applicable to any dispute between the First Lien Notes Collateral Trustee, the Second Lien Notes Collateral Trustee, the

48

First Lien Noteholders, the Second Lien Noteholders, the First Lien Group, or the Second Lien Group and the Debtors, as well as any dispute between the First Lien Notes Collateral Trustee, the Second Lien Notes Collateral Trustee, the First Lien Noteholders or the Second Lien Noteholders and any party-in-interest relating to the First Lien Notes Collateral Trustee's, the Second Lien Notes Collateral Trustee's, the First Lien Noteholders', the Second Lien Noteholders', the First Lien Group's, or the Second Lien Group's request for relief from the automatic stay and adequate protection.

23.   *Payments to First Lien Noteholders, Second Lien Noteholders and Pre-Petition ABL Agent*

(a)   First Lien Notes. All parties reserve all rights to assert that any payments made by the Debtors pursuant to the First Lien Notes Adequate Protection Obligations constitute and may be recharacterized as principal repayments on account of the First Lien Notes. All defenses of the First Lien Noteholders to any effort to recharacterize such payments are expressly reserved. If and only if it is determined by final order of this Court that (i) the First Lien Notes Indenture Obligations are subject in whole or in part to subordination or disallowance or (ii) the amount of payments by the Debtors pursuant to the First Lien Notes Adequate Protection Obligations exceeds the value of the collateral securing the First Lien Notes, this Court may fashion any other appropriate remedy with respect to all relevant First Lien Noteholders after hearing from all parties in interest, which remedy may include disgorgement of any payments made by the Debtors pursuant to the First Lien Notes Adequate Protection Obligations.

(b)    <u>Second Lien Notes</u>. All parties reserve all rights to assert that any payments made by the Debtors pursuant to the Second Lien Notes Adequate Protection Obligations constitute and may be recharacterized as principal repayments on account of the Second Lien Notes. All defenses of the Second Lien Noteholders to any effort to recharacterize such payments are expressly reserved. If and only if it is determined by final order of this Court that (i) the Second Lien Notes Indenture Obligations are subject in whole or in part to subordination or disallowance or (ii) the amount of payments by the Debtors pursuant to the Second Lien Notes Adequate Protection Obligations exceeds the value of the collateral securing the Second Lien Notes, this Court may fashion any other appropriate remedy with respect to all relevant Second Lien Noteholders after hearing from all parties in interest, which remedy may include disgorgement of any payments made by the Debtors pursuant to the Second Lien Notes Adequate Protection Obligations.

(c)    <u>Restriction on Payment</u>. Notwithstanding anything to the contrary in the Interim Order or this Final Order, in no event shall any payment with respect to the First Lien Notes or the Second Lien Notes or any payment to the holders thereof or their respective professionals be made at any time during which a Default or Event of Default shall have occurred and be continuing (or would be caused by such payment).

(d)    <u>Notice of Professional Fees</u>. A copy of each invoice for fees and expenses the payment of which is authorized by paragraphs 13, 16 and 19 above that is submitted to the Debtors shall be simultaneously sent to the U.S. Trustee and counsel for the Committee. The Debtors, the U.S. Trustee and the Committee shall have 15 business days after receipt of the applicable invoice to raise a specific objection, including

quantification of the disputed amount, with the applicable professional, and failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice. Payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of this Court.

(e)     The Secured Noteholders reserve all of their rights to seek payment in these chapter 11 cases of default interest, compounded interest, make-whole amounts and any other fees, costs, charges and other amounts provided in the Indenture Agreements, the Debtors and all parties in interest shall retain their rights to object to such claims and the DIP Agents reserve all rights under the DIP Documents in connection therewith.

24.    *Perfection of DIP Liens*

(a)     Subject to the provisions of paragraph 9(a) above, the DIP Agents and the DIP Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over assets, or take any other action, in each case in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the Administrative Agent on behalf of the DIP Secured Parties shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and

51

security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of the Interim Order. Upon the request of the Administrative Agent or the Co-Collateral Agents, each of the Pre-Petition ABL Agent and Pre-Petition ABL Lenders, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the Administrative Agent to further validate, perfect, preserve and enforce DIP Liens.

