**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ---------------------------------------------------------x | : | **Chapter 11** |
| **In re:** | : | |
| | : | **Case No.: 11-12804 (KG)** |
| **NEWPAGE CORPORATION,** *et al.*, | : | **(Jointly Administered)** |
| | : | |
| Debtors. | : | **Hearing Date:  TBD** |
| | : | |
| | : | Ref. Docket Nos. 1530, 1739, 1745, 1749 and 1764 |
| ---------------------------------------------------------x | | |

**OMNIBUS REPLY TO OBJECTIONS TO MOTION FOR ORDER UNDER
11 U.S.C. §§ 105, 1103, AND 1109 AUTHORIZING OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO COMMENCE
AND PROSECUTE CERTAIN CLAIMS ON BEHALF OF DEBTORS' ESTATES**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

ARGUMENT.........................................................................................................................4

I.    The Claims Asserted in the Proposed Complaint Are Colorable .........................................5

    A.    The Collapsing Doctrine is Applicable and Does Not Require Actual
        Fraud ..............................................................................................................5

    B.    The Bankruptcy Code Provides for the Avoidance of Obligations Which
        Were Fraudulently Incurred................................................................................7

    C.    Objectors' Attempt to Limit the Committee to New York Law Is Baseless
        and Irrelevant .................................................................................................9

    D.    Sections 546(e) and 550(b) Do Not Immunize from Avoidance Either the
        Transfer of Liens or the Incurrence of Obligations at Issue in this Action............12

    E.    The Debt Incurred in the 2009 Refinancing Is Avoidable .....................................16

    F.    Debtors' Transfers and Incurrences in Connection With the 2007 SENA
        Acquisition Were Not Supported by Reasonably Equivalent Value .....................19

    G.    Objectors' Factual Challenges to the Proposed Complaint's Colorable
        Allegations of Unreasonably Small Capital Are Without Merit............................23

    H.    The Proposed Complaint Asserts Colorable Claims Based on the Eve-of-
        Bankruptcy Transfer to the Port Hawkesbury Subsidiary ....................................30

II.    Given the Potential Benefits of the Proposed Litigation and the Debtors' Waiver
    of the Prospective Claims, the Debtors Have Unjustifiably Refused to Assert
    Them .................................................................................................................33

    A.    Having Waived and Now Denounced the Estates' Claims, It is of No
        Solace That the Debtors May Wish to Resolve Such Claims Under a Plan ..........33

    B.    Absent Prosecution of the Estates' Claims by a Faithful Fiduciary,
        Unsecured Creditors Should Expect Little to Nothing From the Debtors .............34

    C.    The Estate and Unsecured Creditors Stand to Benefit Greatly..............................35

    D.    Prosecution of the Proposed Complaint Will Not Harm the Debtors'
        Operations or Prospects of Reorganization.........................................................37

CONCLUSION....................................................................................................................39

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*,
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) .......................................................................4

*Ambrosini v. Labarraque*,
    101 F.3d 129 (D.C. Cir. 1996) ...............................................................................38

*Anderson v. Architectural Glass Constr., Inc. (In re Pfister)*,
    2012 WL 1144540 (Bankr. D.S.C. April 4, 2012) .................................................10

*Boyer v. Crown Stock Distribution, Inc.*,
    587 F.3d 787 (7th Cir. 2009) .................................................................................27

*In re CNB Intern. Int'l, Inc.*,
    440 B.R. 31 (W.D.N.Y. 2010) ..................................................................................6

*In re Centaur, LLC*,
    2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) ..................................................4

*In re Charys Holding Co., Inc.*,
    2010 WL 2774852 (D. Del. July 12, 2010) ............................................................31

*In re Comark*,
    145 B.R. 47 (9th Cir. 1992) ...................................................................................12

*Connecticut National Bank v. Germain*,
    503 U.S. 249 (1992).................................................................................................11

*In re Crown Vantage, Inc.*,
    2006 WL 2348850 (N.D. Cal. Aug. 11, 2006) .......................................................12

*In re Crowthers McCall Pattern, Inc.*,
    120 B.R. 279 (Bankr. S.D.N.Y. 1990).....................................................................18

*Crowthers McCall Pattern, Inc. v. Lewis*,
    129 B.R. 992 (S.D.N.Y. 1991).................................................................................6

*In re DBSI, Inc.*,
    445 B.R. 344 (Bankr. D. Del. 2011) ...................................................................31, 32

*In re Distributed Energy Sys. Corp.*,
    No. 08-1101 (KG) (Bankr. D. Del. July 30, 2008) .......................................5, 30, 34

*In re Distributed Energy Systems, Corp.*,
    No. 08-11101 (KG) (Bankr. D. Del. July 30, 2008) ...............................................47

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron)*
    651 F.3d 329 (2d Cir. 2011)....................................................................................12

*In re G-I Holdings, Inc.*,
  313 B.R. 612 (Bankr. D. N.J. 2004) ....................................................................4

*HBE Leasing Corp. v. Frank*,
  48 F.3d 623 (2d Cir. 1995) ...............................................................5, 6, 16

*In re Hechinger Inv. Co. of Del.*,
  327 B.R. 537 (D. Del. 2005) .............................................................5

*In re Imperial Credit Industries, Inc.*,
  527 F.3d 959 (9th Cir. 2008) ..........................................................15

*Infinity Investors Ltd. ex rel. Yes! Entm't Corp. v. Kingsborough (In re Yes! Entm't Corp.)*,
  316 B.R. 141 (D. Del. 2004) ...........................................................4, 30

*In re Ion Media Networks, Inc.*,
  419 B.R. 585 (Bankr. S.D.N.Y. 2009) ..............................................36

*In re Jevic Holding Corporation*,
  2011 WL 4345204 (Bankr. D. Del. Sep. 15, 2011) ...........................7, 17

*In re Lehman Brothers, Inc.*,
  458 B.R. 134 (Bankr. S.D.N.Y. 2011) ..............................................29

*In re Lyondell Chemical Co.*,
  No. 09-01375 (RG) (Bankr. S.D.N.Y. Sept. 24, 2009) .....................37

*MC Asset Recovery LLC v. Commerzbank AG (In re Mirant)*,
  675 F.3d 530 (5th Cir. 2012) ..........................................................10, 11

*In re M. Fabrikant & Sons, Inc.*,
  394 B.R. 721 (Bankr. S.D.N.Y. 2008) ..............................................18

*In re MIG, Inc.*,
  2009 Bankr. LEXIS 4313 (Bankr. D. Del. Dec. 18, 2009) ................4

*In re MacMenamin's Grill Ltd.*,
  450 B.R. 414 (Bankr. S.D.N.Y. 2011) ..............................................15

*In re Mervyn's Holdings*,
  426 B.R. 488 (Bankr. D. Del. 2010) .................................................6, 7, 16

*In re Nat'l Forge Co.*,
  326 B.R. 532 (Bankr. W.D. Pa. 2005) ..............................................33

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*,
  330 F.3d 548 (3d Cir. 2003) ............................................................3

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*,
  326 B.R. 532 (W.D. Pa. 2005) .........................................................5

*Orr v. Kinderhill Corp.*,
  991 F.2d 31 (2d Cir. 1993) ..............................................................5

*Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*,
  174 B.R. 557 (Bankr. N.D. Cal. 1994) ................................................................8

*In re Palisades at West Paces Imaging Center., LLC*,
  2011 WL 4459778 (Bankr. N.D. Ga. 2011) ........................................................18

*In re Plassein Int'l Corp. v. BA Capital Co. LP (In re Plassein Int'l Corp.)*,
  366 B.R. 318 (Bankr. D. Del. 2007) ....................................................................7

*In re Porter*,
  2009 WL 902662 (Bankr. D.S.D., March 13, 2009) ..........................................11

*In re Qimonda Richmond, LLC*,
  2012 WL 1021789 (Bankr. D. Del. Mar. 26, 2012)......................................13, 15

*In re Revco D.S., Inc.*,
  118 B.R. 468 (Bankr. D. Ohio 1990) ..................................................................18

*In re SemCrude, L.P.*,
  399 B.R. 388 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010) ............29

*Sergeant v. OneWest Bank (In re Walter)*,
  462 B.R. 698 (Bankr. N.D. Iowa 2011) ..............................................................11

*United States v. Tabor Court Realty Corp.*,
  803 F.2d 1288 (3d Cir. 1986).........................................................5, 6, 8, 16

*In re TOUSA, Inc.*,
  422 B.R. 783 (Bankr. S.D. Fla. 2009) ................................................................29

*In re TOUSA, Inc.*,
  2012 WL 1673910 (11th Cir. 2012) ..............................................................17, 21

*In re TSIC, Inc.*,
  428 B.R. 103 (Bankr. D. Del. 2010) ...................................................................18

*United States v. Ron Pair Enter., Inc.*,
  489 U.S. 235 (1989).............................................................................................8

### Statutes

11 U.S.C. § 105.......................................................................................................1, 19

11 U.S.C. § 1103.....................................................................................................1, 19

11 U.S.C. § 1109.....................................................................................................1, 19

11 U.S.C. § 544.......................................................................................................8, 10

11 U.S.C. § 544(a)..............................................................................................8, 10, 15

11 U.S.C. § 544(a)(1)...................................................................................................15

11 U.S.C. § 544(b)..........................................................................................10, 11, 14

11 U.S.C. § 546(e) ...............................................................................................12, 13, 14, 15

11 U.S.C. § 548...............................................................................................................8, 28, 29

11 U.S.C. § 548(c) ....................................................................................................................8

11 U.S.C. § 550(b) ...........................................................................................12, 14, 15, 16

11 U.S.C. § 551.......................................................................................................................34

12 U.S.C. § 1828(u) ..............................................................................................................15

28 U.S.C. § 3003(c) ..............................................................................................................11

N.Y. U.C.C. §§ 9-203(a) - (b)...............................................................................................14

01:12210437.1

The Official Committee of Unsecured Creditors (the "Committee")[1] of NewPage Corporation ("NewPage") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, "Debtors") hereby files this omnibus reply in response to the objections filed by Debtors, Bank of New York Mellon (the "Indenture Trustee"), Goldman Sachs Credit Partners L.P. and Goldman, Sachs & Co. ("Goldman Sachs"), and Wells Fargo Capital Finance, LLC (the "Revolver Agent"; collectively, "Objectors"[2]) to the motion (the "Motion") for entry of an order authorizing the Committee to commence and prosecute certain causes of action on behalf of the Debtors' estates against parties asserting claims against the Debtors and holding liens granted pursuant to Debtors' failed leveraged acquisition transaction. In further support of the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Court decisions in this and every other district caution that contested motions for derivative standing are not to be "mini-trials." The Objectors (each one a prospective defendant, other than the Debtors) nonetheless deluged the Court with thousands of pages of briefing and contested factual content. This effort to turn civil procedure on its head, seeking to distract the Court from the appropriate standard and process through sheer volume,

---

[1]   Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in the Motion for Order Under 11 U.S.C. §§ 105, 1103, and 1109 Authorizing Official Committee of Unsecured Creditors to Commence and Prosecute Certain Claims on Behalf of Debtors' Estates, filed May 4, 2012, ECF No. 1530 (the "Motion"). Further, references to "Section" refer to sections of Title 11 of the United States Code.

