THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
NEWPAGE CORPORATION, et al.,            :   Case No.  11-12804 (KG)
                                        :
        Debtors.¹                       :   Jointly Administered
                                        :
---------------------------------------------------------x
```

## DISCLOSURE STATEMENT FOR DEBTORS'
## FOURTH AMENDED JOINT CHAPTER 11 PLAN

PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036-8299
Tel: 212.969.3000
Fax: 212.969.2900

PACHULSKI STANG ZIEHL & JONES LLP
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Tel: 302.652.4100

Co-Attorneys for the Debtors
and Debtors in Possession

Co-Attorneys for the Debtors
and Debtors in Possession

Dated:  November 7, 2012

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Chillicothe Paper Inc.  (6154), Escanaba Paper Company (5598), Luke Paper Company (6265), NewPage Canadian Sales LLC (5384), NewPage Consolidated Papers Inc.  (8330), NewPage Corporation (6156), NewPage Energy Services LLC (1838), NewPage Group Inc.  (2465), NewPage Holding Corporation (6158), NewPage Port Hawkesbury Holding LLC (8330), NewPage Wisconsin System Inc.  (3332), Rumford Paper Company (0427), Upland Resources, Inc.  (2996), and Wickliffe Paper Company LLC (8293).  The Debtors' corporate headquarters is located at 8540 Gander Creek Drive, Miamisburg, OH 45342.

## IMPORTANT INFORMATION

THE BANKRUPTCY CODE REQUIRES THAT THE PARTY PROPOSING A CHAPTER 11 PLAN PREPARE AND FILE A DOCUMENT WITH THE BANKRUPTCY COURT CALLED A "DISCLOSURE STATEMENT." THIS DOCUMENT IS THE DISCLOSURE STATEMENT FOR THE PLAN DESCRIBED HEREIN. THIS DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE BANKRUPTCY COURT HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED THAT IT CONTAINS ADEQUATE INFORMATION PURSUANT TO SECTION 1125(b) OF THE BANKRUPTCY CODE AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE ON THE PLAN.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS CITED HEREIN AND THE PLAN ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SEE SECTION VII "RISK FACTORS AND OTHER FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF CERTAIN FEDERAL SECURITIES LAWS. ALL STATEMENTS CONTAINED HEREIN THAT ARE NOT CLEARLY HISTORICAL IN NATURE ARE FORWARD-LOOKING AND THE WORDS "ANTICIPATE," "BELIEVE," "COULD," "EXPECT," "ESTIMATE," "FORECAST," "INTEND," "POTENTIAL," "PROJECT," "TARGET," AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ALL STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, OTHER THAN STATEMENTS OF HISTORICAL FACT, INCLUDING STATEMENTS ABOUT THE DEBTORS' PLANS, STRATEGIES, PROSPECTS, AND EXPECTATIONS REGARDING FUTURE EVENTS AND THE DEBTORS' FINANCIAL PERFORMANCE, ARE FORWARD-LOOKING STATEMENTS THAT INVOLVE CERTAIN RISKS AND UNCERTAINTIES. WHILE THESE STATEMENTS REPRESENT THE DEBTORS' CURRENT JUDGMENT ON WHAT THE FUTURE MAY HOLD, AND THE DEBTORS BELIEVE THESE JUDGMENTS ARE REASONABLE UNDER THE CIRCUMSTANCES, THESE STATEMENTS ARE NOT GUARANTEES OF ANY EVENTS OR FINANCIAL RESULTS, AND THE DEBTORS' ACTUAL RESULTS MAY DIFFER MATERIALLY. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FORWARD-LOOKING STATEMENTS, PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION OF THE PLAN, AND THE LIQUIDATION ANALYSIS, ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT. THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE PUBLICLY THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FORWARD-LOOKING STATEMENTS, TO REFLECT NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS REQUIRED BY LAW. ALL FORWARD-LOOKING STATEMENTS INVOLVE RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL, WHICH MAY CAUSE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS TO DIFFER MATERIALLY FROM ANTICIPATED RESULTS, PERFORMANCE, OR ACHIEVEMENTS. THE DEBTORS CANNOT GUARANTEE THAT PROJECTED RESULTS OR EVENTS WILL BE ACHIEVED. FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL RESULTS TO BE

MATERIALLY DIFFERENT FROM THE DEBTORS' EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED HEREIN UNDER SECTION VII "RISK FACTORS AND OTHER FACTORS TO BE CONSIDERED" AND IN DOCUMENTS INCORPORATED HEREIN BY REFERENCE. THE DEBTORS URGE HOLDERS OF CLAIMS AND EQUITY INTERESTS TO CONSIDER THESE FACTORS CAREFULLY IN EVALUATING THE FORWARD-LOOKING STATEMENTS AND NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS.

THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE SET FORTH ON THE COVER PAGE, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN ARE UNCHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION CONCERNING THE PLAN OR THE DEBTORS, OR THE VALUE OF THEIR PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DO NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S CONFIRMATION OF THE PLAN.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY FOREIGN OR STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES DESCRIBED HEREIN OR THIS DISCLOSURE STATEMENT OR OPINED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

NONE OF THE SECURITIES TO BE ISSUED TO HOLDERS OF ALLOWED

CLAIMS PURSUANT TO THE PLAN WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE SECURITIES ACT AND EQUIVALENT STATE LAWS.

THE DEBTORS RECOMMEND POTENTIAL RECIPIENTS OF NEW HOLDCO COMMON STOCK TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN ADVISORS CONCERNING ANY RESTRICTIONS ON HOLDING OR THE TRANSFERABILITY OF SUCH SECURITIES, OR ANY OTHER POTENTIAL CONSEQUENCE OF HOLDING SUCH SECURITIES.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION RELATING TO THE DEBTORS. THE DEBTORS BELIEVE THESE SUMMARIES ARE FAIR AND ACCURATE. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN, OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

THE DEBTORS RESERVE THE RIGHT TO AMEND, MODIFY, OR WITHDRAW THE PLAN AT ANY TIME, IN ACCORDANCE WITH THE TERMS OF THE PLAN AND THE BANKRUTPCY CODE.

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

        A.      Chapter 11:  An Overview ................................................................. 3

        B.      Summary of Key Components of the Chapter 11 Plan............................ 3

                1.      Joint Plan ........................................................................ 4
                2.      Treatment of Allowed Claims........................................... 4
                3.      Summary of Terms of New Holdco Common Stock .......... 5

        C.      Holders of Claims Entitled to Vote on the Plan.............................. 5

        D.      Solicitation and Voting Procedures .............................................. 6

        E.      Confirmation Hearing .................................................................. 8

II.     OVERVIEW OF CLAIMS AND EQUITY INTERESTS TREATED UNDER THE
        PLAN ............................................................................................................ 9

        A.      No Double Payment of Claims ...................................................... 9

        B.      Treatment of Unclassified Claims under the Plan (Administrative Expense
                Claims, Professional Compensation and Reimbursement Claims, and Priority Tax
                Claims)........................................................................................ 9

                1.      Deadline for Filing Certain Administrative Expense Claims. ........... 9
                2.      Treatment of Administrative Expense Claims ................. 10
                3.      Treatment of Professional Compensation and Reimbursement Claims............. 10
                4.      Treatment of Priority Tax Claims ................................ 10
                5.      Treatment of DIP Lender Claims ................................. 11

        C.      Distributions to and Treatment of Classified Claims and Equity Interests under
                the Plan ..................................................................................... 11

III.    DESCRIPTION AND HISTORY OF THE COMPANY'S BUSINESSES ................... 23

        A.      Pre-Bankruptcy Business............................................................ 23

                1.      The Company's History.............................................. 23
                2.      The Company's Business............................................ 24

        B.      Reorganized Debtors' Businesses................................................ 26

        C.      Employees................................................................................. 26

        D.      Publicly Available Information.................................................... 26

        E.      Prepetition Indebtedness ............................................................ 27

                1.      Revolving Credit Facility............................................ 27
                2.      First Lien Notes ........................................................ 27
                3.      Second Lien Notes .................................................... 28
                4.      Senior Subordinated Unsecured Notes .......................... 28

|       | 5. | 2013 PIK Notes | 28 |
|       | 6. | 2015 PIK Notes | 28 |

| IV. | | EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES | 28 |

| | A. | The Debtors' Operations and Significant Debt Obligations | 28 |

| | B. | Canadian Operations and Settlement and Transition Agreement | 30 |

| V. | | DEBTORS' CHAPTER 11 CASES | 31 |

| | A. | First Day Orders and Other Postpetition Orders | 31 |
| | | 1. Case Administration Orders | 31 |
| | | 2. Waiver of Reporting Requirements | 31 |
| | | 3. Business Operations | 31 |
| | | 4. Protection of NOLs and Other Tax Attributes | 33 |
| | | 5. Debtor in Possession Financing | 33 |
| | | 6. Claims Process and Bar Date | 34 |
| | | 7. Executory Contracts and Unexpired Leases | 35 |
| | | 8. Employee Matters | 35 |
| | | 9. Retention of Debtors' Professionals | 36 |
| | | 10. Exclusivity | 36 |
| | | 11. De Minimus Asset Sales | 37 |

| | B. | Appointment of Official Committee of Unsecured Creditors | 37 |
| | | 1. Appointment | 37 |
| | | 2. Composition | 37 |
| | | 3. Retention of Committee Professionals | 38 |

| | C. | The Committee's Motions | 39 |
| | | 1. NPPH Discovery Motion | 39 |
| | | 2. 2004 Motions and Related Discovery | 39 |
| | | 3. The Committee's Standing Motion | 39 |

| | D. | Litigation and Settlements | 40 |
| | | 1. Extension of Time to File Notices of Removal of Civil Actions | 40 |
| | | 2. Plum Creek | 40 |
| | | 3. Antitrust Litigation | 41 |
| | | 4. PM35 | 42 |
| | | 5. NPWSI Retirement Plan Settlement | 43 |
| | | 6. Mediation and Global Settlement | 45 |

| VI. | | THE CHAPTER 11 PLAN | 46 |

| | A. | Corporate Governance and Management of Reorganized Debtors | 47 |
| | | 1. Reorganized Debtors' Directors and Officers | 47 |
| | | 2. Amendment of Governance Documents | 47 |
| | | 3. Corporate Action | 47 |
| | | 4. Corporate Authority of the Debtors | 47 |

| | B. | Classification and Treatment of Classified Claims and Equity Interests | 47 |

C.      Consideration to be Paid Under the Plan ............................................................. 53

D.      Reservation of "Cramdown" Rights .................................................................... 55

E.      Means of Execution of the Plan ......................................................................... 55

    1.      Separate Plans ...................................................................................... 55
    2.      Severability of Plans ............................................................................ 56
    3.      Continued Corporate Existence ........................................................... 56
    4.      Mergers ................................................................................................. 56
    5.      Corporate Structure .............................................................................. 56
    6.      Issuance of Stock of Reorganized NPC and Contribution to New Holdco.......... 56
    7.      Form of Securities to be Issued; Exemption from Registration........................ 57
    8.      Certain Tax Treatment .......................................................................... 57
    9.      Exit Financing ....................................................................................... 57
    10.     Distributions to Holders of Notes ........................................................ 59
    11.     Preservation of Rights of Action ......................................................... 60
    12.     The Settlements ..................................................................................... 61

F.      The Litigation Trust ........................................................................................... 64

    1.      Establishment of the Litigation Trust .................................................. 64
    2.      Litigation Trust Assets.......................................................................... 64
    3.      Funding the Litigation Trust ................................................................ 65
    4.      Distribution of Litigation Trust Net Proceeds ..................................... 66
    5.      Protected Parties ................................................................................... 66
    6.      The Litigation Trustee and Structure of the Litigation Trust.............. 66
    7.      Taxes...................................................................................................... 67
    8.      Dissolution............................................................................................. 68
    9.      Securities Law Matters ......................................................................... 69
    10.     Potential Committee Litigation Claims ................................................ 69

G.      Voting and Distributions under the Plan............................................................. 70

    1.      Impaired Classes to Vote ...................................................................... 70
    2.      Acceptance by Class of Claims............................................................. 70
    3.      Elimination of Vacant Classes.............................................................. 70
    4.      Nonconsensual Confirmation ............................................................... 70
    5.      Distributions under the Plan ................................................................. 71
    6.      Distribution Record Date....................................................................... 72
    7.      Payments to be Made to Indenture Trustees ........................................ 73
    8.      Disbursing Agent .................................................................................. 73
    9.      Manner of Payment Under the Plan ..................................................... 73
    10.     Payment of Interest on Allowed Claims ............................................... 73
