# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| NEWPAGE CORP., | : | Case Number 11-12804 (KG) |
| | : | |
| | : | |
| Reorganized Debtor. | : | **Hearing Date: December 19, 2018 at 9:30 a.m.** |
| | : | **Obj. Deadline:  December 14, 2018 at 4:00 p.m.[1]** |

### RESPONSE OF THE UNITED STATES TRUSTEE TO NEWPAGE CORPORATION'S MOTION FOR ENTRY OF A FINAL DECREE (A) CLOSING ITS CHAPTER 11 CASE, (B) TERMINATING CERTAIN CLAIMS AND NOTICING SERVICES, (C) ESTABLISHING THE AMOUNT OF FEES OWED TO THE UNITED STATES TRUSTEE PURSUANT TO 28 U.S.C. § 1930(a)(6), AND (D) GRANTING RELATED RELIEF

---

[1] The objection deadline was extended by agreement of the parties.

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 3

ARGUMENT .......................................................................................................................... 5

I.     NewPage's Motion for a Final Decree is Premature. .......................................... 5

II.    NewPage Must Pay All of Its Quarterly Fees Due Under Section 1930(a)(6) Because the
       Canon of Constitutional Avoidance Does Not Apply .......................................... 6

   A.    There is no "serious doubt" about the constitutionality of section 1930(a)(6) because
         the Supreme Court has held that charging a user fee (or imposing a tax) is not a taking.
         ................................................................................................................................ 7

   B.    Even if *Koontz* did not end the inquiry, assessing quarterly fees under section
         1930(a)(6) on all disbursements is not an unconstitutional taking .............................. 9

      1.    Supreme Court jurisprudence rejects NewPage's argument that any payment that
            exceeds the benefits received constitutes a taking. ...................................... 9

      2.    This Court should defer to Congress's judgment regarding what fees are necessary. 11

      3.    Assessing quarterly fees under section 1930(a)(6) on all disbursements would not be a
            taking regardless of the level of a U.S. Trustee's activity in a particular chapter 11
            case, and was not a taking here. ................................................................. 15

      4.    NewPage cannot bifurcate section 1930(a)(6). ............................................. 17

   C.    NewPage's legal authorities either support the constitutionality of section 1930(a)(6)
         or are inapposite to NewPage's argument ................................................................. 19

III.   Section 1930(a)(6) Requires Quarterly Fees to Be Calculated Upon All Disbursements,
       Including Ordinary Business Expenses, Made in the Case Until Conversion, Dismissal, or
       Case Closure. ................................................................................................. 21

   A.    The argument that post-confirmation disbursements should be limited to plan
         payments was rejected by the courts twenty years ago, and should be rejected here. . 22

   B.    The plain language of section 1930(a)(6) requires that quarterly fees must be
         calculated on all post-confirmation disbursements, including ordinary operating
         expenses. ........................................................................................................ 25

   C.    Basing quarterly fees on post-confirmation payments of a debtor's ordinary operating
         expenses is consistent with legislative intent. ........................................................ 28

IV.    The U.S. Trustee Did Not, and Could Not, Agree to Allow an Operating Company in an
       Open Chapter 11 Case with Disbursements That Require Payment of the Maximum
       Quarterly Fee to Pay the Minimum Fee .................................................................. 29

CONCLUSION ........................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1095 Commonwealth Ave. Corp.*,
213 B.R. 794 (Bankr. D. Mass. 1997) ...................................................................5

*A. Magnano Co. v. Hamilton*,
292 U.S. 40 (1934)............................................................................................8

*In re A.H. Robins Co. Inc.*,
219 B.R. 145 (Bankr. E.D. Va. 1998).........................................................16, 18, 23

*Alamo Rent-a-Car, Inc. v. Sarasota-Manatee Airport Authority*,
906 F.2d 516 (11th Cir. 1990) ..........................................................................10

*Atlantic Richfield Co. v. Hickel*,
432 F.2d 587 (10th Cir. 1970) ..........................................................................34

*Bachner v. Commissioner of Internal Revenue*,
81 F.3d 1274 (3d Cir. 1996)..............................................................................33

*In re Betwell Oil & Gas Co.*,
204 B.R. 817 (Bankr. S.D. Fla. 1997), *aff'd*, 97-774 (S.D. Fla. Oct. 7, 1998) .......................25

*In re Boulders on the River, Inc.*,
218 B.R. 528 (D. Or. 1997) .........................................................................18, 23

*Boumediene v. Bush*,
553 U.S. 723 (2008)..........................................................................................6

*Brown v. Legal Found. of Wash.*,
538 U.S. 216 (2003) (Scalia, J. dissenting)..............................................................8

*In re Bushnell*,
Nos. 94-10706, 96-10768, 1997 WL 701318 (Bankr. D. Vt. Oct. 1, 1997) ..........................24

*In re Campesinos Unidos, Inc.*,
219 B.R. 886 (Bankr. S.D. Cal. 1998) ...................................................................23

*In re Cash Cow Serv. of Fla. LLC*,
296 F.3d 1261 (11th Cir. 2002) ..........................................................................26

*In re CF&I Fabricators of Utah, Inc.*,
150 F.3d 1233, 1237-38 (10th Cir. 1998) ..........................................................8, 31

*In re Charter Behavioral Health Sys., LLC,*
   292 B.R. 36 (Bankr. D. Del. 2003) ................................................................................24, 34

*Clark v, Martinez,*
   543 U.S. 371 (2005) ..................................................................................................................6

*Commonwealth Edison Co. v. United States,*
   271 F.3d 1327 (Fed. Cir. 2001) (en banc) ...............................................................................9

*In re Corp. Bus. Prods., Inc.,*
   209 B.R. 951 (Bankr. C.D. Cal. 1997) ..................................................................................24

*County of Mobile v. Kimball,*
   102 U.S. 691 (1881) ................................................................................................................8

*Dane v. Jackson,*
   256 U.S. 589 (1921) ................................................................................................................8

*Emery Mining Corp. v. Secretary of Labor,*
   744 F.2d 1411 (10th Cir. 1984) ............................................................................................34

*Federal Crop Ins. Corp. v. Merrill,*
   332 U.S. 380 (1947) ..............................................................................................................33

*Fredericks v. Commissioner of Internal Revenue,*
   126 F.3d 433 (3d Cir. 1997) ..................................................................................................32

*Garneau v. City of Seattle,*
   147 F.3d 802 (9th Cir. 1998) .................................................................................................21

*In re Gates Cmty. Chapel of Rochester, Inc.,*
   212 B.R. 220 (Bankr. W.D.N.Y. 1997) ...............................................................................23

*In re GC Companies,*
   298 B.R. 226 (D. Del. 2003) ...........................................................................................24, 26

*Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.),*
   402 F.3d 416 (3d Cir. 2005) ............................................................................................24, 26

*Heckler v. Community Health Servs. of Crawford Co., Inc.,*
   467 U.S. 51 (1984) ...........................................................................................................32, 33

*Henderson Bridge Co. v. Henderson City,*
   173 U.S. 592 (1899) ................................................................................................................8

*Houck v. Little River Drainage Dist.,*
   239 U.S. 254 (1915) ................................................................................................................9

*In re Huff*,
    270 B.R. 649 (Bankr. W.D. Va. 2001) .................................................................18

*Jennings v. Rodrigues*,
    138 S. Ct. 830 (2018)...........................................................................................6

*In re Kindred Healthcare, Inc.*,
    No. 99-3199 (MFW), 2003 WL 22327933 (Bankr. D. Del. Oct. 9, 2003) ..................... *passim*

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013).......................................................................................... *passim*

*In re Kroy (Europe) Ltd.*,
    244 B.R. 816 (D. Ariz. 2000)...............................................................................17

*Lamar, Archer & Cofrin LLP v. Appling*,
    138 S. Ct. 1752 (2018)........................................................................................29

*In re Maruko*,
    219 B.R. 567 (S.D. Cal. 1998).............................................................................23

*Massachusetts v. United States*,
    435 U.S. 444 (1978)......................................................................................... *passim*

*In re McLean Square Associates*,
    201 B.R. 436 (Bankr. E.D. Va. 1996)....................................................................17

*In re Munford, Inc.*,
    216 B.R. 913 (Bankr. N.D. Ga. 1997) ...................................................................25

*In re N. Hess' Sons, Inc.*,
    218 B.R. 354 (Bankr. D. Md. 1998) ......................................................................23

*In re Nassau Tower Realty, LLC*,
    518 B.R. 842 (Bankr. D.N.J. 2014) .......................................................................25

*Nat'l Cable Television Ass'n v. United States*,
    415 U.S. 336 (1974)............................................................................................9

*Office of Personnel Management v. Richmond*,
    496 U.S. 414 (1990)..........................................................................................32

*In re P.J. Keating Co.*,
    205 B.R. 663 (Bankr. D. Mass. 1997) ..................................................................24

*Perrin v. United States*,
    444 U.S. 37 (1979)...........................................................................................25

*In re Postconfirmation Fees*,
    224 B.R. 793, 799 (E.D. Wash. 1998) ................................................................23

*Public Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993) ...........................................................................29

*In re Quality Truck & Diesel Injection Service*,
    251 B.R. 682 (S.D. W. Va. 2000) ...................................................................18, 23

*In re R&K Fabricating, Inc.*,
    No. 4:09-bk-40337, 2013 WL 5493161 (Bankr. S.D. Tex. Sept. 30, 2013)...........................23

*In re Richards*,
    2017 WL 2743238 (Bankr. S.D. W. Va. June 23, 2017) .......................................................23

*Robiner v. Danny's Markets, Inc. (In re Danny's Markets, Inc.)*,
    266 F.3d 523 (6th Cir. 2001) .....................................................................23, 26, 27

*In re Roy Stanley, Inc.*,
    217 B.R. 23 (Bankr. N.D.N.Y. 1997) .......................................................................23

*Schweiker v. Hansen*,
    450 U.S. 785 (1981).............................................................................................33

*In re SeaEscape Cruises, Ltd.*,
    201 B.R. 321 (Bankr. S.D. Fla. 1996)..................................................................25

*In re Sedro-Woolley Lumber Co.*,
    209 B.R. 987 (Bankr. W.D. Wash. 1997) ...........................................................24

*In re Sgaverdea*,
    377 B.R. 308 (Bankr. D.N.M. 2007) ..................................................................23