(b)     A certified copy of this Final Order may, in the discretion of the Administrative Agent or the Co-Collateral Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording. For the avoidance of doubt, the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agents, the DIP Secured Parties, the Pre-Petition ABL Agent and the Pre-Petition ABL Lenders to take all actions, as applicable, referenced in this subparagraph (b) and in the immediately preceding subparagraph (a).

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby

deemed to be inconsistent with the applicable provisions of the Bankruptcy Code and

shall have no force and effect with respect to the transactions granting post-petition liens,

in such leasehold interest or the proceeds of any assignment and/or sale thereof by any

Debtor, in favor of the DIP Agents, the DIP Secured Parties, the Pre-Petition ABL

Lenders, the Notes Collateral Trustees, and the Secured Noteholders in accordance with

the terms of the DIP Documents or this Final Order.

      25.    *Preservation of Rights Granted Under the Order.*

      (a)    No claim or lien having a priority superior to or *pari passu* with

those granted by the Interim Order or this Final Order to the Administrative Agent and

the DIP Secured Parties and the Notes Collateral Trustees, respectively, shall be granted

or allowed while any portion of the Financing (or any refinancing thereof) or the

commitments thereunder or the DIP Obligations, the First Lien Notes Adequate

Protection Obligations or the Second Lien Notes Adequate Protection Obligations

remain outstanding, and the DIP Liens, the First Lien Notes Adequate Protection Liens

and the Second Lien Notes Adequate Protection Liens shall not be (i) subject or junior to

any lien or security interest that is avoided and preserved for the benefit of the Debtors'

estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari

passu with any other lien or security interest, whether under section 364(d) of the

Bankruptcy Code or otherwise; provided, in each case, that (A) solely with respect to the

Pre-Petition PPE Collateral held by the Debtors as of the Petition Date, (1) the pre-

petition liens and security interests granted to the First Lien Notes Collateral Trustee

pursuant to and in connection with the First Lien Notes Agreements; (2) the pre-petition

53

liens and security interests granted to the Second Lien Notes Collateral Trustee pursuant to and in connection with the Second Lien Notes Agreements; (3) the First Lien Notes Adequate Protection Liens in the Pre-Petition PPE Collateral; and (4) the Second Lien Notes Adequate Protection Liens in the Pre-Petition PPE Collateral are senior to the DIP Liens on such collateral and (B) if all or any portion of the Pre-Petition ABL Debt is reinstated, unless the Court orders otherwise in connection with such reinstatement, the liens and security interests of the Pre-Petition ABL Lenders securing such reinstated Pre-Petition ABL Debt shall be (1) senior to the liens and security interests upon and in the Pre-Petition ABL Collateral granted to the First Lien Notes Collateral Trustee pursuant to and in connection with the First Lien Notes Agreements and senior to the First Lien Notes Adequate Protection Liens in the Pre-Petition ABL Collateral and the Second Lien Notes Adequate Protection Liens in the Pre-Petition ABL Collateral and (2) junior and subordinate in all respects to the Carve Out and the DIP Secured Parties' liens and security interests (including, without limitation, the DIP Liens) upon and in the Unencumbered Property, and all parties reserve all rights in connection with any such reinstatement.