[2]   The Objectors' filings total more than 190 pages, exclusive of supporting declarations and voluminous exhibits. For the Court's convenience, the Committee is filing an omnibus reply brief to address the arguments and factual assertions of the Objectors, rather than burdening the Court with four separate reply briefs, which could have totaled 80 pages. Under these circumstances, the Committee believes the omnibus reply is not subject to the 20 page limit for individual reply briefs as set forth in Del. Bankr. L.R. 7007-2(a)(iv) ("Local Rule 7007-2") and incorporated pursuant to the Court's General Chambers Procedures.

should be rejected.  The proper analysis of the Proposed Complaint[3] is straightforward:  First, are

the prospective claims colorable?  Second, should the costs be incurred to pursue the claims in

view of the potential benefits to the estate (and its unsecured creditors)?

        2.        The claims are more than colorable.  The SENA Acquisition massively

levered both the legacy NewPage Debtors and the new SENA Debtors (*i.e.*, with more than $1.5

billion of new debt).  This transaction left the Debtors with unreasonably small capital when

tested against foreseeable and predictable industry downturns.  To be clear, the Committee does

not rely on, nor are the claims premised on, results stemming from the so-called "Great

Recession."   Moreover, notwithstanding the Objectors' assertions, no new, valuable

consideration was injected into the Debtors.  The fact that Stora Enso Oyj ("Stora"), the target

Debtors' former parent, received "take-back paper" hardly reflects "skin in the game" when

viewed in the context of Stora's contemporaneous receipt of approximately $1.5 billion in cash,

and it certainly did not contribute anything to the combined-entity's financial condition.  Indeed,

from the perspective of the SENA Debtors, this transaction was a quintessential leveraged

buyout: all of the cash that was flushed out to Stora came from staggering amounts of new debt

incurred for such purpose.  The interests of unsecured creditors were sacrificed to fund the

stockholders' payday.

        3.        Objectors argue the Committee's cost-benefit analysis is over-simplified.

Given the circumstances of these cases, however, the determination is straightforward.  As

Objectors uniformly trumpet, unsecured creditors now stand to receive nothing because they

were buried underneath billions of dollars of secured debt pursuant to the SENA Acquisition.

The Committee's prospective litigation seeks to alleviate the burden on the estate and unlock

---

[3]  *See* Motion, Ex. B.

significant value for unsecured creditors by freeing assets from those asserting liens against the

estate.  The cost of litigation must be viewed against the potential benefit; the estate and

unsecured creditors have little to lose and much to gain.

       4.      The Debtors' operations are not likely to suffer any negative effects from

the pursuit of these causes of action.  Business results, customer and supplier relations, and

employee retention have all been positive during the pendency of these cases—which the

Debtors do not deny.  The Debtors offer speculative and unsupported views of what might go

wrong—all of which could arise outside of the chapter 11 context.

       5.      The Debtors' opposition to the Motion actually *supports* the Committee's

cost-benefit analysis.  The Debtors unabashedly try to support their prior decision to waive the

Committee's claims, leaving no mystery as to what sort of recovery the Debtors might fight for

their unsecured creditors to receive under a plan.  When asked what plan term sheets were being

exchanged between the Debtors and secured lenders, the Debtors' lead counsel refused to

provide them, presumably because they provided zero recovery for anyone but lienholders.

       6.      In other words, the Debtors have sent a clear signal to their unsecured

creditors that they should fend for themselves—that their debtor in possession has waived the

only claims that could protect the interests of unsecured creditors.  Indeed, as a result of this

waiver, the Committee was entirely shut out from plan negotiations prior to the filing of the

Motion.  The Debtors' request for denial of the Motion so that they may absurdly "settle" or

"resolve" the already-waived claims is simply an attempt to end the Committee's constituents'

hopes for a meaningful recovery.  Both Congress and the Third Circuit sitting *en banc*

envisioned something more from a fiduciary in chapter 11.  *See Official Comm. of Unsecured*

*Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 568, 580

(3d Cir. 2003).

## ARGUMENT

7.      The standard for granting derivative standing to statutory creditors'

committees is undisputed: it requires (1) the existence of a colorable claim; (2) the debtor's

unjustifiable refusal to pursue the claim (or, alternatively, a showing that a demand that the

debtor pursue the claim would be futile); and (3) the permission of the bankruptcy court to

initiate the action.  *See Infinity Investors Ltd. ex rel. Yes! Entm't Corp. v. Kingsborough (In re*

*Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004).  As discussed in the Motion, the

colorability requirement is less stringent than that of Federal Rule of Civil Procedure 12(b)(6).  It

is met relatively easily, so long as the claims are not "without merit."  (Motion ¶ 10.)  Courts

from other districts are in accord, noting that even if legal arguments are raised which could

result in dismissal of certain claims, litigation should move forward where prospective

defendants' "legal contentions . . . fall far short of being 'show-stopper' issues that could presage

defeat for the Creditors' Committee in the litigation as a whole, especially before factual

inquiry."  *Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*, 330 B.R.

364, 378 (Bankr. S.D.N.Y. 2005).

8.      A cost-benefit analysis may be appropriate in order to assess whether

debtors have unjustifiably refused to assert claims, but even the cases cited by Objectors

uniformly warn that the Court should not hold a "mini-trial" to determine standing.  *See In re*

*Centaur, LLC*, 2010 WL 4624910, *6 (Bankr. D. Del. Nov. 5, 2010); *In re MIG, Inc.*, 2009

Bankr. LEXIS 4313, *4 (Bankr. D. Del. Dec. 18, 2009); *In re G-I Holdings, Inc.*, 313 B.R. 612,

629 (Bankr. D. N.J. 2004).  Moreover, this threshold is lowered where unsecured creditors are

forecast to recover little or nothing—understandably, as the estate has little to risk and much to

gain in such a circumstance.  *See* Tr. of Proceedings 6, 44, *In re Distributed Energy Sys. Corp.*,

No. 08-1101 (KG) (Bankr. D. Del. July 30, 2008).  Finally, courts consider "whether there exists

a conflict of interest between the debtor and the parties against whom the derivative action is

directed and whether the creditors' interests are otherwise protected in view of the debtor's

refusal."  *See Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R.

532, 548 (W.D. Pa. 2005).

I.      **The Claims Asserted in the Proposed Complaint Are Colorable**[4]

        A.      **The Collapsing Doctrine is Applicable and Does Not Require Actual Fraud**

                9.      Goldman Sachs, the Indenture Trustee, and the Revolver Agent argue that

the collapsing doctrine is not available to the Committee because it has not alleged actual fraud.

(IT Obj. ¶ 25; GS Obj. ¶ 27; WF Obj. at 17-18.)  However, the collapsing doctrine in the context

of leveraged buy-out transactions has been endorsed by Courts of Appeals across the country

without any actual fraud requirement.  Indeed, the theory of collapsing "finds its most frequent

application to lenders who have financed leveraged buyouts of companies that subsequently

become insolvent[.]"  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995), *citing Orr

v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993) ("It is well established that multilateral

transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single

transaction for analysis under [fraudulent transfer law]."); *see also United States v. Tabor Court

Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986) (affirming propriety of collapsing the steps of

an LBO transaction to determine fraudulent conveyance liability and looking "beyond the

---

[4]     The Committee disagrees with Debtors' contention that Stora is a necessary party to the proposed litigation.  (*See* Dbtr. Obj. ¶¶ 123-130.)  Nevertheless, the Committee is evaluating potential claims against Stora and will file a supplemental standing motion to sue Stora as appropriate.  When such a motion is filed and claims are commenced, the Committee has no objection to consolidating complaints, or amending the Proposed Complaint to add Stora.  Unlike with respect to the secured lenders, the Committee is not faced with a filing deadline for Stora.

exchange of funds between [the lender] and the [debtors]" because "[t]he two exchanges were part of one integrated transaction"); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 546-47 (D. Del. 2005) (collapsing leveraged buy-out where directors and lenders "all knew about the multiple steps of the transaction. Each step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent and merge Builder's Square and Hechinger" even in absence of intentional fraud).

10.    In determining whether the collapsing doctrine should apply, this court has considered the following factors: (1) whether all parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own; and (3) whether each transaction was dependent or conditioned on other transactions. *See In re Mervyn's Holdings, LLC*, 426 B.R. 488, 497 (Bankr. D. Del. 2010) (citations omitted).

11.    The facts set forth in the Proposed Complaint amply support the Committee's claim that the lending and purchase aspects of the SENA Acquisition were one integrated transaction and that the parties involved had knowledge of the Debtors' overall scheme. (Proposed Complaint ¶¶ 5, 49-50, 57-60.) Moreover, as discussed below, the SENA Acquisition was a quintessential LBO, at least from the perspective of the SENA Debtors.

12.    Contrary to Objectors' assertions, intentional fraud is not required for collapsing. Courts routinely collapse transactions in constructive fraud analysis "without regard to the actual intent of the transferor or the transferee." *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 997 (S.D.N.Y. 1991). Indeed, the Third Circuit has ruled that actual knowledge is not a required element for collapsing. *See Tabor Court Realty Corp.*, 803 F.2d at 1295 (lenders "knew, or should have known" that monies would not be retained by debtor); *see also HBE Leasing*, 48 F.3d at 636 (transferee need not have actual knowledge of the scheme that renders

the conveyance fraudulent); *In re CNB Int'l, Inc.*, 440 B.R. 31, 42 n.6 (W.D.N.Y. 2010)

("[k]nowledge for purposes of collapsing is knowledge of the multiple, integrated layers of the

transaction rather than knowledge of any fraud or voidability"); *In re Mervyn's Holdings, LLC*,

426 B.R. at 498 (constructive knowledge of the fraudulent transactions is sufficient); *In re Jevic*

*Holding Corp.*, 2011 WL 4345204, at *5 (Bankr. D. Del. Sep. 15, 2011) ("Whether the parties

had the requisite intent can be ascertained by demonstrating that the transactions sought to be

collapsed are interdependent because each step of the collapsed transaction would not have

occurred on its own, as each relied on additional steps to fulfill the parties' intent.").