    11.     Fractional Dollars; De Minimis Distributions ..................................... 73
    12.     Calculation of Distribution of New Holdco Common Stock................. 73
    13.     Calculation of Distribution of Litigation Trust Interests ..................... 74
    14.     Unclaimed Property .............................................................................. 74
    15.     Time Bar to Cash Payments.................................................................. 74
    16.     Setoffs ................................................................................................... 74
    17.     Allocation of Plan Distributions Between Principal and Interest ........ 75

H.      Treatment of Disputed Claims under the Plan .................................................... 75

    1.      Objections to Claims; Prosecution of Disputed Claims........................ 75

| | 2. | Claim Objections and Expunged Claims | 76 |
| | 3. | No Distributions Pending Allowance | 77 |
| | 4. | Reserve Account for Disputed General Unsecured Claims | 77 |
| | 5. | Disputed Class 3A Claims | 78 |
| | 6. | No Recourse | 78 |
| | 7. | Distribution to Holders of Allowed Claims Following Disallowance of Disputed Claims | 78 |
| | 8. | Estimation of Claims | 78 |
| I. | | Executory Contracts and Unexpired Leases | 79 |
| | 1. | Assumption and Rejection of Executory Contracts | 79 |
| | 2. | Cure of Defaults and Survival of Contingent Claims | 80 |
| | 3. | Deadline for Filing Rejection Damage Claims | 80 |
| | 4. | Indemnification and Reimbursement Obligations | 80 |
| | 5. | Existing Compensation and Benefit Programs | 81 |
| | 6. | Pension Benefit Guaranty Corporation | 82 |
| | 7. | Reorganized NPC New Compensation Plans | 83 |
| J. | | Effect of Confirmation | 83 |
| | 1. | Re-vesting of Assets | 83 |
| | 2. | Discharge of Claims | 83 |
| | 3. | Preservation of Insurance | 83 |
| | 4. | Injunction Against Claims and Equity Interests | 83 |
| | 5. | Terms of Existing Injunctions or Stays | 84 |
| | 6. | Injunction Against Interference with Plan of Reorganization | 84 |
| | 7. | Injunction Regarding Worthless Stock Deduction | 84 |
| | 8. | Channeling Injunction | 85 |
| | 9. | Exculpation | 86 |
| | 10. | Releases by Debtors | 86 |
| | 11. | Additional Releases of Releasees | 87 |
| | 12. | Releases Pursuant to SEO Settlement Agreement | 87 |
| K. | | Conditions Precedent to Effective Date of the Plan; Implementation Provisions | 88 |
| | 1. | Conditions Precedent to the Effective Date of the Plan | 88 |
| | 2. | Waiver of Conditions Precedent | 88 |
| | 3. | Notice of Confirmation of the Plan | 88 |
| | 4. | Notice of Effective Date of the Plan | 89 |
| L. | | Retention of Subject Matter Jurisdiction | 89 |
| M. | | Alternative Plan(s) of Reorganization | 91 |
| N. | | Liquidation under Chapter 7 | 91 |
| O. | | Miscellaneous Provisions | 92 |
| | 1. | Effectuating Documents and Further Transactions | 92 |
| | 2. | Withholding and Reporting Requirements | 92 |
| | 3. | Exemption from Transfer Taxes | 93 |
| | 4. | Expedited Tax Determination | 93 |
| | 5. | Payment of Statutory Fees | 93 |
| | 6. | Post-Confirmation Date Professional Fees and Expenses | 93 |

|  |  | 7. | Indenture Trustee Claims | 93 |
|  |  | 8. | Plan Modifications | 94 |
|  |  | 9. | Revocation, Withdrawal, or Non-Consummation | 94 |
|  |  | 10. | NPPH Sale Proceeds | 94 |
|  |  | 11. | Cerberus Settlement | 95 |
|  |  | 12. | Plan Supplement | 96 |
|  |  | 13. | Substantial Consummation | 96 |
|  |  | 14. | Severability | 96 |
|  |  | 15. | Governing Law | 97 |
|  |  | 16. | Deemed Acts | 97 |
|  |  | 17. | Binding Effect | 97 |
|  |  | 18. | Exhibits/Schedules | 97 |
|  |  | 19. | Notices | 97 |
|  |  | 20. | Dissolution of Committee | 98 |
|  |  | 21. | Payment of Fees and Expenses of the First Lien Notes Trustee | 98 |
|  |  | 22. | Payment of Fees and Expenses of the Second Lien Group | 99 |
|  |  | 23. | No Admissions | 99 |
|  |  | 24. | Time | 99 |
|  |  | 25. | Section Headings | 99 |
|  |  | 26. | Inconsistencies | 99 |
| VII. |  |  | RISK FACTORS AND OTHER FACTORS TO BE CONSIDERED | 99 |
|  | A. |  | Bankruptcy Risks | 100 |
|  |  | 1. | Risk of Non-Confirmation of the Plan | 100 |
|  |  | 2. | Parties in Interest May Object to the Debtors' Classification of Claims | 100 |
|  |  | 3. | Non-Consensual Confirmation | 100 |
|  |  | 4. | Risk of Non-Occurrence or Delayed Occurrence of the Effective Date | 100 |
|  |  | 5. | Certain Tax Consequences of the Plan are Complex and Subject to Substantial Uncertainties | 101 |
|  |  | 6. | Undue Delay in the Confirmation of the Plan May Significantly Disrupt Operations of the Debtors | 101 |
|  |  | 7. | The Chapter 11 Cases may adversely affect the Company's operations going forward | 101 |
|  |  | 8. | Certain liabilities will not be fully extinguished as a result of the Confirmation of the Plan by the Bankruptcy Court | 101 |
|  |  | 9. | Plan Releases May Not be Approved | 102 |
|  |  | 10. | Litigation Trust Recoveries and Results are Speculative and Uncertain | 102 |
|  | B. |  | Risks Related to the Capitalization of the Reorganized Debtors | 102 |
|  |  | 1. | The Company Will Require Significant Financing to Emerge from the Chapter 11 Cases | 102 |
|  |  | 2. | The Plan Exchanges Senior Securities for Equity | 102 |
|  |  | 3. | Absence of Trading Market for New Holdco Common Stock | 103 |
|  |  | 4. | Holders' Ability to Sell New Holdco Common Stock | 103 |
|  |  | 5. | Upon Consummation of the Plan, There May Be Significant Holders of the New Holdco Common Stock | 104 |
|  |  | 6. | The New Holdco Common Stock May Be Issued in Odd Lots | 104 |
|  |  | 7. | Upon Consummation of the Plan, There May Be Restrictions on the Transfer of New Holdco Common Stock by Certain Holders | 104 |

C.      Variance from Estimates and Projections ..................................................... 104
        1.      Financial Projections..................................................................... 105
        2.      Estimated Recoveries..................................................................... 105
        3.      Liquidation Analysis...................................................................... 105
D.      Risks Associated with the Business ............................................................ 106
        1.      The Debtors' Business Plan ........................................................... 106
        2.      Various Operating Factors and General Economic Conditions ...................... 106
        3.      The Debtors depend on a small number of customers for a significant
                portion of their business................................................................ 106
        4.      Rising postal costs could weaken demand for the Debtors' paper
                products..................................................................................... 107
        5.      Developments in alternative media could adversely affect the demand for
                the Debtors' products. .................................................................. 107
        6.      If the Debtors are unable to obtain raw materials, including petroleum-
                based chemicals, at favorable prices, or at all, it could adversely affect
                the Debtors' business, financial condition and results of operations. ............... 107
        7.      The Debtors are involved in continuous manufacturing processes with a
                high degree of fixed costs.  Any interruption in the operations of the
                Debtors' manufacturing facilities may affect their operating performance. ....... 108
        8.      The Debtors' operations require substantial ongoing capital expenditures,
                and they may not have adequate capital resources to fund all of their
                required capital expenditures. ......................................................... 108
        9.      Rising energy or chemical prices or supply shortages could adversely
                affect the Debtors' business, financial condition and results of
                operations................................................................................... 109
        10.     The failure of the Debtors' information technology and other business
                support systems could have a material adverse effect on the Debtors'
                business, financial condition and results of operations. ........................... 109
        11.     A large percentage of the Debtors' employees are unionized.  Wage
                increases or work stoppages by the Debtors' unionized employees may
                have a material adverse effect on the Debtors' business, financial
                condition and results of operations. .................................................. 109
        12.     The Debtors depend on third parties for certain transportation services. .......... 109
        13.     The Debtors are subject to various regulations that could impose
                substantial costs upon them and may adversely affect their operating
                performance. ............................................................................... 110
        14.     Demand for Printing and Writing Paper is Subject to General Economic
                Events and Developments in Alternative Media ..................................... 110
        15.     The Markets in Which the Debtors Operate are Highly Competitive and
                Imports Could Materially Adversely Affect their Business, Financial
                Condition, and Results of Operations. ............................................... 110
VIII.   CONFIRMATION OF THE PLAN................................................................ 111
        A.      Confirmation Hearing ............................................................................. 111
        B.      Requirements for Confirmation of the Plan................................................. 112
        C.      Feasibility............................................................................................. 114

x

|  | D. | Best Interest Tests | 115 |
|  | E. | Liquidation Analysis | 115 |
|  | F. | Section 1129(b) | 116 |
|  |  | 1. No Unfair Discrimination | 116 |
|  |  | 2. Fair and Equitable Test | 117 |
| IX. | | PROJECTIONS | 117 |
|  | A. | Introduction | 117 |
|  | B. | Projections | 118 |
| X. | | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 119 |
|  | A. | Scope and Limitation | 119 |
|  | B. | Certain U.S. Federal Income Tax Consequences to the Debtors | 120 |
|  |  | 1. Cancellation of Indebtedness Income | 121 |
|  |  | 2. Annual Section 382 Limitation on Use of NOLs and "Built-In" Losses and Deductions | 122 |
|  |  | 3. Alternative Minimum Tax | 124 |
|  |  | 4. Transfer of Litigation Trust Assets to the Litigation Trust | 124 |
|  | C. | U.S. Federal Income Tax Considerations for Certain Holders of Claims | 125 |
|  |  | 1. Exchange of stock of Reorganized NPC for New Holdco Common Stock | 125 |
|  |  | 2. Securities for Tax Purposes | 125 |
|  |  | 3. Holders Receiving Stock in Reorganized NPC or Receiving Stock in Reorganized NPC Plus Cash and/or Litigation Trust Interests | 126 |
|  |  | 4. Holders Receiving Litigation Trust Interests and/or Cash | 127 |
|  |  | 5. Market Discount, Accrued Interest and Limitation on Capital Losses | 127 |
|  |  | 6. Tax Treatment of the Litigation Trust and Litigation Trust Beneficiaries | 129 |
|  |  | 7. Tax Reporting for Assets Allocable to Disputed Claims | 130 |
|  |  | 8. Surtax on Unearned Income | 130 |
|  |  | 9. Backup Withholding and Information Reporting | 130 |
|  | D. | Importance of Obtaining Professional Tax Assistance | 131 |
| XI. | | SECURITIES LAW MATTERS | 131 |
|  | A. | Issuance and Resale of New Holdco Common Stock | 131 |
|  | B. | Legends | 133 |
|  | C. | Book-Entry; Delivery and Form | 134 |
|  | D. | Registration and Listing | 134 |
| XII. | | CONCLUSION | 134 |

## <u>LIST OF EXHIBITS</u>

Exhibit A  Fourth Amended Joint Plan
Exhibit B  Disclosure Statement Order
Exhibit C  Projected Financial Information
Exhibit D  Liquidation Analysis
Exhibit E  Valuation Analysis

## I.   INTRODUCTION

> **THE FOLLOWING STATEMENTS IN THIS SECTION I ARE QUALIFIED IN THEIR ENTIRETY BY THE MORE DETAILED INFORMATION AND FINANCIAL STATEMENTS CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE PLAN AND THE EXHIBITS TO EACH.**

Pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), NewPage Corporation ("NPC") and certain of its subsidiaries and affiliates that are debtors and debtors in possession (collectively, with NPC, the "Debtors") in jointly administered cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), submit this disclosure statement (the "Disclosure Statement") to all holders of Claims[2] against and Equity Interests in the Debtors in connection with (i) the solicitation of acceptances or rejections of the proposed *Debtors' Fourth Amended Joint Chapter 11 Plan* [Docket No. ____] (the "Plan"), dated November 7, 2012, and (ii) the hearing on confirmation of the Plan (the "Confirmation Hearing") scheduled for December 13, 2012 at 12:00 p.m. (prevailing Eastern Time). Of the 14 Debtors that commenced Chapter 11 Cases under the Bankruptcy Code, only 12 Debtors are proponents of the proposed Plan. The Plan provides for the Chapter 11 Cases of the Non-Proponent Debtors to be dismissed upon the Effective Date.

To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan will govern.

Attached as Exhibits to this Disclosure Statement are the following documents, each of which is incorporated in full:

- The Plan, together with its exhibits (Exhibit A);

- Order of the Bankruptcy Court, dated [DATE],[3] approving this Disclosure Statement (the "Disclosure Statement Order") (Exhibit B);[4]

- Projected Financial Information (Exhibit C);

- Liquidation Analysis (Exhibit D); and

- Valuation Analysis (Exhibit E).

On August 13, 2012, the Debtors filed the *Debtors' Joint Chapter 11 Plan* with the Bankruptcy Court [Docket No. 2152]. On October 5, 2012, the Debtors then filed (i) the *Debtors' First Amended Joint Chapter 11 Plan* [Docket No. 2414], (ii) the *Proposed Disclosure Statement for Debtors' First Amended Joint Chapter 11 Plan* [Docket No. 2415], and (iii) the *Debtors' Motion for Order (I) Approving Notice of Disclosure Statement Hearing, (II) Approving Disclosure Statement, (III) Fixing Voting Record Date, (IV) Scheduling Plan Confirmation Hearing and Approving Form and Manner of Related Notice and Objection Procedures, (V) Appointing Balloting Agent, (VI) Approving Solicitation*

---

[2] Capitalized terms used but not otherwise defined in this Disclosure Statement are as defined in the Plan.

[3] References to "[DATE]" and "[TIME]" refer to dates and times that will be added upon Bankruptcy Court approval of the Disclosure Statement.

[4] This exhibit will be inserted after Bankruptcy Court approval of the Disclosure Statement.