*St. Angelo v. Victoria Farms, Inc.*,
    38 F.3d 1525 (9th Cir. 1994) ...............................................................................26

*Swisher Int'l, Inc. v. Schafer*,
    550 F.3d 1046 (11th Cir. 2008) .............................................................................9

*In re Swiss Chalet, Inc.*,
    485 B.R. 47 (Bankr. D.P.R. 2012)..........................................................................5

*Tighe v. Celebrity Home Entm't, Inc. (In re Celebrity Home Entm't, Inc.)*,
    210 F.3d 995 (9th Cir. 2000) .....................................................................23, 26, 28

*Trapper Mining, Inc. v. Lujan*,
    923 F.2d 774 (10th Cir. 1991) .............................................................................34

*Turner Broadcasting Sys., Inc. v. FCC*,
   520 U.S. 180 (1997)............................................................................................11, 12

*U.S. Trustee v. Gryphon at Stone Mansion, Inc.*,
   166 F.3d 552 (3d Cir. 1999)...............................................................................8, 31

*U.S. v. Pepperman*,
   976 F.2d 123 (3d Cir. 1992)...................................................................................33

*United Real Estate Co. v. Hudson*,
   178 F.3d 649 (3d Cir. 1999)....................................................................................9

*United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*,
   33 F.3d 294 (3d Cir. 1994).......................................................................................1

*United States Trustee v. Pettibone Corp.*,
   251 B.R. 335 (N.D. Ill. 2000) ...........................................................................18, 23

*United States v. Asmar*,
   827 F.2d 907 (3d Cir. 1987)...................................................................................32

*United States v. Sperry*,
   493 U.S. 52 (1989)................................................................................... *passim*

*Vergos v. Uncle Bud's, Inc.*,
   1998 WL 652542 (M.D. Tenn. Aug. 17, 1998) ................................................18, 23

*In re Verso Corporation*
   [Case No. 16-10163 (KG)] ......................................................................................3

*Walton v. Jamko, Inc. (In re Jamko, Inc.)*,
   240 F.3d 1312, 1316 (11th Cir. 2001) ............................................................ *passim*

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
   449 U.S. 155 (1980)...............................................................................................20

*West Virginia CVP Fund v. Stacy*,
   671 F.3d 378 (4th Cir. 2011) ..................................................................................9

*In re Wintersilks, Inc.*,
   No. 00-C-0106-C, 2000 WL 34236011 (W.D. Wis. June 2, 2000).............................23, 25, 28

**Statutes**

11 U.S.C. § 307..........................................................................................................1

11 U.S.C. § 350(a) .....................................................................................................5

28 U.S.C. § 586..........................................................................................................1

28 U.S.C. § 586(a)(3)(D) ...................................................................................................30

28 U.S.C. § 589a .................................................................................................12, 13, 17

28 U.S.C. §§ 1334 and 157(a) and (b) ...............................................................................1

28 U.S.C. § 1930 ...................................................................................................... *passim*

28 U.S.C. § 1930(a)(6) .............................................................................................. *passim*

28 U.S.C. § 1930(a)(6)(B) ...........................................................................................14, 15

31 U.S.C. § 3711(a)(2) ......................................................................................................31

31 U.S.C. § 3711(g)(1) ......................................................................................................32

Balanced Budget Downpayment Act, I, § 211, Pub. L. No. 104-99, 110 Stat. 26,
  37-38 (1996).............................................................................................................13, 22

Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72 .........................................4, 13, 14

Bankruptcy Reform Act of 1978, P.L. 95-598, 92 Stat. 2549 (1978)...............................16

Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, §§ 212, 213.....................13

Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Title II, 131 Stat.
  135, 195 (2017)...........................................................................................................14

Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 *et seq*. ....................................31, 32

Departments of Commerce, Justice and State, the Judiciary, and Related Agencies
  Appropriations Act of 1990, Pub. L. No. 101-162, § 406 ........................................13

Departments of Commerce, Justice and State, the Judiciary, and Related Agencies
  Appropriations Act of 1992, Pub. L. No. 102-140, § 111 ...................................13, 28

Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, § 103 ........................13

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 109 ...........13

Pub. L. No. 104-99, § 211 (1996), § 211 ......................................................................13

Pub. L. No. 109-8 (2005), § 325 ...................................................................................13

Pub. L. No. 109-13 (2005), § 6058 ...............................................................................13

Temporary Bankruptcy Judgeships Extension Act of 2012, Pub. L. No. 112-121, §
  3.................................................................................................................................7, 13

**Other Authorities**

28 C.F.R. § 0.160, *et seq.* ...................................................................................31

141 Cong. Rec. H13894 (Dec. 4, 1995)...............................................................28

 "Saving Constructions," 15 Geo. L. J. 1945, 1969 & n.119 (June 1997).......................................7

BLACK'S LAW DICTIONARY (10th ed. 2014) ........................................................26

Fed. R. Bankr. P. 3022 ..........................................................................5

H.R. Conf. Rep. 104-378, 104th Cong., 1st Sess. (Dec. 4, 1995)................................28

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 ....................1, 12, 16, 17

H.R. Rep. No. 99-764, *reprinted in* 1986 U.S.C.C.A.N. 5227 ............................7, 12, 13

H.R. Rep. No. 115-130, *reprinted in* 2017 U.S.C.C.A.N. 154 ....................4, 12, 14, 17

House Report 104-196 ..........................................................................28

https://www.justice.gov/ust/chapter-11-quarterly-fees...........................................4, 14

Joint Explanatory Statement of House Conference Report 104-378 ...........................28

Local Rule 3022-1...............................................................................5

U.S. CONST. amend. V ......................................................................2, 6, 8, 20

Webster's New World Dictionary, 3d College Ed. at 390...........................................26

In support of his objection to the motion of NewPage Corporation ("NewPage") for a final decree that, *inter alia*, establishes the statutory quarterly fees that NewPage owes under 28 U.S.C. § 1930(a)(6), Andrew R. Vara, the Acting United States Trustee for Region 3 ("U.S. Trustee"), through his undersigned counsel, states as follows:

1.     This Court has jurisdiction to hear this objection pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b).

2.     Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing cases commenced under chapter 11 of the Bankruptcy Code.  This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts.  *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing"); H.R. Rep. No. 95-595 at 4, *reprinted at* 1978 U.S.C.C.A.N. 5963, 5966 (describing the U.S. Trustee as a "watchdog").

3.     Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard with regard to this objection.

## SUMMARY OF ARGUMENT

4.     NewPage lacks any sound legal basis for its attempt to avoid its statutory duty under 28 U.S.C. § 1930(a)(6) to pay fees on the hundreds of millions of dollars it has disbursed while its chapter 11 case has been open.  The premise of NewPage's argument is that the term "disbursements" in the statute does not include all disbursements.  According to NewPage, "disbursements" includes only disbursements made pursuant to its plan of reorganization, but does not include any other disbursements such as operating expenses.

5.     NewPage's argument not only runs contrary to the plain terms of section 1930, it was also widely rejected *over twenty years ago* by courts that have considered the issue—

1

including seven circuit and district courts and over a dozen bankruptcy courts.  *See* Argument

Section III(A) *infra.*  The few cases that held otherwise have since been reversed or abrogated.

*See id.*  There is no need to abandon this long-settled law.

6.      NewPage hinges its plea for this Court to flout this settled law on the doctrine of

constitutional avoidance.  But the specter of "serious constitutional issues" under the Takings

Clause is wholly illusory.  Controlling Supreme Court authority holds that government fees are

not takings at all, and thus cannot violate the Takings Clause.  *Koontz v. St. Johns River Water*

*Mgmt. Dist.*, 570 U.S. 595, 615 (2013).

7.      Because NewPage's proposed construction of the statute is not reasonable and

there is no credible risk that the well-accepted reading of the statute as including all

disbursements is unconstitutional, the doctrine of constitutional avoidance does not apply.

8.      Moreover, NewPage's equitable and policy arguments fly in the face of

Congress's decision to assess the statutory fees to protect the public fisc. Congress has

determined how these fees should be assessed, and the statute should be applied as written.  To

do otherwise would subvert congressional intent and shrink statutory revenues intended to offset

appropriations for the U.S. Trustee Program.

9.      As the Eleventh Circuit held in addressing a debtor raising the same argument

regarding section 1930(a)(6) brought by NewPage, "[i]f change is necessary, it is a consideration

for Congress, not the courts."  *Walton v. Jamko, Inc. (In re Jamko, Inc.)*, 240 F.3d 1312, 1316 n.

6 (11th Cir. 2001).  To the extent NewPage disagrees with Congress' policy determination, it

must seek relief from Congress.

10.     Finally, NewPage argues incorrectly that the U.S. Trustee's office gave

assurances that NewPage would not have to comply with its statutory duty under section

1930(a)(6).  But the U.S. Trustee has no authority to compromise this statutorily-mandated fee.

Even if he had entered into an agreement to do so—which he did not—the government could not

be estopped from collecting the statutorily-mandated fee owed by NewPage.

## BACKGROUND

11.    NewPage and certain of its subsidiaries and affiliates filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code on September 7, 2011.  This Court confirmed the

debtors' reorganization plan on December 14, 2012 [ECF No. 2945].  On November 12, 2013,

this Court entered a final decree granting the debtors' motion to close the chapter 11 cases of all

but NewPage [ECF No. 4482].

12.    Verso Corporation and certain of its affiliates (collectively, "Verso") later

acquired NewPage.  *See* Motion, ¶ 5.  On January 26, 2016, NewPage filed a second chapter 11

case in this Court as part of the jointly administered cases styled *In re Verso Corporation* [Case

No. 16-10163 (KG)] (the "Verso Cases").  On June 23, 2016, this Court entered an order

confirming the debtors' joint plan in the Verso Cases [ECF No. 1223].  On March 27, 2018, this

Court entered a final decree closing all of the Verso Cases [ECF No. 1865].

13.    As of the final decree in the Verso Cases, NewPage's first case became the sole

surviving chapter 11 case.