(b)    Unless all DIP Obligations shall have been indefeasibly paid in full (and, with respect to outstanding letters of credit issued pursuant to the DIP Credit Agreement, cash collateralized in accordance with the provisions of the DIP Credit Agreement) on terms and conditions acceptable to the DIP Agents and, except as otherwise set forth herein, the First Lien Notes Adequate Protection Obligations and the Second Lien Notes Adequate Protection Obligations shall have been paid in full, the

Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Debtors to use any and all Cash Collateral if any of the Debtors seeks, or if there is entered, (i) any modifications or extensions of this Final Order without the prior written consent of the Administrative Agent, the First Lien Group and the Second Lien Group, each in its sole discretion (and such modifications or extensions additionally being reasonably acceptable to the Lead Arrangers), and no such consent or acceptance shall be implied by any other action, inaction or acquiescence by the Administrative Agent, the Lead Arrangers, the Notes Collateral Trustees, the Notes Indenture Trustees, the First Lien Group, the Second Lien Group or any Secured Noteholder; (ii) an order converting or dismissing any of the Cases; (iii) an order appointing a chapter 11 trustee in any of the Cases; or (iv) an order appointing an examiner with enlarged powers in any of the Cases; *provided* that with respect to the foregoing clauses (i) through (iv), the consent rights of the First Lien Group and the Second Lien Group, as applicable, shall apply only to any matters directly and adversely affecting the rights of the Notes Collateral Trustees, the Notes Indenture Trustees or the Secured Noteholders under this Final Order. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (A) the DIP Superpriority Claims, the Notes Superpriority Claims, the priming liens, security interests and replacement security interests granted to the Administrative Agent, the other DIP Agents and the DIP Secured Parties and, as applicable, the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, and the Notes Collateral Trustees pursuant to the Interim Order and this Final Order shall continue in

55

full force and effect and shall maintain their priorities as provided in the Interim Order and this Final Order until all DIP Obligations, First Lien Notes Adequate Protection Obligations and Second Lien Notes Adequate Protection Obligations shall have been paid and satisfied in full and outstanding letters of credit issued pursuant to the DIP Credit Agreement have been cash collateralized in accordance with the provisions of the DIP Credit Agreement (and that such DIP Superpriority Claims, Notes Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (A) above.

(c)    If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations, the First Lien Notes Adequate Protection Obligations or the Second Lien Notes Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Administrative Agent, the First Lien Notes Indenture Trustee and the First Lien Group or the Second Lien Notes Indenture Trustee and the Second Lien Group, as applicable, of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations, First Lien Notes Adequate Protection Obligations or Second Lien Notes Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations, First Lien

56

Notes Adequate Protection Obligations or Second Lien Notes Adequate Protection

Obligations incurred by the Debtors to the Administrative Agent, the DIP Secured

Parties, the First Lien Notes Collateral Trustee, the Second Lien Notes Collateral Trustee,

the First Lien Notes Indenture Trustee, the First Lien Noteholders, the Second Lien Notes

Indenture Trustee, or the Second Lien Noteholders prior to the actual receipt of written

notice by the Administrative Agent, the First Lien Notes Collateral Trustee and the First

Lien Group and/or the Second Lien Notes Collateral Trustee and the Second Lien Group,

as applicable, of the effective date of such reversal, stay, modification or vacation shall

be governed in all respects by the original provisions of this Final Order, and the DIP

Agents, the DIP Secured Parties, the Notes Collateral Trustees, the Notes Indenture

Trustees and the Secured Noteholders shall be entitled to all the rights, remedies,

privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order

and pursuant to the DIP Documents and the Payoff Letter with respect to all uses of Cash

Collateral and proceeds of the Financing, DIP Obligations, First Lien Notes Adequate

Protection Obligations and Second Lien Notes Adequate Protection Obligations.

   (d)  Except as expressly provided in this Final Order or in the DIP

Documents, the DIP Liens, the DIP Superpriority Claims, the First Lien Notes Adequate

Protection Liens, the Second Lien Notes Adequate Protection Liens, the Notes

Superpriority Claims and all other rights and remedies of the DIP Agents, the Syndication

Agent, the DIP Secured Parties, the Notes Collateral Trustees, the Notes Indenture