13.     Objectors argue this court held that actual fraud was a necessary requisite

to collapsing in *In re Plassein Int'l Corp. v. BA Capital Co. LP (In re Plassein Int'l Corp.)*, 366

B.R. 318 (Bankr. D. Del. 2007).  In *Plassein*, however, this court did not contemplate collapsing

(1) a debtor's transaction with a lender and (2) a debtor's transaction with a shareholder (as in a

classic LBO, and as here).  Rather, it faced the prospect of collapsing a debtor's transaction with

a non-debtor's transaction.  *Id.* at 326.  That the court applied a heightened standard when faced

with piercing corporate veils and collapsing *entities*, as opposed to *integrated transactions*, is

neither surprising nor relevant to this case.  Indeed, in *Plassein*, the court found that the

complaint failed to "allege any relationship whatsoever among the transactions. . . ."  *Id*.  The

circumstances here, as alleged in the Proposed Complaint, describe the paradigmatic scenario to

collapse transactions.  Objectors' requests to impose an additional requirement of actual fraud

should be rejected.

### B.     The Bankruptcy Code Provides for the Avoidance of Obligations Which Were Fraudulently Incurred

14.     The Indenture Trustee argues that the 2007 Term Loan obligations were

unavoidable as a matter of law, and therefore the 2009 Refinancing of those obligations

01:12210437.1

7

constitutes payment of valid, antecedent debt.  (*See* IT Obj. ¶¶ 54-58.)  The Debtors similarly

conclude that "even if the Committee were to prevail in its avoidance action, the former secured

creditors would merely join the ranks of the unsecured creditors."  (*See* Dbtr. Obj. ¶ 76.)

Objectors want to rush to the remedy stage and dictate that the Court find good faith by the 2007

Lenders, thereby preserving some claim for them, albeit unsecured.  These arguments are

disproved by the plain text of Sections 544 and 548, which provide for the avoidance of any

"obligation" fraudulently incurred by the debtor (whether actual or constructive), not merely the

transfer of a lien securing any such obligation.  11 U.S.C. §§ 544(a), 548.  Congress could have,

but did not, limit an estate's chapter 5 avoidance powers to read as Objectors suggest.  The

statute's plain language controls.[5]  *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241

(1989) (noting that where the Bankruptcy Code is plain, court inquiry begins and ends with the

text).

        15.      The Indenture Trustee does not—and cannot—offer case law to support its

theory that the Committee must prove actual fraud to avoid an obligation.  *See Pajaro Dunes*

*Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*, 174 B.R. 557, 597 (Bankr. N.D.

Cal. 1994) (stating avoidance of an obligation is "*usually* reserved for cases of actual fraud" and

citing cases in which obligations were avoided when proceeds went to entity other than avoiding

debtor) (emphasis added).  Moreover, the assertion by Objectors that the 2007 lenders gave value

to the Debtors ignores the well-settled "collapsing" doctrine (discussed above) which is centrally

premised on the very notion that value was *not* given to the debtor when integrated transactions

are collapsed.  These cases turn on whether the lenders had knowledge of the integrated nature of

the transaction, not on whether the lenders acted with actual fraudulent intent.  *See Tabor Court*

---

[5]   New York and Ohio could also change the language of their respective fraudulent conveyance laws to
apply only to actual fraud.  They too have chosen not to do so.

*Realty Corp.*, 803 F.2d at 1302 n.8 (lender in an LBO participated in meetings and was intimately involved with the formulation of the agreement whereby the proceeds of its loan were "funneled into the hands of the purchasers of the stock of a corporation that was near insolvency").  Objectors' argument—that "value" should be acknowledged under Section 548(c) notwithstanding that, under the collapsing doctrine, it would not be for purposes of Section 548(a)(1)(B)(i)—is entirely unsupported in the statute and would moot the collapsing doctrine entirely.

> **C.    Objectors' Attempt to Limit the Committee to New York Law Is Baseless and Irrelevant**

16.    Seeking to restrict their own estates' avoidance powers, the Debtors assert that "New York law clearly applies."  (Dbtr. Obj. ¶ 144; *see also* IT Obj. ¶ 23, n.29.)  As an initial matter, as the Debtors' own filing makes clear, the choice of law issue will likely be a complex, factual dispute.  The Debtors argue that the transactions were "primarily negotiated" in New York but concede that "[t]here were participants at NewPage's headquarters in Miamisburg, Ohio, as well."  (Dbtr. Obj. ¶ 144, n.126.)  The Indenture Trustee admits that the Debtors are headquartered in Ohio.  (IT Obj. ¶ 23, n.29.)

17.    Neither objection includes any reference to the location of the Debtors' unsecured creditors.  Choice of law hinges on asserting creditors' rights, not the debtor's rights as a corporate entity that transacted certain business in New York with secured creditors.  *See* Thomas Day, *Solution for Conflict of Laws Governing Fraudulent Transfers: Apply the Law That Was Enacted to Benefit the Creditors*, 48 Bus. Law. 889 (1993) (arguing in favor of applying the law of the location of the creditors whose rights fraudulent transfer law will prospectively protect and noting that courts have not given much weight to the transferor's and transferee's location or the place the decision was made to transfer and have "unanimously

rejected arguments that a choice of law provision in a contract should govern as binding on third party creditors"). This issue can hardly be resolved in summary fashion as Objectors propose.

18.    More importantly, the claims would not suffer even if the applicable law were from New York and not Ohio. Ohio fraudulent transfer law allows for *avoid*ance of obligations where unreasonably small capital is alleged,[6] while New York fraudulent conveyance law requires insolvency or intention to incur debts beyond a debtor's ability to pay. The Proposed Complaint fulfills the requirements for pleading a fraudulent conveyance under New York law. The Committee has presented well-pleaded allegations of unreasonably small capital *as well as* knowledge that debt was being incurred beyond an ability to pay as it matured. (*See* Proposed Complaint, Counts I and III.) The Proposed Complaint alleges that, *inter alia*, the Debtors' forecasts did not account for the very kind of downturn that had previously occurred. (Proposed Complaint ¶ 79.) The Debtors therefore knew or should have known that it would not be possible to continue paying their debts as they came due in the event of an entirely predictable slump.

19.    The Committee is not limited to New York *or* Ohio law in any event, as the Proposed Complaint includes claims under Section 544 incorporating the Fair Debt Collection Practices Act ("FDCPA"). The FDCPA avoids obligations even if the allegations are limited to unreasonably small capital—which, as discussed above, is not the case here. Objectors cite *MC Asset Recovery LLC v. Commerzbank AG (In re Mirant)*, 675 F.3d 530 (5th Cir. 2012) for the proposition that Section 544(a) would not operate to give the estate standing to

---

[6]    Debtors suggest that Delaware law might apply pursuant to the "internal affairs" doctrine. (Dbtr. Obj. ¶ 144, n.129.) They then contend that, were that the case, all claims asserted under New York or Ohio law must be dismissed. The factual bases for claims under Delaware law have been pled in detail, just as they have been under Ohio law. Both Delaware and Ohio have incorporated the Uniform Fraudulent Transfer Act and are nearly identical. Were Delaware law to apply, accordingly, the claims would be colorable just as they are under Ohio law.

pursue such a claim.  (Dbtr. Obj. ¶¶ 145, 147; IT Obj. ¶ 23, n.29.)  However, Objectors neglect

or discount the multiple contrary decisions based on the plain and unambiguous language of

Section 544(b).  *See Anderson v. Architectural Glass Constr., Inc. (In re Pfister)*, 2012 WL

1144540, *7-8 (Bankr. D.S.C. April 4, 2012) (allowing avoidance of a constructive fraudulent

transfer under Section 544(b) with the FDCPA and relevant state law, as well as under Section

548(a)(1)(b)); *In re Porter*, 2009 WL 902662, *20-21 (Bankr. D.S.D. March 13, 2009) (allowing

avoidance as fraudulent transfer under Section 544(b) and the FDCPA); *Sergeant v. OneWest

Bank (In re Walter)*, 462 B.R. 698, 712 (Bankr. N.D. Iowa 2011) (finding sufficient pleading of

constructive fraudulent transfer under the FDCPA and applicable state law to avoid the transfer

under Section 544(b)).

          20.     Moreover, the *Mirant* decision runs contrary to Supreme Court precedent

rejecting the use of legislative history in the face of a clear and unambiguous statute.  *See

Connecticut National Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("in interpreting a statute a

court should always turn first to one, cardinal canon before all others . . . . courts must presume

that a legislature says in a statute what it means and means in a statute what it says there").  The

FDCPA provides that "[t]his chapter shall not be construed to supersede or modify the operation

of [the Bankruptcy Code]."  28 U.S.C. § 3003(c).  Yet by holding that the FDCPA fraudulent

transfer provision was not "applicable law" under Section 544(b), the court did just that.  The

Fifth Circuit justified its ruling that the FDCPA called for a different result than state fraudulent

transfer law under Section 544(b) based on a Representative's statement that Bankruptcy Code

references to "nonbankruptcy law" should be read as if the FDCPA did not exist.  *In re Mirant*,

675 F.3d at 535-536.  The Fifth Circuit's reliance on this legislative history is troubling not only

because the Supreme Court has repeatedly criticized such resort to legislative history, but also

because the Representative's statement purporting to interpret the Bankruptcy Code, and not the

FDCPA, was made years after the Bankruptcy Code was adopted by Congress.

     **D.**     **Sections 546(e) and 550(b) Do Not Immunize from Avoidance Either the Transfer of Liens or the Incurrence of Obligations at Issue in this Action**

     21.     Objectors assert that Sections 546(e) and 550(b) bar the bulk of the

avoidance claims in the Proposed Complaint (Dbtr. Obj. ¶¶ 168-171; IT Obj. ¶¶ 62-62), but the

Code provisions have no such effect.  As a result, notwithstanding Objectors' attempt to broaden

the scope of these provisions beyond the plain language of the Bankruptcy Code and what is

permitted by the case law, Objectors' challenge to the colorability of the avoidance claims in the

Proposed Complaint must fail.