*Packages and Procedures for the Distribution Thereof, (VII) Approving Forms of Ballots and Voting Procedures, (VIII) Approving Form and Manner of Notices to Non-Voting Plan Classes, (IX) Fixing Voting Deadline, and (X) Approving Vote Tabulation Procedures* in accordance with the *Debtors' Amended Motion for Order Pursuant to Federal Rule of Bankruptcy Procedure 3016(b) Extending Time to File Disclosure Statement* [Docket No. 2350]. On November 5, 2012, the Debtors filed the *Debtors' Second Amended Joint Chapter 11 Plan* [Docket No. 2609] and the *Proposed Disclosure Statement for Debtors' Second Amended Joint Chapter 11 Plan* [Docket Nos. 2610]. On November 6, 2012, the Debtors filed the *Debtors' Third Amended Joint Chapter 11 Plan* [Docket No. 2620] and the *Proposed Disclosure Statement for Debtors' Third Amended Joint Chapter 11 Plan* [Docket No. 2611]. Finally, after the hearing on November 6, 2012, at which the Bankruptcy Court found the version of the Disclosure Statement contained adequate information of a kind, and in sufficient detail, to enable a hypothetical investor typical of the holders of Claims against and Equity Interests in the Debtors to make an informed judgment about the Plan and in voting to accept or reject the Plan, the Debtors filed the *Debtors' Fourth Amended Joint Chapter 11 Plan* [Docket No. ____] and the *Disclosure Statement for Debtors' Fourth Amended Joint Chapter 11 Plan* [Docket No. _____]. On [DATE], Bankruptcy Court issued the Disclosure Statement Order approving the Disclosure Statement. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Confirmation Hearing may be adjourned or continued from time to time. Therefore, parties in interest should check the online docket at http://www.kccllc.net/NewPage to confirm the latest scheduled date and time of the Confirmation Hearing.

The reorganizing Debtors are furnishing this Disclosure Statement as the proponents of the Plan pursuant to section 1125 of the Bankruptcy Code and in connection with the solicitation of votes to accept or reject the Plan, as it may be amended or supplemented from time to time in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

This Disclosure Statement describes certain aspects of the Plan, the Debtors' and their non-debtor affiliates' operations, their financial condition, including financial projections, as well as other related matters, including the treatment of holders of Claims against and Equity Interests in the Debtors. This Disclosure Statement also describes certain potential federal income tax consequences to Claim holders, voting procedures, and the confirmation process.

A ballot for the acceptance or rejection of the Plan (a "Ballot") is enclosed with the copy of this Disclosure Statement distributed to the holders of Claims in the Classes that are entitled to vote to accept or reject the Plan. The Ballot includes information regarding the voting deadlines and detailed instructions for voting to accept or reject the Plan. Before voting, each holder of a Claim entitled to vote should read this Disclosure Statement (including the exhibits and documents incorporated by reference) and the instructions accompanying the Ballot. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and tabulation of votes. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, as it may be amended, and section 1125 of the Bankruptcy Code. In voting on the Plan, the holder of a Claim should rely solely on the information relating to the Debtors contained or incorporated by reference in this Disclosure Statement, the Plan, and the exhibits attached to these documents.

**THE PLAN IS THE PRODUCT OF SUBSTANTIAL NEGOTIATIONS AMONG THE DEBTORS, THE FIRST LIEN NOTEHOLDERS, THE COMMITTEE, THE SECOND LIEN NOTEHOLDERS, AND SEO. THE DEBTORS BELIEVE THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL CREDITORS OF THE DEBTORS AND, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE**

2

**DEBTORS AND THEIR ESTATES. THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

A.      <u>Chapter 11: An Overview</u>

        The commencement of a chapter 11 case creates a bankruptcy estate comprised of all of the legal and equitable interests of the debtor as of the date of filing of the bankruptcy petition. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

        Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to restructure its business and financial obligations for the benefit of all economic parties in interest. In addition to permitting the rehabilitation of a debtor, chapter 11 promotes fair treatment for similarly situated claims and similarly situated equity interests with respect to distributions to be made from a debtor's bankruptcy estate.

        The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for treating claims against and equity interests in a debtor. Confirmation of a chapter 11 plan by the Bankruptcy Court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order confirming a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

        Holders of certain claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor typical of the holders of claims against and equity interests in the debtor to make an informed judgment about the plan and in voting to accept or reject the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

        The Plan proposed by the Debtors includes a separate chapter 11 plan for each of the Debtors other than the Non-Proponent Debtors. If you have a Claim against more than one Debtor and/or different types of Claims classified in different Classes against one Debtor, you are allowed to vote each Claim separately.

B.      <u>Summary of Key Components of the Chapter 11 Plan</u>

        The Debtors submit the Plan maximizes the value of each Debtor's estate, and any alternative to confirmation of the Plan would result in significant delays, litigation, lost value, and additional costs.

        The Debtors also believe the Plan's contemplated restructuring is in the best interests of their Creditors. If the Plan were not to be confirmed, the Debtors' options would be to either file an alternate chapter 11 plan or liquidate under chapter 7 of the Bankruptcy Code.

        The following overview summarizes certain key components of the Plan. The overview is qualified in its entirety by the full text of the Plan.

3

1.    **Joint Plan**

The Plan consists of twelve separate chapter 11 Plans – one Plan for each of the Debtors that will emerge as a reorganized entity. The Plan does not substantively consolidate any Estates. Two Debtors – NewPage Group Inc. ("NPGI") and NewPage Holding Corporation ("NPHC") – are not proposing a chapter 11 plan and intend to dissolve as described in Section 4.5.1 of the Plan. Any reference herein to the "Plan" will be a reference to the separate Plan of each Debtor, as the context requires. The votes to accept or reject the Plan by holders of Claims against a particular Debtor will be tabulated as votes to accept or reject that Debtor's separate Plan. Distributions under a Debtor's Plan will be made to the holders of Claims in the Classes identified in that Plan.

The Settlement Parties have engaged in extensive communications regarding the Plan process and alternative plan formulations, and participated in a mediation process in a concerted effort to resolve their existing and potential disputes. These efforts have culminated in the Settlements set forth in the Plan pursuant to which Distributions to Creditors will be made in accordance with their terms.

Under the Plan, the First Lien Noteholders will receive, among other consideration, 100 percent of the equity in the Reorganized Debtors. The Second Lien Noteholders and certain other unsecured creditors (excluding certain trade creditors) will receive their pro rata share of (i) $30 million in cash and (ii) the first $50 million in proceeds that are realized by a Litigation Trust. After the first $50 million received by the Litigation Trust, any additional proceeds received by the Litigation Trust will be shared by the First Lien Noteholders, the Second Lien Noteholders and certain unsecured creditors. For the avoidance of doubt, the First Lien Noteholders will be entitled to receive distributions on account of the foregoing distributions through the enforcement of certain subordination rights and/or their deficiency claim, as provided for in the Plan. Certain trade creditors who agree to provide credit terms as specified in the Plan will receive a 15% recovery on their Claims over a two year period. Consistent with the foregoing, on the Effective Date of the Plan, the Debtors will fund the Litigation Trust with: (i) $40 million in cash (less $500,000 retained by the Debtors for the SEO Professional Fees) that the Debtors had previously allocated to resolving issues related to PM35 located in the Debtors' Stevens Point, Wisconsin mill, and (ii) the Committee Litigation Claims. In addition, the Debtors will provide $5 million for trust administration expenses, which will be repaid to the Debtors from certain proceeds of the Litigation Trust (other than the initial $40 million cash deposit referenced above). Pursuant to the SEO Settlement Agreement (as defined below), which has the support of the Committee and the Debtors, SEO will be arranging for the transfer on the Effective Date of the Plan to the Debtors ownership of PM35 in return for a cash payment of approximately $14 million, as set forth in the SEO Settlement Agreement, and, subject to certain agreed exceptions set forth in the Settlement Agreement, in full settlement and release of any and all Claims or Causes of Action whatsoever from the beginning of the world to the Effective Date, known or unknown, of the Debtors against SEO, its affiliates, and, with respect to issues related to PM35, the other parties to the trust from which NPWSI leases PM35.

2.    **Treatment of Allowed Claims**

On the Effective Date, or as soon as reasonably practicable thereafter, New Holdco will issue the New Holdco Common Stock. Each holder of an Allowed First Lien Notes Claim will receive from the Disbursing Agent on account of its Secured Claim shares of stock of the Reorganized NPC, whereupon each holder will contribute such shares to New Holdco in exchange for each holder's Pro Rata Share of the Available New Holdco Common Stock, and New Holdco's Debtor Affiliates having confirmed Plans will issue new shares of stock to their respective parent companies to re-create the same organizational structure that existed on the Commencement Date, or as otherwise directed by those entities.

4

3.    **Summary of Terms of New Holdco Common Stock**

a.    *New Holdco Common Stock*

On the Effective Date, New Holdco will issue, in accordance with the Plan, 1,000,000 shares of New Holdco Common Stock, par value $0.001 per share, for distribution to the holders of Allowed NPC First Lien Notes Claims (in exchange for the stock of Reorganized NPC) and certain senior management employees in accordance with the Reorganized NPC New Compensation Plans (as discussed in Section VI.I.7 below, and the Plan Supplement).

All New Holdco Common Stock issued by New Holdco pursuant to the Plan will be duly authorized and validly issued, fully paid, and nonassessable.

Each holder of New Holdco Common Stock will be entitled to one vote per outstanding share with respect to the election of directors and on all other matters submitted to the vote of the stockholders.

The holders of New Holdco Common Stock will be entitled to receive dividends as may be declared from time to time by the Board of Directors of New Holdco out of funds legally available for dividend payments. In the event of liquidation, dissolution or winding up, after full payment of all liabilities, the holders of New Holdco Common Stock will be entitled to share ratably in any distributions of any remaining assets or the proceeds of those assets. The New Holdco Common Stock will have no preemptive or conversion rights or other subscription rights.

b.    *Stock Non-Certificated and Exempt from Registration*

As discussed in Section XI.A, pursuant to Bankruptcy Code section 1145, the New Holdco Common Stock will be exempt from registration under applicable securities laws, including Section 5 of the Securities Act of 1933, as amended (the "Securities Act"), the Securities Exchange Act of 1934, as amended, or any state or local law requiring registration for the offer or sale of securities.

Shares of New Holdco Common Stock issued under the Plan will be non-certificated. Reorganized NPC does not intend to list the New Holdco Common Stock on a securities exchange, and New Holdco will not participate in making a market (or facilitate making a market) in any such securities.

C.    **Holders of Claims Entitled to Vote on the Plan**

Pursuant to the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and are not deemed to have rejected a proposed chapter 11 plan are entitled to vote to accept or reject a proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under the plan are presumed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests will receive no recovery under the plan are deemed to have rejected the plan and are also not entitled to vote to accept or reject the plan.

Holders of Allowed Claims in the following Classes are Unimpaired under the Plan: NPC Class 2, and GD Class 2. Accordingly, holders of Allowed Claims in those Classes are conclusively presumed to have accepted the Plan and are not entitled to vote.

Holders of Allowed Claims in the following Classes are Impaired under the Plan and will receive distributions under the Plan: NPC Class 1A, NPC Class 1B, NPC Class 3A, NPC Class 3B, NPC

Class 3C, NPC Class 3D, NPC Class 3E, GD Class 1A, GD Class 1B, GD Class 3A, GD Class 3B, GD Class 3C, GD Class 3D and GD Class 3E. Accordingly, holders of Allowed Claims in those Classes are entitled to vote to accept or reject the Plan.

Holders of Claims and Equity Interests in the following Classes are Impaired under the Plan and will neither receive nor retain any property under the Plan in respect of those Claims and Equity Interests: NPC Class 4, NPC Class 5, GD Class 4, and GD Class 5. Accordingly, holders of Claims and Equity Interests in those Classes are conclusively deemed to reject the Plan and are not entitled to vote to accept or reject the Plan. Since NPGI and NPHC are not filing a Plan, their respective creditors will not be solicited for voting purposes.

Section 1126 of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class holding at least two-thirds in dollar amount and more than one-half in number of the claims voted for acceptance or rejection of the plan. Thus, acceptance of the Plan by Claims in NPC Class 1A, NPC Class 1B, NPC Class 3A, NPC Class 3B, NPC Class 3C, NPC Class 3D, NPC Class 3E, GD Class 1A, GD Class 1B, GD Class 3A, GD Class 3B, GD Class 3C, GD Class 3D, and GD Class 3E will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Claims in each Class that cast their Ballots vote in favor of acceptance of the Plan. A holder of a Claim in Class 3A may elect on its Ballot to be treated as a Qualified Trade Creditor in NPC Class 3E or GD Class 3E, as applicable. If such holder is eligible to be a Qualified Trade Creditor, the holder's Class 3A vote will be treated as a vote in Class 3E. As noted above, holders of Claims and Equity Interests in NPC Class 4, NPC Class 5, GD Class 4, and GD Class 5 are conclusively deemed to have rejected the Plan, and holders of Claims in NPC Class 2 and GD Class 2 are conclusively presumed to have accepted the Plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

It is important that holders of Claims in NPC Class 1A, NPC Class 1B, NPC Class 3A, NPC Class 3B, NPC Class 3C, NPC Class 3D, NPC Class 3E, GD Class 1A, GD Class 1B, GD Class 3A, GD Class 3B, GD Class 3C, GD Class 3D, and GD Class 3E exercise their right to vote to accept or reject the Plan. **EVEN IF YOU DO NOT VOTE TO ACCEPT THE PLAN, YOU MAY BE BOUND BY THE PLAN IF IT IS ACCEPTED BY THE REQUISITE HOLDERS OF CLAIMS IN THE SAME CLASS AS YOUR CLAIM.** The amount and number of votes required for acceptance or rejection of the Plan by a Class are computed on the basis of Claims actually voting to accept or reject the Plan. There are no quorum requirements with respect to the number of Claims in a Class that actually vote. Refer to Section VI.G for further information.

If at least one impaired class of claims has accepted a chapter 11 plan (without counting the votes of insiders), section 1129(b) of the Bankruptcy Code permits the confirmation of the plan under certain conditions notwithstanding the rejection of the plan by one or more other impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. Refer to Section VI.D for further information.

The Debtors' determination as to whether to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code will be announced prior to or at the Confirmation Hearing.