14.    Section 1930(a)(6) imposes a quarterly fee on every chapter 11 case.  The statute

provides that "a quarterly fee shall be paid to the United States trustee, for deposit in the

Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction

thereof) until the case is converted or dismissed, whichever occurs first."  The quarterly fee is

based upon the disbursements made in the case during a calendar quarter or fraction thereof, and

is determined by a sliding scale ranging from a minimum of $325 for cases that disburse less

than $15,000, to a cap of 1% of quarterly disbursements or $250,000, whichever is less, for cases that disburse over $1 million.[2]

15.     From the filing of the Verso Cases until their closure, NewPage had two open chapter 11 cases.  To avoid double counting NewPage's disbursements while both cases were open, the U.S. Trustee allocated all of NewPage's quarterly disbursements to its second case, which was filed in 2016, and none of its quarterly disbursements to its first case, which was filed in 2011.  Thus, while both of NewPage's cases were open, the U.S. Trustee assessed the minimum quarterly fee of $325 in one, which happened to be NewPage's first case, and the maximum quarterly fee of $250,000 in the other.  Once NewPage's second case was closed, double-counting of disbursements was no longer a concern.

16.     In the second quarter of 2018, NewPage's disbursements were $688,824,265 [ECF No. 5139].  In the third quarter, NewPage's disbursements were $811,335,969 [ECF No. 5149].

17.     Based on these disbursements, a quarterly fee of $250,000 was due under 28 U.S.C. § 1930(a)(6) for each of the second and third quarters of 2018.  Although the fourth quarter of 2018 has not yet ended, NewPage will likely owe a quarterly fee of $250,000 for the fourth quarter as well.  Despite reporting quarterly disbursements totaling over $1.5 billion since the entry of the Verso Final Decree, NewPage has only paid the minimum quarterly fee of $325 for each quarter.  After NewPage submitted its quarterly summary report for the second quarter,

---

[2] The Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, amended the calculation of chapter 11 quarterly fees, effective January 1, 2018, to increase temporarily through fiscal year 2022 the quarterly fees paid by the largest chapter 11 debtors when the balance of the United States Trustee System Fund (the "Fund") as of the end of the prior fiscal year falls below $200 million.  *See* H.R. Rep. No. 115-130, at 7-8, *reprinted in* 2017 U.S.C.C.A.N. 154, 159-160; 28 U.S.C. § 1930(a)(6)(B).  The balance in the Fund as of September 30, 2017, was less than $15 million.  *See* https://www.justice.gov/ust/chapter-11-quarterly-fees (last viewed on December 13, 2018).

NewPage was promptly advised on September 5, 2018, that it had paid the incorrect amount.

*See* Motion, Exhibit B, September 6, 2018 email.

## ARGUMENT

**I.      NewPage's Motion for a Final Decree is Premature.**

18.      Case closing is governed by 11 U.S.C. § 350(a), which states that "[a]fter an

estate is fully administered and the court has discharged the trustee, the court shall close the

case."  Final decrees in chapter 11 cases are governed by Federal Rule of Bankruptcy Procedure

3022, which states: "[a]fter an estate is *fully administered* in a chapter 11 reorganization case, the

court, on its own motion or on a motion of a party in interest, shall enter a final decree closing

the case."  Fed. R. Bankr. P. 3022 (emphasis added).

19.      The Advisory Committee Note (1991) to Bankruptcy Rule 3022 suggests a list of

factors the court may consider in determining whether an estate is "fully administered,"

including "whether all motions, contested matters, and adversary proceedings have been finally

resolved."  Courts applying these various factors have declined to issue a final decree when all

litigation was not finally resolved.  *See In re Swiss Chalet, Inc.*, 485 B.R. 47, 52 (Bankr. D.P.R.

2012); *In re 1095 Commonwealth Ave. Corp.*, 213 B.R. 794, 795 (Bankr. D. Mass. 1997).  By

NewPage's own admission, one adversary proceeding remains pending, the resolution of which

will result in distributions to claimholders.  Motion, ¶ 18.  Further, by filing its motion seeking

relief from its duty under section 1930(a)(6), NewPage has commenced a new contested matter.

These litigations are not finally resolved.

20.      Additionally, by seeking a final decree before paying its delinquent quarterly fees,

NewPage has violated the local rules.  Local Rule 3022-1 provides that a debtor may seek entry

of a final decree "at any time after the confirmed plan has been fully administered *provided that

all required fees due under 28 U.S.C. § 1930 have been paid*."  Del. Bankr. L.R. 3022-1

(emphasis added).  The predicate for NewPage to file its motion has not been met.  NewPage's

motion for a final decree is premature.

## II.  NewPage Must Pay All of Its Quarterly Fees Due Under Section 1930(a)(6) Because the Canon of Constitutional Avoidance Does Not Apply.

21.    NewPage asks this Court to disregard the meaning and intent of the statute as

determined by two United States courts of appeals and an overwhelming number of lower courts,

*see* Argument Section III(A) *infra*, and instead impose NewPage's uniformly rejected

interpretation of 28 U.S.C. § 1930(a)(6).  Motion, ¶ 41.  In so doing, NewPage asserts that

charging a quarterly fee based on payments made in the ordinary course of a debtor's business

after a plan is confirmed violates the Fifth Amendment Taking Clause because the fee is not

reasonably related to the services provided by the U.S. Trustee post-confirmation.  *Id*. at ¶¶ 40-

41.  That assertion runs afoul of the Supreme Court's pronouncement in *Koontz*, 570 U.S. at 615,

and cannot justify a departure from settled law.

22.    "The canon of constitutional avoidance does not supplant traditional modes of

statutory interpretation."  *Boumediene v. Bush*, 553 U.S. 723, 787 (2008).  A court may not

invoke the doctrine of constitutional avoidance unless it is satisfied that:  **(1)** there is "a serious

doubt" about the constitutionality of section 1930(a)(6); and **(2)** there is more than one

"plausible" reading of the statutory text.  *Jennings v. Rodrigues*, 138 S. Ct. 830, 843 (2018).  The

Supreme Court has explained that merely "[s]potting a constitutional issue does not give a court

the authority to rewrite a statute as it pleases. . . ."  *Id*. (quoting *Clark v, Martinez*, 543 U.S. 371,

381 (2005)).  "A court relying on that canon still must *interpret* the statute, not rewrite it."  *Id*. at

836 (emphasis in original).

23.    The constitutional avoidance canon is "a means of giving effect to congressional

intent, not of subverting it."  *Clark*, 543 U.S. at 382.  Congress clearly intended the fees collected

under section 1930 to fully offset annual appropriations for the U.S. Trustee Program.  *See* H.R.

Rep. No. 99-764, at 25, *reprinted in* 1986 U.S.C.C.A.N. 5227, 5238 ("It is the intent of the

Committee that the monies generated from [increases in filing fees and additional quarterly fees

in chapter 11 cases] be at least equal to the money needed to fund the U.S. Trustee Program each

year, so that the Program will be self-funded by the users of the bankruptcy system-at no cost to

the taxpayer."); *see also* H.R. Rep. No. 99-764, at 22, *reprinted in* 1986 U.S.C.C.A.N. 5227,

5235 ("The U.S. Trustee Program should not have to be self-funding.  It provides a great service

to our country's bankruptcy system.  However, in this time of budget deficit concerns, self-

funding becomes a necessity.").

24.     NewPage failed to satisfy either requirement for resorting to constitutional

avoidance, much less both.  First, as shown below, NewPage has failed to establish a serious

taking claim.

25.     Second, as explained in Argument Section III *infra*, section 1930(a)(6) cannot

plausibly be read to exclude ordinary course payments from the quarterly fee calculation.  That

reading is not supported by the statutory text and to adopt such a sweeping exclusion would

subvert Congress's intention to have users of the bankruptcy system offset the annual

appropriations for the U.S. Trustee Program, instead of requiring taxpayers to pay for it.[3]

**A.      There is no "serious doubt" about the constitutionality of section 1930(a)(6) because the Supreme Court has held that charging a user fee (or imposing a tax) is not a taking.**

26.     NewPage raises only one specific constitutional argument—that calculating

quarterly fees based on all disbursements, including ordinary course payments, could result in a

---

[3] Courts have been particularly reluctant to interpret revenue statutes narrowly under the doctrine of constitutional avoidance, perhaps because of their importance to the operations of the federal government.  *See* "Saving Constructions," 15 Geo. L. J. 1945, 1969 & n.119 (June 1997) (citing cases).

taking in a case where a plan has been confirmed because the fee might exceed the cost of the U.S. Trustee's services to that debtor. Motion, ¶ 41 ("To charge a fee based on ordinary course distributions … would be an unconstitutional levy of a fee that is completely untethered from any 'fair approximation of the cost of benefits supplied,'" and therefore a violation of the Takings Clause."); *id*., ¶ 40 ("To pass constitutional muster, U.S. Trustee fees . . . must bear a 'fair approximation of the cost of benefits supplied . . . . If they do not fairly approximate the cost of such benefits, then the government's levy of the fee is an impermissible taking of the Reorganized Debtor's property under the Takings Clause of the Fifth Amendment of the United States Constitution.").[4]

27.    There is no legal basis for NewPage's assertion that section 1930(a)(6) effects an unconstitutional taking. As the Supreme Court reaffirmed in 2013, "[i]t is beyond dispute that '[t]axes and user fees are not . . . "takings."'" *Koontz*, 570 U.S. at 615 (quoting *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 243, n.2 (2003) (Scalia, J. dissenting) (ellipses in original) and citing *United States v. Sperry*, 493 U.S. 52, 62 n. 9 (1989)); *A. Magnano Co. v. Hamilton*, 292 U.S. 40, 44 (1934); *Dane v. Jackson*, 256 U.S. 589, 599 (1921); *Henderson Bridge Co. v. Henderson City*, 173 U.S. 592, 614-615 (1899); and *County of Mobile v. Kimball*, 102 U.S. 691, 703 (1881)).

28.    NewPage insists that quarterly fees are user fees, not taxes. Motion, ¶ 39. The U.S. Trustee does not concede and the Court need not decide whether NewPage is correct because *Koontz* clarifies that it is not a taking either way. *Koontz*, 570 U.S. at 615. The tax/fee

---

[4]  Courts of appeals have consistently upheld the constitutionality of section 1930(a)(6) and Congress's authority to issue it. For example, the Third Circuit rejected an attack on the bankruptcy court's jurisdiction over post-confirmation claims in *U.S. Trustee v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999) (noting that "Congress . . . purposely changed the scheme so as to require payment of trustee's fees until the case is closed"). And, the Tenth Circuit resoundingly rejected claims alleging the amendment was impermissibly retroactive and violating the Takings Clause by interfering with a confirmed plan in *In re CF & I Fabricators of Utah Inc.*, 150 F.3d 1233, 1237-38 (10th Cir. 1998).

dichotomy is relevant only in the narrow circumstances where the government lacked authority to impose a tax or to delegate its taxing authority.  *See, e.g.*, *Massachusetts v. United States*, 435 U.S. 444, 446 (1978) (holding that user tax as applied to aircraft owned by a state did not violate the implied immunity of a state government from federal taxation); *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336 (1974) (construing statute authorizing federal agencies to prescribe fees but not taxes).  Any distinction is immaterial here, as neither taxes nor user fees are takings.  *Koontz*, 570 U.S. at 615.