Trustees and the Secured Noteholders granted by the provisions of this Final Order and

the DIP Documents, as applicable, shall survive, and shall not be modified, impaired or

discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code(except to the extent permitted by the DIP Documents) (it being understood that the First Lien Notes Adequate Protection Liens and the Second Lien Notes Adequate Protection Liens shall attach to the net proceeds of any such sale and such attachment will not be deemed to have modified, impaired or discharged the First Lien Notes Adequate Protection Liens and the Second Lien Notes Adequate Protection Liens) or (iii) solely with respect to the DIP Liens, the DIP Superpriority Claims, all other rights and remedies of the DIP Agents, the Syndication Agent and the DIP Secured Parties, and the Notes Superpriority Claims (if any), the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Final Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the First Lien Notes Adequate Protection Obligations, the First Lien Notes Adequate Protection Liens, the Second Lien Notes Adequate Protection Obligations, the Second Lien Notes Adequate Protection Liens, the Notes Superpriority Claims and all other rights and remedies of the DIP Agents, the DIP Secured Parties, the Notes Collateral Trustees, the Notes Indenture Trustees and the Secured Noteholders granted by the provisions of this Final Order and

the DIP Documents, as applicable, shall continue in full force and effect until the DIP

Obligations are indefeasibly paid in full.

26.    *Effect of Stipulations on Third Parties*.  The stipulations and admissions

contained in this Final Order, including, without limitation, in paragraph 4 of this Final

Order, shall be binding upon the Debtors and any successor thereto (except any chapter 7

or chapter 11 trustee appointed or elected for any of the Debtors during the pendency of

the Challenge Period) in all circumstances.  The stipulations and admissions contained in

this Final Order, including, without limitation, in paragraph 4 of this Final Order, shall be

binding upon the Debtors' estates and all parties in interest, including, without limitation,

any Committee or any other person or entity acting on behalf of the Debtors, unless (i) a

party in interest has timely filed an adversary proceeding or contested matter (subject to

the limitations contained herein, including, *inter alia*, in paragraph 27) by no later than

the date that is 120 days after the initial selection of counsel by the Creditors' Committee

appointed under section 1102 of the Bankruptcy Code in the Cases (or such later date (x)

as has been agreed to, in writing, and as applicable, by the Pre-Petition ABL Agent, the

First Lien Group or the Second Lien Group, each in its sole discretion or (y) as has been

ordered by the Court (the "**Challenge Period**")) (A) challenging the validity,

enforceability, priority or extent of the Pre-Petition ABL Debt, or the Pre-Petition ABL

Agent's or the Pre-Petition ABL Lenders' liens on the Pre-Petition ABL Collateral, the

First Lien Notes Indenture Obligations or the First Lien Notes Collateral Trustee's liens

on the Noteholder Collateral, the Second Lien Notes Obligations or the Second Lien

Notes Collateral Trustee's liens on the Pre-Petition PPE Collateral or (B) otherwise

59

asserting or prosecuting any action for preferences, fraudulent conveyances, other

avoidance power claims or any other any claims, counterclaims or causes of action,

objections, contests or defenses (collectively, **"Claims and Defenses"**) against (1) the

Pre-Petition ABL Agent, any of the Pre-Petition ABL Lenders or their affiliates,

representatives, attorneys or advisors in connection with matters related to the Pre-

Petition ABL Agreements, the Pre-Petition ABL Debt or the Pre-Petition ABL Collateral,

as applicable, or (2) the Notes Collateral Trustees, the Notes Indenture Trustees, any of

the Secured Noteholders or their affiliates, representatives, attorneys or advisors in

connection with matters related to the Indenture Agreements or the Noteholder Collateral,

each as applicable, and (ii) there is a final order in favor of the plaintiff sustaining any

such challenge or claim in any such timely filed adversary proceeding or contested

matter; *provided* that, as to the Debtors, all such Claims and Defenses are hereby

irrevocably waived and relinquished as of the Petition Date.  In the event of a timely and

successful challenge to the repayment of the Pre-Petition ABL Debt, this Court shall

fashion the appropriate remedy with respect to the Pre-Petition ABL Lenders after

hearing from all parties in interest, which remedy may include disgorgement of any