     22.     First, Objectors cannot use Section 546(e) to insulate from avoidance the

liens transferred upon creation of the 2007 Term Loan.  Simply put, the safe harbor of Section

546(e) does not extend to such bank debt.  Payments against ordinary bank loans are not

settlement payments in connection with a securities contract or any of the other transactions

delineated in Section 546(e).  *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re

Enron)*, 651 F.3d 329, 337 (2d Cir. 2011) (noting that the court's decision "does not contradict

caselaw permitting avoidance of payments made on ordinary loans" and that the court's

interpretation of the statute's language "will exclude from the safe harbor payments made on

ordinary loans"); *see also In re Comark*, 145 B.R. 47 (9th Cir. 1992) (indicating that mere

ordinary loans are not "securities transactions" for the purposes of safe harbor application);  *In re

Crown Vantage, Inc.*, 2006 WL 2348850, at *1, *5 (N.D. Cal. Aug. 11, 2006) ("An agreement by

a bank to loan money is not a transaction on a public market, let alone one that involves the

process of clearing trades.").  Case law in multiple circuits supports this distinction.  *See In re

Enron*, 651 F.3d at 337 (collecting cases).  The safe harbor provisions invoked by the Debtors

and the Indenture Trustee, accordingly, cannot be used to protect liens issued in connection with the 2007 Term Loan from avoidance.  To the extent the Objectors seek to argue the lien transfers were in connection with a contract other than the pertinent Term Loan documents (e.g., a contract related to Stora), courts in this district have applied a specific transaction analysis for purposes of the safe harbor provision.  *See In re Qimonda Richmond, LLC*, 2012 WL 1021789, at *4 (Bankr. D. Del. Mar. 26, 2012) (rejecting argument that transfer on account of letter of credit was in connection with securities secured by letter of credit for purposes of Section § 546(e)).

23.    Next, Objectors contend that the liens securing the 2009 First Lien Notes cannot be avoided because the notes are securities that fall within the scope of Section 546(e). Here, however, Objectors must invoke a fiction to support their argument—namely, they assert that liens securing the 2009 First Lien Notes are distinct from, and thus not a continuation of, the liens first granted in 2007 in connection with an ordinary loan.  On this point, Objectors are demonstrably incorrect.  The grant of the liens securing the 2009 First Lien Notes was pursuant to the 2007 Security Agreement.  There was no new security agreement granting liens to the 2009 First Lien Noteholders, nor were any new U.C.C. financing statements filed to perfect the liens.  Rather, the liens securing the 2009 First Lien Notes are reflected in documents that existed well prior to the issuance of the Notes.  Section 9 of the 2007 Security Agreement, for example, provides:  "This Agreement shall create a *continuing* security interest in the Collateral and shall remain in full force and effect until the Discharge of Priority Lien Obligations. . . ."  2007 Security Agreement, § 9 (emphasis added).  Thus, additional priority lien debt—including the 2009 First Lien Notes—does not result in a new lien being granted; rather, the original 2007 lien grant simply covers the new issuance.

24.     Section 10.01 of the 2009 Indenture recognized no new grant was contemplated or required, providing that "all Priority Liens granted at any time by the Company or any Guarantor shall secure, equally and ratably, all present and future Priority Lien Obligations." 2009 Indenture, § 10.01(a).  Additionally, pursuant to Section 10.01, the "Priority Lien Representative of each future Series of Priority Lien Debt shall be required to deliver a Lien Sharing and Priority Confirmation to the Collateral Trustee and the Trustee at the time of incurrence of such Series of Priority Lien Debt," confirming that the liens are shared equally and ratably by all priority debt.  2009 Indenture, § 10.01.  The 2009 documentation, like the agreements from 2007, demonstrates that new liens did not arise with the issuance of new priority lien debt—they are a continuation of the prior liens granted under the 2007 Security Agreement, which are then shared with all other priority lien debt.[7]

25.     Third, the Indenture Trustee argues that even if the lien securing the priority debt was continued (which it was), Sections 546(e) and 550(b) prohibit avoidance of the lien because it was transferred to the First Lien Noteholders in 2009.  (IT Obj. ¶ 71.)  This argument falls flat for at least two reasons:  The liens were transferred to the Collateral Trustee in 2007 and there they remain (Proposed Complaint ¶10, Counts I-II), thus there was no subsequent transfer to the Indenture Trustee or the First Lien Noteholders.  And, even assuming (contrary to fact) that the liens were subsequently transferred in 2009, Section 546(e) applies

---

[7]    The First Lien Noteholders' citations to the N.Y. U.C.C.'s security interest attachment provision ("a security interest attaches to collateral when it become enforceable against the debtor with respect to the collateral") and the enforceability provision ("a security interest is enforceable against the debtor and third parties with respect to collateral only if . . . value has been given . . .") demonstrate at most that the First Lien Noteholders benefit from liens first arising under the 2007 Security Agreement and that the 2009 First Lien Noteholders became beneficiaries of those liens, with the right to enforce them, when the 2009 First Lien Notes came into existence.  *See* N.Y. U.C.C. §§ 9-203(a) – (b).  These provisions do not support the position that new liens were granted to the 2009 First Lien Noteholders.  Rather, the prior liens continued and the debt covered by them expanded to include the 2009 First Lien Notes.

only to transfers made by a debtor, not to *subsequent* transfers by non-debtors of such interests.

Unsurprisingly, the Indenture Trustee does not cite a single case applying the safe harbor

provision to subsequent transfers.[8]

26.     Objectors' attempt to apply the safe harbor to *obligations* arising under the

First Lien Notes is similarly without merit.  Unlike Sections 544(a) and 548(a)(1), which

specifically allow avoidance of, *inter alia*, "any obligation incurred by the debtor," Section

546(e) provides only that "the trustee may not avoid a *transfer*" (emphasis added).  The safe

harbor provision does not, by its plain terms, protect against avoidance of obligations.  *See In re*

*MacMenamin's Grill Ltd.*, 450 B.R. 414, 428-31 (Bankr. S.D.N.Y. 2011) ("There clearly is a

difference between making a transfer and incurring an obligation; otherwise the relevant

statutory provisions would not have used both terms. . . . It is clearly proper, therefore, to

presume that section 546(e) does not implicitly adopt a definition of 'transfer' that somehow

includes the 'incurrence of an obligation.'") (citations omitted); *see also In re Imperial Credit*

*Industries, Inc.*, 527 F.3d 959, 971-73 (9th Cir. 2008) (distinguishing between avoidance of

bringing fraudulent conveyance claims for "the return of assets" or "for monetary damages or

other legal or equitable relief," which are protected by 12 U.S.C. § 1828(u), and obligations,

which are not).

27.     Objectors' reliance on the good faith defense in Section 550(b) to bar

avoidance of the liens in connection with the First Lien Notes is no more successful, as Section

550(b) applies only when subsequent transferees take without knowledge of voidability.  The

---

[8]     Even if the liens *were* transferred by the Debtors in connection with the First Lien Notes, which as
discussed below, they were not, it is far from certain that those debt instruments are securities
contracts within the definition of the Bankruptcy Code.  *See Qimonda Richmond, LLC*, 2012 WL
1021789, at *4 ("Although it is settled law that bonds and indentures are contracts, the Court is not
persuaded that the Bonds and Indenture are securities contracts within the definitions in the
Bankruptcy Code.").

Indenture Trustee's argument that the First Lien Noteholders took the liens of the 2007 Term

Lenders in good faith and for value under 550(b) is conclusory and inaccurate.  As alleged in the

Proposed Complaint, the Administrative Agent for the Term Loan was a significant purchaser of

the First Lien Notes and there was significant overlap of lending participants in the 2007 Term

Loan and the First Lien Notes.  (*See* Proposed Complaint ¶¶ 5, 11, 89.)  Thus, even if liens were

conveyed to the First Lien Noteholders, they cannot possibly contend that they were unaware of

the circumstances surrounding the creation of the liens in 2007.  Moreover, the First Lien

Noteholders are not transferees "for value"; payment of the 2007 Term Loan did not constitute

satisfaction of valid antecedent debt of the Debtors because the 2007 Term Loan was avoidable.

Section 550(b) cannot apply here, given that so many of the prerequisites to its application were

plainly unfulfilled at the time the First Lien Notes were issued.

   **E.**  **The Debt Incurred in the 2009 Refinancing Is Avoidable**

    28.  As discussed above, under appropriate circumstances, multiple

transactions may be collapsed and treated as steps in a single transaction for analysis under

fraudulent conveyance law.  *See Tabor Court Realty Corp.*, 803 F.2d at 1302.  Although

collapsing is typically applied to LBOs such as the SENA Acquisition, the doctrine applies more

generally to the following "paradigmatic scheme":

> [O]ne transferee gives fair value to the debtor in exchange for the debtor's
> property, and the debtor then gratuitously transfers the proceeds of the first
> exchange to a second transferee.  The first transferee thereby receives the debtor's
> property, and the second transferee receives the consideration, while the debtor
> retains nothing.

*HBE Leasing*, 48 F.3d at 635.  A party seeking to "collapse" must allege that (1) the parties

involved had knowledge of the multiple transactions, (2) the transactions would not have

occurred on their own, and (3) each transaction was dependent or conditioned on other

transactions.  *Mervyn's Holdings*, 426 B.R. at 497 (citations omitted).

29.    Here, the Proposed Complaint sufficiently alleges facts to support "collapsing" of the incurrence of debt in 2009 and the satisfaction of the 2007 Term Loan under the 2009 Refinancing—an inherently integrated transaction.  Goldman Sachs, the Collateral Trustee, and the other 2009 lenders were all fully aware that proceeds from the 2009 Refinancing would merely pass through the Debtors to repay portions of the Debtors' 2007 debt.  (Proposed Complaint ¶¶ 88-89.)  Additionally, the parties knew that the debt being refinanced had been used to fund the SENA Acquisition, and that such debt was therefore avoidable due to the precarious condition in which the transaction left the Debtors.  (*Id.*)  Even absent the significant overlap of lending parties, the law imposes duties upon lenders in these circumstances, such that they may not subsequently come to court and rely on half the story.  *See In re TOUSA, Inc.*, 2012 WL 1673910, at *16 (11th Cir. 2012) (noting that "every creditor must exercise some diligence when receiving payment from a struggling debtor").  Finally, the transactions were clearly interdependent given that the parties expressly conditioned that the 2009 funds be used for such purposes.  (*Id.*)  Consequently, the Debtors did not receive "reasonably equivalent value" or "fair consideration" in exchange for incurring debt under the 2009 Refinancing.