### D.   Solicitation and Voting Procedures

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set November 6, 2012 as the record date for voting on the Plan. Accordingly, only holders of record as of November 6, 2012

otherwise entitled to vote under the Plan will receive a Ballot(s) and may vote on the Plan. To determine whether your Class is entitled to vote on the Plan, refer to the table in Section VI.B below.

If you are entitled to vote, you should carefully review this Disclosure Statement, including the attached exhibits and the instructions accompanying the Ballot. Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot and return the Ballot in the postage-paid envelope provided. Please read your Ballot carefully and provide all the information requested. If you are a holder of a General Unsecured Claim in NPC Class 3A or GD Class 3A, your Ballot will include the option to be treated as a Qualified Trade Creditor. If you elect to be treated as a Qualified Trade Creditor *and* you are eligible for such treatment, your vote to accept or reject the Plan will be counted as a vote to accept or reject the Plan in NPC Class 3E or GD Class 3E, as applicable. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, each of which must be used for the appropriate Class of Claims against the appropriate Debtor. Please refer to Exhibit B for further information.

Holders of Claims who are entitled to vote to accept or reject the Plan and who receive a Ballot on which to indicate their vote on the Plan may also elect on the Ballot not to consent to the releases granted in Section 10.11 of the Plan. If any such holder does not return a Ballot or votes to reject the Plan, such holder will be deemed not to consent to such releases unless such holder advises the Balloting Agent in writing that you do consent to the releases contained in Section 10.11 of the Plan. **IF SUCH HOLDER (i) ELECTS NOT TO CONSENT TO THE RELEASES CONTAINED IN SECTION 10.11 OF THE PLAN, (ii) DOES NOT RETURN YOUR BALLOT OR (iii) VOTES TO REJECT THE PLAN, SUCH HOLDER SHALL NOT RECEIVE THE BENEFIT OF THE RELEASES SET FORTH IN SECTION 10.11 OF THE PLAN.**

If you are a holder of Claims in NPC Class 1A, GD Class 1A, NPC Class 3A, GD Class 3A, NPC Class 3E (as applicable) or GD Class 3E (as applicable), please vote and return your Ballot(s) to the Debtors' Claims Agent:

> NewPageBallot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, California 90245

If you are the beneficial owner (a "Beneficial Owner") of Claims in NPC Class 1B, GD Class 1B, NPC Class 3B, GD Class 3B, NPC Class 3C, GD Class 3C, NPC Class 3D, or NPC Class 3D, please vote and return your Ballot(s) to your broker, bank, commercial bank, trust company, dealer, or other agent or nominee (a "Voting Nominee") to permit your Voting Nominee to complete and return a master ballot (a "Master Ballot") to the Claims Agent.

If you are the Voting Nominee for Beneficial Owners of Claims in NPC Class 1B, GD Class 1B, NPC Class 3B, GD Class 3B, NPC Class 3C, GD Class 3C, NPC Class 3D, or NPC Class 3D, please summarize the votes cast by Beneficial Owners to accept or reject the Plan as described in your master ballot (a "Master Ballot"), and return your Master Ballot to the Debtors' Claim Agent at the following address:

> NewPageBallot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 599 Lexington Avenue, 39th Floor
> New York, New York 10022

**TO BE COUNTED, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> BY THE CLAIMS AGENT NO LATER THAN DECEMBER 10, 2012 AT 5:00 P.M. (PREVAILING PACIFIC TIME). YOUR BALLOT(S) WILL NOT BE COUNTED IF RECEIVED AFTER THIS DEADLINE. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN WILL NOT BE COUNTED.**

If the return envelope provided with your Ballot is addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote on a master Ballot before the voting deadline on December 10, 2012 at 5:00 p.m. (prevailing Pacific Time) (the "<u>Voting Deadline</u>").

Any Claim in an Impaired Class as to which the Debtors have served an objection or request for estimation at least fifteen (15) days before the Voting Deadline, or that is listed on the Debtors' schedules of assets and liabilities filed with the Bankruptcy Court as unliquidated, disputed, or contingent and a proof of claim was not (i) filed by the applicable bar date for the filing of proofs of claim established by the Court, or (ii) deemed timely filed by an order of the Court prior to the Voting Deadline is not entitled to vote unless the holder of that Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan, to the extent, if any, temporary allowance under the Bankruptcy Rules does not impermissibly conflict with the Bankruptcy Code. The Debtors reserve the right to assert that the temporary allowance of any Claim impermissibly conflicts with the Bankruptcy Code.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact Kurtzman Carson Consultants LLC ("<u>KCC</u>") by telephone at (877) 573-3985 or by email at newpageinfo@kccllc.com, or visit the Debtors' restructuring website:

<u>http://www.kccllc.net/NewPage</u>.

**DO NOT RETURN ANY DOCUMENTS WITH YOUR BALLOT(S).**

**THE DEBTORS BELIEVE ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS. THE DEBTORS URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.**

**E.      Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled the Confirmation Hearing on December 13, 2012 at 12:00 p.m. (prevailing Eastern Time), in the United States Bankruptcy Court for the District of Delaware, 824 North Market St., 6th Floor, Courtroom 3, Wilmington, Delaware 19801, before The Honorable Kevin Gross, Chief United States Bankruptcy Judge for the District of Delaware. The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Bankruptcy Court has ordered that objections, if any, to confirmation of the Plan be filed and served on or before December 6, 2012 at 4:00 p.m. (prevailing Eastern Time).

## II.    OVERVIEW OF CLAIMS AND EQUITY INTERESTS TREATED UNDER THE PLAN

### A.    <u>No Double Payment of Claims</u>

To the extent that a Claim is Allowed against more than one Debtor's Estate, there will be only a single recovery on account of that Allowed Claim, but the holder of an Allowed Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the holder has received payment in full on the Allowed Claim.  No holder of an Allowed Claim will be entitled to receive more than payment in full of its Allowed Claim and each Claim will be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

### B.    <u>Treatment of Unclassified Claims under the Plan (Administrative Expense Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims)</u>

#### 1.    Deadline for Filing Certain Administrative Expense Claims.

The procedures in this Section apply to each holder of an Administrative Expense Claim, *other than the holder of:*

| | |
|---|---|
| i. | a Claim of a Professional for compensation and reimbursement of costs and expenses, as described in Section 2.3 of the Plan; |
| ii. | a Section 503(b)(9) Claim; |
| iii. | an Administrative Expense Claim that has been Allowed on or before the Effective Date, including pursuant to the Plan; |
| iv. | an Administrative Expense Claim on account of fees and expenses incurred on or after the Commencement Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court; |
| v. | an Administrative Expense Claim held by a current officer, director or employee of any Debtor for indemnification, contribution, or advancement of expenses pursuant to the Debtor's certificate of incorporation, by-laws, or similar organizational document; |
| vi. | a Claim for U.S. Trustee statutory fees; and/or |
| vii. | a Claim for Union Advisor Fees. |

Other than those holders described above, each holder of an Administrative Expense Claim must file with the Claims Agent by mail or by overnight or hand delivery at the following address:

> NewPage Claims Processing Center
> c/o KCC
> 2335 Alaska Avenue
> El Segundo, CA 90245

and must serve on the Debtors or the Reorganized Debtors in accordance with Section 14.16 of the Plan, proof of its Administrative Expense Claim on or before the 60th day after the Effective Date.  Each proof

of Administrative Expense Claim must include at a minimum (i) the name of each Debtor that is purported to be liable for the Administrative Expense Claim, (ii) the name of the holder of the Administrative Expense Claim, (iii) the amount of the Administrative Expense Claim, (iv) the basis of the Administrative Expense Claim, and (v) supporting documentation for the Administrative Expense Claim. **FAILURE TO TIMELY FILE AND SERVE A COMPLETE PROOF OF ADMINISTRATIVE EXPENSE CLAIM IN ACCORDANCE WITH THE PLAN WILL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

### 2.   Treatment of Administrative Expense Claims

Except with respect to Administrative Claims that are Claims of Professionals as set forth in Section 2.3 of the Plan and except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with the Debtor against whose Estate the Claim is Allowed, each holder of an Allowed Administrative Expense Claim will receive Cash in an amount equal to the Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the date on which the Administrative Expense Claim becomes an Allowed Administrative Expense Claim except that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any Debtor or which have been approved pursuant to an order of the Bankruptcy Court will be paid in full and/or performed by the applicable Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, those liabilities. Notwithstanding the foregoing, the Indenture Trustee Claims will be paid pursuant to Sections 4.8 and 14.7 of the Plan.

### 3.   Treatment of Professional Compensation and Reimbursement Claims

Notwithstanding Sections 2.1 and 2.2 of the Plan, all holders of a Claim for an award of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code will file their respective final applications for allowances of such compensation and reimbursement by a date no later than the date that is 90 days after the Effective Date or by such other date as may be fixed by the Bankruptcy Court, and if granted such an award by the Bankruptcy Court, the holder will be paid in full in the amount Allowed by the Bankruptcy Court to the extent not previously paid pursuant to a prior order of the Bankruptcy Court (i) on the date on which the Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (ii) upon such other terms as may be mutually agreed upon between the holder of an Administrative Expense Claim and the Reorganized Debtors.

### 4.   Treatment of Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Estate liable for that Claim prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim will receive, at the sole option of the applicable Reorganized Debtor and in full and complete satisfaction of any and all liability attributable to that Priority Tax Claim, (a) Cash in an amount equal to the Allowed Priority Tax Claim, (b) a transferable note that provides for equal, semiannual Cash payments equal to the aggregate amount of the Allowed Priority Tax Claim plus interest paid in arrears semiannually at LIBOR (as of the Effective Date) plus 1%, over a period ending not later than five years after the applicable Commencement Date, or (c) any combination of Cash and a note, on the terms provided in subsections (a) and (b), in an aggregate Cash and note principal amount equal to the Allowed Priority Tax Claim. Payment of a Priority Tax Claim will be made on the latest of (i) the Effective Date, (ii) the date on which the Priority Tax Claim becomes an Allowed Priority Tax Claim, and

10

(iii) the date the Allowed Priority Tax Claim is payable under applicable non-bankruptcy law, or, in each case, as soon thereafter as is reasonably practicable.  The Debtors reserve the right to prepay any such note in part or in whole at any time without premium or penalty.  No holder of an Allowed Priority Tax Claim will be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising after the Commencement Date with respect to or in connection with an Allowed Priority Tax Claim.

### 5.        Treatment of DIP Lender Claims

Except to the extent the holder of a DIP Facility Claim agrees to less favorable treatment, on the Effective Date, the DIP Administrative Agent, for the ratable benefit of the DIP Lenders and the DIP Agents, as applicable, will be paid in Cash 100% of the then-outstanding amount, if any, of the DIP Facility Claims.  To the extent that any L/C remains undrawn as of the Effective Date, the Debtors will either (i) cause that L/C to be replaced with a letter of credit issued under the exit financing, (ii) collateralize that L/C with Cash in an amount equal to 105% of its face amount, (iii) provide a back-to-back letter of credit to the L/C Issuer on terms and from a financial institution reasonably acceptable to the L/C Issuer, or (iv) provide such other treatment as the Debtors and the L/C Issuer will agree, each in their sole discretion.  Contemporaneously with all amounts owing in respect of principal included in the DIP Facility Claims (other than Excluded DIP Obligations), interest accrued thereon to the date of payment and fees, expenses and non-contingent indemnification obligations as required by the DIP Facility and arising prior to the Effective Date being paid in full in Cash (or, in the case of the outstanding L/Cs, being guaranteed by back-to-back letters of credit, or collateralized by Cash, in each case in an amount equal to 105% of the face amount of such outstanding letters of credit or otherwise provided for as set forth above), any and all Liens on and security interests in the Debtors' (and the Estates') property held by the DIP Lenders will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity, the DIP Credit Agreement will be deemed terminated, and the Debtors' (and the Reorganized Debtors') obligations thereunder will be canceled; *provided, however*, that the Excluded DIP Obligations will survive the Effective Date and will not be discharged or released pursuant to the Plan or the Confirmation Order, notwithstanding any provision hereof or thereof to the contrary, and the payment on such date of the DIP Facility Claims will in no way affect or impair the obligations, duties, and liabilities of the Reorganized Debtors or the rights of the DIP Agents and the DIP Lenders relating to any Excluded DIP Obligations.

### C.        Distributions to and Treatment of Classified Claims and Equity Interests under the Plan

The following table summarizes the treatment of, and estimated recovery on, Allowed Claims and Equity Interests under the Plan, and identifies those Classes entitled to vote on the Plan based on the rules set forth in the Bankruptcy Code.  The summary information reflected in the table is qualified in its entirety by reference to the full text of the Plan.  The Plan should be consulted for additional information regarding the distributions thereunder to holders of Claims.

The recovery estimates set forth below are preliminary and are generally based upon information available to the Debtors as of October 15, 2012.  The preliminary value of assets and amount of Claims used to calculate the estimated recoveries may be significantly different than the ultimate values collected and the aggregate amount of Allowed Claims.  All Claim amounts were estimated by the Debtors.  Moreover, the recovery estimates are based on certain assumptions.  Therefore, the actual Distributions under the Plan may be substantially higher or lower than the estimated recoveries set forth

11

below.[5]  See Section VII.C for a discussion of variances from estimates and projections in this Disclosure Statement and Section IX for an overview of the Recovery Analysis.

The Disbursing Agent will make a payment on account of a Disputed Claim only after, and to the extent that, the Disputed Claim becomes an Allowed Claim.  All payments to be made in Cash under the Plan will be made, at the election of the Debtors (or their designated Disbursing Agent), by check or automated clearing house transfer.