29.     That is not surprising, as courts widely agree that the mere imposition of an obligation to pay money cannot constitute a taking.  *West Virginia CVP Fund v. Stacy*, 671 F.3d 378, 387 (4th Cir. 2011).  *Accord United Real Estate Co. v. Hudson*, 178 F.3d 649, 659 (3d Cir. 1999); *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1054 (11th Cir. 2008); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001) (en banc).  Assessing a statutory fee for governmental services is simply not akin to the exercise of eminent domain.  *See Sperry*, 493 U.S. at 62 n. 9 (rejecting notion that "any fee for services" might constitute a "physical occupation requiring just compensation"); *cf. Koontz*, 570 U.S. at 617 ("[T]he power of taxation should not be confused with the power of eminent domain[.]") (quoting *Houck v. Little River Drainage Dist.*, 239 U.S. 254, 264 (1915)).

**B.     Even if *Koontz* did not end the inquiry, assessing quarterly fees under section 1930(a)(6) on all disbursements is not an unconstitutional taking**

**1.     Supreme Court jurisprudence rejects NewPage's argument that any payment that exceeds the benefits received constitutes a taking.**

30.     Even if *Koontz* did not dictate the result here, NewPage's takings theory is unavailing because the Supreme Court has specifically rejected the proposition that there must be a close correlation between the specific services provided and the fees and costs charged in every case.  *Sperry*, 493 U.S. at 60-61.

9

31.     The statutory fee in question in *Sperry* was a 1.5% deduction from awards by the Iran-United States Claims Tribunal to reimburse the government for its costs in administering the Tribunal.  Sperry, who had been granted an award by the Tribunal, contended that the deducted charge could not be upheld as a user fee—and thus must constitute a taking—because "there [was] no showing that the amount of the deduction approximates the cost of the Tribunal to the United States or bears any relationship to Sperry's use of the Tribunal or the value of the Tribunal's services to Sperry."  493 U.S. at 60.

32.     The Supreme Court was not persuaded.  It held that "[t]his Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services.  Nor does the Government need to record invoices and billable hours to justify the cost of its services."  *Id.*  The Court elaborated, holding that "when the Federal Government applies user charges to a large number of parties, it probably will charge a user more or less than it would under a perfect user-fee system."  *Id.* at 61 (citing *Massachusetts*, 435 U.S. at 463 n.19).  But absent fees so "clearly excessive as to belie their purported character as user fees"—and the Court noted that a deduction of 1.5% is not excessive "by any standard"— the Court deferred to the judgment of Congress.  *Id.* at 62.

33.     The precise holding of *Sperry* demonstrates that the Constitution does not require a case-by-case correlation between a user fee and either the costs or benefits of the government's services.  *Id.* at 60-61.  Rather, whether the fee represents a "fair approximation" of costs of government benefits is determined on an aggregate basis without any reference to what use was made in any particular case.  *Id.* at 60; *cf. Alamo Rent-a-Car, Inc. v. Sarasota-Manatee Airport Authority*, 906 F.2d 516 (11th Cir. 1990) (upholding airport usage fee against Commerce Clause challenge, despite the "imprecise" nature of approximating airport use by measuring car rental

company's gross receipts from customers at airport, when approximation was "not irrational," and rejecting argument that fee should correspond exactly to the percentage of company's airport use).

34.     Were it otherwise, courts could strike down practically any revenue measure as a "taking."  Instead of quarterly fees based on disbursements, debtors could insist that only fees based on the actual number of hours spent by government personnel working on the debtor's case are a "fair approximation" of the cost of services provided.  Drivers required to register by a state or locality could challenge any fee that does not precisely reflect the actual amount they drive within the state.  State park passes could be held to be unconstitutional because they charge all families the same amount for a family pass without regard to the size of the family or time each member spends in the parks.

35.     The administrative costs associated with attempting to impose and collect precisely calibrated user fees would be astronomical.  *See Massachusetts*, 435 U.S. at 463 ("If the National Government were required more precisely to calibrate the amount of the fee to the extent of the actual use of the airways, administrative costs would increase and so would the amount of revenue needed to operate the system").

36.     This, of course, is not the rule. As these cases show, it is the role of Congress to consider efficiency, equity, revenue adequacy, and administrative burden when it designs federal regulatory fees.  Congress has done that with quarterly fees.

    **2.**  **This Court should defer to Congress's judgment regarding what fees are necessary.**

37.     "In reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress."  *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (internal quotation marks omitted).  This deference stems from the different

institutional competencies and roles of the courts and Congress. Congress as an institution is better equipped to amass and evaluate data bearing on legislative questions. *Id*. In addition, courts "owe Congress' findings an additional measure of deference out of respect for its authority to exercise the legislative power." *Id*. at 196.

38.     There is no warrant for this Court to overrule Congress's considered determination that the amount of the quarterly fees it voted to impose is a fair approximation of the cost of providing the bankruptcy system to chapter 11 debtors.

39.     Congress established the United States Trustee Program, and housed it in the Department of Justice. H.R. Rep. No. 95-595 at 88, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049. To offset the costs of funding the Program, Congress created the United States Trustee System Fund. *See* 28 U.S.C. § 589a(a). A percentage of fees under sections 1930(a)(1) through (5) paid by all debtors filing petitions under the Bankruptcy Code, and quarterly fees under section 1930(a)(6) paid in chapter 11 cases, are deposited into the Fund. *See* 28 U.S.C. § 589a(b).

40.     Congress explicitly mandated the quarterly fee so that the costs of the U.S. Trustee Program would be borne "by the users of the bankruptcy system—at no cost to the taxpayer." *See* H.R. Rep. No. 99-764, at 25, *reprinted in* 1986 U.S.C.C.A.N. 5227, 5238; *see also* H.R. Rep. No. 99-764, at 22, *reprinted in* 1986 U.S.C.C.A.N. 5227, 5235. The fees deposited into the Fund offset Congress's annual appropriations for the U.S. Trustee Program. *See* H.R. Rep. No. 115-130, at 7, *reprinted in* 2017 U.S.C.C.A.N. 154, 159.

41.     Before settling on quarterly disbursements as the basis for determining fees, Congress "considered many different possible mechanisms . . . including fees based on a debtor's assets, fees based on a debtor's liabilities, and a flat fee for all debtors." H.R. Rep. No. 99-764, at 26, *reprinted in* 1986 U.S.C.C.A.N. 5227, 5239. Congress settled on quarterly

disbursements in the case because "[s]maller chapter 11 debtors should pay smaller additional fees than larger debtors; [and] the funding mechanism [in section 1930(a)(6)] ensures that this will be the case." *Id*.

42.     Congress has constructed a mechanism whereby it can either increase or reduce the fees paid, so that the amount collected for deposit in the Fund will never be unacceptably small or unreasonably large.  The Attorney General is required to report to Congress every year on the amounts deposited in the Fund and expenditures made from it.  *See* 28 U.S.C. § 589a(d). If the amounts collected exceed the amount needed for a particular year, the money remains in the Fund for use in subsequent years.  *See* 28 U.S.C. § 589a(c).  Conversely, if the costs of operating the Program in a particular year exceed the amounts available in the Fund, other public funds might be appropriated by Congress to make up the difference.  *See* 28 U.S.C. § 589a(e).

43.     On no fewer than ten occasions, Congress has amended section 1930(a) or section 589a of title 28, which establishes how the U.S. Trustee System Fund is funded and how those funds may be expended.[5]  Each time, Congress recalibrated either the amount of quarterly fees required, or the allocation of collected fees between the U.S. Trustee and the federal courts, as Congress deemed necessary.

44.     On the most recent occasion, in October of 2017, Congress temporarily increased the amount of quarterly fees collected in the largest chapter 11 cases in response to a shortfall.

---

[5]  *See* Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act of 1990, Pub. L. No. 101-162, § 406; Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act of 1992, Pub. L. No. 102-140, § 111; Act Making Appropriations for the Department of Commerce, Justice, and State, the Judiciary and Related Agencies for the Fiscal Year Ending September 30, 1994, and for Other Purposes, Pub. L. No. 103-121, § 111; Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 109; Balanced Budget Downpayment Act, Pub. L. No. 104-91, § 101, (1996) & Pub. L. No. 104-99, § 211 (1996), § 211; Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, § 103; Pub. L. No. 109-8 (2005), § 325, as amended by Pub. L. No. 109-13 (2005), § 6058; Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, §§ 212, 213; Temporary Bankruptcy Judgeships Extension Act of 2012, Pub. L. No. 112-121, § 3; Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004.

*See* H.R. Rep. No. 115-130, at 7-8, *reprinted in* 2017 U.S.C.C.A.N. 154, 159-160.  Due to

declining bankruptcy filings, the amount of fees collected in bankruptcy cases had fallen short of

the U.S. Trustee Program's congressionally-budgeted appropriations.  As outlined on the U.S.

Trustee's website, the balance in the Fund as of September 30, 2017, was less than $15 million,

and as of September 30, 2018, was less than $45 million.  *See*

https://www.justice.gov/ust/chapter-11-quarterly-fees (last viewed on December 13, 2018).  By

contrast, the annual appropriations to fund the necessary expenses of the U.S. Trustee Program

for the fiscal year ending on September 30, 2017, was nearly $226 million.  *See* Consolidated

Appropriations Act, 2017, Pub. L. No. 115-31, Title II, 131 Stat. 135, 195 (2017).