amounts paid to the Pre-Petition ABL Lenders on the Pre-Petition ABL Debt.  If no such

adversary proceeding or contested matter is timely filed, (x) to the extent not theretofore

indefeasibly repaid, the Pre-Petition ABL Debt, the Notes Indenture Obligations and all

related obligations (the **"Pre-Petition Obligations"**) shall constitute allowed claims

against the applicable Debtors, not subject to counterclaim, setoff, recoupment,

subordination, recharacterization, defense or avoidance, for all purposes in the Cases and

any subsequent chapter 7 cases, (y) the Pre-Petition ABL Agent's liens and the Pre-Petition ABL Lenders' liens on the Pre-Petition ABL Collateral and the Notes Collateral Trustees' liens on the Pre-Petition ABL Collateral and Pre-Petition PPE Collateral, as applicable, shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance, and such liens shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for any of the Debtors) and (z) the repayment of the Pre-Petition ABL Debt will have become irrevocable and will not be subject to restitution, disgorgement or any other challenge under any circumstances, including, without limitation, pursuant to any Claims and Defenses.  If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in paragraph 4 of this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any Committee (including the Creditors' Committee) and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter.  Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Pre-Petition ABL Agreements, the Pre-Petition Obligations, the Indenture Agreements or the Indenture Obligations.  Except as expressly provided in this Final Order, the rights and remedies of

the Pre-Petition ABL Agent and the Pre-Petition ABL Lenders granted by the provisions of this Final Order and set forth in the Payoff Letter, and the rights and remedies of the Notes Collateral Trustees, the Notes Indenture Trustees and the Secured Noteholders granted by the provisions of this Final Order shall (i) survive and shall not be modified or affected by the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code in full force and effect. Notwithstanding anything to the contrary in this Final Order, the Debtors' stipulation in paragraph 22 that they have no equity in the Noteholder Collateral shall not be binding upon the Creditors' Committee.

27.    *Limitation on Use of Financing Proceeds and Collateral.*

(a)    Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, letters of credit, Cash Collateral, Collateral or the Carve Out may be used (in each case except in connection with any proceeding or dispute contemplated by paragraph 17 above) to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Pre-Petition ABL Agreements or the Indenture Agreements, or the liens or claims granted under the Interim Order, this Final Order, the DIP Documents, the Pre-Petition ABL Agreements or the Indenture Agreements, (ii) investigate, initiate or prosecute any Claims and Defenses or causes of action against any of the DIP Agents, the Syndication Agent, the DIP Secured Parties, the Pre-Petition ABL Agent, the Pre-Petition

ABL Lenders, the Notes Collateral Trustees, the Notes Indenture Trustees, the Secured

Noteholders, or their respective agents, affiliates, representatives, attorneys or advisors

under or relating to the Pre-Petition ABL Agreements, the DIP Documents or the

Indenture Agreements, (iii) prevent, hinder or otherwise delay the DIP Agents' assertion,

enforcement or realization on the Cash Collateral or the Collateral in accordance with the

DIP Documents, the Interim Order or this Final Order, (iv) seek to modify any of the

rights granted to the DIP Agents, the Syndication Agent, the DIP Secured Parties, the

Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the Notes Collateral Trustees,

the Notes Indenture Trustees or the Secured Noteholders hereunder or under the DIP

Documents, the Pre-Petition ABL Agreements or the Indenture Agreements, in each of

the foregoing cases without such applicable parties' prior written consent or (v) pay any

amount on account of any claims arising prior to the Petition Date unless such payments

are (A) approved by an order of this Court and (B) in accordance with the DIP Credit

Agreement and any relevant budgets; *provided* that, advisors to the Committee may

investigate the liens granted pursuant to the Pre-Petition ABL Agreements and the

Indenture Agreements during the Challenge Period at an aggregate expense for such

investigation not to exceed $150,000. Notwithstanding anything to the contrary in this

Final Order, neither the Second Lien Notes Collateral Trustee, nor the Second Lien Notes

Indenture Trustee nor the Second Lien Noteholders shall have any right to consent to any

use of the Pre-Petition ABL Collateral. In the event that the Creditors' Committee is

granted standing by this Court to pursue Claims and Defenses against the Second Lien

Noteholders or the Second Lien Notes Collateral Trustee, nothing in this Final Order

shall prohibit the Creditors' Committee from requesting authority from this Court to use Cash Collateral with respect to such Claims and Defenses, or any party's right to object thereto.