30.    In an attempt to circumvent the Committee's claim, the Debtors' argue that since the 2009 Refinancing satisfied antecedent debt, it cannot be avoided.[9]  In support thereof, Debtors cite to *Jevic*, 2011 WL 4345204, at *9 for the proposition that the 2009 Refinancing cannot be "collapsed" with the 2007 Acquisition, as they could not possibly be deemed as "part of one integrated transaction."  (Dbtr. Obj. ¶ 161; *see also* IT Obj. ¶ 6, n.5.)  The

---

[9]    Debtors also assert, without foundation, that the since the "[c]omplaint itself seeks only to invalidate the First Lien Noteholders' liens, NOT the underlying debt . . . the Committee's allegations that the 2009 Refinancing did not satisfy valid antecedent debt cannot stand."  (Dbtr. Obj. ¶ 160; *see also* IT Obj. ¶ 38, n.35.)  Debtors' argument, however, ignores that Counts V-VII of the Proposed Complaint seek rulings that the 2007 debt was avoidable as of the time of the 2009 Refinancing.  (Proposed Complaint ¶¶ 143-44, 152-53, 163-64.)  Upon such a finding, as the Debtors' tacitly concede, repayments made thereon will also be avoidable.  (*See* Dbtr. Obj. ¶ 165.)

Debtors misunderstand the Committee's claim. The Committee is not seeking to avoid the 2009 Refinancing by "collapsing" that transaction with the 2007 Acquisition. Rather, the Proposed Complaint seeks to collapse the two steps of the 2009 Refinancing itself (*i.e.*, the incurrence of the debt in 2009 that was used for and conditioned upon repaying the 2007 debt).

31.    While satisfaction of *valid*, antecedent debt will often constitute adequate consideration for fraudulent transfer analysis, satisfaction of *invalid* antecedent debt is not afforded the same protection. *See In re TSIC, Inc.*, 428 B.R. 103, 113 (Bankr. D. Del. 2010) (payments made on avoidable debt cannot be said to be for reasonably equivalent value); *In re Palisades at West Paces Imaging Ctr., LLC*, 2011 WL 4459778, at *7 (Bankr. N.D. Ga. 2011) (determining value based on the satisfaction of antecedent debt "beg[s] the question of whether the underlying debt is an unavoidable debt of the Debtor"); *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 732 (Bankr. S.D.N.Y. 2008) (validity of the loan obligation is crucial to analyzing whether antecedent debt provides adequate consideration); *In re Revco D.S., Inc.,* 118 B.R. 468, 521 (Bankr. D. Ohio 1990) (noting that if obligations were deemed fraudulent, related interest payments would also be fraudulent transfers).[10] Thus, the 2009 Refinancing is avoidable to the extent it was used to "launder" or refinance invalid, avoidable antecedent debt.

---

[10]    Objectors have no answer to such cases. The Indenture Trustee relies exclusively on *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 289-90 (Bankr. S.D.N.Y. 1990) for the proposition that "avoidability" is not enough and that the antecedent debt must have actually been avoided. (IT Obj. ¶ 39.) But *Crowthers* militates in favor of granting the Motion. That case addressed a chapter 11 plan settling avoidance action litigation that sought to avoid obligations incurred in connection with a refinancing – *and for which the creditors' committee was previously granted standing to pursue*. *Id.* at 286. Under the terms of the settlement, the lenders/defendants agreed to waive "subordination rights as against the Debentureholders and partially subordinate[] its claim to a portion of the claim of the Debentureholders" such that the harmed creditors were to receive "over 50%" of their claim. *Id.* at 288. This was described as a "fine result" by the committee's special counsel. *Id.* In deeming this settlement reasonable, the court was comforted by the fact that "the lender was not involved in the incurrence of the original obligation." *Id.* at 289-90. As stated above, and alleged in the Proposed Complaint, the 2009 lenders had every reason to know of the avoidability of the 2007 debt they were refinancing.

01:12210437.1

32.     Instead of refuting the Committee's contention, Objectors ask this Court to ignore the actual claim of the Proposed Complaint: that the 2007 debt incurred in connection with the SENA Acquisition left the Debtors with insufficient capital to survive and is therefore avoidable.  (Dbtr. Obj. ¶ 160; GS Obj. ¶ 50; IT Obj. ¶¶ 36-39.)  However, as stated above, the Committee has amassed a compelling record supporting its claim that the SENA Acquisition layered avoidable debt upon the Debtors.  The 2009 Refinancing, which involved significantly overlapping lending parties, is avoidable as a result thereof.  Only by ignoring the SENA Acquisition altogether can one make sense of the Objectors' argument.

**F.     Debtors' Transfers and Incurrences in Connection With the 2007 SENA Acquisition Were Not Supported by Reasonably Equivalent Value**

33.     Objectors wrongly contend that the Debtors obtained fair value in exchange for the interests they transferred and the obligations they incurred at the time of the SENA Acquisition.  The Debtors, for example, argue that NewPage's subsidiaries obtained "intangible benefits from the enhanced financial strength of the parent or corporate enterprise as a whole."  (Debtors' Objection to Mot. of Statutory Creditors' Committee for Order Under 11 U.S.C. §§ 105, 1103, and 1109 Authorizing Commencement and Prosecution of Certain Claims on Behalf of Debtors' Estates ("<u>Dbtr. Obj.</u>") ¶ 114.)  Goldman Sachs and the Revolver Agent contend that these subsidiaries benefited from access to a $500 million revolver and the synergies that purportedly were created by the combination of businesses.  (Opp'n of Goldman Sachs Credit Partners L.P. and Goldman, Sachs & Co. to Mot. for Order Under 11 U.S.C. §§ 105, 1103 and 1109 Authorizing Official Committee of Unsecured Creditors to Commence and Prosecute Certain Claims on Behalf of Debtors' Estates ("<u>GS Obj.</u>") ¶¶ 39-41; Objection of Wells Fargo Capital Finance, LLC, Successor to Wells Fargo Capital Markets, LLC, to Motion of the Official Committee of Unsecured Creditors for Authority to Prosecute Certain Claims of

01:12210437.1

Debtors' Estates ("WF Obj.") at 21.)  These potential benefits, however, cannot compare to the very real guarantees provided by the various subsidiaries; guarantees that exposed *each* subsidiary to more than a billion dollars of liability, even if such liability could potentially be mitigated by pursuing claims against other subsidiaries that posted similar guarantees.

34.    Objectors' assertion that all Debtors obtained fair value for their transfers is grounded in Objectors' incomplete description of the SENA Acquisition.  That description focuses solely on the acquisition by *one* Debtor (NewPage) of the equity interest of another Debtor (SENA).  Objectors contend that NewPage acquired SENA—purportedly worth at least $2.1 billion,[11] although the Proposed Complaint alleges that the valuation was manipulated—for a mere $1.5 billion.  (GS Obj. ¶ 14.)

35.    Objectors fail to acknowledge, however, the core aspect of the SENA Acquisition that is the functional equivalent of an LBO.  Specifically, Objectors cannot dispute that three Debtors—namely, NewPage Port Hawkesbury Holding LLC, NewPage Wisconsin System Inc., and NewPage Canadian Sales LLC (together, the "SENA Subsidiaries")—prior to the transaction were subsidiaries of SENA that (a) received no cash or other consideration in connection with NewPage's purchase of SENA's equity, and (b) immediately became guarantors of the very debt used to fund NewPage's acquisition of the SENA equity from their former ultimate parent, Stora.  Simply put, these SENA Subsidiaries are in exactly the same position as any target company subjected to a classic, standard LBO:  *They are on the hook for massive debt*

---

[11]  Goldman Sachs asserts that the SENA entities were "valued at a minimum of $2.1 billion."  (GS Obj. at ¶ 14.)  It appears that Debtors do not attribute a specific value to the SENA entities, unless that information is hidden somewhere in their 93-page brief.

*used principally to fund the purchase of their ultimate equity, altering their ownership but*

*affording them no economic benefit.*[12]

36.     In some respects, these SENA Subsidiaries are even worse off than a

company subjected to a typical LBO.  In a standard LBO, a portion of the new debt often

refinances a portion of pre-existing debt.  As Objectors acknowledge, approximately $460

million of the new debt incurred in the SENA Acquisition was used to pay off preexisting

*NewPage* indebtedness.  (GS Obj. ¶ 32.)  The SENA Subsidiaries, of course, received *absolutely*

*no benefit* from the payment of this preexisting debt, as to which they had no liability.  But upon

the completion of the SENA Acquisition, they were newly liable as guarantors on the new debt

incurred to pay off these preexisting loans.  To add insult to this injury, SENA and the SENA

Subsidiaries became liable on more than $500 million in preexisting NewPage debt incurred in

2005.

37.     The Proposed Complaint more than adequately alleges that the SENA

Subsidiaries did not receive fair value in exchange for the guarantees they provided and liens

they transferred as part of the SENA Acquisition.  Objectors posit that these Debtors benefited in

certain undefined, unquantifiable ways.  *At most,* such assertions create factual issues as to any

benefit obtained by these Debtors.  *See TOUSA*, 2012 WL 1673910, at *16 ("It has long been

established that whether fair consideration has been given for a transfer is largely a question of

---

[12]   Debtors contend that the SENA Acquisition is distinguished from an LBO because "Cerberus already
      had hundreds of millions of dollars of equity at risk and had given NewPage Group equity as
      consideration in the Acquisition."  (Dbtr. Obj. ¶ 41.)  As alleged in the Proposed Complaint, however,
      Cerberus already had stripped out nearly all of its equity in NewPage through a series of sales years
      earlier.  (Proposed Complaint ¶ 24.)  Cerberus had little to lose in levering up NewPage, and even
      handing over NewPage equity in the SENA Acquisition (effectively transferring 20% of what would
      be a much larger company); it was simply swinging for the fences, hoping that a big acquisition could
      one day lead to a profitable company.  If this over-levered gamble collapsed, Cerberus's exposure to
      NewPage was already limited, and that exposure was not increased by the SENA Acquisition.

fact, as to which considerable latitude must be allowed to the trier of the facts.") (internal citation

omitted).

38.    Moreover, Debtors' contention that SENA's debt-to-asset ratio fell from

82% to 35% as a result of the SENA Acquisition (Dbtr. Obj. ¶ 105) is incorrect and misleading

on multiple levels.  First, following the SENA Acquisition, the SENA Subsidiaries became

guarantors of NewPage's legacy debt, which had a debt-to-asset ratio of 86.5% after the SENA

Acquisition even according to the Debtors.  Thus, the SENA Subsidiaries were *more* exposed to

debt after the SENA Acquisition than before.  Second, the purported SENA debt reduction

achieved during the SENA Acquisition was nothing more than satisfaction of its parent's bridge

"loan"—which, for reasons set forth in the Proposed Complaint, was really not debt at all.[13]

(Proposed Complaint ¶¶ 50-52.)