**SUMMARY CHART OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN FOR EACH DEBTOR**

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[♦] | ESTIMATED RECOVERY UNDER SETTLEMENT[♠] |
|---|---|---|---|---|
| NPC PLAN | | | | |
| NPC Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| NPC Class 1B – First Lien Notes Claims | Impaired | Yes | $1,601,507,818 | 56.5% |

---

[5] The estimated recoveries set forth in the table represent the estimated recovery of each Class under the Plan.  To the extent a Creditor is entitled to satisfy all or a portion of its Claim through setoff, offset, or recoupment, that Creditor's recovery may be higher than reflected in this Disclosure Statement.

[♦]Underlying Assumptions Regarding Estimated Allowed/Disputed Claim Amounts:  The estimated amount of Allowed Claims excludes certain Claims expected to be satisfied or otherwise resolved on or before the Effective Date.  For example, cure amounts payable in respect of assumed contracts are excluded, as those Claims will be satisfied in connection with the contract assumption.  Further, Claims that are addressed in the Plan as ongoing obligations of the Reorganized Debtors that are not discharged by the Plan are expected to be resolved as of the Effective Date, such as the Pension Benefit Guaranty Corp.'s Claim, the Unions' Claims regarding certain collective bargaining agreements, and certain Claims regarding workers compensation – these Claims will not be counted for purposes of calculating the amount to be deposited in the Disputed Claims Reserve.  Further, pension liability Claims regarding NewPage Port Hawkesbury Holding LLC are excluded because the Claims (which were meritless) have been waived as a result of the sale of NPPH.  Also excluded are the First Lien Notes Deficiency Claims, which are waived under the Plan as to the Settlement Cash and up to the first $50 million of Litigation Trust proceeds.

[♠] The Settlement Cash and the Litigation Trust Initial Proceeds shall be distributed among the Debtors (other than the Non-Proponent Debtors) for subsequent *pro rata* Distribution to each Debtor's (other than the Non-Proponent Debtors') respective Creditors.  The distribution of Settlement Cash and the Litigation Trust Initial Proceeds among the Debtors' (other than the Non-Proponent Debtors') Estates shall be made in a manner such that Creditors of each Debtor (other than the Non-Proponent Debtors) shall receive approximately the same percentage of their Allowed Claims from the sum of the Settlement Cash and the Litigation Trust Initial Proceeds; *provided, however*, that if the Bankruptcy Court finds that the foregoing distribution method is contrary to law, then the Settlement Cash will be allocated among the Debtors (other than the Non-Proponent Debtors) based on each Debtor's (other than the Non-Proponent Debtors') book value of assets and then, within each Debtor (other than the Non-Proponent Debtors), *pro rata* to its Creditors.

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[*] | ESTIMATED RECOVERY UNDER SETTLEMENT[*] |
|---|---|---|---|---|
| NPC Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| NPC Class 3A– General Unsecured Claims | Impaired | Yes | $29,289,410 | 5.2%[6] |
| NPC Class 3B –First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| NPC Class 3C – Second Lien Notes Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| NPC Class 3D – Senior Subordinated Unsecured Notes Claims | Impaired | Yes | $207,884,353 | 0.2% |
| NPC Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $21,378,534 | 15.0%[7] |
| NPC Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| NPC Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| CHILLICOTHE PAPER INC. ("CHILLICOTHE") PLAN | | | | |
| Chillicothe Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |

---

[6] If all holders of General Unsecured Claims decline to elect treatment as Qualified Trade Creditors and remain holders of General Unsecured Claims, then the General Unsecured Claims recovery would be 5.0%, while the Second Lien Notes Claims recovery would be 5.7%.

[7] 15% of its Allowed Claim over a two year period, in installments no less frequent than four equal semiannual payments (without interest).

13

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[♦] | ESTIMATED RECOVERY UNDER SETTLEMENT[♦] |
|---|---|---|---|---|
| Chillicothe Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| Chillicothe Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| Chillicothe Class 3A – General Unsecured Claims | Impaired | Yes | $0 | 5.2%[1] |
| Chillicothe Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| Chillicothe Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| Chillicothe Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| Chillicothe Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $24,160 | 15.0%[3] |
| Chillicothe Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| Chillicothe Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| ESCANABA PAPER COMPANY ("ESCANABA") PLAN | | | | |
| Escanaba Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| Escanaba Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |

14

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS* | ESTIMATED RECOVERY UNDER SETTLEMENT* |
|---|---|---|---|---|
| Escanaba Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| Escanaba Class 3A – General Unsecured Claims | Impaired | Yes | $47,630 | 5.2%[1] |
| Escanaba Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| Escanaba Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| Escanaba Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| Escanaba Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $4,839,084 | 15.0%[3] |
| Escanaba Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| Escanaba Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| LUKE PAPER COMPANY ("LUKE") PLAN | | | | |
| Luke Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| Luke Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| Luke Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[♦] | ESTIMATED RECOVERY UNDER SETTLEMENT[♦] |
|---|---|---|---|---|
| Luke Class 3A – General Unsecured Claims | Impaired | Yes | $208,920 | 5.2%[1] |
| Luke Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| Luke Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| Luke Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| Luke Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $5,433,461 | 15.0%[3] |
| Luke Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| Luke Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| NEWPAGE CANADIAN SALES, LLC ("NPCS") PLAN | | | | |
| NPCS Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| NPCS Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| NPCS Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| NPCS Class 3A – General Unsecured Claims | Impaired | Yes | $0 | 5.2%[1] |

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[♦] | ESTIMATED RECOVERY UNDER SETTLEMENT[♦] |
|---|---|---|---|---|
| NPCS Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| NPCS Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| NPCS Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| NPCS Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $0 | 15.0%[3] |
| NPCS Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| NPCS Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| NEWPAGE CONSOLIDATED PAPERS INC. ("NPCP") PLAN | | | | |
| NPCP Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| NPCP Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| NPCP Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| NPCP Class 3A – General Unsecured Claims | Impaired | Yes | $0 | 5.2%[1] |
| NPCP Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[♦] | ESTIMATED RECOVERY UNDER SETTLEMENT[♦] |
|---|---|---|---|---|
| NPCP Class 3C – Senior Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| NPCP Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| NPCP Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $0 | 15.0%[3] |
| NPCP Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| NPCP Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| NEWPAGE ENERGY SERVICES LLC ("NPES") PLAN | | | | |
| NPES Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| NPES Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| NPES Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| NPES Class 3A – General Unsecured Claims | Impaired | Yes | $0 | 5.2%[1] |
| NPES Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| NPES Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[*] | ESTIMATED RECOVERY UNDER SETTLEMENT[*] |
|---|---|---|---|---|
| NPES Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| NPES Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $0 | 15.0%[3] |
| NPES Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| NPES Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| RUMFORD PAPER COMPANY ("RUMFORD") PLAN | | | | |
| Rumford Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| Rumford Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| Rumford Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| Rumford Class 3A – General Unsecured Claims | Impaired | Yes | $3,201,623 | 5.2%[1] |
| Rumford Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| Rumford Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| Rumford Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[♦] | ESTIMATED RECOVERY UNDER SETTLEMENT[♦] |
|---|---|---|---|---|
| Rumford Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $4,900,936 | 15.0% [3] |
| Rumford Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| Rumford Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| NEWPAGE PORT HAWKESBURY HOLDING LLC ("NPPHH") PLAN | | | | |
| NPPHH Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| NPPHH Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| NPPHH Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| NPPHH Class 3A – General Unsecured Claims | Impaired | Yes | $0 | 5.2% [1] |
| NPPHH Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| NPPHH Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| NPPHH Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| NPPHH Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $0 | 15.0% [3] |

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[♦] | ESTIMATED RECOVERY UNDER SETTLEMENT[♦] |
|---|---|---|---|---|
| NPPHH Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| NPPHH Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| UPLAND RESOURCES INC. ("UPLAND") PLAN | | | | |
| Upland Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| Upland Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| Upland Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| Upland Class 3A – General Unsecured Claims | Impaired | Yes | $0 | 5.2%[1] |
| Upland Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| Upland Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| Upland Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| Upland Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $0 | 15.0%[3] |
| Upland Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |

21

| CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT OF ALLOWED CLAIMS[♦] | ESTIMATED RECOVERY UNDER SETTLEMENT[♦] |
|---|---|---|---|---|
| Upland Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |
| WICKLIFFE PAPER COMPANY LLC ("WICKLIFFE") PLAN | | | | |
| Wickliffe Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| Wickliffe Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| Wickliffe Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| Wickliffe Class 3A – General Unsecured Claims | Impaired | Yes | $1,091,610 | 5.2%[1] |
| Wickliffe Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| Wickliffe Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| Wickliffe Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| Wickliffe Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $7,574,539 | 15.0%[3] |
| Wickliffe Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| Wickliffe Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |

| NEWSI PLAN | | | | |
|---|---|---|---|---|
| NPWSI Class 1A – Other Secured Claims | Impaired | Yes | $0 | 100.0% |
| NPWSI Class 1B – First Lien Notes Guaranty Claims | Impaired | Yes | $1,601,507,818 | 56.5% |
| NPWSI Class 2 – Non-Tax Priority Claims | Unimpaired | No (presumed to accept) | $0 | 100.0% |
| NPWSI Class 3A – General Unsecured Claims | Impaired | Yes | $31,393,931 | 5.2%[1] |
| NPWSI Class 3B – First Lien Notes Deficiency Claims | Impaired | Yes | $735,000,000 | Unknown |
| NPWSI Class 3C – Second Lien Notes Guaranty Claims | Impaired | Yes | $1,060,315,839 | 5.9% |
| NPWSI Class 3D – Senior Subordinated Unsecured Notes Guaranty Claims | Impaired | Yes | $207,884,353 | 0.2% |
| NPWSI Class 3E – Qualified Trade Creditor Claims | Impaired | Yes | $13,499,880 | 15.0%[3] |
| NPWSI Class 4 – Debtor Intercompany Claims | Impaired | No (deemed to reject) | $0 | 0.0% |
| NPWSI Class 5 – Equity Interests | Impaired | No (deemed to reject) | $0 | 0.0% |

## III.    DESCRIPTION AND HISTORY OF THE COMPANY'S BUSINESSES

### A.    Pre-Bankruptcy Business

#### 1.    The Company's History

The Debtors and their non-debtor subsidiaries and affiliates (collectively, the "Company") comprise the largest coated paper manufacturer in North America based on production capacity. One of the Debtors' paper mills has its roots in the West Virginia Paper Company (a/k/a the

West Virginia Pulp & Paper Company, and later, MeadWestvaco Corporation) that was established in 1888 by William Luke along the Potomac River in Maryland and West Virginia. On May 2, 2005, the printing and writing papers business of MeadWestvaco was acquired by NewPage. The acquisition was financed through a series of debt financings described in more detail below.

Post-acquisition, the Company was comprised of five pulp and paper manufacturing mills in Kentucky, Maine, Maryland, Michigan, and Ohio. In April 2006, the Company sold its carbonless operations located in Ohio to P.H. Glatfelter Company, and in 2007, the Company purchased the North American paper-making operations of Stora Enso Oyj ("SEO"), which included mills in Minnesota, Wisconsin, and Nova Scotia, Canada. In connection with the acquisition, SEO acquired 11,251,326 shares of the equity in NPGI. NPGI owns 100% of the common stock of NPHC, which in turn owns 100% of the common stock of NPC. NPC is the Company's primary operating subsidiary and directly and indirectly owns the other Debtors and various other affiliated non-debtor entities. NPC's subsidiary Debtors own and operate the various paper mills in the United States. Non-debtor subsidiary NewPage Port Hawkesbury Corp. ("NPPH") owns and operates the paper mill in Nova Scotia, Canada.[8] NPPH was restructured and sold to an unrelated third party in the CCAA Proceedings and is now operating as Port Hawkesbury Paper Inc.

### 2.    The Company's Business

Headquartered in Miamisburg, Ohio, the Debtors' mills primarily produce coated paper, which is typically used for magazines, magazine covers and inserts, corporate annual reports, high-end advertising brochures, direct mail advertising, coated labels, catalogs, and textbooks. While the Company also manufactures supercalendered paper, uncoated paper, and specialty labels,[9] coated paper represented approximately 74% of its net sales for the twelve months ended June 30, 2012. Approximately 90% of the Company's sales are within the United States.

#### a.    *Manufacturing*

The Company operates 16 papermaking machines at eight paper mills located in Kentucky, Maine, Maryland, Michigan, Minnesota, and Wisconsin with distribution centers near major print markets. As of June 30, 2012, the Company had a production capacity of approximately 3.5 million short tons (one short ton equals 2,000 pounds) of paper, including approximately 2.9 million short tons of coated paper, approximately 400,000 short tons of uncoated paper, and approximately 200,000 short tons of specialty paper.

Paper production requires three primary inputs: pulp (wood reduced to its paper-making form), water, and various chemicals. The primary sources for pulp used in paper production are timber and its byproducts, such as wood chips. The Company maintains a policy of obtaining wood produced by trained loggers in compliance with sustainable forestry principles, and produces most of its own pulp from wood logs and wood chips purchased locally. Although the Company purchases limited amounts of pulp directly from other mills, most of the Company's pulp is produced in-house at its various mills. Excess pulp produced at the Company mills is sold to third parties in the United States and internationally.

---

[8] NPPH commenced proceedings under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, in the Supreme Court of Nova Scotia, in Halifax, Nova Scotia, on September 9, 2011 (the "CCAA Proceedings").

[9] See below for a description of these different types of paper.

Once wood has been reduced to pulp, it is then bleached and refined to adjust the length and surface area of the pulp fibers. The pulp is then mixed with other materials, including clay, calcium carbonate, and starch, and is uniformly distributed onto a continuous screen to extract water and form a web. The web is further pressed between large rollers and dried with steam to remove the remaining water. If the paper is to be coated, it is passed through coating machines where latex-based coatings are applied. The paper is then wound onto large rolls and is eventually shipped in its roll form or cut into sheets and delivered to merchants, printers, and end-users.

Water and chemicals are used in virtually every step of the papermaking process. The Company's primary water supply is derived from local lakes or rivers, which require applicable licenses and permits for its usage. Various chemicals are used throughout the pulping, bleaching, and paper-making process. These chemical products are purchased by the Company from various suppliers.