45.     The manner in which Congress chose to increase the 1930(a)(6) fees in 2017

reflects yet another exercise of congressional judgment.  The 2017 amendment affected only

those debtors whose disbursements during a quarter equal or exceed $1 million.  Based on

historical fee and disbursement patterns, the U.S. Trustee estimates that only about 10% of

chapter 11 debtors have fallen in this range and only about 1% of chapter 11 debtors would be

assessed the maximum fee.  The amendment provides for the fees to revert to their previous

levels if the Fund surpasses a specified amount at the end of any fiscal year.  28 U.S.C. §

1930(a)(6)(B); *see* H.R. Rep. No. 115-130, at 8.  Regardless, the increase terminates in 2023.  *Id.*

46.     Additionally, Congress arranged for a portion of the quarterly fees collected to go

to the general fund of the Treasury to offset the costs of 18 bankruptcy judgeships, including

seven in this District.  *See* Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, §§ 1003,

1003, 1004(b); H.R. Rep. No. 115-130, at 7-8.  Congress intended for that portion of the

quarterly fees, as bolstered temporarily by the increase in fees on the biggest chapter 11 debtors

like NewPage, to cover the costs of these judgeships.  H.R. Rep. No. 115-130, at 8.

47.     Congress did not set out to create a perfect user-fee system calibrated to each

debtor's cost or benefit in any one case in any given quarter.  *Sperry*, 493 U.S. at 60-61.  Rather,

it set up a system based on the disbursements made in the case during the quarter as a "fair

approximation" of the cost to the government of providing bankruptcy relief.  This Court should

not accept NewPage's invitation to second-guess this legislative judgment.

> **3.     Assessing quarterly fees under section 1930(a)(6) on all disbursements would not be a taking regardless of the level of a U.S. Trustee's activity in a particular chapter 11 case, and was not a taking here.**

48.     Fifteen years ago, following the Supreme Court's guidance in *Sperry*, Judge

Walrath expressly upheld the constitutionality of section 1930(a)(6) against the same taking

challenge asserted by NewPage – that quarterly fees exceeded benefits provided.  *In re Kindred

Healthcare, Inc.*, No. 99-3199 (MFW), 2003 WL 22327933, at *3-5 (Bankr. D. Del. Oct. 9,

2003).

49.     *Kindred Healthcare* held that Congress has already determined the "fair

approximation of the cost of the benefits supplied" to the debtors, and that a "more precise

calculation of the benefit on a case by case basis is not required."  *Id.* at *5 (citing

*Massachusetts*, 435 U.S. at 463 and *Sperry*, 493 U.S. at 60).  *Kindred Healthcare* rejected the

argument that the quarterly fees were excessive, noting that the fee range "represents .16% to

3.3% of disbursements for all categories except the minimum and maximum fee."  *Id.  Kindred

Healthcare* concluded that "[s]uch a fee scheme is not so excessive as to be unconstitutional."

*Id.*  As the Supreme Court did in *Sperry*, *Kindred Healthcare* deferred to Congress's

determination of the costs to fund the system.  *Id.*  This Court should do the same in this case.

50.     While *Kindred Healthcare* predated the 2017 amendment, as amended, the

statute's maximum fee is capped at the lesser of $250,000 or 1% of disbursements.  28 U.S.C. §

1930(a)(6)(B).  As calculated by the U.S. Trustee, the maximum fee that NewPage is statutorily

required to pay for the second and third quarters in 2018 reflects .036% and 0.031% of its disbursements.  NewPage cannot credibly claim the fee is excessive.

51.    Moreover, even if *Koontz*, *Sperry*, and *Kindred Healthcare* had not already answered the question, NewPage has not shown that the quarterly fees mandated by statute exceed the benefits it received.  NewPage twice successfully reorganized under chapter 11 [ECF No. 2945; Case No. 16-10163 (KG), ECF No. 1223].  Section 1930 is titled "bankruptcy fees," and *Kindred Healthcare* held that fees assessed under section 1930(a)(6) are "fees associated with the Debtors' use of the bankruptcy judicial system." *Id.* at *4.  As long as this case remains open, NewPage receives the benefits of this system. *See*, *e.g.*, *In re A.H. Robins Co. Inc.*, 219 B.R. 145, 148 n.8 (Bankr. E.D. Va. 1998) (noting that while the U.S. Trustee had done little in the case post-confirmation, the debtor "benefitted from the Court's continued involvement in this still-open case").  NewPage cannot claim it did not receive government services while it is in bankruptcy.

52.    NewPage attempts to circumvent this unavoidable conclusion by slicing and dicing what "services" are provided when, and by whom, under section 1930(a).  These attempts must fail.  The U.S. Trustee's services are simply part of the overall bankruptcy system as a whole, whose costs are being "fairly approximated" by Congress.

53.    In passing the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978) ("Reform Act"), Congress overhauled the bankruptcy system that had been in place since 1898 because bankruptcy courts were burdened with statutory duties to supervise and administer bankruptcy cases.  H.R. Rep. No. 95-595 at 3, *reprinted in* 1978 U.S.C.C.A.N. 5963, 5965.  The solution was to remove the supervisory functions from the judges and transfer them to a "new system of United States trustees." *Id.* at 4, 100.

54.     Thus, as envisioned by Congress, the U.S. Trustee Program was integral to the new bankruptcy system.  *Id*. at 88-109.

55.     And the U.S. Trustee is not the sole beneficiary of quarterly fees.  As mentioned *supra*, under the October 2017 amendment, two percent of the quarterly fees assessed under section 1930(a)(6) is allocated to the courts to fund 18 bankruptcy judgeships.  *See* H.R. Rep. No. 115-130, at 7, *reprinted in* 2017 U.S.C.C.A.N. 154, 159.  Quarterly fees under section 1930(a)(6) thus pay a portion of the appropriations for court administration—another cost that is being "fairly approximated" by Congress.

56.     Even if quarterly fees were solely a fee for use of the U.S. Trustee's services, however, they are still a "fair approximation" of the cost of providing these services.  *See Kindred Healthcare*, 2003 WL 22327933, at *5 (concluding "Congress constructed a reasonable approximation of the costs borne by the UST in doing its job").  Congress directed how the Department of Justice could use the funds for U.S. Trustees' operations, including employees' salaries, office space, furniture, and supplies.  28 U.S.C. § 589a(a).  All of these are necessary for U.S. Trustees to carry out their duties in every chapter 11 debtor's case.

### 4.     NewPage cannot bifurcate section 1930(a)(6).

57.     NewPage tries to buttress its takings challenge by asserting that assessing fees based on all post-confirmation disbursements would be "unfair" given the level of U.S. Trustee's activity.  Motion, ¶¶ 36-37.  This has been considered and rejected by numerous courts.  *See*, *e.g.*, *In re Kroy (Europe) Ltd.*, 244 B.R. 816, 819 (D. Ariz. 2000) (finding no "inequitable exception" to duty under section 1930(a)(6) despite debtor's assertion that it was no longer "using" the system; *In re McLean Square Associates*, 201 B.R. 436, 443 (Bankr. E.D. Va. 1996) (finding post-confirmation fees warranted by U.S. Trustee's duty to monitor cases, including

applications for compensation, post-confirmation, and that assessing post-confirmation fees will encourage efficient case closures).[6]  As one district court noted:

> Congress created a single straight-forward system which tailors UST fees to the amount of disbursements without requiring courts to engage in a time-consuming and burdensome process of determining how much money the UST should receive in each case.  Congress could have, but did not, tailor the fees to the amount of time or effort actually expended by the UST.

*United States Trustee v. Pettibone Corp.*, 251 B.R. 335, 341 (N.D. Ill. 2000).

58.     Notwithstanding the weight of authority against its position, NewPage argues that post-confirmation quarterly fees "should be calculated based solely on post-confirmation disbursements made pursuant to the plan of reorganization, and not disbursements made in the ordinary course of business that are entirely divorced from the bankruptcy."  Motion, ¶ 26.  Fundamentally, NewPage seeks to rewrite section 1930(a)(6) to divide quarterly fees into two new categories: (1) pre-confirmation fees; and (2) post-confirmation fees.  Under that rewording, NewPage contends that the fees assessed post-confirmation are unconstitutional takings to the extent the U.S. Trustee was not active in its case.   Motion, ¶41.

59.     But that is not how Congress wrote the statute.  Section 1930(a)(6) makes no distinction between fees required pre- or post-confirmation.  NewPage cannot rewrite section 1930(a)(6) and then challenge the constitutionality of a portion of the statute it has rewritten.

---

[6]  *See also*, *e.g.*, *Boulders on the River*, 218 B.R. at 540 (declining proposition that "a correlation between the effort put forth by the UST in a case and the quarterly fee received" is required); *In re Quality Truck & Diesel Injection Service*, 251 B.R. 682, 688 (S.D. W. Va. 2000) (observing "nowhere in the statute or legislative history is it indicated that Congress sought strict proportionality between the quarterly fees paid and the services rendered"); *In re Huff*, 270 B.R. 649, 653 (Bankr. W.D. Va. 2001) ("[T]here is no indication that these fees are to be reflective of actual supervision or oversight by a particular UST in a specific case."); *A. H. Robins Co., Inc.*, 219 B.R. 145, 148-49 n.8 (Bankr. E.D. Va. 1998) (finding "nothing in the statute to suggest that the payment of quarterly UST fees depends upon the UST's involvement in the case, thus the UST's actions, or lack thereof, in the case at bar does not affect the payment of such fees"); *Vergos v. Uncle Bud's, Inc.*, 1998 WL 652542 at *7 (M.D. Tenn. Aug. 17, 1998) (rejecting argument that assessing post-confirmation fees was "grossly unfair").

60.     Moreover, the flaw of NewPage's argument was exposed by the Supreme Court in *Sperry*.  Like NewPage, Sperry contended that its use of the Tribunal's procedures was minimal, claiming that its award was more the result of private negotiations with Iran that through the Tribunal.  493 U.S. at. 63.

61.     Nevertheless, the Supreme Court held that the fee was constitutionally reasonable even if Sperry made no "use" whatsoever of the Tribunal's services in settling its claim: "Sperry may be required to pay a charge for the availability of the Tribunal even if it never actually used the Tribunal; Sperry received the 'benefit from [the Tribunal] in the sense that the services are available for [its] use.'"  *Id.* (quoting *Massachusetts*, 435 U.S. at 468).  The Court concluded, "[t]he Tribunal made available to claimants such as Sperry sufficient benefits to justify the imposition of a reasonable user fee."  493 U.S. at 64.  So too here.  The U.S. Trustee was available at every stage of NewPage's case.