28.    *Priorities Among Pre-Petition ABL Lenders.*  Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Pre-Petition ABL Lenders, such priorities and rights shall continue to be governed by the Pre-Petition ABL Agreements.

29.    *Sales of Collateral, Administrative Agent's Right to Credit Bid.*  The Administrative Agent shall have the right to credit bid the DIP Obligations in connection with any sale of Collateral conducted (i) pursuant to a plan of reorganization in any of the Cases that does not provide that all DIP Obligations will be paid in cash in full on the effective date of such plan of reorganization or (ii) pursuant to and in accordance with section 363(b) of the Bankruptcy Code; *provided*, that solely with respect to the Pre-Petition PPE Collateral, such right of the Administrative Agent shall not arise until the obligations under the First Lien Notes and the Second Lien Notes shall have been repaid in full. No sale of any Collateral shall constitute a waiver by any DIP Secured Party, the Notes Collateral Trustees, any Secured Noteholder or, to the extent applicable, any other holder of a valid, perfected and unavoidable pre-petition lien of any deficiency claim under any applicable law, regardless of whether any DIP Agent, the Syndication Agent, any DIP Lender, either Notes Collateral Trustee, any Secured Noteholder or, to the extent applicable, any other holder of a valid, perfected and unavoidable pre-petition lien

consents to or opposes such sale and regardless of whether the DIP Obligations are credit bid in connection with such sale.

30.    *Wells Fargo Capital as Pre-Petition ABL Agent.*  To the extent Wells Fargo Capital, in its role as Pre-Petition ABL Agent under the Pre-Petition ABL Agreements, is the secured party under any Control Agreements (as defined in the Pre-Petition ABL Agreements), listed as loss payee under the Debtors' insurance policies as required under the Pre-Petition ABL Security Agreement or is the secured party under any other Pre-Petition ABL Agreement, it shall turn over and distribute any proceeds recovered or received <u>first</u>, for the benefit of the DIP Lenders in accordance with the DIP Credit Agreement and <u>second,</u> subsequent to indefeasible payment in full of all DIP Obligations and only to the extent the Pre-Petition ABL Debt has been reinstated, for the benefit of the Pre-Petition ABL Lenders under the Pre-Petition ABL Agreement.

31.    *Order Governs.*  In the event of any inconsistency between the provisions of this Final Order and the DIP Documents, the provisions of this Final Order shall govern.

32.    *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agents, the Syndication Agent, the DIP Secured Parties, the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the First Lien Notes Indenture Trustee, the First Lien Notes Collateral Trustee, the First Lien Noteholders, the Second Lien Notes Indenture Trustee, the Second Lien Notes Collateral Trustee, the Second Lien Noteholders, any Committee appointed in

these Cases, the Debtors and any Person (as defined in the DIP Credit Agreement) that becomes a Domestic Subsidiary (as defined in the DIP Credit Agreement) of the Debtors and commences a case under chapter 11 of the Bankruptcy Code and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the Syndication Agent, the DIP Secured Parties, the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the First Lien Notes Indenture Trustee, the First Lien Notes Collateral Trustee, the First Lien Noteholders, the Second Lien Notes Indenture Trustee, the Second Lien Notes Collateral Trustee, the Second Lien Noteholders and the Debtors and their respective successors and assigns; *provided, however*, that the DIP Agents, the Syndication Agent and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors and the Collateral Trustees and Secured Noteholders shall have no obligation to consent to the use of their Cash Collateral or the Pre-Petition PPE Collateral in connection with any chapter 7 case (with all parties reserving their rights with respect to all such issues).  In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Final Order or the DIP Documents, the DIP Agents, the Syndication Agent and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response,

66

Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

33.    *Reports from Debtors.*  The First Lien Advisors, the Second Lien Advisors and counsel to the Creditors' Committee shall receive copies (for professionals' eyes only or subject to any applicable confidentiality agreement) of all reports provided by the Debtors to the Administrative Agent reasonably contemporaneously with delivery to the Administrative Agent.