39.    The Proposed Complaint also adequately alleges that the preexisting

NewPage subsidiaries, like their SENA counterparts, did not receive fair value for the guarantees

they provided and liens they conveyed in connection with the new debt.  Through the SENA

Acquisition, NewPage took on an additional $1.7 billion in debt (not including the debt on the

books of the legacy SENA Debtors, which was consolidated into NewPage).  (Proposed

Complaint ¶ 56.)  As an initial matter, NewPage's overall debt-to-asset ratio is not the proper

metric for determining the effect on individual subsidiaries.  Individual subsidiaries do not

benefit from all of NewPage's assets, held through other subsidiaries.  In contrast, as a result of

the SENA Acquisition, these subsidiaries themselves became guarantors of substantially more

debt, the proceeds of which were flushed out to Stora.  Fundamentally, the individual NewPage

---

[13]    Even if the distribution to Stora, in the form of repayment of the "bridge loan," constituted repayment
of a valid debt, the only entity to benefit from that repayment was the parent SENA itself.  The SENA
Subsidiaries were *not* guarantors of that obligation, to the extent it ever was a real liability.

subsidiaries took on more liability in the SENA Acquisition without enjoying any measurable benefit. They received no measurable value, let alone reasonably equivalent value, in exchange for their enhanced liabilities.

        40.     Objectors try to get around this fact by contending that subsidiaries "may" receive "intangible" value even when they do not receive the proceeds of new debt. (Dbtr. Obj. ¶ 114.) It is far from clear, however, that such "intangible" benefits would ever materialize here. Indeed, Debtors do not articulate how any of the subsidiary Debtors (legacy NewPage or SENA) would benefit from having a parent company with broader operations. Rather, they contend without explanation or justification that subsidiaries "invariably" benefit because they use centralized administrative services provided by NewPage. Debtors' assertion that the subsidiary Debtors would benefit through some sort of "enterprise theory" (*id.* ¶ 115) is conclusory and speculative.

### G.    Objectors' Factual Challenges to the Proposed Complaint's Colorable Allegations of Unreasonably Small Capital Are Without Merit

        41.     As alleged in the Proposed Complaint, the SENA Acquisition tied together two sinking rocks in an effort to make them float. The transaction joined two unprofitable companies and hobbled them further by substantially increasing their debt load. From 2004 through the transaction, SENA incurred net losses of $1.266 billion. (Proposed Complaint ¶ 47.) In a similar period, starting in 2005, NewPage incurred losses of $101 million. (*Id.*) The notion that the combined entity was left with unreasonably small capital is not only plausible, it is common sense. Starting from this shaky base, NewPage used the transaction as an opportunity to pile on new debt: the $1.6 billion term loan and $460 million of new second lien notes, not to mention taking on a $500 million revolving facility. (Proposed Complaint ¶ 49.) Offset by the

payment of NewPage's pre-existing debt, the *increase* in NewPage indebtedness totaled approximately $1.7 billion.  (*Id.* ¶ 56.)

42.     Objectors contend that the Committee has not adequately alleged that NewPage suffered from unreasonably small capital after being burdened with this enhanced debt load.  But the Proposed Complaint's allegations make it clear that the company was in fact overlevered—and that both NewPage and the First Lien Noteholders should have known that. Specifically, the stress test performed by the 2007 Term Loan's administrative agent, Goldman Sachs, should have warned that NewPage was emerging from the SENA Acquisition with far too little capital to withstand foreseeable industry downturns.

43.     As an initial matter, Goldman Sachs based the stress test on forecasts received from management, and it knew from its close relationship with NewPage that those forecasts were unreliable.  In its own documents, Goldman Sachs acknowledged that NewPage has historically "underperformed relative to its projections."  (Proposed Complaint ¶ 48.) Goldman Sachs also acknowledged that "EBITDA for YE06 was 13% lower than estimates shared with the [ratings] agencies in August 2006 and 20% lower than projections from its May 2006 presentation."  (*Id.*)  Indeed, Cerberus itself called NewPage's projections "totally inaccurate" and "BS."  (*Id.*)

44.     More fundamentally, Goldman Sachs failed to adequately stress the projections to provide a realistic assessment of future performance.  While Objectors are quick to assert that the Committee rests its claim on the "Great Recession" that followed the SENA Acquisition, Goldman Sachs's failure had nothing to do with the subsequent economic downturn. Rather, *Goldman Sachs failed to stress the projections against the conditions that prevailed in the prior market downturn of 2001-03.*  (*Id.* ¶ 79.)  To be clear, NewPage could not have met its

projections even if the so-called "Great Recession" never occurred; rather, a downturn identical to one that had occurred fewer than five years before the SENA Acquisition would have been enough to drive the company under.  Put simply, NewPage was undercapitalized in December 2007.

45.     Failure to perform an adequate stress test was particularly egregious given the cyclical nature of the paper market.  Over the 35 years preceding the SENA Acquisition, the coated paper industry had experienced five pronounced down cycles, during which coated paper sales volume dropped by an average of 14%.  (*Id.* ¶ 80.)  Again, the Committee is not suggesting that NewPage or Goldman Sachs had to foresee what the Debtors term the "Great Recession." Had they simply considered the most recent downturn suffered by the coated paper industry, the stress test would have indicated what was, in fact, the case:  NewPage lacked sufficient funds to withstand an *entirely foreseeable* downturn.[14]  These are the basics of what bankers are paid millions of dollars to do—even bankers less experienced than Goldman Sachs.

46.     Objectors' attempts to counter the well-founded allegations of undercapitalization set forth in the Proposed Complaint are both misguided and highly fact intensive.  An attempt to address the myriad assertions that Objectors raise would require the very form of "mini-trial" that is not appropriate for determining the Committee's standing. Accordingly, the Committee addresses just a few of the points pressed by Objectors to illustrate the procedural error in trying to pre-try a case such as this.

---

[14]  The Indenture Trustee asserts, "In LBO cases, the reasonableness of a debtor's financial projections is the most commonly cited factor in determining whether the transaction left the debtor with unreasonably small capital."  (IT Obj. ¶ 51.)  For the reasons set forth above, the financial projections used in connection with the SENA Acquisition were entirely *unreasonable*, and obviously so to anyone familiar with the paper industry's history in recent years.

47.    Objectors falsely contend that the Committee relies upon the "Great Recession" to establish undercapitalization.  First, Objectors claim that NewPage's fall into bankruptcy resulted from the massive economic downturn that followed on the heels of the SENA Acquisition.  (*See, e.g.*, Objection of Indenture Trustee to Mot. of Official Committee of Unsecured Creditors for Authorization to Prosecute Certain Claims on Behalf of Debtors' Estates ("IT Obj.") ¶ 12 ("What NewPage could not have foreseen at the time of the 2007 Acquisition was the impending global economic recession of 2008, the worst since the Great Depression of the 1930s."); Dbtr. Obj. ¶ 1 ("[I]t was only the subsequent great recession" that led to the chapter 11 filing.)  They further assert that the Committee relies on the company's failure in this context as evidence of undercapitalization in 2007.  (*See, e.g.*, Dbtr. Obj. ¶ 83 ("The Committee contends the '2008 great recession' and the effect of the 'digital media revolution' somehow were foreseeable.").)[15]  To be generous, that argument misunderstands the Proposed Complaint.  The Committee's claims are properly premised on an assessment of the reasonableness of the Debtors' forecasts as of the SENA Acquisition.  Indeed, the Debtors acknowledge this fact, their "Great Recession" argument notwithstanding.  (*See* Dbtr. Obj. ¶ 82 ("Committee attacks the Debtors' projections at the time of the Acquisition.").)  The SENA Acquisition left NewPage with unreasonably small capital in 2007, regardless of the impending economic crisis.  Looking solely at that point in time, NewPage's excessive debt level made it impossible for the company to survive a downturn equal to that experienced in 2001-03 (which was, by definition, foreseeable).

---

[15]  Debtors do not—because they cannot—cite any paragraph in the Proposed Complaint alleging that the undercapitalization was based on the "Great Recession" or that the "Great Recession" was foreseeable.  The Committee made no such allegation, nor does it need to do so to establish undercapitalization in 2007.  The Debtors cannot rewrite the Proposed Complaint to fit within their preconceived bias for opposing it.

01:12210437.1

48. Second, Objectors claim that the company was performing well until the economic downturn. Debtors go so far as to assert that their "business exploded after the Acquisition," even providing a chart purporting to support the claim. (Dbtr. Obj. ¶ 5.) Both the claim and the chart, however, are utterly absurd, bordering on the disingenuous. The chart simply shows that NewPage's net sales jumped following its acquisition of SENA. And of course they did, since up until that time those same sales were reported separately by NewPage and SENA. Notably, on the very chart the Debtors provided, there is not a single post-acquisition period when sales reached the level reported immediately after the companies combined (and the initial arithmetic was done), demonstrating the completely fictitious nature of Debtors' assertion that business "boomed" following the SENA Acquisition. (Dbtr. Obj. ¶ 9.) These were companies in despair before the SENA Acquisition, and the acquisition—including the tremendous debt it engendered—aggravated the problems rather than relieved them.

49. Third, Objectors assert that the company could not possibly have been undercapitalized following the SENA Acquisition because it managed to stay out of bankruptcy for several years after the transaction. (*See, e.g.*, IT Obj. ¶ 52 (it is "impossible" for the Committee to establish undercapitalization in 2007 because "nearly *four years* had passed since the closing of the 2007 Acquisition before the Debtors actually filed for chapter 11 protection").) Avoiding bankruptcy for four years, however, hardly demonstrates a company's solvency. Rather, all it shows is that management pursued a strategy of avoiding bankruptcy. *See, e.g.*, *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 795 (7th Cir. 2009) ("An inadequately capitalized company may be able to stagger along for quite some time, concealing its parlous state . . . ."). In large part, that was possible because a similar set of first lien lenders agreed to refinance the senior-most debt of the company at higher interest rates two years after the SENA

Acquisition so as to avoid a default.  (Proposed Complaint ¶ 88.)  For the lenders, there was little

downside to this gamble—they remained protected by the same liens, yet earned a higher rate of

return.  For the company, avoiding covenant defaults extended its ability to avoid a chapter 11

filing—what has become known in the industry as "extend and pretend."  Moreover, just as there

were unforeseen difficulties in the years following the SENA Acquisition, NewPage enjoyed

unforeseeable windfalls that helped keep the company afloat, such as $320 million in

unanticipated tax credits.  (*Id.* ¶ 88.)  Just as it is entirely inappropriate to include unforeseeable

negative events when conducting an undercapitalization analysis, it is similarly inappropriate to

give the Objectors the benefit of unforeseeable positive events.

        50.      In any event, the limitations period for various constructive avoidance

claims reaches back as far as four or six years.  Accepting Objectors' logic, the limitations

periods built into the statutes would be pointless, since surviving for four years would be

dispositive evidence of sufficient capitalization.  Clearly, the limitations periods set forth by

Congress and state legislatures cannot so easily be disregarded as providing for the "impossible."