Because paper production is also energy intensive, the Company generates power at most of its facilities using by-products of the manufacturing process to off-set its need to procure energy from outside sources. Of the energy produced by the Company, most of it is used internally. The Company typically produces approximately 50% of its energy requirements by burning biomass-related fuels, some of which are by-products of paper production, including black liquor, wood waste, and bark. For the balance of its energy needs, the Company either purchases its energy directly from third parties (principally electricity or steam) or purchases various energy-related products from outside suppliers, including natural gas, fuel oil, petroleum coke, tire-derived fuel, coal, and wood waste to generate electricity and steam.

One of the Debtors' non-debtor affiliates, Consolidated Water Power Co. ("CWPCo"), provides electricity to the Debtors' mills located in central Wisconsin. CWPCo has 33.3 megawatts of generating capacity on 39 generators located in five hydroelectric plants on the Wisconsin River. CWPCo is a regulated public utility and also provides electricity to a small number of residential, light commercial, and light industrial customers.

b.    *Primary Products*

As noted, the Company's paper products include coated paper, supercalendered paper, and specialty paper.

*Coated Paper*:    Coated paper is paper coated with certain chemical compounds to enhance gloss, smoothness, and surface qualities, such as ink absorption. Coated paper consists of both coated freesheet and coated groundwood. Coated freesheet papers comprised 68% of the coated paper produced by the Company for the twelve months ended June 20, 2012, and is typically used for printing higher-end brochures, annual reports, and yearbooks, among other things. Coated groundwood paper comprised 32% of the coated paper produced by the Company for the twelve months ended June 30, 2012. Generally lighter, less expensive, and not as bright as coated freesheet paper, coated groundwood paper is typically used in catalogs and magazines, among other things.

*Supercalendered Paper*:    Supercalendered paper is uncoated paper pressed to give it a gloss and smoothness similar to coated paper. The Company primarily produces supercalendered paper for magazines, catalogs, advertisements, inserts, and flyers.

*Specialty Paper*:    Specialty paper is primarily used in producing labels and packaging for other products, including food wrappers and packaging, glass and plastic bottle labels, and technical labels used by shipping industries.

c.    *Sales, Marketing, and Distribution*

The Company sells paper products primarily in the United States and Canada, using three sales channels: (a) direct sales, which consist of sales made directly to end-use customers (primarily large companies such as publishers, printers, and retailers); (b) merchant sales, which consist of sales made to paper merchants and brokers, who in turn sell to end-use customers; and (c) specialty sales, which consist of sales made to packaging and label manufacturers.

As part of its distribution chain, the Company owns and leases space in a number of warehouses and uses third parties to ship its products by truck and rail.

**B.    Reorganized Debtors' Businesses**

The Debtors plan to continue their businesses after emergence from these Chapter 11 Cases. To that end, the Debtors have developed a post-confirmation business plan with the intent of increasing sales and profitability.

Significant risks are inherent in the Debtors' ability to achieve their business plan. All holders of Claims and Equity Interests should carefully read and consider fully the "Important Information" section at the front of this Disclosure Statement and Section VII, "Risk Factors and Other Factors to be Considered."

**C.    Employees**

As of the date of this Disclosure Statement, the Debtors employ approximately 6,000 individuals located at NPC's headquarters in Miamisburg, Ohio, at the eight domestic mill locations, and in various sales offices and other locations throughout the United States. Approximately 70% of the Debtors' employees are represented by labor unions, including the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (the "USW"); the International Brotherhood of Electrical Workers; the International Association of Machinists and Aerospace Workers; the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; the Teamsters, Chauffeurs, Warehousemen and Helpers; and the Office & Professional Employees' International Union (together with their respective local unions, the "Unions"). Pursuant to a Memorandum of Agreement ratified by the Unions on June 4, 2012, the Debtors consensually modified their collective bargaining agreements, subject to approval by the Bankruptcy Court. A motion seeking that approval is pending in the Bankruptcy Court. Pursuant to the Plan, the Debtors intend to assume the collective bargaining agreements, as modified, as of the Effective Date.

**D.    Publicly Available Information**

Certain historical financial and other information about NPC can be found in, among other publicly available sources, (i) the Annual Report on Form 10-K for the fiscal year ended December 31, 2010, filed by NPC with the U.S. Securities and Exchange Commission (the "SEC") on February 17, 2011; (ii) the Quarterly Report on Form 10-Q for the period ended March 31, 2011, filed by NPC with the SEC on May 12, 2011; and (iii) the Quarterly Report on Form 10-Q for the period ended June 30, 2011, filed by NPC with the SEC on August 15, 2011. The documents are available at http://investors.newpagecorp.com/sec-filings. Documents filed by NPC with the SEC may be read at and copied from the SEC's Public Reading Room located at 450 Fifth Street, N.W., Washington D.C. 20549. Information on the operation of the Public Reading Room may be obtained by calling the SEC at 1-800-

SEC-0300. The SEC also maintains an Internet site (www.sec.gov) through which reports and other information regarding NPC and its subsidiaries may be accessed.

The Debtors' monthly operating reports are available on the Bankruptcy Court's Electronic Case Filing System, which can be found at www.deb.uscourts.gov, the official website for the Bankruptcy Court.[10] See Section VII for important information that should be considered when reviewing the Debtors' financial information.

E.    **Prepetition Indebtedness**

    1.    **Revolving Credit Facility**

NPC was the borrower under a Revolving Credit and Guaranty Agreement, dated as of December 21, 2007 (as amended, the "Senior Secured Revolver") with various lenders (the "Revolver Lenders"). Each of the Debtors (other than NPGI and NPPH were guarantors under the Senior Secured Revolver (collectively, the "Revolver Guarantors"). As of June 30, 2011, the Senior Secured Revolver had a total commitment of $500 million, of which there was $131 million of borrowings (excluding L/C's outstanding and $101 million in L/C's issued but undrawn. Amounts outstanding under the Senior Secured Revolver bore interest at a rate per annum equal to either (i) the base rate plus 2.5%, or (ii) LIBOR plus 3.5%. NPC and each of the Revolver Guarantors granted the Revolver Lenders a first priority security interest in, and lien against, present and future cash, deposit accounts, accounts receivable, inventory, and intercompany debt (the "ABL Collateral") to secure their obligations under the Senior Secured Revolver.

On the Commencement Date, the Debtors filed the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. Sections 361, 362, 363, and 364: (i) Authorizing Debtors to (a) Obtain Post-Petition Financing, and (b) Grant Senior Liens, Junior Liens, and Superpriority Administrative Expense Priority; (ii) Approving Use of Cash Collateral; (iii) Granting Adequate Protection to Certain Prepetition Secured Parties; (iv) Scheduling a Final Hearing; and (iv) Granting Related Relief* [Docket No. 19] (the "DIP Motion"). The DIP Motion, among other things, sought approval to repay in full the borrowings and other obligations existing under the Senior Secured Revolver simultaneously with the initial borrowing under the DIP Credit Agreement and deem the L/C's outstanding under the Senior Secured Revolver to have been issued and/or provided (as applicable) under the DIP Credit Agreement. On October 5, 2011, the Bankruptcy Court issued a final order approving the DIP Motion and authorizing the Debtors to enter into the DIP Credit Agreement [Docket No. 310] (the "DIP Order"). The obligations under the Senior Secured Revolver were fully satisfied as of September 8, 2011. As discussed in Section V.A.5 below, the Committee appealed the DIP Order and this appeal will be dismissed as part of the Settlement.

    2.    **First Lien Notes**

NPC is also the issuer of $1.77 billion in face amount of 11.375% senior secured first lien notes due 2014 (the "First Lien Notes") pursuant to an indenture dated as of September 30, 2009, among NPC, as issuer, Bank of New York Mellon, as indenture trustee, the Guarantor Debtors and NPWSI. The obligations of NPC and each of the Guarantor Debtors and NPWSI under the First Lien Notes are secured by a first-priority lien against substantially all their respective assets (the "Fixed Collateral") other than the ABL Collateral, and by a second priority lien on the ABL Collateral.

---

[10] The Debtors' monthly operating reports are also available at http://kccllc.net/NewPage.

### 3.    Second Lien Notes

NPC is also the issuer of the second lien notes consisting of (i) approximately $806 million in face amount of 10% fixed rate senior secured second lien notes (the "Second Lien Fixed Rate Notes"), pursuant to an indenture dated as of May 2, 2005, among NPC, as issuer, Wilmington Trust, National Association, as successor indenture trustee, the Guarantor Debtors, and NPWSI and (ii) approximately $225 million in face amount of floating rate senior secured second lien notes (the "Second Lien Floating Rate Notes," and together with the Second Lien Fixed Rate Notes, the "Second Lien Notes"), pursuant to an indenture, dated as of May 2, 2005, among NPC, as issuer, Wilmington Trust, National Association, as successor indenture trustee, the Guarantor Debtors, and NPWSI. The Second Lien Notes matured on May 1, 2012.

The obligations of NPC and each of the Guarantor Debtors and NPWSI under the Second Lien Notes are secured by a second-priority lien on the Fixed Collateral. The Second Lien Notes are subject to a lien subordination in favor of the First Lien Notes, and are senior in right of payment to the Senior Subordinated Unsecured Notes.

### 4.    Senior Subordinated Unsecured Notes

NPC is also the issuer of the 12% senior unsecured subordinated notes due 2013 (the "Senior Subordinated Unsecured Notes") pursuant to an indenture, dated as of May 2, 2005, among NPC, as issuer, HSBC Bank USA, National Association, as successor indenture trustee, the Guarantor Debtors, and NPWSI. The Senior Subordinated Unsecured Notes have an outstanding balance of approximately $200 million. The Senior Subordinated Unsecured Notes are subordinated in right of payment to the First Lien Notes and Second Lien Notes.

### 5.    2013 PIK Notes

NPHC is the issuer of floating rate senior unsecured paid-in-kind notes due 2013 (the "2013 PIK Notes") pursuant to an indenture, dated as of May 2, 2005, between NPHC, as issuer, and U.S. Bank, National Association, as successor indenture trustee. The 2013 PIK Notes have a current balance outstanding of approximately $228 million. The 2013 PIK Notes are unsecured and not guaranteed by any of the Debtors.

### 6.    2015 PIK Notes

In connection with the 2007 Acquisition, NPGI issued to SEO approximately $200 million in aggregate principal amount of floating rate senior unsecured paid-in-kind notes due 2015 (the "2015 PIK Notes"), pursuant to an indenture dated as of December 21, 2007, between NPGI, as issuer, and Deutsche Bank Trust Company Americas, as successor indenture trustee. The 2015 PIK Notes have a current outstanding balance of approximately $270 million and mature on December 21, 2015. The 2015 PIK Notes are unsecured and are not guaranteed by any of the Debtors.

## IV.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    The Debtors' Operations and Significant Debt Obligations

Several factors contributed to the commencement of these Chapter 11 Cases. As with any business, the Debtors' financial performance depends primarily on the demand for their products and the prices at which they can be sold. In the last few years, the Debtors experienced a significant decline

in the North American demand for coated paper, which has impacted many of the markets for the Debtors' key products. The North American paper industry is cyclical and prices for paper, like other cyclical products, are largely affected by the relation of demand to available supply. The North American coated paper demand is primarily driven by advertising and print media usage. In particular, the demand for certain grades of coated paper is affected by spending on catalogue and promotional materials by retailers and spending on magazine advertising, which affects the number of printed pages in magazines. The "great recession" and accelerated digital substitution have resulted in a general decrease in both advertising spending and magazine/catalog circulation, as well as an overall decline in the demand for coated paper, the Debtors' primary product. Negative trends in advertising, increases in the use of electronic data transmission and storage, continued expansion of the Internet as a medium for numerous advertising and marketing applications, an increased demand for electronic reading material, and increased postal rates, have also contributed to substantial demand decline and volatility in the pulp and paper industry.

In addition, despite the decline in North American demand, foreign imports from Europe and Asia, driven by similar overcapacity in their own markets, continued to have a negative impact on North American coated paper producers. This led to significant levels of market-related downtime and temporary shutdowns, especially during 2008 and 2009. Accordingly, from January 2008 through December 2011, mills and machines comprising the paper industry throughout North America with gross coated paper capacity of more than 3 million tons were closed or re-aligned to produce other types of paper.

Finally, the rising costs of raw materials, including significant increases in energy, fuel and chemicals costs, also negatively impacted the Debtors' financial performance, liquidity and stability. Wood prices are affected directly by the cost of wood in the Debtors' regional locations and indirectly by the effect of higher fuel costs on logging and transportation of timber to the Debtors' facilities. While the Debtors have fiber supply agreements in place that ensure a portion of their wood requirements, purchases under these agreements are typically at market rates. The prices of market pulp and chemicals have also fluctuated significantly. Pulp prices fluctuate due to changes in worldwide consumption of pulp, pulp capacity additions, expansions or curtailments affecting the supply of pulp, changes in inventory levels by pulp consumers (which affect short-term demand) and pulp producer cost changes related to wood availability and environmental issues. Certain chemicals used in the papermaking process are petroleum-based and also fluctuate with the price of crude oil.

Pulp and paper manufacturing is energy intensive. While the Debtors produce a large portion of their energy requirements from burning wood waste and other byproducts of the paper manufacturing process, during 2011, the Debtors generated only approximately 50% of their energy requirements from these sources. The remaining energy (consisting of electricity and fuels, primarily natural gas, fuel oil, and coal) was purchased from third-party suppliers. Crude oil and other energy costs remain volatile.