62.     NewPage makes no effort to prove that the assessment of a quarterly fee based on all disbursements, whether imposed pre-confirmation or post-confirmation, does not relate to a "fair approximation" of the costs of the U.S. Trustee Program and the bankruptcy system from which it derived benefits in its two cases.[7]  As a result, it has not shown that basing quarterly fees on all post-confirmation disbursements in its case is a taking.

**C.      NewPage's legal authorities either support the constitutionality of section 1930(a)(6) or are inapposite to NewPage's argument.**

63.     Given the Supreme Court's explanation in *Koontz* that user fees are not takings, it is unsurprising that NewPage has not cited a single case holding a user fee to constitute a taking.

64.     In fact, as explained *supra*, two cases cited by NewPage in ¶ 40 of the Motion actually support the constitutionality of the quarterly fees.  The Supreme Court in *Sperry*, 493

---

[7]  Nor does it matter under *Koontz*, 570 U.S. at 615.

U.S. at 60, expressly rejected the argument that a user fee was a taking regardless of whether the costs exceeded the value of the government benefit received in an individual case.  And Judge Walrath in *Kindred Healthcare* directly upheld the constitutionality of section 1930(a)(6) against a takings challenge based on the argument that the quarterly fees charged were excessive for the hours expended by the U.S. Trustee.  2003 WL 22327933, at *5.

65.      The remaining three cases cited in ¶ 40 of the Motion do not save NewPage's arguments.

66.      The first, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 163 (1980), is the only case cited by NewPage in which a taking was upheld, but it did not involve a user fee.  Motion, ¶ 40.  There, the Court addressed a Florida statute providing that interest accruing on an interpleader fund deposited in the registry of the court "shall be deemed income of the office of the clerk of the circuit court…." *Id.* at 156 n.1.  It was undisputed that the appropriation of accrued interest was *not* a user fee, because a user fee was already provided by a separate Florida statute.  *Id.* at 160.  While the Court determined that the confiscation of the interest earned on the fund was a "taking," it did so under the "narrow circumstances" of the case, including that a separate statute existed to provide for a user fee.  *Id.* at 164.[8]  Moreover, the *Webb* Court "express[ed] no view as to the constitutionality of a statute that prescribes a county's retention of interest earned, where the interest would be the only return to the county for services it renders."  *Id.*  *Webb's Fabulous Pharmacies* thus cannot support a challenge against the constitutionality of a user fee.

---

[8]  Governmental appropriation of property—a car, a bank account, etc.—can be a taking, but as explained in Argument Section II(A) and (B), *supra*, a statutory requirement to make a payment for government services cannot be attacked under the Takings Clause.

67.     NewPage's reliance on *Garneau v. City of Seattle*, 147 F.3d 802 (9th Cir. 1998), is similarly misplaced.  Motion, ¶ 40.  As an initial matter, NewPage mistakenly cites to the concurrence and quotes the dissent; in fact, the majority rejected the takings challenge brought therein.  *Compare* 147 F.3d at 807 (holding) *with* 147 F.3d at 817 (dissent in part).  Moreover, *Garneau*, too, did not involve a "user fee," but rather a land-use regulation—in that case, a city ordinance requiring landlords to pay a portion of cost of relocating tenants displaced by redevelopment of the landlords' property.  As noted in *Koontz,* 16 years after *Garneau*, land-use regulations are different from taxes and user fees, which the Supreme Court explained are not takings.  570 U.S. at 615.

68.     Finally, no taking claim was even alleged in *Massachusetts*, 435 U.S. at 444.  Motion, ¶ 40.  Moreover, *Massachusetts*, as the Court unanimously explained in *Sperry*, expressly rejected the need for a "perfect" user system in which all fees charged are "closely calibrated" to actual use.  *Id.* at 466.

69.     For these reasons, there is no "serious concern" that section 1930(a)(6) may be interpreted as an unconstitutional taking such that this Court could consider applying the avoidance canon.

## III.    Section 1930(a)(6) Requires Quarterly Fees to Be Calculated Upon All Disbursements, Including Ordinary Business Expenses, Made in the Case Until Conversion, Dismissal, or Case Closure.

70.     NewPage argues that the term "disbursements" in the statute should be read to exclude ordinary business expenses when calculating post-confirmation (but not pre-confirmation) quarterly fees.  Motion, ¶ 26.  But this interpretation has no support in any statutory language, any legislative history, or any case law interpreting section 1930(a)(6) that has not been reversed or superseded.

71.     NewPage's argument is an old one that appellate courts have uniformly rejected. NewPage should pay its quarterly fees as the government has calculated, both for the second and third quarters of 2018 and beyond.

A.     **The argument that post-confirmation disbursements should be limited to plan payments was rejected by the courts twenty years ago, and should be rejected here.**

72.     NewPage's arguments seeking to limits its post-confirmation fees are not new. They were raised and rejected two decades ago.  This Court should follow the overwhelming majority of courts, including two circuit courts, to have ruled on the issue and reject NewPage's interpretation of section 1930(a)(6).

73.     Until January 1996, quarterly fees under section 1930(a)(6) were due from the time of commencing a chapter 11 case until one of three events—plan confirmation, dismissal, or conversion—occurred.  Congress amended section 1930(a)(6) in January 1996 to increase quarterly fee revenues by deleting plan confirmation as an event that terminates the obligation to pay quarterly fees.  *See* Balanced Budget Downpayment Act, I, § 211, Pub. L. No. 104-99, 110 Stat. 26, 37-38 (1996).  Pursuant to that amendment, as explained below, it is universally recognized that quarterly fees are owed for post-confirmation quarters just as they are for pre-confirmation quarters.

74.     Following the 1996 amendment, numerous debtors challenged their duty to pay quarterly fees on all post-confirmation disbursements under section 1930(a)(6).  These challenges were all either rejected, reversed on appeal, or abrogated by subsequent appellate precedent.

75.     For example, as NewPage noted, certain debtors argued that post-confirmation quarterly fees should be calculated only upon payments from the estate, which ceases to exist upon confirmation—therefore, those debtors argued, only the minimum fee under section

1930(a)(6) was required, regardless of how much was actually disbursed during the quarter, for as long as the case remained open.  Motion, ¶ 33.  This interpretation was roundly rejected by the appellate courts.  *See, e.g.*, *Tighe v. Celebrity Home Entm't, Inc. (In re Celebrity Home Entm't, Inc.)*, 210 F.3d 995 (9th Cir. 2000) (holding that post-confirmation disbursements are not limited to payments from the estate); *In re Maruko*, 219 B.R. 567, 572 (S.D. Cal. 1998); *See In re Boulders on the River, Inc.*, 218 B.R. 528, 541 (D. Or. 1997).

76.    Other debtors argued, as NewPage does, that post-confirmation quarterly fees should be calculated only upon plan payments.  This view, too, was ultimately rejected by the appellate courts, including both the Sixth and Eleventh circuits, *Robiner v. Danny's Markets, Inc. (In re Danny's Markets, Inc.)*, 266 F.3d 523, 526 (6th Cir. 2001); *Jamko*, 240 F.3d at 1313, and no fewer than five district courts.  *Quality Truck & Diesel Injection Serv.*, 251 B.R. at 689; *Pettibone*, 251 B.R. at 343-44; *Maruko*, 219 B.R. at 572; *In re Wintersilks, Inc.*, No. 00-C-0106-C, 2000 WL 34236011 (W.D. Wis. June 2, 2000); *Vergos*, 1998 WL 652542 at *8.

77.    Further, over a dozen bankruptcy courts have declined to adopt the interpretation of section 1930(a)(6) proposed by NewPage, and held instead that "disbursements" included *all* post-confirmation payments, including operating expenses.  *See, e.g.*, *In re Richards*, 2017 WL 2743238 at *2 (Bankr. S.D. W. Va. June 23, 2017); *In re R&K Fabricating, Inc.*, No. 4:09-bk-40337, 2013 WL 5493161 at *3 (Bankr. S.D. Tex. Sept. 30, 2013); *In re Sgaverdea*, 377 B.R. 308, 314 (Bankr. D.N.M. 2007); *In re Postconfirmation Fees*, 224 B.R. 793, 799 (E.D. Wash. 1998) (bankruptcy court en banc); *In re Campesinos Unidos, Inc.*, 219 B.R. 886, 890 (Bankr. S.D. Cal. 1998); *In re A.H. Robins Co. Inc.*, 219 B.R. 145, 151 (Bankr. E.D. Va. 1998); *In re N. Hess' Sons, Inc.*, 218 B.R. 354, 359-60 (Bankr. D. Md. 1998); *In re Roy Stanley, Inc.*, 217 B.R. 23, 26 (Bankr. N.D.N.Y. 1997); *In re Gates Cmty. Chapel of Rochester, Inc.*, 212 B.R. 220, 225

(Bankr. W.D.N.Y. 1997); *In re Sedro-Woolley Lumber Co.*, 209 B.R. 987, 989 (Bankr. W.D.

Wash. 1997); *In re Corp. Bus. Prods., Inc.*, 209 B.R. 951, 953-55 (Bankr. C.D. Cal. 1997); *In re

P.J. Keating Co.*, 205 B.R. 663, 665 (Bankr. D. Mass. 1997); *In re Bushnell*, Nos. 94-10706, 96-

10768, 1997 WL 701318 at *1 (Bankr. D. Vt. Oct. 1, 1997).

78.    Similarly, the District Court for the District of Delaware has rejected the

argument that "the term 'disbursements' is limited to the 'legal obligations' of a debtor,"

holding:  "The Court can find no support for imposing such a limitation on the term

'disbursements.'  Rather, courts have consistently recognized that the term 'disbursements' is

defined broadly and encompasses ordinary operating expenses."  *In re GC Companies*, 298 B.R.

226, 230 (D. Del. 2003).

79.    Not surprisingly, both the Third Circuit and Judge Walrath of this Court have

expressly agreed that the term "disbursements" includes operating expenses.  *See Genesis Health

Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 418 (3d Cir.

2005) (affirming that "each debtor was obligated to pay quarterly fees based on the payment of

its respective operating expenses"); *In re Charter Behavioral Health Sys., LLC*, 292 B.R. 36, 45

(Bankr. D. Del. 2003) ("We agree that the plain language of the statute supports the UST

argument that the word disbursement includes, as to the individual Debtors, the payment of their

operating expenses. . . . In cases considering what disbursements must be included in

determining quarterly fees post-confirmation, the Courts have held that all disbursements, not

simply those to creditors under the plan of reorganization, must be included in the calculation.");

*see also Kindred Healthcare*, 2003 WL 22327933, at *1.