34.    *Segregation of Proceeds.*  Notwithstanding anything to the contrary herein, (a) the Debtors will segregate any proceeds from the sale, lease, license, exchange, or other disposition of any Shared Collateral, and any insurance proceeds received in respect of any Shared Collateral that are not reinvested in such Shared Collateral, and will not use such proceeds other than (i) with the First Lien Noteholders' and, to the extent required by the CTA, the Second Lien Noteholders' further written consent or (ii) pursuant to further order of the Court and (b) the Debtors will segregate any proceeds from the sale, lease, license, exchange, or other disposition, in each case only to the extent that such is approved by final order of this Court, of all or any part of the "Facility", as such term is defined in that certain Participation Agreement dated as of December 23, 1997, between, inter alia, Debtor NewPage Wisconsin System Inc. ("**NPWS**") (as successor to Consolidated Papers, Inc.) and Wilmington Trust Company (as Owner Trustee) (together with all exhibits and schedules thereto, and as such agreement may have been supplemented or amended from time to time, the "**Participation Agreement**"), currently leased and operated by NPWS at its mill in

Stevens Point, WI, if, but only if, the Facility is ever determined by final order of this Court to be property of the Debtors' estates (such proceeds, if any, **"PM 35 Proceeds"**) and any Avoidance Proceeds (in the case of any cash PM 35 Proceeds or cash Avoidance Proceeds by depositing such funds in an escrow account held at JPMCB) and will not use the PM 35 Proceeds or the Avoidance Proceeds except (1) in the case of the Avoidance Proceeds only, in accordance with paragraph 9(b) above or (2) pursuant to further final order of the Court.

35.    *Paper Machine 35.*  Notwithstanding anything to the contrary in this Final Order, the Interim Order, or the DIP Documents, with respect to (a) all or any part of the Facility that is determined by final order of this Court to be property of the Debtors' estates and (b) the "Site", the "Plant", the "Parcel", the "Easement Area", the "Dedicated Support Facilities", the "Facility Support Facilities", the "Facility Support Items", and the "Common Facilities" (in each case, with the meaning ascribed to each such term in the Participation Agreement): (I) the stipulations and provisions of this Final Order, the Interim Order, and the DIP Documents are without prejudice to the rights of any party to the Participation Agreement, or any successor or assign of such party (including without limitation by merger, subrogation, or other operation of law) that is determined by final order to hold a valid, perfected and unavoidable pre-petition lien or leasehold interest on all or any part of items in the foregoing clauses (a) and (b) with respect to such lien or leasehold interest and any such liens and leasehold interests hereof shall not be primed by any of the liens or claims granted under this Final Order, the Interim Order, or the DIP Documents and (II) all parties reserve all rights related to the existence of any prepetition

lien on all or any part of the Facility that is determined by final order to be property of the

Debtors' estates in favor of the First Lien Notes Collateral Trustee, the First Lien

Noteholders, the Second Lien Notes Collateral Trustee and/or the Second Lien

Noteholders.

36.     *Effectiveness.* This Final Order shall constitute findings of fact and

conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the

Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules

4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a)

of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective

and enforceable upon its entry and there shall be no stay of execution or effectiveness of

this Final Order.


Dated:    October 5, 2011
          Wilmington, DE

                                    _____
                                    The Honorable Kevin Gross

                                    Chief Judge, United States Bankruptcy Court

69