        51.      Objectors also claim that "savings clauses" in the relevant credit

documents invalidate the Committee's claims.  The Debtors assert that potential Committee

recovery would be limited by savings clauses in the relevant guarantees, and Goldman Sachs

claims that the clauses limit the guaranty liability of subsidiaries to an amount that would not

render guarantees under the 2007 loans avoidable.  (Dbtr. Obj. ¶ 114, n.107; GS Obj. ¶ 44.)

First, the Objectors are incorrect with respect to the effect of the clauses.  Without even

performing a complex analysis, the savings clauses at issue are limited by their own plain

language, which limits their putative effect on federal law to Section 548. They would not affect the application of the fraudulent transfer provisions of the FDCPA.[16]

52.    Moreover, savings clauses have been held incapable of overriding the protections of the Bankruptcy Code, including chapter 5's avoidance actions. *Cf. In re Lehman Brothers, Inc.*, 458 B.R. 134, 142 (Bankr. S.D.N.Y. 2011) ("There simply is no contract exception to section 553(a), because the statute itself does not allow for one.") (*citing In re SemCrude, L.P.*, 399 B.R. 388 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010)). As a matter of law, the enforcement of a savings clause to escape avoidance and limit recovery as suggested by the Debtors would essentially nullify the basic principles of fraudulent transfer law. *See In re TOUSA, Inc.*, 422 B.R. 783, 863-65 (Bankr. S.D. Fla. 2009) ("The savings clauses are a frontal assault on the protections that section 548 provides to other creditors. They are, in short, entirely too cute to be enforced.").[17] That court called a similar savings clause argument "unpersuasive for multiple reasons," including when savings clauses attempt to inoculate existing insolvency and when they "contract around the core provisions of the Bankruptcy Code." *Id*. at 864-65. Additionally, as further explained by *TOUSA*, the issue of savings clauses is a heavily factual one, requiring specific and individualized contractual analysis. *See id*. at 865. Such an analysis is neither necessary nor appropriate at this juncture.

53.    Although Objectors seek to force a summary judgment-style analysis, the question to be addressed in this Motion is whether the Proposed Complaint's allegations of undercapitalization are "colorable." Objectors attempt to obscure this fact through massively

---

[16]    *See* GS Obj. ¶ 44, n.24. Section 7.1, Guaranty of the Obligation, concerns solely the effect on obligations as a result of "Section 548 of Title 11 of the United States Code or any comparable applicable provisions of a state, provincial or foreign law . . . ."

[17]    *Quashed in part on separate grounds by* 444 B.R. 613 (S.D. Fla. 2011), *and aff'd in part, rev'd in part by* 2012 WL 1673910 (11th Cir. May 15, 2012).

01:12210437.1

voluminous submissions concerning NewPage's capital adequacy at the time of the SENA

Acquisition.  But the Committee should not be forced at this stage to undergo a "mini-trial" to

*prove* undercapitalization.  That issue, of course, would be addressed and resolved at an ultimate

trial on the merits.  The Proposed Complaint's allegations, which are well grounded in

documentary and other evidence, more than sufficiently set forth a basis for a fact-finder to

conclude that the Debtors were, in fact, undercapitalized as a result of the SENA Acquisition.

That, in turn, is enough to satisfy the undercapitalization prong of the avoidance claims at this

stage of the proceeding.

**H.    The Proposed Complaint Asserts Colorable Claims Based on the Eve-of-Bankruptcy Transfer to the Port Hawkesbury Subsidiary**

54.    Six days before the petition date, NewPage transferred $25 million to

NewPage Port Hawkesbury ("NPPH"), both directly and into an escrow for NPPH's benefit.

(Proposed Complaint ¶ 102.)  Debtors now argue that the Committee cannot be permitted to

proceed with claims based on these payments because, Debtors contend, the Committee (1) has

not asked permission to challenge the NPPH settlement payment; and (2) does not plead actual

fraud with sufficient particularity.  (Dbtr. Obj. ¶¶ 186-197.)  The Debtors are wrong.  First,

standing requires the Court's permission "to initiate *the action*."  *In re Yes! Entm't Corp.*, 316

B.R. at 145 (emphasis added).  The Debtors offer no support for their argument that the Motion

must delineate every *claim* in the action.  As stated in the Motion, "[i]n Delaware, courts have

eschewed line-by-line or claim-by-claim analysis of proposed complaints in favor of a more

general analysis of the import of what has been alleged."  (Motion ¶ 10) (citing Tr. of

Proceedings 6, 44, *In re Distributed Energy Sys. Corp.*, No. 08-1101 (KG) (Bankr. D. Del. July

30, 2008).)  Here, the Committee asks the Court's permission to challenge fraudulent transfers.

The NPPH challenge is in the Proposed Complaint and is clearly before the Court.[18]

        55.    Second, the Committee adequately pleads actual fraud.  "It is not a

defendant's fraudulent *intent* that must be pled with particularity, but the *circumstances*

constituting fraud."  *In re Charys Holding Co., Inc.*, 2010 WL 2774852, at *3 (D. Del. July 12,

2010) (emphasis added).  Further, because direct evidence of fraud is difficult to prove, a

plaintiff can sufficiently plead fraud "by alleging certain badges of fraud, including (1) the

relationship between the debtor and the transferee; (2) consideration for the conveyance;

(3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was

transferred; (5) reservation of benefits, control or dominion by the debtor over the property

transferred; and (6) secrecy or concealment of the transaction."  *In re DBSI, Inc.*, 445 B.R. 344,

348 (Bankr. D. Del. 2011) (internal quotation marks omitted).

        56.    Here, among the other badges of fraud, the Proposed Complaint alleges

that NewPage and NPPH were insiders.  (Proposed Complaint ¶ 238(a).)  The settlement

payment was between NewPage and its indirect, wholly owned subsidiary (NPPH) and was

negotiated by officers who simultaneously held positions at both companies.  (*Id.* ¶ 238(a)-(b).)

The officers had a motive to execute the settlement and avoid potential personal liability due to

NPPH's insolvency.  (*Id.* ¶ 238(b).)  At the time of the settlement, the companies were insolvent

and represented by the same law firm.  (*Id.* ¶ 238(c)-(d).)  Further, the settlement payment was

for inadequate consideration because NewPage (1) already owned the purportedly disputed

receivables that comprised part of the Current Assets; and (2) appears to have waived both its

---

[18]  In any event, the Committee specifically asked for "such other relief as this Court deems just and proper."  (Motion at 15.)  Granting the Committee permission to file the entire complaint, including the NPPH challenge, is "such other relief."

$45 million intercompany claim against NPPH and its right of contribution from NPPH for letters of credit that NewPage issued for NPPH's sole benefit.  (*Id.* ¶ 238(f).)  Although the Committee alleges more than three badges of fraud (it alleges *eight*), these three standing alone—insider status, insolvency, and inadequate consideration—are sufficient to plead an actual fraudulent transfer.[19]  *See In re DBSI, Inc.*, 445 B.R. at 349.

57.    Finally, both the Debtors and the Indenture Trustee argue that the First Lien Noteholders did not benefit from the NPPH settlement payment.  The Debtors, for example, assert that any recovery from the Canadian proceeding will reduce the First Lien Noteholders' claims against the Debtors' estates, dollar for dollar.  (Dbtr. Obj. ¶ 191(iv).)  This argument misses the point.  First, it presumes that the first liens and obligations are valid.  The Proposed Complaint, of course, challenges the validity of these liens and obligations.  Second, the $25 million transferred to NPPH on the eve of bankruptcy was used to fund expenses that otherwise would have given rise to administrative expenses in the NPPH insolvency proceeding, thereby priming the claims of the First Lien Noteholders.  (Proposed Complaint ¶¶ 108, 238(h).)  The transfer also preserved NPPH's value as a going-concern during the sale of its enterprise.  (*Id.* ¶ 238(h).)

58.    The First Lien Noteholders now enjoy a secured claim against NPPH in Canada, which this Court cannot reach.  To the extent of the $25 million transferred to NPPH, the First Lien Noteholders are now insured against the loss that could result should this Court avoid the first liens and obligations.  The Proposed Complaint, accordingly, adequately pleads how the First Lien Noteholders benefited from the last minute transfer.

---

[19]  The Debtors also claim that the Committee's badges of fraud are conclusory allegations and legal conclusions.  The Committee, however, earlier in the complaint pleads sufficient factual material about the NPPH settlement payment to satisfy heightened pleading standards.  (*See* Proposed Complaint ¶¶ 98-113.)

59.     Objectors' opposition to the NPPH challenge is a factual dispute that is more appropriately resolved after the record is fully developed than in a "mini-trial."  *See In re Nat'l Forge Co.*, 326 B.R. 532, 548 (Bankr. W.D. Pa. 2005).  In sum, the Committee adequately pleads a colorable claim of actual fraud with respect to the NPPH transfer.

**II.     Given the Potential Benefits of the Proposed Litigation and the Debtors' Waiver of the Prospective Claims, the Debtors Have Unjustifiably Refused to Assert Them**

**A.     Having Waived and Now Denounced the Estates' Claims, It is of No Solace That the Debtors May Wish to Resolve Such Claims Under a Plan**

60.     The Debtors argue that even if the claims at issue are colorable, they are not unjustifiably refusing to assert them.  (*See also* WF Obj. at 24-26.)  Rather, the Debtors state that "there is no reason why the Debtors should sue when they can resolve the issues, if any, in a plan they have the right to exclusively propose."  (Dbtr. Obj. ¶ 10.)  In other circumstances, it may reassure a creditors' committee that their "trustee" was seeking to resolve estate claims for consideration under a plan.  Not here, however.

61.     Not only have the Debtors—in their capacity as debtors in possession—waived their right to assert any of these claims on behalf of the estates, they have now expended estate resources to argue (after waiving) that these claims were "entirely without merit" anyway.  (Dbtr. Obj. ¶ 4, 12 (". . . the relevant facts and context . . . doom any chance of the Committee's success on the merits").)  It is in this light that one must view the Debtors' statement that they are negotiating a plan which they state begrudgingly "must address the Committee's proposed litigation in one form or another."  (Dbtr. Obj. ¶ 4.)  To the extent the Court determines the claims are colorable, it cannot be contended that the Debtors will negotiate for fair consideration in resolution of such claims.

62.     Exacerbating the foregoing, prior to the filing of the Motion, the Committee was not invited to any plan discussions between the Debtors and the Indenture

Trustee and its constituents.  When asked, the Debtors refused to share with the statutory

committee even the proposals made by secured lenders to the Debtors.  The Debtors also refused

to share any of their own proposals or positions taken with the lenders, hardly giving comfort to

the Committee that unsecured creditors were being represented in such discussions.