Notwithstanding the significant reduction in coated paper demand and increased input costs, the Debtors were able to significantly improve performance during the first half of 2011, generating significant levels of EBITDA and cash flow, through a combination of increased prices and operational streamlining. However, the Debtors' operational improvements were insufficient to offset the higher inflation and lower demand for coated paper products. With the Debtors' cash position already significantly constrained, negative press regarding the Debtors' ability to refinance its maturing debt obligations caused vendors to significantly slash trade terms or to switch to pay in advance or cash on delivery — adding additional stress to the Debtors' already precarious cash situation resulting from their high debt service.

By the second quarter of 2011, as a result of the above factors, the Debtors' liquidity position became severely constrained, and the Debtors began to consider various restructuring alternatives. The Debtors retained Lazard Frères & Co. ("Lazard") to analyze and determine whether an out-of-court restructuring of the Debtors' balance sheet would be possible. At that time, Lazard considered various options to improve the Debtors' liquidity and debt positions, including increasing the borrowing capacity under the Debtors' Senior Secured Revolver and refinancing certain debt obligations. Lazard's efforts were met with a general market unwillingness to provide the Debtors with additional financing or to increase the Debtors' borrowing base. The lack of market interest in an out-of-court restructuring, coupled with the Debtors' increasing needs to service, and in the near term refinance the majority of, their long-term debt obligations, were important factors influencing the Debtors' conclusion that an out-of-court restructuring was increasingly unlikely.

Accordingly, after considering all available options, the Debtors determined that their burdensome long-term debt obligations were impeding their ability to continue the strides in operational improvements they had been making in 2011. Having concluded that seeking chapter 11 relief would be in their best interests, as well as those of their creditors and other parties in interest, the Debtors commenced these Chapter 11 Cases.

## B.    Canadian Operations and Settlement and Transition Agreement

NPPH had been operating cash flow negative for some time, incurring operating losses of approximately $4 million per month, due to the same declining market demand for NPPH's paper products and rising input costs that adversely impacted the Debtors. The relative value of the Canadian dollar to the U.S. dollar further exacerbated the impact on NPPH. Accordingly, during the year prior its commencement of Canadian restructuring proceedings, NPPH had examined various restructuring alternatives, including the potential marketing and sale of its Canadian business operations. As negotiations surrounding a potential sale ensued, NPPH's performance continued to decline. Ultimately, NPPH determined to implement a process for an orderly shutdown of its operations, while at the same time preserving its assets for a potential sale as a going concern. During this period, NPC continued to support NPPH operations with both administrative and financial services in the ordinary course to bridge it to a potential sale, notwithstanding NPPH's declining performance.

On August 22, 2011, NPPH announced it had scheduled planned down-time for its mill, targeting the shutdown of its newsprint paper production on September 10, 2011, and its supercalendered paper production on September 16, 2011. NPPH intended to maintain its paper making machines in "hot idle" post-September 16, 2011, allowing for the substantial shutdown of the manufacturing facilities of NPPH, but continuing to maintain the machines to facilitate start-up, support a future sale process, and preserve their value.

In connection with the planned down-time for NPPH and eventual "hot idle" state, NPC determined it was appropriate to provide certain services to NPPH to assist NPPH with the closure of its mill, maintenance of its machines, and realization of its outstanding accounts receivable, and to resolve complex issues surrounding disputed ownership of certain accounts receivable and inventory. Accordingly, on September 1, 2011, NPC and NPPH entered into a Settlement and Transition Agreement (the "Settlement Agreement"), which provided, among other things, for NPC to pay $25 million (the "Settlement Funds") in settlement of certain potential disputes over certain accounts receivable and inventory existing on, or arising after, September 2, 2011. In addition, NPC was required to pay certain amounts necessary for NPPH to continue operations pending a sale or wind-down process. The Settlement Agreement further contemplated that NPC and NPPH would each provide limited administrative and other services during a transition period. By order dated September 9, 2011, the Canadian court approved the Settlement Agreement. The Settlement Agreement was disclosed to the

Bankruptcy Court upon commencement of these Chapter 11 Cases. [Docket No. 3]. The Settlement Agreement was the subject of the Committee's investigation, and was resolved as part of the Settlement. See further discussion below, at Section V.C.3.

## V.    DEBTORS' CHAPTER 11 CASES

After carefully reviewing and exploring their alternatives and after implementing numerous cost-saving strategies, the Debtors concluded an orderly reorganization of their obligations under chapter 11 was the best of all available strategic options to maximize value for their creditors, shareholders, and other parties in interest.

On September 7, 2011, each of the Debtors commenced voluntary cases for relief under chapter 11 of the Bankruptcy Code. Shortly after the Commencement Date, the Bankruptcy Court approved certain "first day" orders designed to minimize the disruption of the Debtors' business operations and to facilitate their Chapter 11 Cases.

### A.    First Day Orders and Other Postpetition Orders

#### 1.    Case Administration Orders

Upon the commencement of these Chapter 11 Cases, the Bankruptcy Court issued certain orders facilitating the administration of these Chapter 11 Cases. These orders (i) directed joint administration of the Chapter 11 Cases of the Debtors, (ii) established interim compensation procedures for professionals, (iii) authorized the Debtors or their agent, KCC, to act as agent for the clerk of the Bankruptcy Court in noticing all matters customarily noticed by the clerk pursuant to the Bankruptcy Code, and (iv) enforced the Bankruptcy Code's automatic stay and anti-discrimination provisions [Docket Nos. 55, 301, 61, and 56, respectively].

#### 2.    Waiver of Reporting Requirements

On September 20, 2011, the Debtors filed a motion requesting waiver of certain reporting requirements under Rule 2015.3 of the Bankruptcy Rules for non-debtor subsidiaries or affiliates [Docket No. 163]. The motion was approved on a final basis by an agreed order entered by the Bankruptcy Court on November 9, 2011 [Docket No. 516].

#### 3.    Business Operations

a.    *Cash Management*

On September 8, 2011, the Bankruptcy Court authorized the Debtors to (i) maintain their existing cash management system, (ii) maintain existing bank accounts, (iii) maintain existing investment practices with financial institutions, and (iv) maintain existing business forms [Docket No. 57].

b.    *Taxes*

On September 8, 2011, the Bankruptcy Court authorized the Debtors to (i) pay certain accrued and outstanding prepetition sales, use, franchise, and real and personal property taxes, and such other similar taxes as the Debtors deem necessary, and (ii) pay fees for licenses, permits, and other similar charges and assessments, including any penalties and interest thereon, to various taxing authorities. In

31

connection with this, the Bankruptcy Court authorized banks and other financial institutions to honor and process checks and transfers related to these payments [Docket No. 62].

      c.    *Insurance*

     On September 8, 2011, the Bankruptcy Court authorized (i) the Debtors to (a) continue their insurance programs and pay, in their sole discretion, any prepetition insurance obligations, (b) renew any insurance policies, and (c) enter into new insurance programs as the terms of the existing programs expire, and (ii) banks and financial institutions to process, honor, and pay all checks and electronic fund transfers relating to the foregoing [Docket No. 63].

      d.    *Utilities*

     On September 8, 2011, the Bankruptcy Court entered an interim order (i) prohibiting the Debtors' utility providers from altering, refusing, or discontinuing utility services to the Debtors, (ii) approving the Debtors' proposed form of adequate assurance, and (iii) establishing procedures for resolving objections thereto by utility providers. [Docket No. 75]. All objections to the interim order were ultimately resolved. A final order granting the requested relief was entered by the Bankruptcy Court on October 4, 2011, and two supplemental final orders, each resolving certain additional objections, were entered on November 9, 2011, and December 21, 2011 [Docket Nos. 299, 515, and 777, respectively].

      e.    *Shippers, Warehousemen, Subcontractors, and Technicians*

     On September 8, 2011, the Bankruptcy Court authorized (i) the Debtors to pay certain prepetition claims of shippers, warehousemen, subcontractors, and technicians, and (ii) banks and financial institutions to receive, process, honor, and pay all checks and electric fund transfers relating to these payments [Docket No. 60].

      f.    *Critical Vendors*

     On September 8, 2011, the Bankruptcy Court authorized (i) the Debtors to pay the prepetition claims of certain critical vendors, and (ii) banks and financial institutions to process, honor, and pay all checks and electronic fund transfers relating to the foregoing (the "Critical Vendor Order") [Docket No. 58].

      g.    *Customer Programs*

     On September 8, 2011, the Bankruptcy Court entered an order (i) authorizing the Debtors, subject to their business discretion and in their sole judgment, to perform and honor their prepetition obligations under certain customer programs, and continue the customer programs in the ordinary course of business, and (ii) authorizing banks and financial institutions to process, honor, and pay all checks and electric fund transfers relating to these payments (the "Customer Programs Order") [Docket No. 59]. The Customer Programs Order was amended on October 11, 2011 to reflect oversight provisions requested by the Committee [Docket No. 335]. On February 7, 2011, the Bankruptcy Court entered an order supplementing the amount the Debtors are authorized to spend in connection with the Customer Programs [Docket No. 1059].

      h.    *Reclamation*

     On October 4, 2011, the Bankruptcy Court issued a final order (i) establishing procedures for reconciling claims arising under section 546(c) of the Bankruptcy Code (the "Reclamation Claims")

asserted by vendors and suppliers, (ii) authorizing, but not directing, the Debtors to return certain goods purchased prior to the Commencement Date, and (iii) prohibiting third parties from interfering with the delivery of the Debtors' goods. [Docket No. 300].

After a review of asserted Reclamation Claims, on January 5, 2012, the Debtors filed the Notice of Debtors' Report of Reclamation Claims (the "Reclamation Notice"), listing all asserted Reclamation Claims and amounts, along with the Debtors' determination of their validity or invalidity. [Docket No. 851]. To the extent parties with claims included in the Reclamation Notice did not object, those claims were deemed valid and allowed, disallowed, or otherwise treated in accordance with the Reclamation Notice without further order of the Bankruptcy Court. The Debtors received sixteen (16) objections to the Reclamation Notice. Several of these objections have been resolved as a result of payments approved by the Bankruptcy Court under other circumstances, including pursuant to the Critical Vendor Order and the assumption of executory contracts. Any allowed Reclamation Claims against the Debtors will be included in NPC and GD Class 3A General Unsecured Claims, as applicable, and are entitled to share in the Settlement Cash Distribution and Litigation Trust proceeds as provided in the Plan.

### 4.    Protection of NOLs and Other Tax Attributes

On the Commencement Date, the Debtors filed a motion seeking to establish procedures with respect to (i) the ownership, acquisition, and disposition of beneficial interests in equity securities in NPGI and claims against the Debtors, and (ii) any holder of 50-percent or more of the stock of NPGI intending to take a worthless securities deduction under section 165(g) of the Internal Revenue Code of 1986, as amended, with respect to that stock. [Docket No. 14]. By order issued October 4, 2011, the motion was approved on a final basis [Docket No. 307].

### 5.    Debtor in Possession Financing

On the Commencement Date, the Debtors filed a motion seeking authorization to (i) enter into a debtor in possession financing facility, (ii) grant senior liens, junior liens, and superpriority administrative expense claims, (iii) use cash collateral, (iv) provide "adequate protection" to certain prepetition secured parties, and (v) pay, in the Debtors' discretion, certain amounts in respect of interest, fees, and expenses [Docket No. 19]. By order issued on September 9, 2011, the motion was approved on an interim basis [Docket No. 102].

On October 5, 2011, the Bankruptcy Court issued the final DIP Order which, *inter alia*, (i) authorized NPC to obtain post-petition financing up to the aggregate principal amount of $600 million, (ii) authorized all the other Debtors to guarantee and be jointly and severally obligated to pay NPC's obligations in connection with the post-petition financing, (iii) authorized the Debtors to execute and enter into documents related to the post-petition financing, and to perform such other and further acts as may be required in connection with those documents, (iv) granted adequate protection to the Bank of New York as collateral trustee, (v) authorized the Debtors to use cash collateral, (vi) approved certain stipulations by the Debtors as set forth in the DIP Order with respect to certain pre-petition agreements, First Lien Notes agreements, and Second Lien Notes agreements, and the liens and security interests arising therefrom, (vii) granted superpriority administrative expense claims to the DIP Lenders; the DIP Agents; Barclays Capital, the investment banking division of Barclays Bank, as syndication agent; and the holders of Banking Services Obligations[11] and Designated Hedging Obligations, and (viii) limited the

---

[11] For this subsection V.A.5 only, capitalized terms used but not otherwise defined in this subsection or in the Plan are as defined in the DIP Credit Agreement.

Debtors' right to surcharge costs and expenses of preserving or disposing of the collateral securing the obligations as described in the DIP Order [Docket No. 310].

On October 18, 2011, the Committee appealed the portion of the DIP Order that prohibited charging estate expenses against the Collateral of the First Lien Noteholders, Second Lien Noteholders, Notes Collateral Trustees, or Indenture Trustees [Docket No. 358]. The Debtors, First Lien Noteholders and Second Lien Noteholders have opposed the appeal. The appeal is fully briefed and currently pending before the United States District Court for the District of Delaware. The Plan provides that this appeal will be dismissed as part of the Settlements.

> **6.    Claims Process and Bar Date**

> a.    *Schedules and Statements*

On December 8 and 9, 2011, each of the Debtors filed with the Bankruptcy Court its statement of financial affairs (the "SOFAs") and schedules of assets and liabilities (the "Schedules"). On June 6, 2012, the Debtors filed certain supplements and amendments to SOFA questions 3b and 3c to reflect, among other things, payments made to certain affiliates of SEO. On June 26, 2012, the Debtors filed certain amendments to Schedule G to reflect additional information that became available to the Debtors after the initial Schedules were filed. On October 23, 2012, the Debtors filed supplements to SOFA question 4a and Schedule F for Debtor NPWSI to reflect information concerning the Antitrust Litigation pending against NPWSI as further described in Section V.D.3 of this Disclosure Statement.