80.    All of the cases NewPage cites to the contrary have been abrogated or reversed.

Motion, ¶¶ 28 & 32. Three of these cases are no longer good law because the Eleventh Circuit

later held in reversing a fourth case that *all* post-confirmation disbursements apply in calculating quarterly fees. Those cases—*In re Munford, Inc*., 216 B.R. 913 (Bankr. N.D. Ga. 1997); *In re Betwell Oil & Gas Co*., 204 B.R. 817 (Bankr. S.D. Fla. 1997), *aff'd*, 97-774 (S.D. Fla. Oct. 7, 1998); and *In re SeaEscape Cruises, Ltd*., 201 B.R. 321 (Bankr. S.D. Fla. 1996)—were all abrogated by the Eleventh Circuit's holding in *Jamko*, 240 F.3d at 1313. Likewise, the *Wintersilks* case cited by NewPage was reversed. Motion, ¶ 31; s*ee Wintersilks, Inc.*, 2000 WL 34236011. This Court should decline NewPage's invitation to import reversed or abrogated law into the District of Delaware.[9]

81.    NewPage presents its argument as though it were still a viable one that this Court could reasonably adopt. But, as shown by the foregoing discussion, NewPage's interpretation was uniformly rejected years ago and is no longer good law anywhere in the country. It should be rejected now by this Court for the same reasons it was rejected long ago.

**B.    The plain language of section 1930(a)(6) requires that quarterly fees must be calculated on all post-confirmation disbursements, including ordinary operating expenses.**

82.    The consensus among the courts in the cases cited above is that both the plain language of the statute and legislative history support reading "disbursements" as including operating expenses.

83.    Because the term "disbursement" is not defined in the statute, it is given its everyday, ordinary meaning. *See Perrin v. United States*, 444 U.S. 37, 42 (1979).

---

[9] NewPage's reliance on *In re Nassau Tower Realty, LLC*, 518 B.R. 842 (Bankr. D.N.J. 2014), is mistaken for three reasons. First, that case is inapposite, as the disbursements in question were made in pre-confirmation quarters, *id*. at 844, and is entirely unrelated to the now-defunct line of cases holding post-confirmation disbursements are reduced to zero because the estate no longer exists. Second, the dispute in that case was not whether the debtor's operating expenses generally should be included as disbursements; instead, the dispute was whether the assignment of rents and payment of insurance proceeds to secured creditors constituted disbursements. *Id*. at 845. Third, the debtor in that case was required to include the assignment of rents and payment of insurance proceeds as disbursements—and was ordered to pay quarterly fees in the amount requested by the U.S. Trustee. *Id*. at 847-49. As a result, *Nassau Tower* provides no support for NewPage's argument.

84.    As noted by the *GC Companies* court, defining "disbursements" as encompassing ordinary operating expenses "is consistent with the plain meaning of the term 'disbursement' as an 'expenditure.'"  298 B.R. at 230 (quoting Webster's New World Dictionary, 3d College Ed. at 390).  Likewise, Black's Law Dictionary defines a "disbursement" is "the act of paying out money, commonly from a fund or in settlement of a debt or account payable" or "the amount so paid; an amount of money given for a particular purpose."  Black's Law Dictionary (10th ed. 2014).

85.    The Third Circuit and other courts of appeals that have addressed this issue agree that "disbursements" include any amount paid out by, or on behalf of, the debtor.  *Genesis Health Ventures*, 402 F.3d at 421 (holding that even "indirect payment of a debtor's expenses— *i.e.*, payments made by an unrelated third party to secured creditors of the debtor—are disbursements"); *In re Cash Cow Serv. of Fla. LLC*, 296 F.3d 1261 (11th Cir. 2002) (holding that "disbursement" includes loans debtor makes to consumers); *Danny's Markets*, 266 F.3d at 526 (holding that "Congress contemplated that disbursements will encompass all payments to third parties" regardless of "the technical source of the payments"); *Jamko*, 240 F.3d at 1316 (holding that "disbursements" includes ordinary operating expenses during the bankruptcy case); *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1533-34 (9th Cir. 1994) (holding that "a plain language reading of the statute shows that Congress clearly intended 'disbursements' to include *all* payments from the bankruptcy estate").[10]

---

[10]  As subsequently explained by the Ninth Circuit, *St. Angelo* did not say that disbursements are "*limited* to payments from a bankruptcy estate," and after the 1996 amendment to section 1930(a)(6), "disbursements" now also include payments from the reorganized debtor post-confirmation.  *Celebrity Home Entm't, Inc.*, 210 F.3d at 998-99 (emphasis in original).

86.     As a result, under the plain meaning of the statute, the "disbursements" made in a chapter 11 case for purposes of section 1930(a)(6) include the payment of the costs of operating the debtor's business.

87.     Notably, NewPage does not argue that "disbursements" excludes a chapter 11 debtor's operating costs before the confirmation of a reorganization plan.  Rather, it claims that after a plan is confirmed, the term "disbursements" refers only to payments made under the reorganized plan.  Motion, ¶ 27.  Under this interpretation, a payment to a vendor is a "disbursement" before a plan is confirmed, but a second payment to the same vendor is not a "disbursement" after the plan is confirmed.  NewPage made no attempt to include statutory analysis in support of this argument.  This is unsurprising, because the plain language of section 1930(a)(6) makes no distinction between disbursements pre- and post-confirmation.

88.     The lack of any statutory support to limit the interpretation of "disbursements" in the post-confirmation context was recognized by two courts of appeals.  As the Sixth Circuit held, "throughout the proceeding, [a disbursement's] "essential character" will not change," *Danny's Markets*, 266 F.3d at 526, and thus disbursements must be interpreted consistently through the debtor's case.  As the Eleventh Circuit further noted, "[t]here is nothing in the statute . . . to indicate that Congress intended . . . a distinction be made post-confirmation . . .," *Jamko*, 240 F.3d at 1316, and thus all post-confirmation operating costs of the debtor are considered "disbursements" under section 1930(a)(6).  As explained in Argument Section III(A), *supra*, the overwhelming majority of lower courts have agreed.

89.     Because there is no support in the statutory language for NewPage's proposed limitation on the post-confirmation quarterly fees due, this Court should reject it.

**C.    Basing quarterly fees on post-confirmation payments of a debtor's ordinary operating expenses is consistent with legislative intent.**

90.    NewPage's attempt to limit post-confirmation quarterly fees is also contrary to legislative intent.

91.    The legislative history of the 1996 amendment to section 1930(a)(6) shows that, by extending quarterly fees to post-confirmation quarters, Congress intended the fee to be calculated the same way post-confirmation as it was calculated pre-confirmation.  Both the House Report 104-196 and the Joint Explanatory Statement of House Conference Report 104-378 provide that the quarterly fee assessment will simply continue post-confirmation, without suggesting any change in the calculation of the fee:

> In addition, under section 111, the conferees agree to include *an extension of post-confirmation quarterly fee payments made under Chapter 11* as proposed in both the House and Senate bills and expect that these fees will apply to all pending Chapter 11 cases with confirmed reorganization plans.

H.R. Conf. Rep. 104-378, 104th Cong., 1st Sess. (Dec. 4, 1995); 141 Cong. Rec. H13894 (Dec. 4, 1995) (emphasis added).

92.    Moreover, NewPage's constrained reading of the term "disbursements" is contrary to the congressional intent to raise revenue, including through the specific imposition of fees through the closing of a case.  *See Celebrity Home Entm't*, 210 F.3d at 998  (holding Congress's goal was to raise revenue by extending quarterly fees into the post-confirmation period; if the term "disbursement" is limited to payments by bankruptcy estate, amendment would have only minimal impact because most reorganized debtors would have to pay only minimum quarterly fee based on no disbursements); *Wintersilks, Inc.*, 2000 WL 34236011, at *6 ("[A]ll indications point to a deliberate decision to impose a fee on *all* disbursements made by reorganized debtors before their cases terminate.  . . . Why would Congress have bothered to

amend the statute as it did if it had intended merely to enable United States Trustees to collect the minimum fees set by the statute?").

93.     In the wake of the long line of cases expressly holding that "disbursements" include post-confirmation operating expenses, Congress amended the statute yet again in 2017 because further funding was needed.  If Congress had disagreed with this uniform interpretation of "disbursements" as including all operating expenses, it could have so stated.  It did not.  This fact confirms that the term "disbursements" includes all operating expenses.  *Lamar, Archer & Cofrin LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018) ("When Congress used the materially same language . . . , it presumptively was aware of the longstanding judicial interpretation of the phrase and intended for it to retain its established meaning."); *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 194 (D.C. Cir. 1993) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.") (internal quotation marks omitted).

94.     Accordingly, this Court should reject the constricted view of disbursements proposed by NewPage—which would decrease the amount collected from chapter 11 debtors post-confirmation—because it would be contrary to the clear congressional intent to increase funding in the 2017 amendments.

**IV.     The U.S. Trustee Did Not, and Could Not, Agree to Allow an Operating Company in an Open Chapter 11 Case with Disbursements That Require Payment of the Maximum Quarterly Fee to Pay the Minimum Fee.**

95.     NewPage says a purported "agreement" with the U.S. Trustee allows it to pay the minimum quarterly fee despite having quarterly disbursements well in excess of $600 million, which necessitates payment of the maximum fee under section 1930(a)(6).  Motion, ¶ 24.  The only support produced by NewPage of this purported agreement is an email by an employee of the U.S. Trustee, which clearly stated that the reason NewPage would be allowed to only pay the

$325 minimum per quarter in this case was "to avoid double-counting disbursements" after NewPage filed its second chapter 11 case.[11]  *See* Motion, Exhibit B.  The avoidance of such double-counting of a single debtor's disbursements was all NewPage requested, so it was all NewPage received.

96.     Contrary to NewPage's argument, the U.S. Trustee did not agree to give NewPage an exemption from a statutory fee if NewPage's second case closed while this case remained open.  NewPage has not produced, and cannot produce, any evidence that the U.S. Trustee agreed, or had the lawful authority to agree, that NewPage would not have to pay the statutorily-required quarterly fee to the United States if this case remained open after its second case closed.  The email attached to the Motion is not in itself such an "agreement."