   63. Indeed, the Debtors' sudden intention to "settle" these claims under a plan

equates to nothing more than a Debtor-veto on derivative standing which runs counter to, and

would effectively eviscerate, the Third Circuit's holding in *Cybergenics*, 330 F. 3d at 573-74

(endorsing derivative standing to guard against "lax pursuit of avoidance actions" by debtors in

possession who advocate less than vigorously on behalf of unsecured creditors—the "real

losers").  There is no ambiguity here.  The Debtors are not pursuing these claims.  The only issue

is whether their refusal to do so is justifiable.

  **B.** **Absent Prosecution of the Estates' Claims by a Faithful Fiduciary,**
    **Unsecured Creditors Should Expect Little to Nothing From the Debtors**

   64. The Indenture Trustee argues that a cost-benefit analysis militates in favor

of denying the Motion because the proposed claims *will not benefit the estates*.  (*See also* WF

Obj. at 27.)  Irreconcilably, however, the Indenture Trustee also opines that under the status quo,

the Debtors' secured debt exceeds its enterprise value and that unsecured creditors are an "out of

the money constituency."  (IT Obj. ¶ 1.)  Giving credence to the Indenture Trustee's assertions,

the litigation proposed here, if successful, will necessarily benefit the estate.  *See* 11 U.S.C. §

551 ("Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724 (a) of this title, or

any lien void under section 506 (d) of this title, is preserved *for the benefit of the estate*. . . .")

(emphasis added).  Unsurprisingly, this court has recognized that the cost/benefit showing is

*reduced*, not increased, when unsecured creditors face dim prospects for recoveries absent

litigation.  *See, e.g.*, Tr. of Proceedings at 45, *In re Distributed Energy Systems, Corp*., No. 08-

11101 (KG) (Bankr. D. Del. July 30, 2008) (determining that where unsecured creditors'

recovery is uncertain, the showing concerning "potential recovery versus the cost" is "reduced").

**C.      The Estate and Unsecured Creditors Stand to Benefit Greatly**

65.      Here, it cannot seriously be questioned that unsecured creditors will

benefit significantly if the Committee is successful prosecuting the estates' claims.  The

Proposed Complaint includes claims which seek to avoid more than $2 billion in purportedly

secured obligations and corresponding liens.  The Indenture Trustee has made it clear that it

seeks to effectively foreclose on all of the Debtors' asset value, which is conservatively

estimated in excess of $1 billion.  The Committee's claims seek to unlock such value through

avoidance of liens and obligations.  This may be unsecured creditors' only path to recovery.

66.      Indeed, general unsecured creditors (which are not party to any contractual

subordination agreement whatsoever) have asserted hundreds of millions of dollars of claims

against Debtor estates that have significant asset value.  (*See* Stegenga Dec. ¶¶ 3-5.)  For

example, at NewPage Wisconsin System Inc. ("NPWS"), one of the SENA Subsidiaries, more

than $2 billion in asset value has been scheduled.  General unsecured claims exceeding $600

million have been filed against NPWS.  Absent avoidance of the secured lenders' claims, the

entirety of these claims may go without recovery, and the entirety of NPWS's asset value will

inure to the benefit of the secured creditors.  To the extent the lenders' claims are avoided, the

entirety of this value will inure to the benefit of the estate and its unsecured creditors.  Even if

only the liens are avoided for the benefit of the estate, this significant value will be shared pro

rata among and between all of NPWS's creditors.

67.      Objectors argue that certain contractual subordination provisions will

moot the effect of the claims in Proposed Complaint.  (Dbtr. Obj. ¶ 69-76; IT Obj. ¶ 89.)  As a

threshold matter, this argument is entirely irrelevant to general unsecured creditors.  Moreover, at

01:12210437.1

least with respect to the holders of the Debtors' second lien notes, who the Debtors and Indenture Trustee have asserted are underwater and thus unsecured, the Debtors' argument is flawed.

68.	The Collateral Trust Agreement, as Debtors assert, requires that no payment from the proceeds of collateral be made to the Second Lien Noteholders until the Priority Lien Obligations are discharged, and if the Second Lien Noteholders receive any such payment, they must pay it over to the holders of Priority Lien Obligations.  (*See* Dbtr. Obj. ¶ 73; Collateral Trust Agreement, §§2.5(c) – (d).)  If the liens associated with the First Lien Notes are avoided, however, the notes cease to fall within the definition of Priority Lien Obligations under the Collateral Trust Agreement, which obligations must be "secured by a Priority Lien." Collateral Trust Agreement, §1.1.  Accordingly, if there ceases to be a Priority Lien securing the First Lien Notes, the noteholders are no longer the beneficiaries of any pay over provision contained in the Collateral Trust Agreement.  Moreover, the Collateral Trust Agreement does not require the pay over provision to apply to any debt that is avoided in a bankruptcy, or as to which its lien is avoided.  The intercreditor agreements in cases discussed by the Objectors provided for substantially more expansive pay-over provisions and thus do not advance the analysis here.  *See In re Ion Media Networks, Inc*., 419 B.R. 585 (Bankr. S.D.N.Y. 2009) (intercreditor agreement provided that priorities shall not be affected by "any nonperfection of any lien *purportedly* securing any of the Secured Obligations (including, without limitation, whether any such Lien is now perfected, hereafter ceases to be perfected, is avoidable by any bankruptcy trustee or otherwise is set aside, invalidated, or lapses)").  Thus, following a successful avoidance action against the First Lien Noteholders, the noteholders would not benefit from any pay over provision contained in the Collateral Trust Agreement.

01:12210437.1

**D.**     **Prosecution of the Proposed Complaint Will Not Harm the Debtors'
Operations or Prospects of Reorganization**

69.     The Debtors resort to scare tactics, arguing that the prosecution of the

Proposed Complaint will "derail" the reorganization process and have detrimental effects on

their operations.  (Dbtr. Obj. ¶ 58.)  This argument is speculative at best.

70.     First, there are many plan structures that could be used to balance the

interests of unsecured creditors if the Court determines the claims are colorable and would

benefit the estate.  A trust could be established under a plan of reorganization to reserve the

equity in the reorganized company, pending determination of which creditors are entitled to

receive it.  A sale can be pursued under a plan, with the cash held pending the resolution of the

litigation.

71.     Second, there is no reason why this litigation should result in protracted

delays—other than the prospective defendants' own desire for delay.  The Court could order

expedited responses to the Proposed Complaint and could set tight deadlines for motions to

dismiss, the conclusion of discovery, the submission of expert reports, and trial.  As Judge

Gerber did when faced with a similar conundrum, the Court could bifurcate the issue of

undercapitalization and financial condition, trying that issue first to deal with the quintessential

fact inquiry that pervades most of the counts of the Proposed Complaint.  *See* Order Bifurcating

Phase I of Trial, *In re Lyondell Chemical Co.*, No. 09-01375 (RG) (Bankr. S.D.N.Y. Sept. 24,

2009).

72.     Moreover, the Debtors concede that "up until now," there has been no

problem with employee turnover, they "have maintained their relationships with customers," and

they have "negotiated improved payment terms."  (Dbtr. Obj. ¶¶ 61-63.)  However, the Debtors

fear that things could take a turn for the worse if their stay in chapter 11 were extended.  (Dbtr.

01:12210437.1

Obj. ¶¶ 61-65 ("*likely* lower morale"; "*if* NewPage is unable to fulfill their purchase orders"; "*unlikely*, however, to continue to offer improved payment terms, and *may impose* more restrictive terms"; "other costs are *likely* to increase"; "*could* face significant challenges") (emphases added).)  In support of this assertion, they have submitted the Epstein Declaration, which employs essentially identical verbiage.  Because the Epstein Declaration is entirely speculative, it is without probative value.  It is also inadmissible.  *See Ambrosini v. Labarraque*, 101 F.3d 129, 138 n.11 (D.C. Cir. 1996) ("Lay and expert testimony that amounts to no more than mere conjecture is generally inadmissible.").

73.    A review of the Debtors' actual performance to date reflects absolutely no reason to believe that an extended stay in chapter 11 would have any negative impact on their businesses.  (*See* Denison Dec. ¶¶ 3-6.)  There have been no reported problems with employee turnover, maintaining customer relationships, or difficulties with suppliers and vendors.  (*Id*.)  Chapter 11 has not prevented NewPage from performing as well as, and perhaps better than, most of its peers.  (*Id*.)  Moreover, the Debtors are unlikely to encounter difficulties extending their current DIP financing or entering into a new comparable facility if necessary.  (*Id*. at ¶¶ 7-8.)

74.    In sum, there is absolutely no reason to expect that prosecution of the Proposed Complaint will lead to anything in the parade of horribles enumerated by the Debtors, and the Debtors have submitted no sustainable evidence in support of such concerns.  In any event, mere speculation of detrimental effect should not counterbalance the import Congress has assigned avoidance actions under the Bankruptcy Code and the rights of the Debtors' unsecured creditors.  *See Cybergenics*, 330 F. 3d at 575 ("Congress, however, has clearly decided that such actions are valuable to the Chapter 11 process, and we will not second-guess that judgment.").

## CONCLUSION

75.    For all of the foregoing reasons, the Motion should be granted and the

Objections overruled.

## NOTICE

76.    Notice of this Application has been provided to:  (1) the Office of the

United States Trustee for the District of Delaware, (2) counsel for the Debtors, (3) counsel for

J.P. Morgan Chase Bank, N.A., and (4) all parties who have filed a notice of appearance and

requested service of pleadings in these chapter 11 cases.


*[Remainder of page intentionally left blank.]*

01:12210437.1

**WHEREFORE**, the Committee respectfully requests that this Court enter an order, substantially in the form attached to the Motion, granting the relief requested, and granting the Committee such other relief as this Court deems just and proper.

Dated: June 18, 2012          YOUNG CONAWAY STARGATT & TAYLOR LLP
      Wilmington, Delaware


*/s/ Michael S. Neiburg*                 
M. Blake Cleary (No. 3614)
Jamie N. Luton (No. 4936)
Michael S. Neiburg (No. 5275)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Co-Counsel for the Official Committee of Unsecured Creditors of NewPage Corp., et al.*

-and-

QUINN EMANUEL URQUHART
& SULLIVAN LLP
Susheel Kirpalani
Robert S. Loigman
Benjamin I. Finestone
Alex Rossmiller
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Proposed Conflicts Counsel for the Official Committee of Unsecured Creditors of NewPage Corp, et al.*

01:12210437.1

40