> b.    *Bar Date*

On December 13, 2011, the Bankruptcy Court issued an order (the "Bar Date Order") pursuant to Bankruptcy Rule 3003(c)(3) establishing deadlines for filing proofs of claim against the Debtors [Docket No. 716]. The Bar Date Order fixed February 3, 2012, at 5:00 p.m. (prevailing Pacific Time) as the deadline for proofs of claim filed by any person or entity other than a governmental unit, and March 5, 2012, at 5:00 p.m. (prevailing Pacific Time) as the deadline for proofs of claim filed by any governmental unit.

> c.    *Section 503(b)(9) Claims*

Within the first few months of the Chapter 11 Cases, 12 claimants filed motions (the "Section 503(b)(9) Motions") seeking immediate allowance and/or payment of claims arising under section 503(b)(9) of the Bankruptcy Code (the "Section 503(b)(9) Claims"). Section 503(b)(9) of the Bankruptcy Code provides a creditor with an administrative expense for "the value of any goods received by the debtor within 20 days before the commencement of the case . . . in which the goods have been sold to the debtor in the ordinary course of the debtor's business." The Debtors objected to each of the Section 503(b)(9) Motions.

On November 22, 2011, the Debtors filed a motion seeking to establish procedures for the assertion and resolution of Section 503(b)(9) Claims (the "Section 503(b)(9) Procedures") [Docket No. 557]. On December 16, 2011, the Bankruptcy Court entered an order approving the Section 503(b)(9) Procedures [Docket No. 746].

Also on December 16, 2011, the Bankruptcy Court entered an order (i) denying all but one of the Section 503(b)(9) Motions, and (ii) deeming all but one of the Section 503(b)(9) Motions as a proof of claim to be administered in accordance with the Section 503(b)(9) Procedures (the "December 16

Order") [Docket No. 747]. The Section 503(b)(9) Motion not included in the December 16 Order was resolved through a separate order on January 11, 2012 [Docket No. 878].

Pursuant to the Section 503(b)(9) Procedures and the December 16 Order, the Debtors filed notices on December 28, 2011 and January 30, 2012 identifying (i) Section 503(b)(9) Claims that were the subject of Section 503(b)(9) Motions, (ii) the amount, if any, the Debtors determined to be valid for each such claim, and (iii) any amount the Debtors disputed for each such claim. Three objections were filed to the January 30 notice. Two of those objections have been resolved by stipulation.

On June 1, 2012, the Debtors filed a further notice identifying (i) the balance of timely filed Section 503(b)(9) Claims not listed in the December or the January notices or resolved by separate order, (ii) the amount, if any, the Debtors determined to be valid for each claim, and (iii) the amount, if any, the Debtors disputed for each claim. The Debtors received 17 timely objections. Three of those objections have been withdrawn and six have been resolved by stipulation. The Debtors are in the process of resolving the remaining objections.

### 7.    Executory Contracts and Unexpired Leases

Section 365 of the Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases (collectively, "Executory Contracts").

Section 365(d)(4)(A) provides that unexpired leases of nonresidential real property under which a debtor is the lessee are deemed rejected if not assumed by the debtor by the earlier of (a) 120 days from the petition date (subject to extension of up to 90 additional days for cause), or (b) the date of entry of the confirmation order. On December 13, 2011, the Bankruptcy Court issued an order, pursuant to section 365(d)(4)(B)(i) of the Bankruptcy Code, extending the deadline by which the Debtors must assume or reject unexpired leases for nonresidential real property for 90 days, through and including April 4, 2012 [Docket No. 707]. On March 28, 2012, the Bankruptcy Court issued an order authorizing the Debtors to (i) assume 60 of these unexpired leases of nonresidential real property, (ii) assume two additional ones as modified, and (iii) extend the deadline under section 365(d)(4)(A) of the Bankruptcy Code for three more [Docket No. 1351].

During the Chapter 11 Cases, the Bankruptcy Court issued other orders authorizing the rejection or assumption of various Executory Contracts pursuant to section 365 of the Bankruptcy Code.

### 8.    Employee Matters

a.    *Wages, Compensation, and Employee Benefits*

As of the Commencement Date, the Debtors employed approximately 6,000 individuals located at NPC's headquarters in Miamisburg, Ohio, the eight domestic mill locations, and in various sales offices and other locations throughout the United States. Prior to the Commencement Date and in the ordinary course of their business, the Debtors established for their workforce various benefit plans, policies, and programs including (i) medical insurance, prescription drug coverage, dental insurance, vision insurance, life and accidental death and dismemberment insurance, long- and short-term disability insurance, travel accident insurance, and an employee assistance program, (ii) retiree benefits, (iii) vacation policies, (iv) retirement and savings plan, (v) flexible spending and health savings account, (vi) an executive MBA program, (vii) automobile and homeowner insurance programs, (viii) long-term care insurance, (ix) a critical illness insurance program, and (x) other benefits.

On September 8, 2011, the Bankruptcy Court issued an order authorizing the Debtors to (i) pay prepetition employee obligations, including prepetition employee benefits, and to continue to honor the programs under which those obligations and benefits arise in the ordinary course, and (ii) authorize financial institutions to honor and process related checks and transfers [Docket No. 77].

    b.    *Short-Term Incentive Plan*

On November 22, 2011, the Debtors filed a motion seeking (i) approval of the short-term incentive plan (the "STIP") component of the Debtors' proposed Executive Incentive Program (the "EIP") for certain insider participants, and (ii) authorization of payments under the STIP [Docket No. 560]. On December 13, 2011, the Bankruptcy Court entered an order approving the STIP [Docket No. 706].

    c.    *Long-Term Incentive Plan*

On November 14, 2011, the Debtors presented the long-term incentive plan (the "LTIP"), the second and final component of the EIP, to the professional advisors for Committee, an *ad hoc* group of First Lien Noteholders, and the Second Lien Group.

On January 25, 2012, the Debtors filed a motion seeking approval of the LTIP and authorization of payments under the LTIP [Docket No. 952]. By order dated March 5, 2012, the Bankruptcy Court approved the LTIP [Docket No. 1232].

### 9.    Retention of Debtors' Professionals

On September 20, 2011, the Debtors filed with the Bankruptcy Court applications seeking an order authorizing the Debtors to retain Dewey & LeBoeuf LLP and Pachulski Stang Ziehl & Jones LLP as their chapter 11 co-counsel [Docket Nos. 173 and 171, respectively]. On October 4, 2011, the Bankruptcy Court entered orders approving these retentions [Docket Nos. 303 and 304]. On June 13, 2012, the Debtors filed an application to substitute Proskauer Rose LLP as chapter 11 co-attorneys for the Debtors effective May 14, 2012, as the attorneys previously associated with Dewey ended their affiliation with the firm, and became members of, or associated with, Proskauer [Docket No. 1766]. On July 5, 2012, the Bankruptcy Court entered an order approving the substitution [Docket No. 1934].

During these Chapter 11 Cases, the Debtors have also obtained orders approving the retention of (i) FTI Consulting Inc., as financial advisors, (iv) Lazard Frères & Co. LLC, as investment banker and financial advisor, (v) Deloitte Tax LLP, as tax and accounting services provider, (vi) Deloitte Financial Advisory Services LLP, as bankruptcy and emergence accounting services provider, (vii) Hewitt Associates LLC, d/b/a Aon Hewitt, as compensation consultants, (viii) Ciardi Ciardi & Astin, as special conflict counsel, and (ix) PricewaterhouseCoopers LLP, as independent auditor and accountant.

Upon the Commencement Date, the Bankruptcy Court also authorized the retention of various ordinary course professionals, subject to certain retention procedures. The Debtors have retained numerous additional ordinary course professionals pursuant to this order.

### 10.    Exclusivity

Pursuant to sections 1121(b) and 1121(c)(3) of the Bankruptcy Code, the initial period during which the Debtors held the exclusive right to file a chapter 11 plan was set to expire on January 5, 2012, and the period during which the Debtors could solicit votes in favor of the plan was set to expire on March 5, 2012 (together, the "Exclusive Periods"). On December 23, 2011, the Debtors filed a motion in

the Bankruptcy Court to extend the Exclusive Periods [Docket No. 795]. By order dated January 11, 2012, the Bankruptcy Court extended the Debtors' Exclusive Periods through and including May 4, 2012, and July 3, 2012, respectively [Docket No. 879]. By further order dated June 22, 2012, the Exclusive Periods were extended through and including September 4, 2012 and October 31, 2012, respectively [Docket No. 1865]. By further order dated October 16, 2012, the Bankruptcy Court extended the Exclusive Periods through and including January 2, 2013 and February 28, 2013, respectively [Docket No. 2467].

### 11. *De Minimis* Asset Sales

On December 13, 2011, the Bankruptcy Court issued an order approving certain procedures proposed by the Debtors to effectuate the sale and abandonment of certain assets of de minimis value (the "De Minimis Procedures") [Docket No. 708]. In January 2012, pursuant to the De Minimis Procedures, the Debtors (i) sold approximately two acres of land and certain improvements thereon located at Beryl, Mineral County, West Virginia, including all easements, rights-of-way, and other appurtenances to the land, (ii) sold 41 small lots in and around Luke, Maryland, and (iii) abandoned certain raw materials, other than wood, located at NPPH's mill. In April 2012, pursuant to the De Minimis Procedures, the Debtors abandoned equipment related to certain wells. In September 2012, pursuant to the De Minimis Procedures, the Debtors sold 11.746 acres of land and an access easement on 4.36 acres of land located at the Debtors' mill in Escanaba, Michigan.

### B.    Appointment of Official Committee of Unsecured Creditors

### 1.    Appointment

On September 22, 2011, the acting United States Trustee for the District of Delaware, Region 3 (the "U.S. Trustee"), pursuant to her authority under section 1102 of the Bankruptcy Code, appointed the Committee in these Chapter 11 Cases.

### 2.    Composition

The Committee currently consists of the following members:

HSBC Bank USA, National Association
Attn: Diane Scott
10 East 40th Street, 14th Floor
New York, NY 10016
Tel: (212) 525-1358
Fax: (212) 252-1366

Deutsche Bank Trust Company Americas
Attn: Rodney Gaughan
100 Plaza One
6th Floor
Mail Stop JCY03-0699
Jersey City, NJ 07311-3901
Tel: (201) 593-4016
Fax: (732) 380-2345

US Bank National Association
Attn: Timothy Sandell
60 Livingston Avenue
Saint Paul, MN 55107
Tel: (651) 495-3959
Fax: (651) 495-8100

United Steelworkers
Attn: David Jury
Five Gateway Center, Room 807
Pittsburgh, PA 15222
Tel: (412) 562-2545
Fax: (412) 562-2574

Pension Benefit Guaranty Corporation
Attn:  Adi Berger
1200 K.  Street NW
Washington, DC 20005
Tel:  (202) 326-4070
Fax:  (202) 842-2643

PIRINATE Consulting Group, LLC
Attn:  Eugene I. Davis
5 Canoe Brook Drive
Livingston, NJ 07039
Tel:  (973) 533-9027
Fax:  (973) 533-1843

OMNOVA Solutions Inc.
Attn:  Chet Fox
175 Ghent Road
Fairlawn, OH 44333
Tel:  (330) 869-4270
Fax:  (330) 869-4210

National Starch LLC
Attn:  Lawrence Karr
10 Finderne Avenue
Bridgewater, NJ 08807
Tel:  (908) 685-5069

### 3.    Retention of Committee Professionals

The Bankruptcy Court has authorized the Committee to retain the following professionals: (i) Paul Hastings LLP, as co-chapter 11 attorneys; (ii) Young Conaway Stargatt & Taylor, LLP, as co-chapter 11 attorneys; (iii) Alvarez & Marsal North America, LLC ("Alvarez & Marsal"), as financial advisors; and (iv) Moelis & Company LLC ("Moelis"), as investment banker.

On November 1, 2011, the Debtors objected to the Committee's retention of Alvarez & Marsal and Moelis and sought denial of the applications [Docket No. 428]. Alternatively, the Debtors requested the Bankruptcy Court to restrict the Committee to employing a single financial advisor, and condition the approval upon the elimination of requested completion fees. An ad hoc group of First Lien Noteholders (the "Ad Hoc Group of First Lien Noteholders") joined the Debtors' objection, and the Second Lien Group filed a limited joinder [Docket Nos. 430 and 434, respectively]. On December 1, 2011, the Bankruptcy Court entered an order denying the retentions of Alvarez & Marsal and Moelis [Docket Nos. 605 and 606, respectively]. On December 6, 2011, the Committee sought reconsideration of these orders [Docket No. 623]. The Debtors opposed this reconsideration, and the Ad Hoc Group of First Lien Noteholders joined the objection [Docket Nos. 680 and 694, respectively]. On December 27, 2011, the Bankruptcy Court entered orders granting the Committee's motion for reconsideration and authorizing the retentions of Alvarez & Marsal and Moelis [Docket Nos. 796 and 797]. In so authorizing the retentions, the Bankruptcy Court approved the requested completion fee on an interim basis only.

On May 15, 2012, the Committee filed an application to retain Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn"), as conflicts counsel for the Standing Motion [Docket No. 1589] (see discussion at C.3 below). On June 1, 2012, the Debtors filed a limited response to the application on the basis that the application did not explain how Quinn will be compensated given the DIP Order's preclusion of the use of any borrowings, collateral, or cash collateral to investigate, initiate or prosecute certain avoidance actions [Docket No. 1683]. The First Lien Notes Trustee joined in the Debtors' limited response [Docket No. 1688]. By order dated June 26, 2012 [Docket No. 1878], the Bankruptcy Court approved the retention of Quinn as conflicts counsel for the Standing Motion and preserved the rights of the First Lien Noteholders to assert that any payment to Quinn violates the DIP Order and may be subject to disgorgement to the extent it does not comply with paragraph 27 of the DIP Order.