97.     During the period of anticipated overlap between NewPage's two chapter 11 cases, NewPage asked as a single debtor not to be double-charged, and the U.S. Trustee determined that the statutory minimum (which is required even where there are no disbursements) could be paid in one open case as long as the statutorily maximum (based on NewPage's actual disbursements) was paid in NewPage's other open case.[12]  Of course, now that there is no more overlap, the statutorily-required maximum fee based on NewPage's quarterly disbursements in its one existing case must be paid as Congress intended.

---

[11]  NewPage needed only to pay the $325 minimum in this case as it was deemed to have zero disbursements while its second case, to which all of NewPage's disbursements were allocated, was pending.

[12]  Congress has authorized the U.S. Trustee to, "whenever [he] considers it to be appropriate . . . tak[e] such action as [he] deems to be appropriate to ensure that all  . . . fees required to be filed under title 11 and this title by the debtor are properly and timely filed."  See 28 U.S.C. § 586(a)(3)(D) (emphasis added).  This statutory language authorizes the U.S. Trustee to allocate disbursements by a company with two chapter 11 cases open at the same time to one, rather than both, of the debtor's cases; the U.S. Trustee interprets section 1930(a)(6) to not require a debtor's disbursements to be counted twice in both cases.  However, 28 U.S.C. § 586(a)(3)(D) does not authorize the U.S. Trustee to allow a company that has only one open chapter 11 case to pay only the $325 minimum fee rather than the fee mandated by the statute.

98.     The payment of post-confirmation quarterly fees is congressionally "mandated."
*See Gryphon*, 166 F.3d at 557.  As a result, the quarterly fees owed at every stage of a chapter 11

case are established by the schedule enacted by Congress in section 1930(a)(6); they are "not . . .

the subject of negotiation," and a debtor "cannot negotiate away this statutory fee."  *See CF & I*

*Fabricators*, 150 F.3d at 1239.

99.     For the following reasons, the U.S. Trustee has no authority to allow an entity in a

single max-fee chapter 11 case to only pay the minimum fee required in cases with less than

$15,000 in quarterly disbursements.

100.     Under section 1930(a)(6), quarterly fees are "paid to the United States trustee, for

deposit in the Treasury."  As a result, quarterly fees are debts owed to the federal government,

and their collection and compromise is governed by the Debt Collection Improvement Act of

1996, 31 U.S.C. § 3701 *et seq*. (the "DCIA").  The U.S. Trustee has not been delegated the

authority to compromise a claim owed to the government.  31 U.S.C. § 3711(a)(2); 28 C.F.R.

§ 0.160, *et seq.*

101.     As a result, for each quarter in which NewPage paid the maximum fee required by

section 1930(a)(6), there is no fee due.  But, for all quarters in which NewPage was in an open

chapter 11 case and made disbursements that warranted the maximum quarterly fee but paid a

lesser amount, each of those quarterly fees is overdue, and NewPage's debt to the government

cannot be compromised by the U.S. Trustee, *see* 31 U.S.C. § 3711(a)(2); 28 C.F.R. § 0.160, *et*

*seq.*  The monitoring and collection of quarterly fees is part of the U.S. Trustee's oversight of

chapter 11 cases, and the U.S. Trustee must take appropriate action when quarterly fees remain

unpaid.  If, after the U.S. Trustee's collection efforts, the quarterly fee debt remains outstanding

and the case is closed, any delinquent quarterly fees must be referred to the Treasury Department for collection under section 3711(g)(1) of the DCIA.

102.    Here, the only "agreement" the U.S. Trustee made was the reasonable interpretation of section 1930(a)(6) that a single debtor does not have to "double-pay" the maximum quarterly fee while it had two open chapter 11 cases.  The U.S. Trustee did not, and indeed could not, agree that NewPage need not have to "single-pay" the statutorily-required maximum of $250,000 for every quarter in which it was in a single open chapter 11 case.

103.    NewPage's naked assertion in ¶ 24 of the Motion that it relied on the so-called "agreement" it purports to have had with the U.S. Trustee resembles an equitable estoppel argument.  But, even if the DCIA did not prohibit any "agreement" here to waive the $500,000 fee currently owing for the two most recent quarters, equitable estoppel could not be used against the federal government the same way it can be used against other litigants.  *See, e.g.*, *Heckler v. Community Health Servs. of Crawford Co., Inc.*, 467 U.S. 51, 60 (1984) ("[I]it is well settled that the Government may not be estopped on the same terms as any other litigant[.]").  Indeed, the Supreme Court has reversed every circuit court government estoppel ruling with which it has been presented.  *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 433 (1990).

104.    Under Third Circuit law, a party attempting to invoke equitable estoppel against the federal government must prove that government officials engaged in "affirmative misconduct" in addition to proving the traditional estoppel elements of **(i)** a false statement of fact, not law, **(ii)** on which a party ignorant of the true facts reasonably relied, **(iii)** to its detriment.  *See, e.g.*, *Fredericks v. Commissioner of Internal Revenue*, 126 F.3d 433, 438 (3d Cir. 1997); *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987).  As a result, courts only consider estoppel against the government in the "rare and extreme circumstances" in which "'the

interest of citizens in some minimum standard of decency, honor, and reliability in their dealings

with their Government'" are imperiled.  *U.S. v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992)

(quoting *Heckler*, 467 U.S. at 61)).

105.     Indeed, the Supreme Court has said that even "affirmative misconduct" might not

act to estop the government.  *See Schweiker v. Hansen*, 450 U.S. 785, 788 (1981).

106.     Here, there was nothing even remotely resembling affirmative misconduct by the

U.S. Trustee when he agreed to allow NewPage to pay the maximum fee only once per quarter,

rather than twice.  The U.S. Trustee was only trying to ensure that NewPage paid the amount

based on its quarterly disbursements that Congress required it to pay.  Similarly, there is no

affirmative misconduct now; the U.S. Trustee is only trying to ensure that NewPage pays the

amount based on its quarterly disbursements that Congress required it to pay.

107.     NewPage also fails to prove the other estoppel elements.  The purported

agreement with the U.S. Trustee was not a misrepresentation of a fact even if NewPage's version

of events were accurate; it was, at worst, "negligence or mistake of law, neither of which

furnishes proper grounds for estoppel."  *See Bachner v. Commissioner of Internal Revenue*, 81

F.3d 1274, 1282 (3d Cir. 1996).  And any reliance on a purported agreement to avoid paying the

quarterly fee in the amount required by section 1930(a)(6) based on NewPage's actual

disbursements during the quarter was not reasonable, as such an agreement would be contrary to

law and beyond the U.S. Trustee's authority.  *See, e.g.*, *Heckler*, 467 U.S. at 63 ("[T]he general

rule [is] that those who deal with the Government are expected to know the law and may not rely

on the conduct of Government agents contrary to law."); *Federal Crop Ins. Corp. v. Merrill*, 332

U.S. 380, 385 (1947) ("Anyone entering into an arrangement with the Government takes the risk

of having accurately ascertained that he who purports to act for the Government stays within the

bounds of his authority."). Indeed, "[a] party who enters an arrangement with the government and relies on an official's interpretation of the law 'assume[s] the risk that that interpretation [is] in error.'" *Trapper Mining, Inc. v. Lujan*, 923 F.2d 774, 781 (10th Cir. 1991) (quoting *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984)).

108.    Judge Walrath rejected a similar estoppel argument alleging that the U.S. Trustee agreed to allow a debtor to pay less in quarterly fees than it was statutorily required to pay. *See Charter*, 292 B.R. at 40-44. In *Charter*, the debtor tried to hold the U.S. Trustee to a purported agreement regarding the proper calculation of quarterly fees. *Id.* Judge Walrath held that any such agreement, even if it did exist, was not a misrepresentation of fact, but was negligent at worst and did not constitute the kind of affirmative misconduct required to estop the U.S. Trustee from collecting the correct amount of quarterly fees from the debtor. *Id.*

109.    As a result, even if the U.S. Trustee had expressly told NewPage to pay fees in a way that is contrary to the plain language of section 1930(a)(6)—which he neither did nor is authorized to do—the U.S. Trustee would not be estopped from later seeking payment consistent with the statutory language. Thus, "[a]s harsh as the tenet is under practical application, an administrative determination running contrary to law will not constitute an estoppel against the federal government." *See Atlantic Richfield Co. v. Hickel*, 432 F.2d 587, 592 (10th Cir. 1970).

110.    For the foregoing reasons, the U.S. Trustee could not, and did not, agree that NewPage would not have to pay the quarterly fee commensurate with its quarterly disbursements during any quarter in which it was in a single open chapter 11 case.

## CONCLUSION

WHEREFORE, the U.S. Trustee requests that this Court issue an order denying the

Motion and granting such other relief as this Court deems appropriate, fair and just.

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE,**
**REGION 3**

**By:**    */s/ Jane M. Leamy*
Jane M. Leamy (#4113)
Richard L. Schepacarter
Trial Attorneys

RAMONA D. ELLIOTT                    ANDREW R. VARA
    *Deputy Director/General Counsel*       *Acting United States Trustee for Region 3*
P. MATTHEW SUTKO                      T. PATRICK TINKER
    *Associate General Counsel*            *Assistant United States Trustee*
WENDY COX                             JANE M. LEAMY (#4113)
SUMI SAKATA                           RICHARD L. SCHEPACARTER
BETH A. LEVENE                            *Trial Attorneys*
    *Trial Attorneys*                     *Department of Justice*
    *Department of Justice*               *Office of the United States Trustee*
    *Executive Office for United States*   *J. Caleb Boggs Federal Building*
        *Trustees*                        *844 King Street, Suite 2207*
    *441 G Street, N.W., Suite 6150*       *Wilmington, DE 19801*
    *Washington, DC  20530*               *(302) 573-6491*
    *Tel: (202) 307-1399*                 *(302) 573-6497 (Fax)*
    *Fax: (202) 307-2397*

                                      ROBERT J. SCHNEIDER, JR.
                                          *Trial Attorney*
                                          *Department of Justice*
                                          *Office of the United States Trustee*
                                          *One Newark Center, Room 2100*
                                          *Newark, NJ 07102*
                                          *(973) 622-7888*

Dated: December 14, 2018